# AFFIDAVIT OF MARK DAVENPORT

1. Your affiant, Mark Davenport, being duly sworn deposes and says the following facts are true and correct.

2. I am over the age of eighteen (18) and make the following statements based upon my personal knowledge.

3. I submit this Affidavit in relation to the copyright infringement claims asserted on behalf of Blueport Company, LLC.

4. I am a Technical Sargent, Command Manpower Data Systems Manager, assigned to HQ PACAF at Hickman Air Force Base, Honolulu, Hawaii. Currently, I am on permissive/terminal leave for the purpose of my pending retirement. As a Manpower Data Systems Manager, I maintained the Manpower Data System for Pacific Air Force (PACAF) by ensuring accuracy in the input/output data operations of the Manpower Data System and overseeing the system interfaces between all necessary agencies of the United States Air Force. I also ensured the training and connectivity to the Manpower Data Systems database for the nine (9) PACAF base Manpower Offices and the sixty (60) personnel assigned to HQ PACAF/XPM, which made up my clientele.

5. In May of 1998, I worked as a Manpower Data Systems Manager at Hickman Air Force Base, Honolulu, Hawaii. The Manpower Data Systems Manager position is identical to that of the above-referenced Command Manpower Data Systems Manager.

6. On or around May 28, 1998, I completed the development of the first version of the Access Unit Manpower Document (AUMD) program. The AUMD program was developed to address the deficiencies within the ADHOC program which supported the Manpower Data Systems at that time. The AUMD program is a more powerful, efficient, and user-friendly



PLAINTIFF'S EXHIBIT 3-page 1 of 18

program when compared to the ADHOC program. The AUMD program enables the user to run both simple and complex Manpower Data System-specific queries, to export the corresponding data to Microsoft Excel, Word, or Access, to save the queries for future use, and to create specialized databases capable of being forwarded to the Office(s) of Prime Responsibility for use with the AUMD program. The AUMD program was and still is capable of replacing the ADHOC program. The proficiency of the AUMD program is such that it has resulted in a reduction in the time needed to produce the necessary manpower reports by eighty-five percent or more.

7. The AUMD program was not produced within the scope of my employment as I was not employed, directed, requested, encouraged, or expected to develop the AUMD program. Moreover, the federal government neither directed nor had the right to direct the work that ultimately created the AUMD program. Lastly, I developed the AUMD program on my own time, at my own expense, and without the assistance of government equipment, materials, or facilities. Specifically, I purchased my own version of Microsoft Office 97, Professional Edition for use on my own personal computer at my own residence. This software contained, among other applications, Access97. By inputting artificial, non-work-related data into the Access software, I created the underlying structure of the AUMD program. Attached as Exhibit "C" is a letter authored by Lieutenant Colonel William Manning indicating that the AUMD program was not a "work made for hire." Attached as Exhibit "D" is a letter authored by Mr. Anthony Dant similarly indicating that the AUMD program was not a "work made for hire."

8. Attached hereto as Exhibit "A" is the job description for the United States Air Force's Communications-Computer Systems career field, CEM Code 3COXX.



PLAINTIFF'S EXHIBIT
3 page 2 of 18

9. In June 1998, I delivered a copy of the AUMD program to M.Sgt. William Luckie at Scott Air Force Base. M.Sgt. Luckie is not within my chain of command. M.Sgt. Luckie only offered constructive feedback regarding the application of the AUMD program and did not directly assist me in the actual development of the AUMD program.

10. At no time during my employment with the Air Force did I ever order, influence, or otherwise induce the use of the AUMD program by the federal government. In fact, given my position within the Armed Forces, I was not even capable of ordering, influencing, or inducing the use of the AUMD program by the federal government. Rather, awareness of the AUMD program was largely a function of word-of-mouth and need.

11. The AUMD program was neither prepared nor updated as part of my express or implied official functions or duties and was not performed in accordance with any general research or teaching obligations. Specifically, I was not hired or expected to teach or conduct research, either specifically or generally, in any matter related to my employment duties. Further, I was not hired or expected to create, test, or recommend any computer program(s) or system(s) relating directly or indirectly to my employment duties.

12. In September 1998, I was asked to demonstrate the AUMD program to the managers at Manpower Data Systems at Randolph Air Force Base, San Antonio, Texas. At the time, the AUMD program clearly reflected ownership in my name. Further, I was introduced as the individual who authored the AUMD program. Response to the demonstration was overwhelmingly positive and I was directed to distribute the software to Air Force personnel nationwide. In my estimation, users of the AUMD program increased from 400 to 1,000 as a result of the September 1998 demonstration. Prior to this time, the AUMD program had only been distributed regionally to a limited number of manpower support personnel.



PLAINTIFF'S EXHIBIT
B-page 3 of 18

13. On or around October 1999, Air Force Manpower and Innovation Agency (AFMIA) personnel approached me about the AUMD program, attempting to offer me up to $25,000.00 in exchange for my submitting an AF Form 1000 IDEA Application on the AUMD program. I declined the offer, as well as subsequent requests to turn over the source code for the AUMD program.

14. On or around January 2000, I learned that the Air Force had issued a Request for Proposal (RFP) which requested government contractors to "recreate" a duplicate of the AUMD program so that it could be "seamlessly substituted" for the AUMD program. I further understood that the contractor's responding to the RFP were provided with a copy of Version 2.1f of the AUMD program, my name, phone number, and e-mail address to assist in this task. At no time did I ever consent to the Air Force's effort to duplicate the AUMD program. Further, no contractor has ever contacted me. Attached as Exhibit "B" is the January 11, 2000 RFP.

15. The AUMD program's compiled code included an automatic expiration function so that the program would cease to operate after a certain date. This function has always been included in the program in an effort to ensure that users updated the program to the most current version. The version supplied to the prospective government contractors, Version 2.1f, contained an expiration date of May 15, 2000.

16. On or around April 17, 2000, I was advised by Colonel Zeimet that the Air Force claimed a partial interest in the AUMD program and that I extend the May 15, 2000 expiration date encrypted into Version 2.1f of the AUMD program and reveal the AUMD program's source code. It was my understanding that if I refused to follow this direction, I would have been given a direct order to extend the AUMD program's expiration date, such that a refusal would have resulted in the initiation of court-martial proceedings against me. It was also my understanding



PLAINTIFF'S EXHIBIT 3-page 4 of 18

that the Air Force requested this extension in the AUMD program's expiration date so that contractors responding to the Air Force's RFP would have adequate time to develop a replacement AUMD program-equivalent software.

17. With Blueport's consent, on May 12, 2000, I delivered an updated version of the AUMD program, Version 2.1g, which was programmed to expire on June 30, 2000. Version 2.1g of the AUMD program listed Blueport as the owner of the AUMD program. Per Colonel Zeimet's instructions, I sent the updated AUMD program to AFMIA on May 12, 2000.

18. On May 15, 2000, AFMIA published on their open web site Version 2.1e of the AUMD program which had been modified (hacked into) and had the expiration date extended to February 15, 2001. The "About" screen for the software had also been changed to indicate that the Air Force was the programmer and owner of the copyright for the software. Although publication of the AUMD program had previously been limited to the Air Force's network, this altered version of the software was published on the world-wide web.

19. Mr. Hendricks notified me on May 17, 2000 that AFMIA was returning Version 2.1g of the AUMD program that I had delivered to the Air Force on May 12, 2000, and that they would not distribute this version. On May 18, 2000, AFMIA replaced Version 2.1e of the AUMD program with Version 2.1g -- the same version that Mr. Hendricks returned to me the day before. There existed a known problem in Version 2.1e of the AUMD program. I corrected this problem as reflected in Version 2.1f of the AUMD program. After AFMIA installed the "hacked" Version 2.1e of the AUMD program onto their network, I received several inquiries asking what the problem was. Apparently, as a result of Version 2.1e's shortcomings, AFMIA looked to a version of the AUMD program subsequent to Version 2.1f to remedy the situation. AFMIA



PLAINTIFF'S EXHIBIT
3-page 5 of 18

apparently resolved the problem by "hacking" into Version 2.1g of the AUMD program and posting this version onto their network.

Further your affiant saith not.

EXECUTED this 28 day of April, 2001.

Mark Davenport

SUBSCRIBED and sworn to me this 28th day of April, 2001.

Notary Public
State of Washington
MARK A. GRIFFITH
My Appointment Expires Sep 25, 2004

Notary Public for the State of WA
Residing at: 298 S Main Colville WA 99114
Commission Expires: 9/25/04



PLAINTIFF'S EXHIBIT
3 page 6 of 18

EXHIBIT "A"

PLAINTIFF'S
EXHIBIT
3-page 7 of 18

## COMMUNICATIONS - COMPUTER SYSTEMS
(Changed 30 Apr 96)

**1. Specialty Summary.** Manages communications-computer systems (C-CS) operations and software activities. Activities include system analysis and design, programming, systems operation and maintenance, resource management and security management. Monitors functional C-CS. Helps develop C-CS plans and policy. Related DoD Occupational Subgroup: 532.

**2. Duties and Responsibilities:**
2.1. Plans and organizes C-CS operations and software activities. Plans and supervises system installation, and evaluates facilities layout. Evaluates performance standards. Designs and develops organizational structures, and determines equipment, training, and supplies required for systems implementation and support. Interacts with customers to promote customer satisfaction. Establishes C-CS procedures.
2.2. Directs C-CS activities responsible for system analysis and design, programming, operations and maintenance, security, systems management, technical support, and resource management. Implements and interprets policies, directives, and procedures.
2.3. Establishes training requirements. Establishes training programs to meet local knowledge requirements and to enhance professional awareness of C-CS technology.
2.4. Inspects and evaluates C-CS activities for compliance with directives. Evaluates, rates, and prepares reports on the C-CS activity effectiveness. Recommends and implements corrective action for improved methods and procedures. Evaluates effectiveness of equipment usage, systems performance, customer service, supplies, and system scheduling, processing, and maintenance.
2.5. Manages C-CS development functions. Helps functional users define requirements. Recommends automated methods to enhance resource use. Supervises functional user requirements translation into automated systems capabilities. Organizes software development teams that use software methodologies. Oversees data base design to optimize collecting and retrieving information. Supervises test and evaluation efforts to determine errors in logic, information flow, and system performance. Organizes and participates in C-CS implementation and conversion. Ensures continued interface between functional users, and programming and operations personnel for implemented systems. Ensures compliance with standards for systems software and documentation.

**3. Specialty Qualifications:**
3.1. Knowledge. Knowledge is mandatory of: techniques and procedures of systems analysis and design; software methodology; communications-computer processing; system operation and maintenance; system and equipment capability, capacity, and logic; and performance measurement, security, and resource management.
3.2. Education. Not used.
3.3. Training. Not used.
3.4. Experience. For award of AFSC 3C090, qualification in and possession of AFSC 3C071 or 3C072 is mandatory. Also, experience is mandatory in directing functions such as systems analysis, design, software development, teleprocessing systems operations and maintenance, C-CS security, or resource management.
3.5. Other. For award and retention of AFSC 3C090, eligibility for a Secret security clearance according to AFI 31-501, *Personnel Security Management Program*, is mandatory.

PLAINTIFF'S EXHIBIT
3 - page 8 of 18

EXHIBIT "B"

PLAINTIFF'S
EXHIBIT
3-page 9 of 18

# GENERAL SERVICES ADMINISTRATION
# FEDERAL TECHNOLOGY SERVICE
# IT SOLUTIONS
# GREATER SOUTHWEST REGION

## STATEMENT OF WORK

TASK: FY570001
REVISION NO.: N/A
NAME: Manpower Access Report System

DATE: 01/11/00 *
PM: PETER PEPPIN
PHONE: 210-472-5053

* Transmission date. PROPOSAL DUE DATE IS NO LATER THAN FIVE WORKING DAYS AFTER RECEIPT OF THIS STATEMENT OF WORK.

## I REQUIRING AGENCY.

A. Agency and address:
Air Force Manpower Innovation Agency (AFMIA)
550 E Street East
Randolph AFB, TX 78150

B. Client Representative:
Peggy Gast
Peggy.gast@afmia.randolph.af.mil
(210) 652-2470 ext: 3039
FAX (210) 652-5311

C. Alternate Client Representative.
Thomas E. Spitzer
Thomas.spitzer@afmia.randolph.af.mil
(210) 652-5192, ext. 3026

## II WORK REQUIREMENTS.

**A. Objectives:**
The objective is to obtain contractor support for the AFMIA Manpower Access Report System.

**B. Deliverables:**

The Air Force manpower community has a Manpower Data System (MDS) report system (existing system), written in Microsoft® Access 97, which is used by MDS system managers, manpower personnel, and functional managers worldwide. We only have the restricted database (.mde) application files. We do not have the source database



PLAINTIFF'S EXHIBIT
3-page 10 of 18

(.mdb) files. Without the source database (.mdb), we can not make future modifications to the system.

The service provider shall provide us with the source database (.mdb) for this system, which will then be called the Manpower Access Report System (MARS).

The existing system is divided into two applications. The first application ("Get-Data") is an administrative program(s) with remote connection to the MDS Oracle® database. The second application ("Report-Query") provides a range of query and report options to users of the existing system.

"Get-Data" downloads 19 MDS tables from an active database located on a regional Oracle® database server and has an option to convert the data to the Unit Manning Document (UMD) format. "Get-Data" can also construct static (snapshot) databases for distribution. These databases can contain either current or historical data.

With the appropriate password permissions, "Get-Data" can also can also download tenant (other commands on host base) data from the MDS Central Data Repository. This tenant data can then be processed by "Report-Query". Since the appropriate password permissions are not available at this time, the requirement for joint tenant information will be addressed in a follow-on Task Order.

"Report-Query" can be used with any database from "Get-Data". "Report-Query" can also be distributed with a database from "Get-Data" to any user in the government. "Report-Query" can be used to produce a variety of reports including (but not limited to):

1. The Unit Manning Document (UMD)
2. Summary Reports (Example: Air Force Specialty Code (AFSC) by Occupational Series Code (OSC) with or without subtotals)
3. Comparison Reports (Example: Compare funded positions by unit)
4. Organization Structure Reports.

The service provider shall recreate the existing system so that the Air Force manpower community can seamlessly substitute MARS for the existing system. MARS shall have exactly the same user interface and function as the existing system and shall provide responses to user inputs within the same time constraints as the existing system.

The government will require textual changes such as adding the acronym MARS to the screens. A list of these textual changes will be provided to the service provider.

The service provider shall document MARS. The MARS documentation shall include (but not be limited to):

1. Software Requirement Specification (SRS)
2. Software Design Document
3. Database Design Document
4. Meta Data Dictionary
5. Test Plan for testing by the service provider
6. Test Case Description for testing by the service provider
7. Test Report from testing by the service provider
8. User's Manual including a list of all installed components.

**Service Delivery Summary:**
**The System:**



PLAINTIFF'S EXHIBIT
3-page 11 of 18

1. The service provider shall provide an event-driven Graphical User Interface (GUI) based Manpower Access Report System (MARS).
   a. MARS shall be written in Microsoft® Access 97. A Microsoft® Access 2000 version of MARS will be addressed as a separate issue.
   b. MARS' GUI environment shall be identical in event-driven functionality to the existing system's functionality.
   c. MARS' GUI environment shall be identical to the existing system's GUI environment with only textual changes as required by the government.
   d. Within government specified allowances, MARS shall have the same level of resource usage and processing speed as the existing system.
   e. To transparently replace the existing system, MARS' deliverable files shall have the same names as the existing system's files.

2. The service provider shall provide the government the MARS source database (.mdb) files, the corresponding restricted database (.mde) application files, and any other tables or files required to use and/or modify MARS.

**The Documentation:**

Each document shall be submitted in a format approved by the government. The service provider shall review each document with the government and shall obtain written approval from the government for each document. The service provider shall obtain written concurrence from the government before delaying the delivery of any document.

1. The Software Requirement Specification (SRS) shall be delivered prior to beginning the Design phase.

2. The Software Design Document, Database Design Document, and Meta Data Dictionary shall be delivered prior to beginning the Development phase.

3. The service provider shall provide the Test Plan prior to starting the Development phase. The Test Plan pertains to testing by the service provider.

4. The service provider shall provide the Test Case Description prior to starting the Test phase. The Test Case Description pertains to testing by the service provider.

5. The service provider shall provide the Test Report prior to the start of acceptance testing at AFMIA. The Test Report pertains to the test results of the service provider.

6. An updated copy of the User's Manual shall be provided before each phase of acceptance testing.

Since documentation changes will normally occur, a final copy of the documentation shall be delivered within 30 days after acceptance testing is successfully concluded.



PLAINTIFF'S EXHIBIT
tabbies
3-page 12 of 18

**The Timeline:**

**The desired start date for this project is 1 February 2000 with completion by 31 October 2000.** The proposed phases and timeline for MARS is:

| | |
|---|---|
| Planning - | 1 person month |
| Analysis - | 2 person months |
| Design - | 3 person months |
| Development - | 3 person months |
| Testing - | 1 person month |
| Documentation - | 2 person months |

The service provider shall obtain written concurrence from the government before lengthening any phase of this timeline. No phase of the timeline shall be omitted. The service provider shall review each phase with the government. The service provider shall not move from one phase to the next without prior written approval from the government. The service provider shall also provide weekly written progress reports to the government using a report format previously approved by the government.

**Acceptance Testing:**

Acceptance testing will be in three phases:

1. The government will test MARS at AFMIA by running MARS and the existing system in parallel.
2. After the AFMIA test successfully concludes, AETC will conduct a single-site beta test, also running MARS and the existing system in parallel.
3. After the AETC beta test successfully concludes, MARS will be beta tested at multiple selected sites. When these tests are successfully concluded, MARS will be accepted pending acceptance of the documentation.

The service provider shall make necessary modifications (resulting from acceptance test results) to the MARS system and MARS documentation. When these tests are successfully concluded, MARS will be accepted pending acceptance of the documentation.

**Government Furnished Property and Services:**

The government will provide:

1. Workstation(s) and computer(s) for use during this project. The workstation(s) and computer(s) will be located at AFMIA, 550 E Street East, Randolph AFB, Texas.
2. Access to the existing system (.mde) for review and analysis.
3. A government approved software suite for MARS development.
4. Access from the computer(s) at AFMIA to the MDS regional server at Tinker AFB, Oklahoma, and to MDS Central at Hill AFB, Utah, for the purpose of downloading data.
5. A draft User's Manual for the existing system. In case of a conflict between the draft User's Manual and the existing system, the existing system shall take precedence.

**General Information:**

1. The government reserves the right to interview potential candidates for this position(s).



PLAINTIFF'S EXHIBIT
3-page 13 of 18

2. The service provider shall be required to work at AFMIA, Randolph AFB, Texas, unless a written waiver is obtained from the government. Work by the service provider at AFMIA shall be performed during the normal duty hours for AFMIA personnel. Government holidays will be observed.
3. The service provider shall maintain an ongoing dialogue with the government project manager overseeing MARS.
4. All information pertaining to this project belongs to the government and nothing shall be released except with written permission from the government.
5. The MARS system (both .mde and .mdb), all related data tables, and all related documentation belong to the government and nothing shall be released except with written permission from the government.
6. This project is for the development of MARS. Maintenance will be addressed as a separate issue.

Microsoft® and Oracle® are registered trademarks.

**C. Travel & ODC's:**
The service provider may be required to travel outside the San Antonio, Texas, metropolitan area. Travel shall be approved in writing in advance by the government. The approval document will specify the reimbursable travel cost. A separate task modification is required before travel is performed.

**D. Security:**
The position(s) requires a completed National Agency Background Check security clearance for access to Air Force network resources.

**E. Invoicing (recurring services):** Billing will be accomplished on a monthly basis. The monthly rate will encompass all hours performed and all ODC/Travel costs incurred during the billing period. Invoices for recurring services will include a statement from the authorized Client Representative or Alternate that labor, travel and ODC costs billed during the billing period are acceptable. "CONTRACTOR MUST SUBMIT CLIENT ACCEPTANCE FOR RECEIPT OF GOODS OR SERVICE WITH INVOICE. FAILURE TO DO SO WILL RESULT IN AUTOMATIC INVOICE REJECTION."

**F. Other.** The Contractor shall notify the Client Representative or designated Alternate if, in its opinion, the cost to perform directed work exceeds the value of the delivery order, or if the work is outside the scope of this delivery order. The Government will make the final determination on these issues.



PLAINTIFF'S EXHIBIT
3-page 14 of 18

EXHIBIT "C"

PLAINTIFF'S
EXHIBIT
3-page 15 of 18

Lt Col William E. Manning Jr
USSTRATCOM/J006
Offutt AFB, NE 68113

To Whom It May Concern, 11 Sep 00

I was assigned to HQ PACAF/XPM from Jun 96 through Jun 99, where I met SSgt Davenport. I was Chief, Programs and Organization Branch from April 1997 through June 1999. In this position, I was within SSgt Mark Davenport's reporting chain as his supervisor's boss. During this period, SSgt Davenport developed software in support of the manpower business and significantly enhanced the ability of the average manpower technician/officer to readily access command manpower data that previously had to be retrieved through hand tailored or standard inquiries usually run over night and printed hardcopy. SSgt Davenport's program placed that information at your fingertips, by providing it through your desktop computer. His program allowed access to the same data in a matter of seconds. The benefits were tremendous and well received by people who used the program.

This program gained in popularity and use across PACAF and Air Force manpower circles. At one point SSgt Davenport was invited to present his program to a Manpower Conference at the request of an Air Force colonel who was impressed with this new capability. Soon people were calling from what is now called the Air Force Manpower and Innovation Agency, and the Gunter Design Center demanding SSgt Davenport provide them the program. They wanted the program complete with its code so that others could maintain the program at the Air Force level. While this seems logical, most people did not understand that SSgt Davenport created this program and wrote the code on his own time, after duty, at his own expense, on his own personal computer at his residence. This program was developed over many hours and at significant expense to SSgt Davenport.

I understand and respect SSgt Davenport's as the person who created, and fully developed this program on his own time and at his own expense. I can attest that during my tenure, he was never ordered or tasked in any way to develop this program.

Wm E. Manning

WILLIAM E. MANNING JR, Lt Col, USAF

PLAINTIFF'S EXHIBIT
3-page 16 of 18

# EXHIBIT "D"

PLAINTIFF'S EXHIBIT
3-page 17 of 18

Anthony M Dant
2612 Star Light Lane
Schertz Tx 78150

July 10, 2000

To Whom It May Concern:

I was a co-worker of Mark Davenport at Headquarters Pacific Air Command, Director of Plans, Manpower and Organization Division, HQ PACAF/XPM, from February 1997 to February 2000. At one time during that period, November 1997 to April 1998, I served as his immediate supervisor.

During this period of supervision I did not direct Mark Davenport to create the software program in question, or any other software programs that could be used in the performance of our official duties. To my knowledge, no one within the HQ PACAF/XPM community directed him to create this program.

During the entire three year period of working in close proximity of Mark Davenport I never saw him working on the program in question at his duty location. To my knowledge, he created the program while off duty at his private residence.

Based upon my day to day interaction with Mark Davenport during the time he created this program I believe he created it at home and of his own volition.

Sincerely,

Anthony M Dant
Anthony M Dant

PLAINTIFF'S EXHIBIT
tabbies
3 page 18 of 18