IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUEPORT COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1622C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence J. Block |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

OF COUNSEL:

CHUN-I CHIANG
Air Force Legal Operations Agency
Department of the Air Force

May 25, 2006

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . 1

II. ULTIMATE ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT . . . . . 2

III. STATEMENT OF THE ISSUES OF FACT . . . . . 3

IV. ANALYSIS . . . . . 19

A. This Court Has Jurisdiction over Claims of Copyright Infringement by or for the United States . . . . . 19

B. This Court Lacks Jurisdiction for DMCA Claims Against the Government . . . . . 19

C. Blueport's Claim is Barred by the Defenses Incorporated into Section 1498(b) . . . . . 20

1. Mark Davenport actually influenced and induced the government's use of the AUMD program . . . . . 20

2. Mark Davenport prepared the AUMD program as a part of his official functions . . . . . 22

3. Mr. Davenport used government time, material, and facilities to create the AUMD program . . . . . 25

D. The Government Did Not Infringe Blueport's Copyright . . . . . 26

1. The Government Held an Implied License to Use AUMD up to May 15, 2000 . . . . . 27

2. The Government Copied and Adapted AUMD as an Essential Step in the Utilization of the Program – 17 U.S.C. § 117 . . . . . 28

3. The government fairly adapted the AUMD program in the context of SAIC's efforts to reverse engineer the AUMD program – 17 U.S.C. § 107 . . . . . 31

4. Blueport registered only one version of the AUMD program . . . . . 32

5. Blueport cannot prove that MARS infringes AUMD . . . . . 34

a. The government and SAIC did not have access to the AUMD source code . . . . 34

b. The MARS program is not substantially similar to the AUMD program . . . . 34

E. Compensation . . . . 37

1. Reasonable and Entire Compensation Under Section 1498(b) . . . . 38

2. Damages Under 17 U.S.C. § 504(b) . . . . 39

3. Blueport is not entitled to any compensation . . . . 41

4. Dr. Rudd's analysis is fundamentally flawed . . . . 43

5. Blueport cannot seek an injunction or damages for willfulness . . . . 45

6. Blueport cannot recover fees, costs, or compensation under the Equal Access to Justice Act . . . . 46

7. The proper measure of compensation . . . . 46

a. Statutory damages . . . . 46

b. Compensation based on the SAIC contract . . . . 46

F. The Digital Millennium Copyright Act . . . . 48

CONCLUSION . . . . 50

## TABLE OF AUTHORITIES

### CASES

Abeshouse v. Ultragraphics, Inc.,
754 F.2d 467 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Amini Innovation Corp. v. Anthony California, Inc.,
439 F.3d 1365 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 34, 35

Atari Games Corp. v. Nintendo of America,
975 F.2d 832 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Autoskill, Inc. v. Nat'l Educ. Support Systems,
994 F.2d 1476 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Aymes v. Bonelli,
47 F.3d 23 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Boyle v. United States,
44 Fed. Cl. 60 (1999), aff'd 200 F.3d 1369 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . 27, 39, 45

Chamberlain Group, Inc. v. Skylink Techs., Inc.,
381 F.3d 1178 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Childress v. Taylor,
798 F. Supp. 981 (S.D.N.Y.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Commission For Creative Non-Violence v. Reid,
490 U.S. 730 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Commissioner v. Keystone Consol. Industries, Inc.,
508 U.S. 152 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Computer Assocs. Int'l, Inc. v. Altai, Inc.,
982 F.2d 693 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Data East USA, Inc. v. Epyx, Inc.,
862 F.2d 204 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Data General Corp. v. Grumman Systems Support Corp.,
36 F.3d 1147 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Decca Ltd. v. United States,
640 F.2d 1156 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

DSC Communications Corp. v. Pulse Communications, Inc.,
170 F.3d 1354 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Effects Assocs., Inc. v. Cohen,
908 F.2d 555 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Engineering Dynamics, Inc. v. Structural Software, Inc.,
26 F.3d 1335 (5th Cir 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Feist Publ'ns, Inc. v. Rural Telephone Services Co.,
499 U.S. 340 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 35

Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,
772 F.2d 505 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Gates Rubber Co. v. Bando Chemical Indus.,
9 F.3d 823 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Harper & Row, Publishers, Inc. v. Nation Enters.,
471 U.S. 539 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Herbert v. United States,
36 Fed. Cl. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Krause v. Titleserv, Inc.,
402 F.3d 119 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 - 31

Lane v. Pena,
518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Leesona v. United States,
599 F.2d 958 (Ct. Cl. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 45

Lotus Development Corp. v. Borland Intern., Inc.,
49 F.3d 807 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Marshburn v. United States,
20 Cl. Ct. 706 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 34

Miller v. CP Chemicals, Inc.,
808 F. Supp. 1238 (D.S.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Missouri Pac. R.R. Co. v. Ault,
256 U.S. 554 (1921) . . . . . . . . 45

MiTek Holdings, Inc. v. Arce Engineering Co., Inc.,
89 F.3d 1548 (11th Cir. 1996) . . . . . . . . 35

Montgomery v. Noga,
168 F.3d 1282 (11th Cir. 1999) . . . . . . . . 33

Motorola, Inc. v. United States,
729 F.2d 765 (Fed. Cir. 1984) . . . . . . . . 39

Myers v. United States,
147 Ct. Cl. 485 (1959) . . . . . . . . 24

Polar Bear Productions, Inc. v. Timex Corp.,
384 F.3d 700 (9th Cir. 2004) . . . . . . . . 40

Sony Corp. of Am. v. Universal City Studios, Inc.,
464 U.S. 417 (1984) . . . . . . . . 39

Standard Mfg. Co. v. United States,
42 Fed. Cl. 748 (1999) . . . . . . . . 45

Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.,
421 F.3d 1307 (Fed. Cir. 2005) . . . . . . . . 48

Trek Leasing, Inc. v. United States,
66 Fed. Cl. 8 (2005) . . . . . . . . 34 - 37

Vermont Agency of Natural Res. v. United States ex rel. Stevens,
529 U.S. 765 (2000) . . . . . . . . 45

Zoltek v. United States,
442 F.3d 1345 (Fed. Cir. 2006) . . . . . . . . 19

**STATUTES**

17 U.S.C. § 101 . . . . . . . . 33

17 U.S.C. § 102 . . . . . . . . 35

17 U.S.C. § 107 . . . . . . . . . . 27, 31

17 U.S.C. § 117 . . . . . . . . . . 27 - 31

17 U.S.C. § 504 . . . . . . . . . . 39, 40, 43

17 U.S.C. § 1201 . . . . . . . . . . 19, 48, 49

17 U.S.C. § 1202 . . . . . . . . . . 19, 48

28 U.S.C. § 1498 . . . . . . . . . . *passim*

28 U.S.C. § 2412 . . . . . . . . . . 46

**OTHER AUTHORITIES**

United States Constitution, Fifth Amendment . . . . . . . . . . 38

Nimmer on Copyright by Melville B. Nimmer . . . . . . . . . . 40

Restatement (Second) of Agency . . . . . . . . . . 24

Rules of the Court of Federal Claims, Appendix A . . . . . . . . . . 1

S. Rep. No. 1877
(86th Cong., 2nd Sess. 1960, reprinted in 1960 U.S.C.C.A.N. 3444, 3446) . . . . . . . . . . 38

The American Heritage Dictionary of the English Language (4th ed. 2000) . . . . . . . . . . 6

United States Copyright Office Copyright Circular 61 . . . . . . . . . . 33

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUEPORT COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1622C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence J. Block |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's Order of December 22, 2005, and Paragraph 14(b) of Appendix A of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States ("the government"), hereby respectfully submits its contentions of fact and law.

## I. INTRODUCTION

Blueport brought this case against the United States pursuant to 28 U.S.C. § 1498(b), claiming that the government infringed Blueport's copyright. Blueport alleges that it is entitled to compensation for the unauthorized copying and use of a computer program known as the AUMD program. In addition, Blueport claims that this action arises under the Digital Millennium Copyright Act of 1998.

The AUMD program was written by an Air Force Technical Sergeant named Mark Davenport, who worked as an Air Force Manpower Data Manager when he wrote the program. The AUMD program provided an interface to the Air Force's Manpower database that allowed users to download data from the database and format it into standard and customized reports. Other Manpower Data Managers began using the AUMD program. At the end of 1999, a dispute arose

between Mr. Davenport and the Air Force over the ownership of the source code to the AUMD program. During the spring of 2000, the Air Force contracted with Science Applications International Corporation ("SAIC") to develop a different program that offered functionality that was similar to the AUMD program. The replacement program is known as the MARS program. Mr. Davenport subsequently assigned all rights to the AUMD program to Blueport, a company that was formed by Mr. Davenport and his uncle, Robert Gunter. On March 9, 2000, Blueport registered its copyright for version 2.1d of AUMD. On November 18, 2002, Blueport filed a Complaint against the government, contending that the reproduction and use of the MARS program, as well as the unauthorized use of the AUMD program, infringed its copyright.

This Court must resolve four general issues of law: (1) whether the Section 1498(b) defenses relating to Mr. Davenport's creation of the program during his employment are applicable; (2) whether Blueport can prove infringement; (3) assuming infringement, what is the reasonable and entire compensation under Section 1498(b); and (4) whether Blueport can prove the government violated the DMCA.

## II. ULTIMATE ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

Section 1498(b) Defenses

A. Whether Mark Davenport was in a position to order, influence, or induce use of the AUMD program by the government

B. Whether Mark Davenport prepared the AUMD program as a part of his official duties

C. Whether Mark Davenport prepared the AUMD program with the use of government time, material, or facilities

Non-Infringement

D. Whether the government copied and adapted the AUMD program as an essential step in the utilization of the program

E. Whether the government fairly used the AUMD program by reverse-engineering the program

F. Whether the government had access to the source code of the AUMD program

G. Whether any of the MARS programs are substantially similar to the AUMD program

Reasonable and Entire Compensation

H. Whether Blueport suffered any actual damages

I. Whether Section 1498(b) permits recovery of the infringer's profits, and if so, whether the government profited from the alleged infringement

DMCA Claim

J. Whether Blueport can establish that the government infringed the DMCA

## III. STATEMENT OF THE ISSUES OF FACT

***Whether Mark Davenport was in a position to order, influence, or induce use of the AUMD program by the government***

1. Blueport brought this case against the United States pursuant to 28 U.S.C. § 1498(b), claiming that the government infringed Blueport's copyright. See Blueport Law ¶¶ 1, 12.[1]

[1] Citations to "Blueport Fact," "Blueport Law," and "Blueport Damages" refer to the corresponding paragraph in Blueport's Proposed Findings of Fact and Conclusions of Law

2. Blueport's copyrighted work was registered as Registration No. TX 5-159-682 on March 9, 2000. Mark Davenport is identified as the author of the work. The registration is titled "UMD Admin Program V.2.0A and Master Program V.2.1D." See Blueport Fact ¶ 2; Complaint ¶¶ 26, 31-32. The two programs comprise one registered work, and are known collectively as the AUMD program.

3. Blueport filed a Supplementary Registration with the Copyright Office on October 21, 2004 in connection with the AUMD program. The Supplementary Registration was assigned the code TX 6-064-419. See Blueport Fact ¶ 2.

4. The AUMD program was written by an Air Force Technical Sergeant named Mark Davenport, who worked as a Manpower Data Systems Manager for the Air Force when he wrote the program. See Blueport Fact ¶¶ 6, 15.

5. Blueport Company, LLC was formed by Robert Gunter on February 7, 2000. Robert Gunter is Mr. Davenport's uncle. See Davenport Dep. at 32-33. Mr. Davenport and Mr. Gunter are the only members of Blueport. See 100081-83.

6. Mr. Davenport designed the AUMD program to be used exclusively with the Air Force's Manpower database. The database is known as the Manpower Data System ("MDS"), and is housed at Gunter Air Force Base in Alabama. The database contains "information on Air Force manpower profiles for each unit in the Air Force based on specified readiness levels, including skill profiles for each personnel slot. Air Force personnel use MDS information to manage current and future manpower needs." Blueport Fact ¶ 7.

---

("Blueport's Memorandum"), filed on May 4, 2006. Similarly, citations to "Gov't Fact" refer to the incorporated Statement of the Issues of Fact. Finally, citations to "Complaint" refer to Blueport's Amended Complaint, filed April 7, 2005.

7. As a Manpower Data Systems Manager, Mr. Davenport oversaw and maintained MDS by ensuring the accuracy of both the input and output data. See Blueport Fact ¶ 15; Davenport Dep. at 68.

8. As part of his employment, Mr. Davenport distributed "data which reflected personnel requirements for assignment purposes and combat readiness throughout the Pacific Air Force ("PACAF") theater." Blueport Fact ¶ 15. Mr. Davenport frequently incorporated this data into the Unit Manpower Document ("UMD"), a standard report used by Air Force Manpower data managers. See Davenport Dep. at 11, 55, 68-70.

9. The purpose of the AUMD program is to create reports from data in MDS. First, the program downloads data resident in MDS and incorporates the data into a local database. The component of the program responsible for this task is known as AUMD Admin. Second, the program manipulates the data in the local database into standard reports, such as the Unit Manpower Document ("UMD"), and into user-customizable reports. This component of the program is known as AUMD Master. See Blueport Fact ¶ 7.

10. The AUMD program was created in Microsoft Access 97, and was programmed in the Visual Basic programming language. Microsoft Access can save the program into at least two different kinds of files: (1) Access can save a program in .MDB format, which is human-readable source code; and (2) Access can save a program in .MDE format, which is not human-readable, and is compiled binary (or object) code. See generally Davenport Dep. at 53-54.

11. Mr. Davenport incorporated an automatic expiration date function in many versions of the AUMD program. If a user of a copy of the AUMD program attempted to use the program after the automatic expiration date, the program would stop running, and would display a message

that directed the user to "contact your MAJCOM Data Manager," or to go to a website managed by Mr. Davenport "to download the most current version." See Blueport Response to Req. for Adm. 10; see generally Blueport Fact ¶ 14.

12. Mr. Davenport completed development of a beta version[2] of the AUMD program "on or about May 28, 1998." This version was known as Beta 0.9. See Blueport Fact ¶ 6; 200141; 200148.

13. After completing development of the beta version of AUMD, Mr. Davenport "sent a copy of the [beta] AUMD program to M. Sgt. William Luckie" in June 1998. Blueport Fact ¶ 16.

14. M. Sgt. William "Butch" Luckie, the Manpower Data Manager at Scott Air Force Base, first met Mr. Davenport when they worked together on MDS and was a friend of Mr. Davenport. See Davenport Dep. at 92, 155.

15. Mr. Davenport also distributed copies of the programs to others within the Air Force's Manpower community:

> Out of generosity, [Mr. Davenport] shared the program with interested individuals. Initially, Mr. Davenport's friend from a prior assignment, MSgt William Luckie, was the person with whom Mr. Davenport shared copies of the program. He later shared the program with individuals at other Air Force bases in the PACAF.

See Interrogatory 17; see also Davenport Dep. at 117 ("I wrote the program and I made it available for them to use.").

16. Mr. Davenport increased the availability of the program by posting the AUMD program on the PACAF web page. See Davenport Dep. at 118.

---

[2] A "beta test" is defined as "the final stage in the testing of new software before its commercial release, conducted by testers other than its developers." The American Heritage Dictionary of the English Language (4th ed. 2000).

17. In addition to directing other Manpower employees to the PACAF website, he also distributed the program by sending copies of the program on disks and by sending copies by email. See Davenport Dep. at 161.

18. In September 1998, Mr. Davenport traveled to an Air Force Manpower conference at Randolph Air Force Base in San Antonio, Texas, to demonstrate the AUMD program to many of the Manpower managers from the various Air Force Air Commands. See Blueport Fact ¶ 16; Davenport Dep. at 90-92.

19. As alleged in Blueport's Proposed Findings of Fact, the response to Mr. Davenport's demonstration of AUMD was "overwhelmingly positive," and the Air Force's use of the program "increased substantially" after Mr. Davenport's demonstration. Blueport Fact ¶ 16.

20. In the annual Enlisted Performance Report for Mr. Davenport, Mr. Davenport's superior, Col. Richard Zeimet, recognized that Mr. Davenport had influenced the use of the "Net Worth" program.[3] See 100030 ("Presented his creation at worldwide conference – absolutely sold his audience – now a 'must have' tool"); see also Davenport Dep. at 145.

21. Prior to the San Antonio Manpower conference, Mr. Davenport had already demonstrated his program at Eielson and Elmendorf Air Force bases, as well as in Misawa, Japan. According to Mr. Davenport's testimony and Blueport's discovery responses, these demonstrations took place in July 1998 – two months after he had allegedly created the program, but two months before he demonstrated the program in San Antonio, Texas. See Davenport Dep. at 98-101; Response to Interrogatory 18.

---

[3] Mr. Davenport's influence may have been due, in part, to others' respect for his technical abilities, as indicated by his Performance Reports. See Davenport Dep. at 138-141; 100029-30, 1000596-601.

22. Mr. Davenport never acted to reduce or limit the distribution of the AUMD program. See Davenport Dep. at 119.

23. Mr. Davenport did take action to limit the distribution and use of at least two other computer programs he created:

> Q (By Mr. Bolden) In the Comments section for the Project Listing program it states "I've only let a couple people use this one because I don't have time to support another program." What did you mean by [this]?
> A I would assume my verbiage was there as I sent it to Butch [Luckie] and I wasn't going to let any of the other – I wasn't going to pass it out to the others and make it available as the other programs because I didn't want them calling me for – for help.

See Davenport Dep. at 155; see also Davenport Dep. Ex. 14 (limiting access to the MDS Error Checking program).

24. Mr. Davenport provided technical support for his program while on duty:

> I believe that I am being very responsive to anyone using the program and until someone comes up with a better way to accomplish what this program does, I hope to continue the same support.

G101; see also Davenport Dep. at 87.

25. Mr. Davenport testified that he extensively supported the program:

> I was taking care of the program. I was maintaining it. I was making modifications to it and it was working so I was supporting that program. I was keeping it running on – on my end.

Davenport Dep. at 88.

26. He added features to the program at the request of other Air Force employees. See Davenport Dep. at 128.

27. Mr. Davenport supported the government's use of the program for at least 18 months after he first developed the beta version of the AUMD program.

28. Mr. Davenport was a member of the Air Force MDS Users Group ("MUG"). See G00099; Davenport Dep. at 46.

***Whether Mark Davenport prepared the AUMD program as a part of his official functions***

29. As noted above, Mr. Davenport's responsibilities as a Manpower Data Systems Manager included collecting data from the MDS database and incorporating that data into the Unit Manpower Document ("UMD"), as well as other reports. See Blueport Fact ¶ 15; Gov't Fact ¶¶ 7-8. Mr. Davenport's Enlisted Performance Report from April 11, 1998 through April 10, 1999 states that Mr. Davenport:

> Manages the command manpower database containing over 40,000 manpower authorizations in more than 400 units . . . . Directs the daily operation of the manpower data system (MDS) throughout PACAF theater. Supervises execution of the manpower data system providing manpower resource information to HQ USAF . . . . Provides resource information to customers across the Air Force including HQ USAF, PACAF and other MAJCOMs.

100029-30 ("Key Duties, Tasks, and Responsibilities").

30. Mr. Davenport's job responsibilities were also outlined in an Air Force Manual. According to 1997 AFMAN 36-2108, a Manpower manager:

> 2.1. . . . . Uses industrial engineering and computer techniques to facilitate work measurement and process improvement . . . .
> 2.3. Designs, operates, and maintains manpower data systems at base major command (MAJCOM), or Headquarters USAF. Develops and prepares manpower documents . . . . Prepares and maintains manpower reports.

G0251-52.

31. The AUMD program directly assisted Mr. Davenport in the performance of his responsibilities with respect to MDS and the creation of the UMD and other reports. The AUMD program created UMDs and other customizable reports from data in MDS. See Davenport Dep. at 68-70.

32. Prior to his creation of the AUMD program, Mr. Davenport spent a significant portion of his work time manually interfacing with MDS to create the UMD and other reports. See 200145. The AUMD program directly assisted him in his day-to-day tasks, and helped disperse his workload. See Davenport Dep. at 152.

33. Mr. Davenport testified that, in general, "probably 50 to 60%" of his job involved working on a computer. Davenport Dep. at 29.

34. As part of his duties, Mr. Davenport helped create PACAF's website. He was also responsible for the content on that website. He could add content to the website by updating a directory on his work computer. See Davenport Dep. at 112-113.

35. Mr. Davenport admitted that he had learned at least some Visual Basic during duty hours. See Davenport Dep. at 31-32.

36. Mr. Davenport taught a colleague how to program in Visual Basic in Microsoft Access during work hours. See Davenport Dep. at 156, 159.

37. Mr. Davenport's predecessor, the previous Manpower Data Manager for PACAF, had designed a database query in Microsoft Access as part of his job. See Davenport Dep. at 135-136.

38. Mr. Davenport created at least four other Microsoft Access programs while employed by the government, including the NetWorth program. See 200133; Davenport Dep. at 153-55.

39. Mr. Davenport provided technical support for the AUMD program while at work. See Davenport Dep. at 88-89.

40. When he received questions at work about his program, he either referred the user to other data managers, or he answered the question personally. See Davenport Dep. at 102-103.

41. As noted above, he added features to AUMD at the request of other Air Force users. See Davenport Dep. at 127.

42. His demonstrations of AUMD occurred while on duty, on trips paid for by the Air Force. See Davenport Dep. at 90, 97-98.

43. Mr. Davenport testified that M. Sgt. Luckie was primarily responsible for creating the User Manual for the AUMD program, but that Mr. Davenport assisted by reviewing and editing the document. See Davenport Dep. at 124-125.

44. Mr. Davenport helped review and edit the User Manual for the AUMD program while at work. See Davenport Dep. at 124, 127. M. Sgt. Luckie created the manual while at work. These facts are supported by the document metadata properties of the manual. See Davenport Dep. at 127, 130-131; Davenport Dep. Ex. 11-12.

45. Mr. Davenport may also have helped by contributing graphics to the manual. See Davenport Dep. at 125-126.

46. Dr. Rudd, Blueport's expert on damages, testified that he included time and expenses for creating software documentation within the scope of the cost of developing of a program:

> Q. Okay. What about requirements, definition, design and documentation? Did you include that in the earlier analysis as well?
> A. I included what I thought the Air Force was contracting for, which was what Mr. Davenport did.
> . . . .
> Q. And with respect to these noncoding activities that they talk about, are those activities considered part of the development of the program?
> A. They would be, yes.

Rudd Dep. at 91-92, 92-93.

47. Mr. Davenport received excellent performance ratings for his creation of the AUMD program. See Davenport Dep. Ex. 13.

48. Mr. Davenport's Enlisted Performance Report dated April 10, 1999, recognizes Mr. Davenport's work on the AUMD program and its contribution to the Air Force:

> - Foresaw delays fielding critical MDS functionalities – single-handedly rectified problem for the Air Force
> – Designed, tested, implemented two database programs – used off-the-shelf software at no cost to PACAF
> – Selflessly passed programs to other MAJCOMs – now employed AF wide – outstanding contribution

Davenport Dep. Ex. 13; 100029-30.

49. Mr. Davenport's other Enlisted Performance Reports during this time period also acknowledge his efforts with respect to the AUMD program specifically, and with respect to computer programming generally:

> – Authored several data code queries to ensure most accurate reflection of information within both manpower and personnel data systems – quickly assessed the problem and provided corrective actions
> . . . .
> – Devised a method allowing all MAJCOMs to download and use data from MDS central location

Davenport Dep. Ex. 13; 100596-97; see also 100030 ("Created 'Net Worth' program . . . presented his creation at worldwide conference – absolutely sold his audience – now a 'must have' tool"); 100601 ("Drawing on his extensive computer background . . . [wrote] some experimental programs for analysts . . . . Designed a query to produce manpower data by unit").

50. Mr. Davenport created the program with the desire to help the Air Force. See Davenport Dep. at 44-46; Blueport's Response to Interrogatory No. 15.

***Whether Mark Davenport prepared the AUMD program with the use of government time, material, or facilities***

51. With respect to the actual AUMD program, M. Sgt. Luckie was instrumental in testing and debugging the program. Mr. Davenport discussed M Sgt. Luckie's role in an email sent to Robert Gunter:

> I knew that [the AUMD program] worked with my MAJCOMs data, and *when I sent it to Butch [Luckie] for testing, he was not only testing the application, but making sure that it worked with other MAJCOMs data. He found places that didn't work with his data and he had suggestions to the program* . . . . People did find errors and had suggestions for enhancements . . . . That's what each one of the version numbers were – as I made changes, I increased the letters so that I knew when someone called if they had the most current version or not. At no time did anyone question the way the program was being distributed around.

200142 (emphasis added).

52. Mr. Davenport verified the content of this email during his deposition. See Davenport Dep. at 162-63.

53. M. Sgt. Luckie assisted Mr. Davenport in the development of at least one other program. See Davenport Dep. at 155.

54. It is impossible to create the AUMD program without knowledge of and access to MDS, and Mr. Davenport had both. See generally Davenport Dep. at 119 ("without data for it to report on there was no sense in having the program").

55. Mr. Davenport tested his AUMD program with the MDS database, while at work, using government computers. See Blueport's Response to Request for Admission No. 18 ("After he had developed the AUMD Admin program he tested it with the 'Oracle Database'.").

56. To access the data in MDS, the AUMD program must log into the database through the use of a user account, issued only to Manpower employees. See Davenport Dep. at 52-53.

57. Initially, the AUMD program logged into MDS through the use of one server. After a dispute with personnel at Gunter Air Force Base, the AUMD program logged into MDS through a personal user account, going "through two or three different servers." Davenport Dep. at 169.

58. Mr. Davenport could not access MDS from his home. He could only access MDS from his work computer. See Blueport's Response to Request for Admission No. 18.

59. Mr. Davenport used his work computer and his work email account to send information on the program to his personal email account and Robert Gunter. See Davenport Dep. at 122-123.

***Whether the copyright was infringed***

60. During 1999, the Air Force began to request that Mr. Davenport release the source code to the AUMD program to the Air Force Manpower and Innovation Agency ("AFMIA").

61. Mr. Davenport refused to release the source code, but continued distributing binary, compiled versions of the program, and continued supporting the program. See generally Blueport Fact ¶ 17.

62. On January 11, 2000, the Air Force issued a solicitation for contractors to write a replacement program for the AUMD program. See G0178-82. The solicitation was republished on March 14, 2000. See G0040-48. The replacement program was to be known as the MARS program. See G0041.

63. Science Applications International Corporation ("SAIC") was selected to write the replacement program on April 10, 2000. See G0078-79.

64. As a result of the impasse, Mr. Davenport ceased distribution of the AUMD program. The last version of the AUMD program that was distributed by Mr. Davenport and used by the Air

Force was version 2.1f. Version 2.1f was created on January 5, 2000, and contained an expiration date of May 15, 2000. See 200148.

65. Mr. Davenport authorized the Air Force to use the AUMD program up until May 15, 2000. In an Interrogatory Response, Blueport essentially admits that the Air Force held an implied license to use the AUMD program on all dates prior to May 15, 2000. See Interrogatory No. 7 ("With regard to the compensation that Plaintiff seeks in this action, Blueport specifies that the copyright infringement began on May 15, 2000."). Blueport admits that the Air Force "may" have had an implied license "to use the compiled version of the AUMD software prior to May 15, 2000." Blueport Law ¶ 5.

66. SAIC, acting as a contractor for the Air Force, extended the expiration date of version 2.1d of the AUMD program by modifying the compiled object code of the AUMD program with a hexadecimal editor. SAIC relabeled this version as 2.1e. This program was used by the Air Force until May 17, 2000. See G0152-54.[4]

67. SAIC, acting as a contractor for the Air Force, extended the expiration date of version 2.1f of the AUMD program by modifying the compiled object code of the AUMD program with a hexadecimal editor. SAIC relabeled this version as 2.1g. The modified expiration date of this program was set to February 15, 2001. See G0152-54.

68. The Air Force continued using SAIC modified version 2.1g until SAIC distributed version 1C of the MARS program on December 11, 2000. See G0248.

---

[4] Note that Blueport appears to generally agree with this Statement of Fact, except that: (1) the AUMD versions are incorrectly identified; and (2) Blueport alleges that AUMD version 2.1d / Modified version 2.1e was used between May 15 and May 18, 2000. See Blueport Fact ¶ 21.

69. The Air Force used the modified version of version 2.1d of the AUMD program (relabeled as 2.1e), without Mr. Davenport's authorization, for approximately two days – the time period between May 15, 2000 and May 17, 2000. See Gov't Fact ¶¶ 65-66.

70. The Air Force used the modified version of version 2.1f of the AUMD program (relabeled as 2.1g), without Mr. Davenport's authorization, for approximately seven months – the time period between May 17, 2000 and December 11, 2000. See Gov't Fact ¶¶ 66-68.

71. Mr. Davenport retained sole possession of the AUMD source code. He never brought the source code from his home, and never copied the source code to his work computer. See generally Blueport Response to Request for Admission No. 6) ("the AUMD programs installed on Mr. Davenport's computer at work were the compiled programs and could not be modified"). Mr. Davenport verified this statement during his deposition:

> Q Sure. Does a user of your AUMD programs who has access to the MDE file, do they have access to the source code?
> A No, they do not.
> Q Okay. Did you ever bring your programs in [source code] format into your office?
> A No, I did not.
> Q Did you ever let any other person have access to a [source code version] of your AUMD programs?
> A Not with my knowledge, no.

Davenport Dep. at 54.

72. There is no evidence that the government or SAIC ever had access to the source code for the AUMD program during the development of the MARS program.

73. The MARS program(s) contains more features than AUMD, runs on more recent versions of Microsoft Access, and contains more lines of source code.

74. The MARS program(s) are not substantially similar to any protectable expression in the AUMD program.

***The applicable accounting period***

75. In an Interrogatory Response, Blueport stated that the applicable accounting period for its claim of copyright infringement "began on May 15, 2000 and continues to this day." Blueport Response to Interrogatory No. 7.

***Blueport has never earned income from the AUMD program***

76. There is no evidence that Blueport experienced any economic harm as a direct result of the government's activities.

77. Blueport admits that it never sold a single copy or license of the AUMD program. See Blueport Response to Req. for Adm. 19.

78. Furthermore, Blueport admits that it has never received *any* income from the AUMD program. See Blueport Response to Req. for Adm. 20.

79. Finally, Blueport admits that it did not submit a proposal in response to the Air Force's official solicitation for contractors. See Blueport Response to Req. for Adm. 21.

***The SAIC Contract***

80. Initially, the Air Force paid SAIC $152,354.09. See G0078-79. On December 19, 2000, the contract was modified and the payment was increased by $4528.62 to a total amount of $156,882.71. See G0080-81. On February 9, 2001, the contract was modified for a second time and the payment was increased by $163,440.96 to a total amount of $320,323.67. See G0082-83. On September 4, 2001, the contract was modified for a fourth time[5] and the payment was increased by

[5] The third contract modification was never executed.

$290,111.13 to a total amount of $610,434.80. See G0084-85. On August 16, 2002, the contract was modified for a final time and the payment was increased by $67,980.58 to a final amount of $678,415.38. See G0086-87.

81. The SAIC contract proposed the following allocation of work for the development of the MARS program: 8.3% to Planning; 16.7% to Analysis; 25.0% to Design; 25.0% to Development; 8.3% to Testing; and 16.7% to Documentation. See G0072.

***Other Damages Issues***

82. An Air Force document indicates that, as of August 1, 2003, there were 78 users of the MARS Get Data program, and 2510 users of the MARS Query and Report program. See G0088.

## IV. ANALYSIS

### A. This Court Has Jurisdiction over Claims of Copyright Infringement by or for the United States

With respect to Blueport's First Claim for Relief, as set forth in the Complaint, this Court has jurisdiction pursuant to 28 U.S.C. § 1498(b) over Blueport's action to recover compensation for alleged copyright infringement by the United States.

### B. This Court Lacks Jurisdiction for DMCA Claims Against the Government

As set forth in the government's Motion for Partial Summary Judgment and the responsive and supplemental briefs, this Court lacks jurisdiction with respect to Blueport's Digital Millennium Copyright Act claim. See 17 U.S.C. §§ 1201, 1202. That issue is a matter of law and will not be reargued in this Memorandum. It is worth noting, however, that the Federal Circuit recently confronted a similar issue in its recent decision in Zoltek.[6] See Zoltek v. United States, 442 F.3d 1345 (Fed. Cir. 2006). In Zoltek, the Federal Circuit reversed the trial court's ruling that the patentee could allege patent infringement as a Fifth Amendment taking under the Tucker Act. See id. at 1352-53 ("We simply note that to reach its conclusion the Court of Federal Claims had to read an entire statute, § 1498, out of existence – a result that betrays the error in the trial court's analysis.").

[6] The Federal Circuit's decision was published on March 31, 2006, after both Blueport and the government had filed their Supplemental Briefs with respect to the Motion for Partial Summary Judgment.

### C. Blueport's Claim is Barred by the Defenses Incorporated into Section 1498(b)

Even if a copyright infringement claim may otherwise be actionable against the government pursuant to Section 1498(b), the claim may still be denied under three statutorily-enumerated circumstances:

> where [the copyright author] was in a position to order, influence, or induce use of the copyrighted work by the Government . . . . where the copyrighted work was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used.

28 U.S.C. § 1498(b). "The use of the word 'or' in the statute indicates that satisfaction of any one of these conditions is sufficient to deny a right of action." Herbert v. United States, 36 Fed. Cl. 299, 305 (1996).

The Court of Federal Claims thoroughly analyzed and applied these defenses in the Herbert case. See id. In Herbert, the plaintiff claimed that the National Institutes of Health, through its contractor, had infringed his copyrights in three written works. See id. at 302-03. After a trial, the court held that under Section 1498(b), the plaintiff had no cause of action because: (1) the written works were prepared as part of his official functions; (2) the plaintiff used government facilities in the preparation of his works; and (3) the plaintiff was in a position to influence the use of his works. See id. at 304-07. The Herbert decision is particularly relevant to this case, and it will be discussed in conjunction with each of the factors below.

#### *1. Mark Davenport actually influenced and induced the government's use of the AUMD program*

The facts of this case demonstrate that Mr. Davenport actually influenced and induced the government's use of the AUMD program. Note that Mr. Davenport's role goes far beyond what is

required by statute – Section 1498(b) merely requires that the author have been *in a position* to order, influence, or induce the use of the work. See id. at 307.

The Herbert court held that the plaintiff's cause of action was denied on facts that were much more limited than in this case. The court held that as a member of the Food and Nutrition Board, the plaintiff was clearly in a position to influence his appointment to a later committee, and "thereby in a position to influence the Committee's use of his works." Herbert, 36 Fed. Cl. at 307. As a member of the committee, he knew that his written works would be published. Id. Thus, the court held that he was in a position to influence the use of his works. Id.

Mr. Davenport's direct influence over the government's use of the AUMD program is proved by his: (1) free and widespread distribution of the AUMD program throughout the Air Force Manpower community; (2) demonstrations of the program to others; (3) failure to restrict the use of the program; and (4) unfailing support of the program as part of his official job duties up until the early part of the year 2000. As noted by the facts discussed above, Mr. Davenport began distributing the AUMD program to other Air Force personnel almost as soon as he finished development of the beta version. See Gov't Fact ¶¶ 12-16. The evidence shows that after he finished development of the beta version in May 1998, he almost immediately shared a copy of the program with his friend, M. Sgt. Luckie. See Gov't Fact ¶¶ 12-14. Then, he demonstrated the program at Eielson and Elmendorf Air Force bases, as well as in Misawa, Japan, beginning in July 1998. See Gov't Fact ¶¶ 21. Two months later, he demonstrated the program to Manpower directors in San Antonio, Texas. See Gov't Fact ¶¶ 18-20. He even facilitated its use by posting it on a military website for easy downloading, sent copies to others on disk and through email, and actively supported the program through technical help and the inclusion of new features in new versions. See Gov't Fact ¶¶ 15-17,

24-27. He was a member of the MDS User's Group, a group that had influence with respect to the use of the MDS database throughout the Air Force. See Gov't Fact ¶ 28. Throughout this time period, he took no active steps to impede the use of his program. See Gov't Fact ¶¶ 22-23. Perhaps most significantly, Mr. Davenport could have easily stopped the government's use of the program at any time during 1998 and the early part of 1999. He could have kept it as his own private project, and not given it out to friends. Compare Gov't Fact ¶ 23 (limiting distribution of two other programs). He could have refused to demonstrate the program. He could have refused to post the program on the website. He could have stopped making new versions of the program, and let the initial versions expire.

Accordingly, Blueport's claim of infringement must be denied. Mr. Davenport was in a position to influence and induce the use of the AUMD program, and actually did influence and induce the use of the AUMD program.

***2. Mark Davenport prepared the AUMD program as a part of his official functions***

With respect to the second defense incorporated into Section 1498(b), it is clear that Mr. Davenport created the AUMD program within the scope of his employment with the Air Force. This ultimate conclusion is supported by three main areas: (1) his job responsibilities; (2) the recognition he received for his efforts; and (3) his desire to assist the Air Force.

Mr. Davenport, as a Manpower data manager, was responsible for maintaining and operating MDS, the Air Force's Manpower database. See Gov't Fact ¶¶ 4, 7-9. As part of this responsibility, he was required to analyze data in MDS, and to create the Unit Manpower Document, as well as other written summaries of the information contained within the database. See Gov't Fact ¶¶ 8-9, 29-30. The sole purpose of AUMD was to accomplish the goal of creating UMDs and other written

summaries. See Gov't Fact ¶¶ 9-10, 31. As he stated in his deposition, the AUMD program directly assisted him in his day-to-day tasks, and helped disperse his workload. See Gov't Fact ¶ 32.

Even though he was not officially classified as a computer programer, a significant amount of his job responsibilities involved computer use and computer programming. See Gov't Fact ¶ 33. He admitted that he had learned to program in the computer language that was used for AUMD during work hours, and that he taught a colleague how to program during work hours. See Gov't Fact ¶¶ 35-36. He authored several other programs and database queries for the Air Force as part of his job. See Gov't Fact ¶ 38. Finally, his predecessor, the previous Manpower Data Manager, had also designed a database query as part of his job. See Gov't Fact ¶ 37.

After the Manpower community began to use the AUMD program, he helped support the program at work. See Gov't Fact ¶ 39. He provided technical support. See Gov't Fact ¶ 39. He answered questions. See Gov't Fact ¶ 40. He added features to AUMD at the request of other users. See Gov't Fact ¶ 41. He demonstrated the program during work hours. See Gov't Fact ¶ 42. He helped review and edit the AUMD user manual while at work. See Gov't Fact ¶¶ 43-45. And he was recognized and praised for his efforts in his Enlisted Performance Reports. See Gov't Fact ¶¶ 47-49.

The Court of Federal Claims cited several identical facts in the Herbert case to support its decision that the plaintiff had created the written works within the scope of his official duties. See Herbert, 36 Fed. Cl. at 305 (citing excellent performance reports, and reputation as an expert). Furthermore, the court flatly rejected the contention that "writing and publishing the [written works] was not a specific duty or condition of his employment . . . and therefore could not be considered part of his official duties or functions." Id. The court held that the plaintiff's reliance on "specific"

tasks was misplaced, and that where the employee's official functions included the activity generally, the employee may still be barred a right of action for infringement. Id. at 305-06 (citing Myers v. United States, 147 Ct. Cl. 485, 489 (1959)).

Although not directly applicable, several other courts have confronted scope of employment copyright issues outside of the context of Section 1498. As an example, in Miller v. CP Chemicals, the District Court for the District of South Carolina ruled that an employee created a computer program within the scope of his employment with similar facts to this case. Miller v. CP Chemicals, Inc., 808 F. Supp. 1238 (D.S.C. 1992). In that case, the plaintiff contended that the copyrighted computer programs were a result of his own initiative, were written and tested at his home, and that he was an hourly employee and was never compensated for his creation of the computer programs. See id. at 1242. In response, the defendant contended that the programs were specific to products manufactured by the defendant, and that the plaintiff, as a supervisor, had broad responsibilities, "and that writing the computer programs, although not required, was in connection with and incidental to his job." Id. at 1243. The court held that the general common law of agency applied, citing both the Supreme Court and the Second Restatement of Agency. See id.; see also Commission For Creative Non-Violence v. Reid, 490 U.S. 730, 741 (1989); Restatement (Second) of Agency § 228 (1958). The court determined that programming was within the ultimate objective of the employer, that programming was not an unlikely act for an employee in that position, and that the plaintiff created the programs in an effort to serve his employer. See Miller, 808 F. Supp. at 1243 ("The initial program was created to simplify Miller's job and to eliminate errors, which was for the benefit of both Miller and CP."). The court weighed the factors and concluded that the plaintiff developed the computer programs within the scope of his employment. See id. at 1244.

Thus, Mr. Davenport's creation of the AUMD program fell within the scope of his official duties. Blueport's copyright claim must be denied on the basis of Mr. Davenport's day-to-day responsibilities; the recognition he received for developing, distributing, and supporting the AUMD program; and the ultimate purpose of the program – to benefit the Air Force and to simplify his job. See Gov't Fact ¶¶ 32, 50.

#### *3. Mr. Davenport used government time, material, and facilities to create the AUMD program*

With respect to the third Section 1498(b) defense, it is clear that Mr. Davenport used government personnel and a government database to create the AUMD program. First, Mr. Davenport extensively relied on M. Sgt. Luckie to assist in the development of the program – while M. Sgt. Luckie was on duty. See Gov't Fact ¶¶ 51-53. Among other things, M. Sgt. Luckie helped Mr. Davenport: draft the user manual, test the AUMD program, debug the AUMD program, and test other programs created by Mr. Davenport. See Gov't Fact ¶¶ 51-53. These actions occurred while M. Sgt. Luckie was at work, and were facilitated by his access to the government's MDS database. See Gov't Fact ¶¶ 51-52, 56. By obtaining this critical assistance from another government employee while the employee was being paid by the government, Mr. Davenport's actions are no different than if he had simply done the work on his own while he was at work. And there is proof that he did – he helped review and edit the AUMD user manual while at work. See Gov't Fact ¶¶ 43-45. Mr. Davenport's reliance on M. Sgt. Luckie, as well as his reliance on the Manpower community as a whole, consumed government time, materials, and facilities.

Second, Mr. Davenport could not have programmed the AUMD program without extensive access to the government's MDS database. The evidence shows that Mr. Davenport used a variety of user names to access MDS to obtain data for his program. See Gov't Fact ¶¶ 55-58. In addition,

Mr. Davenport's program needed to be tested against the real MDS database in order to correct errors in the final output. See Gov't Fact ¶¶ 51, 55, 58. MDS access was a prerequisite for the creation, modification, and operation of the AUMD program. See Gov't Fact ¶ 54.

In Herbert, the court concluded that it was likely that the plaintiff had produced the works while on government time, and that the parties had stipulated that government facilities were used. See Herbert, 36 Fed. Cl. at 306. In this case, it appears that Mr. Davenport produced AUMD while relying on other government employees who were working on government time, using government materials, in government facilities. Mr. Davenport also personally used government time and materials by directly accessing the MDS database to create and troubleshoot his program.

In conclusion, the government has established the existence of at least three Section 1498(b) defenses, where only one would be sufficient to bar Blueport's claim for copyright infringement.

**D. The Government Did Not Infringe Blueport's Copyright**

Blueport must prove two elements to establish copyright infringement: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Telephone Services Co., 499 U.S. 340, 361 (1991). With respect to the second element, "[c]opying requires evidence that a defendant literally copied the [work] or, alternatively, that a defendant had access to the protected [work] before creating the accused [products] with an additional showing of substantial similarity not only of the general ideas but of the expression of those ideas as well." Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1368 (Fed. Cir. 2006) (applying Ninth Circuit law) (citation omitted); see also Herbert, 36 Fed. Cl. at 303; Marshburn v. United States, 20 Cl. Ct. 706, 709 (1990). Thus, in this case, Blueport must prove

that: (1) the government made verbatim copies of the AUMD program (also known as "direct evidence"); or (2) the government had access to the AUMD program source code and that the MARS programs are substantially similar with respect to the original expression of the AUMD program. See generally Atari Games Corp. v. Nintendo of America, 975 F.2d 832, 837-38 (Fed. Cir. 1992) (discussing infringement in the context of a computer program). Even if Blueport proves unauthorized copying, that copying may be noninfringing pursuant to the limitations on infringement in Sections 107 through 122 of Title 17. See 17 U.S.C. §§ 107-122.

Ultimately, Blueport cannot prove infringement. First, the government did not infringe because it copied and adapted the AUMD program as an essential step in the utilization of the program, and because its reverse engineering of AUMD was a fair use. See 17 U.S.C. §§ 107, 117. Second, there is no evidence that either the government or SAIC had access to the source code of AUMD. Third, MARS and AUMD are not substantially similar with respect to any original elements. Blueport fails to comprehend that "a copyright does not preclude others from using ideas found in a copyrighted work." Boyle v. United States, 44 Fed. Cl. 60, 63 (1999), aff'd 200 F.3d 1369 (Fed. Cir. 2000).

***1. The Government Held an Implied License to Use AUMD up to May 15, 2000***

Through Mr. Davenport's conduct, the government held an implied license to use the AUMD program up to May 15, 2000. As noted above, Mr. Davenport freely distributed and supported the AUMD program throughout the Manpower community up until the expiration of version 2.1f on May 15, 2000. Mr. Davenport's actions fit within the definition of an implied license. The Court of Federal Claims directly addressed this issue in Herbert:

> An implied license is one derived from the conduct of the parties. The existence and scope of such an implied license depends upon the facts of the individual case, but courts have found such licenses to exist where, for example, a person voluntarily submitted a work for publication. Delivery of a copy of the work is one type of conduct that demonstrates the existence of an implied license. In [Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990)], the Ninth Circuit Court of Appeals found that by creating a work at defendant's request and conveying it to him, intending that it be copied and distributed, plaintiff necessarily conveyed a license because otherwise the conveyance would have been of minimal value. In the present case, as in Cohen, plaintiff and others worked on the 10th RDA at the Academy's request, and voluntarily created and conveyed their writings to the Academy. In doing so, the court finds that Dr. Herbert necessarily transferred a nonexclusive license for his works as well as the manuscript to the Academy.

Herbert, 36 Fed. Cl. at 310 (citations omitted). Mr. Davenport's widespread distribution of AUMD is equivalent to the "delivery" and "conveyance" discussed in the Herbert case. His support of AUMD and his reliance on other employees for troubleshooting and features are other indicia that an implied license existed. In addition, Blueport's response to an interrogatory supports the conclusion that an implied license existed between Mr. Davenport and the government, at least up until May 15, 2000. See Interrogatory No. 7 ("With regard to the compensation that Plaintiff seeks in this action, Blueport specifies that the copyright infringement began on May 15, 2000."). Finally, Blueport admits in its Memorandum that the "Air Force may have had a fully revocable implied license to use the compiled version of the AUMD software prior to May 15, 2000." Blueport Law ¶ 5.

### *2. The Government Copied and Adapted AUMD as an Essential Step in the Utilization of the Program – 17 U.S.C. § 117*

Even though the government, through its contractor, copied and adapted the AUMD program for an extremely short period,[7] that activity is not a copyright infringement. Pursuant to Section 117

---

[7] AUMD version 2.1d (relabeled as 2.1e) was used without authorization for approximately two days; AUMD version 2.1f (unregistered) (relabeled as 2.1g) was used without authorization for

of Title 17, the owner of a copy of a computer program may make non-infringing copies or adaptations of the computer program if:

> that . . . new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

17 U.S.C. § 117(a)(1). To put it another way, the government did not infringe Blueport's copyright if it: (i) owned a copy of the AUMD program; (ii) adapted AUMD as "an essential step in the utilization of" the AUMD program "in conjunction with a machine"; and (iii) "used [the adaptation] in no other manner." Id.

First, the government owned copies of the AUMD program. The same facts that support the existence of the implied license support the finding that the government owned copies of the AUMD program. The issue of ownership of a copy was discussed at length in the Second Circuit's decision in the recent Titleserv case. Krause v. Titleserv, Inc., 402 F.3d 119 (2d Cir. 2005). In Titleserv, the plaintiff had previously worked as a computer programmer for the defendant. See id. at 120. After a falling out between the two parties, the plaintiff terminated the business relationship, and left the defendant with only the executable object code for several programs. See id. at 120-21. The defendant later managed to decompile the executable object code, obtained the source code, and modified the source code to enable the continued use of the programs. See id. The Second Circuit held that the defendant's adaptation of the source code of the computer programs was non-infringing within the scope of Section 117(a)(1) of Title 17. See id. at 130. In reaching its decision, the Second Circuit held that Section 117 does *not* require formal title in a copy of the computer program. The court held that other courts, including the Federal Circuit, had downplayed the

---

approximately seven months. See Gov't Fact ¶¶ 65-70.

significance of a formal title. See id. at 123 (citing DSC Communications Corp. v. Pulse Communications, Inc., 170 F.3d 1354 (Fed. Cir. 1999)). Instead, courts should inquire into whether sufficient incidents of ownership over a copy exist. See id. at 124. The Second Circuit cited the following six facts in support of its conclusion that the defendant owned copies of the copyrighted work, in the absence of formal title: (1) the defendant was free to discard or destroy the copies at any time; (2) the plaintiff customized the software to serve the defendant's operations; (3) the copies were stored on a server owned by the defendant; (4) the plaintiff never reserved the right to repossess the copies; (5) the plaintiff agreed that the defendant had the right to continue to possess and use the programs; and (6) the defendant paid the plaintiff substantial consideration to develop the programs for its sole benefit. See id. In the case at hand, the first four facts are equally present with Mr. Davenport, the Air Force, and the AUMD program. In addition, the sixth fact is similar, in that Mr. Davenport was paid a salary as a Manpower Data Manager and that the AUMD program was developed for the sole benefit of the Air Force. Thus, the government should be considered the owner of copies of the AUMD program for the purposes of Section 117.

Second, the government can show that it adapted AUMD as an essential step in the utilization of the program in conjunction with a machine. See 17 U.S.C. § 117(a)(1). Here, there can be no question that the government's sole reason for adapting AUMD was to extend the expiration date of the program beyond May 15, 2000. The government sought to do this in order to keep the program functioning until SAIC could create the replacement MARS program. According to Titleserv, actions taken to allow the use of the program within the purpose of the program are allowable. See Titleserv, 402 F.3d at 125 (citing Aymes v. Bonelli, 47 F.3d 23 (2d Cir. 1995)). The court cited activities such as troubleshooting, and keeping the program up to date as

"essential" activities within the meaning of Section 117. See id. Similarly, the government's sole modification to the AUMD program – extending the expiration date in the object code – was an "essential" step in continuing to use the AUMD program.

Third, the government will show that it used the adaptation of AUMD "in no other manner" within the scope of Section 117. Again, this issue looks at the purpose of the program, and whether the adaptation changed the purpose of the program. See id. at 129. The government's adaptation of the AUMD object code was conducted solely to keep the program operational. Accordingly, the government's copying and adaptation of the AUMD program cannot be considered an infringement under Section 117.

***3. The government fairly adapted the AUMD program in the context of SAIC's efforts to reverse engineer the AUMD program – 17 U.S.C. § 107***

Because the Copyright Act does not protect ideas, the Copyright Act permits "fair use" of a copyrighted work in certain circumstances:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment . . . scholarship, or research, is not an infringement of copyright.

17 U.S.C. § 107; see also Atari, 975 F.2d at 842 ("Under the Act, society is free to exploit facts, ideas, processes, or methods of operation in a copyrighted work."). Section 107 lists four factors for courts to consider for fair use – the purpose and character of the use; the nature of the copyrighted work; the amount and substantiality of the portion used; and the effect upon the market for the copyrighted work. 17 U.S.C. § 107.

In the Federal Circuit's Atari case, the court analyzed the fair use defense in the context of a claim of reverse engineering a computer program. The court held that reverse engineering a

computer program's object code to discern unprotectable ideas is a fair use. See Atari, 975 F.2d at 843 ("When the nature of a work requires intermediate copying to understand the ideas and processes in a copyrighted work, that nature supports a fair use for intermediate copying."). The court discussed the potential application of the fair use defense to two different situations. First, the court held that Atari's acquisition of the source code from the Copyright Office was not a fair use, because Atari obtained and used the source code without authorization. See id. Second, the court held that Atari's efforts to obtain the source code from the embedded computer chip through dissection and analyzation qualified as fair use. See id. at 843-44. The distinction is that Atari owned a copy of the embedded computer chip, and copied only what was necessary to reverse engineer the chip.

The government and SAIC's use of the AUMD program after May 15, 2000 was similarly a fair use. First, the government and SAIC never had access to the source code of the AUMD program. Second, the use of AUMD was restricted to the minimum amount necessary. The program was used as an interim solution until MARS became operational. Hypothetically, even if SAIC did run the AUMD program during the development of MARS, it did so only to examine the unprotectable features of the AUMD program, such as its interaction with MDS and the creation of standard UMD reports. Thus, the copying of the AUMD program by the Air Force was a fair use.

***4. Blueport registered only one version of the AUMD program***

Blueport registered only one version of the AUMD program. That version (composed of two sub-programs) is known as version 2.1d. Each of the other versions of AUMD are unregistered, and were not pled in the Complaint. Section 101 of Title 17 draws a clear legal distinction between different versions:

> A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and *where the work has been prepared in different versions, each version constitutes a separate work*.

17 U.S.C. § 101 (also defining "computer program") (emphasis added). The statutory mandate is reflected in the Copyright Office's publication on copyright protection in computer programs:

> To obtain the full benefits of registration, each separately published version of a given computer program must be separately registered, provided each contains a sufficient amount of new or revised authorship to sustain a claim to copyright.

Copyright Circular 61 at <http://www.copyright.gov/circs/circ61.html>.

This issue is important because it affects the facts that Blueport must establish to prove infringement. For example, the government copied and used two versions of the AUMD program after May 15, 2000 – version 2.1d (the subject of the copyright registration), and version 2.1f (unregistered). With respect to the government's use of AUMD version 2.1d, Blueport must simply show that the government made verbatim copies of AUMD version 2.1d. With respect to the government's use of AUMD version 2.1f, however, Blueport must show that the unregistered AUMD version 2.1f contains a significant amount of source code from version 2.1d that was copied by the government. See, generally, Montgomery v. Noga, 168 F.3d 1282, 1292-93 (11th Cir. 1999) (finding infringement where an unregistered later version incorporated over seventy percent of the original source code from the registered version). The modified version of 2.1f was derived from unregistered AUMD version 2.1f, which may or may not have been derived from registered AUMD version 2.1d. Blueport has not proved that version 2.1f incorporates a significant amount of source code from version 2.1d. Blueport must do so before the government's use of version 2.1f can be considered infringing.

### *5. Blueport cannot prove that MARS infringes AUMD*

In the absence of evidence of direct copying, copyright infringement may be found when "defendant had access to the copyrighted materials and that there is substantial similarity between the alleged infringing [work] and the copyrighted [work]." Herbert, 36 Fed. Cl. at 303; see also Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 11 (2005). Blueport can prove neither access nor substantial similarity.

#### *a. The government and SAIC did not have access to the AUMD source code*

As mentioned before, the government and SAIC never had access to the AUMD source code. Throughout this case, Blueport steadfastly asserted that Mr. Davenport was the only one who had access to the AUMD source code, and that Mr. Davenport never copied the source code to his work computer. See generally Gov't Fact ¶¶ 71-72. Mr. Davenport verified this statement during his deposition. See Gov't Fact ¶ 71. Blueport has not produced any evidence that the government or SAIC ever had access to the source code of the AUMD program. See Gov't Fact ¶ 72. Thus, Blueport cannot prove an essential element of its infringement assertion. "Without a showing of access, the plaintiff will not be able to establish [its] case." Marshburn, 20 Cl. Ct. at 709.

#### *b. The MARS program is not substantially similar to the AUMD program*

In its Memorandum, Blueport argues that the "organization, structure, sequence, look and feel" of the AUMD program are all protectable elements. Blueport Law ¶ 17. When assessing substantial similarity, however, courts must first distinguish "protectable expression from unprotectable design elements." Amini Innovation, 439 F.3d at 1369 (citations omitted). "[T]he mere fact that a work is copyrighted does not mean that every element of the work may be

protected." Feist, 499 U.S. at 348. It is "well settled" that copyright protects only expression of ideas, not ideas themselves. Trek Leasing, 66 Fed. Cl. at 13; see Amini Innovation, 439 F.3d at 1369; 17 U.S.C. § 102(b). Computer programs almost always contain a mix of copyrightable and uncopyrightable elements. As acknowledged by the Federal Circuit in the Atari case, "Section 102(b) is intended, among other things, to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law." Atari, 975 F.2d at 839.

In light of these principles, courts apply the "abstraction-filtration-comparison" test to cases involving computer program copyright infringement. This test, as articulated by the Tenth Circuit, involves three steps:

> First, in order to provide a framework for analysis, we conclude that a court should dissect the program according to its varying levels of generality as provided in the abstractions test. Second, poised with this framework, the court should examine each level of abstraction in order to filter out those elements of the program which are unprotectable. Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination. Third, the court should then compare the remaining protectable elements with the allegedly infringing program to determine whether the defendants have misappropriated substantial elements of the plaintiff's program.

Gates Rubber Co. v. Bando Chemical Indus., 9 F.3d 823, 834 (10th Cir. 1993); see also Autoskill, Inc. v. Nat'l Educ. Support Systems, 994 F.2d 1476, 1491-97 (10th Cir. 1993); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 707 (2d Cir. 1992). Several other circuits have cited and adopted this test. See, e.g., MiTek Holdings, Inc. v. Arce Engineering Co., Inc., 89 F.3d 1548, 1555 (11th Cir. 1996); Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1343 (5th Cir 1994). The Court of Federal Claims cited this test with approval in the Trek Leasing case, and

applied it to a case involving an architectural copyright. See Trek Leasing, 66 Fed. Cl. at 12. Finally, the Federal Circuit applied this test in a copyright infringement case involving a computer program. See Atari, 975 F.2d at 839-40 (applying Ninth Circuit law).

Blueport cannot prove substantial similarity because it never applied the correct legal standard. Blueport does not cite the abstraction-filtration-comparison test in its Memorandum. Blueport's infringement expert, Dr. Orr, did not review the proper source code, did not apply the proper test, and could not distinguish between patents and copyrights. Rather than discuss this issue in detail here, the government anticipates filing a Motion in Limine with respect to this matter, and will argue this issue at trial.

In addition, to the extent that the MARS programs and the AUMD programs do contain any similar elements, these elements are unprotectable because they are imposed by interacting with MDS, by being programmed in Microsoft Access, or by other common programming practices.

Furthermore, Blueport's allegation regarding the similarity of the "look and feel" of the two programs fails. There is no evidence that the "look and feel" of the AUMD program is protected by copyright. For example, in Lotus v. Borland, the First Circuit held that the menu structure for a computer spreadsheet program was unprotectable. See Lotus Development Corp. v. Borland Intern., Inc., 49 F.3d 807, 816, 819 (1st Cir. 1995) ("If specific words are essential to operating something, then they are part of a 'method of operation' and, as such, are unprotectable."). In addition, to the extent Blueport cites the similar "look and feel" of both programs, this "look and feel" is nothing more than unprotectable *scenes a faire*:

> *[S]cenes a faire*, defined as "thematic concepts or schemes" that are not original to the author, and incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic, play a role in which elements of a work are protectable by copyright. The idea of *scenes a faire*

> has been most commonly employed in the literary or dramatic context, but the concept has been applied in cases involving computer software copyrightability and audiovisual games.

Trek Leasing, 66 Fed. Cl. at 13. Even though Blueport has the burden with respect to substantial similarity, Blueport again made no effort to distinguish between protectable and unprotectable elements, and to exclude the unprotectable elements from consideration.

Thus, even if the Court were to ignore the utter lack of access to the AUMD source code, substantial similarity cannot be based upon unprotectable elements. "Because a copyrighted work may consist of both protected and unprotected elements, a finding of infringement is not appropriate where the similarities arise only with respect to unprotected elements of the creator's work." Trek Leasing, 66 Fed. Cl. at 12 (citing Data East USA, Inc. v. Epyx, Inc., 862 F.2d 204, 208 (9th Cir.1988)).

In conclusion, Blueport fails to prove both essential elements of its infringement assertion. The evidence will demonstrate that the government did not have access to the source code of the AUMD program, and that the MARS programs are not substantially similar to any protectable expression within the AUMD program.

**E. Compensation**

Blueport is not entitled to any compensation under Section 1498(b) because: Mr. Davenport was in a position to influence, induce, or order the use of the AUMD program; the creation of the AUMD program was within the scope of Mr. Davenport's duties; and he used government time, materials, and facilities in the creation of the program. In addition, Blueport cannot prove that the government infringed the AUMD program. Accordingly, Blueport is not entitled to any compensation.

The remainder of this Section of this Memorandum will analyze the proper standards for assessing reasonable and entire compensation if the government's defenses are inapplicable and if Blueport proves infringement. Finally, assuming that the Court rules that Blueport is entitled to compensation under Section 1498, this Memorandum will apply the proper standards to the facts to estimate the quantum of damages.

### *1. Reasonable and Entire Compensation Under Section 1498(b)*

Section 1498(b), the sole jurisdictional basis for this lawsuit, invokes the eminent domain principles of the Fifth Amendment by allowing the recovery of "reasonable and entire compensation":

> the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17.

28 U.S.C. § 1498(b). Because identical language is used in both Section 1498(a) and Section 1498(b), the analysis for "reasonable and entire compensation" should be parallel between the two sections. The legislative history for Section 1498(b) and canons of statutory construction support the conclusion that "reasonable and entire compensation" means just compensation under the Fifth Amendment. See Commissioner v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159 (1993) ("It is a normal rule of statutory construction, that identical words used in different parts of the same act are intended to have the same meaning.") (citations omitted); S. Rep. No. 1877 (86th Cong., 2nd Sess. 1960, reprinted in 1960 U.S.C.C.A.N. 3444, 3446). ("[I]t seems illogical to treat copyright infringements by the United States differently from patent infringements . . . .").

Therefore, the decisions that previously analyzed eminent domain in the context of Section 1498(a) patent cases are persuasive in the context of Section 1498(b).[8] Under Section 1498, the United States is not an ordinary infringer, but rather a compulsory, nonexclusive licensee. See Motorola, Inc. v. United States, 729 F.2d 765, 768 (Fed. Cir. 1984); Leesona v. United States, 599 F.2d 958, 968 (Ct. Cl. 1979).

Because patent or copyright infringement by the government is akin to the taking of a compulsory, nonexclusive license, the Court must ascertain the value of the license at the time of the taking to determine compensation. See Decca Ltd. v. United States, 640 F.2d 1156, 1167 (Ct. Cl. 1980). In addition, the proper focus is "what the owner has lost, not what the taker has gained." Leesona, 599 F.2d at 969. Accordingly, in order for Blueport to recover compensation in excess of minimum statutory damages under Section 1498(b), Blueport must demonstrate that the AUMD program: (1) has some fair market value; and (2) the government's actions directly caused Blueport economic harm.

***2. Damages Under 17 U.S.C. § 504(b)***

Even though actual damages under Title 17 are not directly applicable to Section 1498(b) actions, actual damages under Title 17 require the plaintiff to show the same two elements before an award is made: loss and causation. Section 504(b) contains two distinct monetary remedies – actual damages and recovery of the infringer's profits. See 17 U.S.C. § 504(b). The plain language

[8] Also, prior patent law decisions may sometimes be helpful when analyzing alleged copyright infringement. See Auerbach v. Sverdrup, 829 F.2d 175, 179-80 (D.C. Cir. 1987) (considering Decca and Leesona for Section 1498(b) authorization and consent); see also Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 439 (1984) (it is appropriate to refer to patent law cases because of the "historic kinship between patent law and copyright law"); Boyle, 44 Fed. Cl. at 62 n.3 (Congress "extended" Section 1498(a) to create Section 1498(b) for copyright infringement).

of the statute mandates that actual damages must be suffered "as a result of the infringement," and profits must be "attributable to the infringement." Id. "[I]t is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits . . . a plaintiff in a § 504(b) action must establish this causal connection." Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004). To put it another way, a plaintiff must prove "that, but for the defendant's infringement, the plaintiff would not have suffered the loss." Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1171 (1st Cir. 1994). In this case, Blueport bears the burden of proving that the government's alleged infringement was the cause of its loss of revenue. See Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 567 (1985). If Blueport does establish a causal connection between the infringement and its loss of revenue, the burden shifts to the government "to show that this damage would have occurred had there been no taking of copyrighted expression." Id.

In addition, actual damages may not be based on "undue speculation." Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir. 1985); see also Childress v. Taylor, 798 F. Supp. 981, 991-92 (S.D.N.Y.1992) (declining to award actual damages because copyright owner's play was a commercial failure and estimates of damages were unduly speculative). "Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement. The result is that a plaintiff seeking to recover indirect profits must formulate the initial evidence of gross revenue duly apportioned to relate to the infringement." Polar Bear, 384 F.3d at 711 (citing 4 Nimmer On Copyright § 14.03[B], 14-39); see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d

505, 517 (9th Cir. 1985) ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

### *3. Blueport is not entitled to any compensation*

Blueport has completely failed to establish a nexus between the infringement and any economic harm. First, the AUMD program does not have any economic value independent from the Air Force and the Air Force's data. Blueport admits that it never sold a single copy or license of the AUMD program. See Gov't Fact ¶ 77. In addition, Blueport admits that it has never received any income from the AUMD program. See Gov't Fact ¶ 78. The reason for this is that the AUMD program was created for only one purpose – to assist Mr. Davenport and other Manpower data managers in their official duties. See Gov't Fact ¶ 50. As such, the program is so narrowly focused that it has zero independent economic value.

Second, Blueport could not have sold its program to the Air Force, so it had zero economic value with respect to the Air Force. Blueport admits that it did not submit a proposal in response to the Air Force's official solicitation for contractors. See Gov't Fact ¶ 79. Even if Blueport could have submitted a proposal, it is unlikely that they could have fulfilled the contract, because Mr. Davenport was unwilling to release the source code. See Gov't Fact ¶¶ 60-61, 71. The Air Force specifically required its contractor to provide the source code in order to make future modifications to the program:

> 2.2.1 The Air Force manpower community has a Manpower Data System (MDS) report system (existing system), written in Microsoft Access 97 . . . . We only have the restricted database (.mde) application files. We do not have the source database (.mdb) files. Without the source database (.mdb), we can not make future modifications to the system.
> 2.2.2 The service provider shall provide us with the source database (.mdb) for this system, which will then be called the Manpower Access Report System (MARS).

G0069-70; compare with Blueport Fact ¶ 17 (stating that, despite the offer of money, Mr. Davenport "expressed his interest in maintaining control over the AUMD program and indicated that he would not release its source code to the government").

Third, the estimates cited by Blueport are completely speculative and unsupported. As one of its estimates of damages, Blueport claims that it is entitled to "$426,000 based on reasonable license [*sic*] for the number of MARS users." Blueport Damages ¶¶ 2(a), 3(a), 4(a), 5(a), 7. This figure is based on an imaginary estimate of licensing fees of $100 per copy, multiplied by 4,264 MARS users. Blueport Damages ¶ 3(a). Yet the evidence shows that the total number of MARS users was only 2,510. See Gov't Fact ¶ 82. In addition, Blueport appears to argue that each alleged infringing activity is a separate act of infringement that results in separate compensation. Compare Blueport Damages ¶¶ 1-3. Treating these actions separately for the purpose of compensation has no rational relationship with any hypothetical damages suffered by Blueport.

Fourth, the MARS programs and the AUMD programs are not directly comparable. MARS was created by professional programmers with government input, specifications, and oversight. The MARS programs ultimately contained more features than AUMD, ran on different versions of Microsoft Access, and contained more lines of source code. See Gov't Fact ¶ 73. Blueport does not account for these differences. In addition, SAIC created at least 23 different versions of MARS. Blueport completely fails to distinguish between these versions, and broadly assumes that every version of MARS infringes the AUMD copyright. Thus, Blueport's argument that AUMD and MARS are equivalent for damages purposes is unduly speculative.

Fifth, even if the government had replaced the AUMD program with a program other than the MARS program, Blueport still would not have suffered a loss. Blueport was not selling anything and did not submit a response to the government's contract solicitations.

Thus, with respect to Section 1498(b), Blueport failed to demonstrate that: (1) the AUMD program had any fair market value; and (2) the government's actions directly caused economic harm to Blueport. Even under Section 504(b), Blueport did not establish that, but for the government's actions, Blueport would not have suffered a loss, because there was no loss.

Finally, the infringer's profits are not recoverable under Section 1498(b). Unlike Title 17, the compensation provision in Section 1498(b) does not mention profits as a measure for compensation. Even if this were a copyright infringement case under Title 17, the government has not made any profits that are attributable to the alleged infringement. There is no proof that it sold any software or earned any revenue with respect to the use of the AUMD or the MARS programs.

### ***4. Dr. Rudd's analysis is fundamentally flawed***

The analysis of Blueport's damages expert is flawed. First, Dr. Rudd's opinion was primarily based on his calculations of the "cost to produce" the MARS program. Yet such a calculation has no relevance to Blueport's hypothetical loss as a result of the alleged infringement, and it has no relevance to copyright damages.

Second, Dr. Rudd, when calculating the "cost to produce" the MARS program, did not examine the MARS program. He did not even review the complete source code from either program. See Rudd Dep. at 21-22. Instead, he simply looked at the AUMD source code excerpt attached as the original copyright deposit. Thus, he estimated the "cost to produce" MARS by looking at an excerpt of the source code for AUMD – an illogical approach.

Third, Dr. Rudd grossly over-counted the lines of source code in the AUMD program. Due to the way the copyright deposit was printed, single lines of code were frequently "word-wrapped" onto several lines:

> Q. Do you consider that to be three lines of source code?
> A. I counted it as three.
> Q. Do you consider it to be three lines of source code?
> A. I think you can make an argument that it's one.
> Q. Why did you count it as three instead of one?
> A. I guess it's simply that I didn't feel free to spend the extra hours it would have taken to handle that kind of situation.

Rudd Dep. at 81. To use an analogy, Dr. Rudd's analysis

would count this current sentence as three sentences

because it has been "word-wrapped" onto three separate lines. Such a result is clearly inaccurate. Dr. Rudd admitted that it would have been more accurate to count the "word-wrapped" lines of code as one line of code.

> Q. Do you think it would have been more accurate to count lines that were wrapped around due to the physical page margin limits of the printed page as only one line instead of multiple lines?
> A. Yes.

Rudd Dep. at 82.

After counting the gross lines of code, both Dr. Rudd and Mr. Keohane, the government's expert witness, subtracted the blank and comment lines. Using this method, Dr. Rudd estimated that the net lines of source code for the AUMD program totaled 21,804. He used this erroneous calculation throughout the remainder of his "cost to recreate" analysis. Mr. Keohane, analyzing the entire source code of the AUMD program, and properly counting the number of lines of code, calculated that the program contained 6,064 net lines of source code. Mr. Keohane's result is approximately 28% of Dr. Rudd's result.

### *5. Blueport cannot seek an injunction or damages for willfulness*

In its Memorandum, Blueport claims that the Air Force willfully infringed the copyright, and that the Air Force should be enjoined. See Blueport Law ¶¶ 13-14. Yet Blueport cites no legal authority that would permit either willful damages or an injunction against the government. Compare 28 U.S.C. § 1498(b) (invoking the Fifth Amendment, and phrased in terms of "reasonable **and entire**" compensation) (emphasis added). First, with respect to willful damages, a waiver of sovereign immunity permitting punitive damages must be unequivocally expressed in explicit statutory text, but no such text appears in section 1498(b). See Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 784-85 (2000) (articulating a "presumption against imposition of punitive damages on governmental entities"); Lane v. Pena, 518 U.S. 187, 192 (1996); Missouri Pac. R.R. Co. v. Ault, 256 U.S. 554, 563 (1921). In addition, the punitive aspects of increased damages are not apt in the context of the government exercising its power of eminent domain. See Leesona, 599 F.2d at 969.

Second, for similar reasons, Blueport cannot obtain an injunction against the government in this case. The Court of Federal Claims "does not have general equitable power to issue injunctions in cases other than those in which such power has explicitly been granted." Boyle, 44 Fed. Cl at 65. Nor does an injunction make sense in the context of eminent domain principles and the Fifth Amendment. Ultimately, "injunctive relief, increased damages and attorneys fees available against private infringers . . . are not appropriate when claiming infringement by the government under section 1498." Standard Mfg. Co. v. United States, 42 Fed. Cl. 748, 758 (1999).

***6. Blueport cannot recover fees, costs, or compensation under the Equal Access to Justice Act***

Blueport has no basis for claiming attorneys fees, costs, and expert fees "under the Copyright Act, 28 U.S.C. § 1498(b), and the Equal Access to Justice Act." Blueport Damages ¶ 8. First, Blueport cannot claim remedies under the Copyright Act, as opposed to Section 1498, for the reasons discussed in the preceding section. Second, Section 1498(b) does not allow the recovery of these damages. Finally, with respect to Blueport's Equal Access to Justice Act ("EAJA") claim, the government's position is "substantially justified." 28 U.S.C. § 2412.[9]

***7. The proper measure of compensation***

Assuming that the Court rules that Blueport is entitled to compensation under Section 1498, Blueport's estimates of compensation are wildly overstated.

*a. Statutory damages*

First, in light of Blueport's failure to provide any evidence of economic loss attributable to the infringement, its recovery would be capped at the minimum statutory amount for each registered copyright. Since there is only one registered copyright, Blueport would be entitled to $750 for statutory damages, based on the plain reading of Section 1498(b). See 28 U.S.C. § 1498(b) ("including the *minimum* statutory damages").

*b. Compensation based on the SAIC contract*

The SAIC contract is not a proper measure of compensation for Blueport. As noted above, Blueport must establish a causal link between the amount paid to SAIC and any economic loss suffered by Blueport, attributable to the alleged infringement. Even if the SAIC contract is used as

[9] If Blueport establishes liability and files an application for fees under EAJA, the government will then elaborate its position on this issue.

a proper measure for compensation, however, the compensation owed to Blueport is very small. The Court must account for the time period of infringement and the amount paid to SAIC to specifically develop the software. For example, if the Court finds that the government infringed the AUMD program, Blueport would be entitled to actual damages for the two days that version 2.1d of the AUMD program was used without authorization. These damages are highly speculative, but a number could be derived from the SAIC contract. For example, SAIC was paid $156,882.71 to replace the AUMD program between April 10, 2000 and December 19, 2000. See Gov't Fact ¶ 80. There are 253 days between April 10, 2000 and December 19, 2000, so the government paid SAIC $620.09 per day. Under this hypothetical, for two days of unauthorized use, the total figure would be $1240.18.

This figure, however, should be further discounted in accordance with the allocation of work under the SAIC contract. According to the contract, SAIC spent approximately 50% of the time working on coding activities (design and development) and approximately 50% of the time working on other activities (planning, analysis, testing, and documentation). See Gov't Fact ¶ 81. The evidence shows that Mr. Davenport planned, analyzed, tested, and documented his program while at work, while being compensated by the government. Accordingly, Blueport's compensation should be reduced by at least 50% if the SAIC contract is used as a measure for actual damages. In this particular hypothetical, Blueport would be entitled to reasonable and entire compensation in the amount of $620.09.

**F. The Digital Millennium Copyright Act**

Even if the Court has jurisdiction to entertain Blueport's Digitial Millennium Copyright Act ("DMCA") claim, Blueport cannot prove that the government has violated the DMCA. See 17 U.S.C. §§ 1201, 1202. Blueport's DMCA claim will fail for at least four reasons.

First, in order to proceed with its DMCA claim, Blueport must prove that its copyright was infringed by the government. See Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc., 421 F.3d 1307, 1318 (Fed. Cir. 2005) ("A copyright owner . . . must prove that the circumvention of the technological measure either infringes or facilitates infringing a right protected by the Copyright Act."). Accordingly, if the government succeeds in proving one of the Section 1498(b) defenses, or if Blueport fails to prove infringement, Blueport's DMCA claim must be denied.

Second, compiled source code, or object code, is not "essentially encrypted." Blueport Law ¶ 29. Mr. Davenport testified that he did not do anything to the source code, other than compile it into object code. See Davenport Dep. at 48. Rather than encryption, the transformation from source code to object code is more akin to the process of translation. To use an analogy, analog music recordings are translated into digital (that is, binary) form when they are recorded onto compact discs. This process is not considered to be encryption; and while an individual who copies or modifies the digital music on a compact disc may have infringed a copyright, that individual has not infringed the DMCA because the music is not encrypted.

Third, with respect to Section 1201, the DMCA permits the circumvention of an access control for the purpose of reverse engineering. See 17 U.S.C. § 1201(f). The factual and legal analysis of this issue is identical to the analysis discussed previously in this Memo at Section

IV.D.3. See also Chamberlain Group, Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1202 (Fed. Cir. 2004) (permitting circumvention for the purpose of fair use).

Finally, the government's alleged activity took place before certain provisions of the DMCA became effective. See 17 U.S.C. § 1201(a) ("The [anticircumvention prohibition] shall take effect at the end of the 2-year period beginning on the date of the enactment of this chapter."). Section 1201(a) did not become effective until October 23, 2000.

For these reasons, as well as the absence of jurisdiction, Blueport will fail to establish that the government has violated the DMCA.

## CONCLUSION

In view of the foregoing, the government's use of the AUMD programs and the MARS programs did not infringe Blueport's copyright or the DMCA. Blueport is not entitled to any damages.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

s/Scott Bolden
SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

OF COUNSEL:

CHUN-I CHIANG
Air Force Legal Operations Agency
Department of the Air Force

May 25, 2006

Attorneys for the United States

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on May 25, 2006 I electronically filed the foregoing DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW with the Clerk of Court using the ECF system which will send notification of such filing to the following e-mail address:

rylander@pacifier.com

Upon information and belief, this email address corresponds to the following individual:

Kurt M. Rylander
KURT M. RYLANDER TRIAL AND
PATENT ATTORNEY AT LAW PC
406 West 12th Street
Vancouver, Washington 98660
(360) 750-9931

Attorney for Plaintiff

s/Scott Bolden
SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345