# The United States Court of Federal Claims

**No: 02-1622 C**
**June 29, 2006**

**BLUEPORT COMPANY, LLP,**

***Plaintiff*,**

**v.**

**THE UNITED STATES,**

***Defendant*.**

**Summary Judgment; Waiver of Sovereign Immunity; Tucker Act; Digital Millennium Copyright Act**

## OPINION

Before this court is the defendant United States' motion for partial summary judgment pursuant to Rule of the Court of Federal Claims ("RCFC") 56(b). The sole issue arising out of this motion, one of first impression, is whether the U.S. Court of Federal Claims has jurisdiction to adjudicate Count II of the Complaint—a claim for monetary damages against the United States arising under the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 1201 *et seq.* ("DMCA"). Defendant argues that its motion should be granted because the DMCA does not expressly waive sovereign immunity. The court agrees.

## I. INTRODUCTION

The law of copyright protection faces an unprecedented challenge brought on by rapid and far reaching technological innovations. The purpose of copyright law has always been to provide authors an adequate level of legal protection to ensure that they profit from their creations while, at the same time, not prohibiting others from making improvements upon those ideas.[1] This balance

---

[1] This sentiment was captured by Lord Mansfield:

> [W]e must take care to guard against two extremes equally prejudicial; the one, that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits, and the reward of their ingenuity and labour; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded.

is created to increase the likelihood that the optimal level of creative works enters the market.[2]

But technology, ranging from as the widespread use of photocopiers to the growth of the Internet, has overwhelmed the institutional copyright protection framework, and thereby tilted economic incentives against protection and towards copying.[3] S. REP. NO. 105-190, at 2 (1998). Copyright holders have responded by employing technological remedies, such as encryption coding and password protection, to counter these technological maladies. This, in turn, has led to countermeasures to circumvent software and other copyright protections, the most infamous being "hacking" into computers in order to destroy encrypted protections.[4]

By and large, United States and international copyright law did not provided effective remedies against such "circumvention." Legal copyright protection generally prohibited the copying of most works, but did not address the technological measures designed to deny access to copyrighted works. H.R. REP. NO. 105-551 (I) at 10 (1998). Similarly, the selling or "trafficking" of circumvention technology, software or otherwise, did not directly contravene copyright law so long as the copyrighted work was not copied by the purveyor of circumvention technology. *Id.*

---

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 n.6 (1975) (quoting *Cary v. Longman*, 1 East 358, 362 n.(b), 102 Eng. Rep. 138, 140 n.(b) (1801)).

[2] An imbalance conceivably creates a disincentive for creating new works and for investing in existing works. *See generally* Michael G. Anderson & Paul F. Brown, *The Economics Behind Copyright Fair Use: A Principled and Predictable Body of Law*, 24 Loy. U. Chi. L.J. 143, 158 (1993) ("Copyright law, both ancient and modern, is founded on the fundamental, though perhaps implicit, notion that adverse economic incentives are created if unrestricted copying of intellectual products is permitted. When adverse incentives exist, society will not have as much creative innovation as it wishes to encourage.").

[3] The economic disincentive these technologies would provide to authors was apparent to the drafters the DMCA. The Senate Judiciary Committee Report notes that: "Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." S. REP. NO. 105-190, at 8. *See generally*, Anderson & Brown, note 2, at 159 ("If intellectual property were not protected, many authors would wait for another to create a literary work and then take the work away from the innovator. Authors would be less likely to expend their own efforts because as soon as their efforts had been expended, some other person would steal the work. Thus, creation of intellectual property presents a classic free rider situation.").

[4] Hack (*v*): (1) To write program code; (2) To modify a program, often in an unauthorized manner, by changing the code itself. Webopedia, http://www.webopedia.com/TERM/h/hack.html (last visited June 2, 2006) (online dictionary for words, phrases and abbreviations that are related to computer and Internet technology).

In response to these problems, the World Intellectual Property Organization ("WIPO") held a diplomatic conference in Geneva, Switzerland in December, 1996. H.R. REP. NO. 105-551 (I) at 9; H.R. REP. NO. 105-551 (II) at 21 (1998); S. REP. NO. 105-190, at 5. Two separate treaties were consummated, the "WIPO Copyright Treaty" and the "WIPO Performances and Phonograms Treaty," which were ratified by 160 countries. S. REP. NO. 105-190, at 5. The WIPO Copyright Treaty required ratifying nations to:

> [P]rovide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law.

World Intellectual Property Organization Copyright Treaty, art. 11, Apr. 12, 1997, S. Treaty Doc. No. 105-17 (1997).

The United States responded with the DMCA, enacted in 1998. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001); H.R. REP. NO. 105-551 (I) at 9; S. REP. NO. 105-190, at 8. In pertinent parts, the Act contains subsections directed at the circumvention of technological copyright protections, the trafficking of devices and software that abets such circumvention, and maintaining the integrity of copyright management information. The first part, DMCA § 1201(a)(1)(A), is the Act's anti-circumvention provision, which prohibits the circumvention of technological measures, such as encryption, that protect copyrighted works. This provision prohibits any person from "circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17, governing copyright]." 17 U.S.C. § 1201(a)(1)(A). To "circumvent a technological measure" is statutorily defined as "to descramble a scrambled work . . . or otherwise . . . bypass . . . a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). The anti-circumvention provision is at the heart of the instant motion in this case.

The "anti-trafficking" provisions of the Act are DMCA § 1201(a)(2) and (b)(1), respectively. Both subsections prohibit trafficking in circumvention technology.[5] The integrity of copyright information is addressed in DMCA § 1202(a) and (b). DMCA § 1202(a)(1), prohibits the supply or distribution of false copyright information, and DMCA § 1202(b)(1) prohibits the removal or alteration of copyright management information.

The DMCA remedy provisions are also significant, because they are implicated in the jurisdictional argument raised by plaintiff. DMCA § 1203(a)(1) provides monetary remedies,

---

[5] The distinction between these anti-trafficking provisions is that, while both prohibit the trafficking of anti-circumvention devices and software, DMCA § 1201(a)(2) applies to the trafficking of circumvention of technology designed to *prevent access* to a copyrighted work, while DMCA § 1201(b)(1) applies to the trafficking of circumvention of technology designed to permit access to a copyrighted work, but *prevent copying* of that work. *See* S. REP. NO. 105-190, at 11-12. Plaintiff's claim, in essence, is predicated only on the anti-circumvention provision—not these trafficking provisions.

including trial damage awards and civil monetary penalties. DMCA § 1203(b)(1) provides permanent injunctive relief. Both are available through civil proceedings commenced in, "an appropriate United States district courts." DMCA § 1203(a). Finally, criminal sanctions are available under DMCA § 1204.

The bare facts of the matter now before the court are quite simple.[6] It involves a copyrighted computer management information program and the alleged attempts by the U.S. Air Force to circumvent technological safeguards designed to protect the program. Plaintiff is a limited liability corporation, organized in the State of Idaho. On March 6, 2000, plaintiff acquired all the rights to a computer program entitled AUMD and AUMD Admin ("computer program") from Mr. Mark Davenport, who was then a Technical Sergeant in the Air Force. Allegedly, the computer program greatly increased the efficiency with which Air Force manpower resource requirement reports were generated. The computer program contained an automatic expiration function, so that the program would stop operating on a particular date. This feature was included in the program to control licensing and to prevent unauthorized use beyond the license expiration date. Plaintiff alleges, in essence, that Air Force personnel unlawfully "hacked" into the computer program to alter the automatic expiration function, to the Air Force's advantage.

On November 18, 2002, plaintiff filed a complaint in which it contends, in Count I, that defendant's acts infringed its copyright. Count II of the complaint is based on the theory that these same acts also constituted a violation of the DMCA.[7] The latter count is the subject of defendant's

---

[6] The facts from this paragraph are drawn generally from plaintiff's complaint ¶¶ 5-24.

[7]Count II appears to be predicated on an alleged violation of DMCA § 1201 (the anti-circumvention provision ). Pl. Compl. ¶ 34 ("Plaintiff is informed and believes and on that basis alleges that Defendant violated the Digital Millennium Copyright Protection Act of 1998 by improperly, without voluntary consent of Plaintiff and its predecessors in interest and/or through use of improper threats and duress, *circumventing the technological measures* put in place by Blueport and its successors in interest to prevent access and/or copying and/or alteration of its copyrighted work.") (emphasis added). In its response to defendant's motion for summary judgment, plaintiff for the first time alleged a violation of DMCA § 1202 (removal or alteration of copyright management information provision) as a ground for relief. Pl. Resp. 4-5, 10-13. Nowhere in Count II of its complaint does plaintiff allege defendant violated the DMCA by altering or removing the computer program's copyright management information—the key language of DMCA § 1202. Pl. Compl. ¶¶ 33-35. Instead, plaintiff's complaint refers only to circumventing technological measures, the prohibited activity captured in DMCA § 1201. Because the allegation of a violation of DMCA § 1202 was entirely absent from plaintiff's complaint, it would be improper for the court to consider it. *See Cubic Def. Sys. v. United States*, 45 Fed. Cl. 450, 466-68 (1999) (noting that to permit such a tactic would contravene notice pleading requirements of the modern federal rules of appellate and civil procedure and would condone "litigation by ambush"). However, even if plaintiff's allegations under DMCA § 1202 were considered, no provision in that section would change this court's determination that subject matter jurisdiction is completely lacking. Plaintiff also raised a Fifth Amendment takings claim for the first time in its response. Pl. Resp. 11-13. Since a response to a motion for summary judgment is an inappropriate means to raise a new claim, the court does not

motion for partial summary judgement. In particular, defendant argues that this court lacks of jurisdiction over Count II because the government has not waived its sovereign immunity from monetary suits under the DMCA.

## II. Discussion

Under RCFC 56, "the judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." RCFC 56(c). In this instance, the parties have agreed that there are no issues of material fact, leaving only the question of law as to whether this court has jurisdiction to hear plaintiff's claim of an alleged violation of the DMCA.

"It has often been said that one of the hardest things in the world is to sue the federal government. This is no mere truism. Government is protected from suit by the doctrine of sovereign immunity." *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 524 (2002), *aff'd*, 365 F.3d 1333 (Fed. Cir. 2004). Accordingly, it is black letter law that the "United States, in the absence of its consent, is immune from suit." *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1126 (Fed. Cir. 2004) (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 315 (1986)). In general, courts have "jurisdiction only where and to the extent that the government has waived its sovereign immunity, and any waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Ledford v. United States*, 297 F.3d 1378, 1381 (Fed. Cir. 2002). *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *United States v. Testan*, 424 U.S. 392, 398 (1976); *United States v. King*, 395 U.S. 1, 4 (1969).

The very existence of a waiver of sovereign immunity, as a species of subject matter jurisdiction, may in turn be challenged at any time by the parties, or even raised *sua sponte* by the court. *See Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004). What is more, plaintiff, as the party invoking jurisdiction, bears the burden of establishing jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In its motion defendant argues that the DMCA is void of any clear statement waiving sovereign immunity which, if true, would preclude this court from exercising jurisdiction over plaintiff's DMCA claim. Def.'s Mot. 4. Defendant further argues that the DMCA not only lacks an express statement waiving sovereign immunity, *see generally* 17 U.S.C. §§ 1201-1205, but that there is also no indication in the DMCA that the United States government was ever intended to be subject to the Act's provisions. Def.'s Reply 2. Supporting defendant's position is the fact that throughout the entire Act, the federal government is never identified as a potential part. Instead, "party" is generally referred to as "any person."[8] *See* DMCA §§ 1201(a)(1)(A), (b)(1), 1203(a), (c)(1).

---

consider plaintiff's arguments on that issue. *Cubic Def. Sys.*, 45 Fed. Cl. at 466-68.

[8] DMCA only contains references to "any party" when providing for costs against a party, and then it specifically excludes the United States. DMCA § 1203(b)(4) (The court "in its discretion may allow the recovery of costs by or against any party other than the United States or officer thereof . . . .").

Faced with statutory provisions devoid of any clear, express language indicating that the sovereign was intended to be a target of the DMCA, plaintiff proffers two inferential arguments in response. First, plaintiff maintains that a waiver of sovereign immunity is found by construing provisions of the DMCA according to traditional cannons of statutory construction, designed to aid courts in ascertaining the meaning of ambiguous statutory language. Pl.'s Resp. 4. Specifically, plaintiff argues that a waiver can be found in the language of DMCA § 1201(e), which exempts federal law enforcement personnel from the liability provisions of the DMCA. Pl.'s Resp. 5. *See* 17 U.S.C. § 1201(e). Further, plaintiff contends that a waiver of sovereign immunity can be inferred from DMCA § 1203(b)(4), the costs and fees provision, which prevents costs from being assessed against the United States. Pl.'s Resp. 6. *See* 17 U.S.C. § 1203(b)(4).

Second, plaintiff maintains that reading the DMCA within the context of underlying copyright provisions demonstrates that Congress intended to waive sovereign immunity. Pl.'s Resp. 7. Plaintiff reaches this conclusion by equating the protections afforded by the DMCA to those traditionally found in the Copyright Act, 17 U.S.C. § 101, where sovereign immunity has been waived, 28 U.S.C. § 1498(b). *Id.* at 9. Plaintiff arrives at its "piggy-back" argument through an observation that a violation of the DMCA is essentially a "digital trespass," and, as such, must be viewed as a subset of copyright infringement under 28 U.S.C. 1498(b), since infringement is also a trespass. *Id.* at 7-8.

**A. What Constitutes a "Clear Statement" Necessary for a Waiver of Sovereign Immunity?**

In answering what is the standard necessary for a waiver of sovereign immunity and turning to the merit of these arguments, the court must address two statutes, not one. The DMCA is obvious. The Tucker Act, 28 U.S.C. § 1491, perhaps less so. The Tucker Act vests in the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." provided that the damages claim does not sound in tort. 28 U.S.C. § 1491(a)(1). It has been said, therefore, that the Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *Testan*, 424 U.S. at 398; *see also United States v. Mitchell*, 463 U.S. 206, 216 (1983) [hereinafter Mitchell II].[9] The Act merely "confers jurisdiction upon [the Court of Federal Claims] whenever the substantive right exists." *Testan*, 424 U.S. at 398. Put another way, the Act

---

[9] Both *Mitchell I* and *Mitchell II* involved suits by individual allottees of land on an Indian reservation to recover damages against the United States for alleged mismanagement of the reservation's timber resources. In *United States v. Mitchell*, 445 U.S. 535 (980) [hereinafter "*Mitchell I*"] the Supreme Court, reversing and remanding a Court of Claims decision, held that the Allotment Act, 25 U.S.C. § 348, did not obligate the United States to manage the timber. *Mitchell I*, 445 U.S. at 542-543. On remand, the Court of Claims found the United States subject to suit under various other statutes. The United States appealed, and, in *Mitchell II*, the Supreme Court held that the "statutes and regulations specifically addressing the management of timber on allotted lands raised the fair implication that the substantive obligations imposed on the United States by those statutes and regulations were enforceable by damages." *White Mountain Apache*, 537 U.S. at 473-74 (citing *Mitchell II*, 463 U.S. at 209).

confers jurisdiction upon this court "only when a *substantive right* exists" in the *underlying* statute at issue in the litigation. *Pope v. United States*, 15 Cl. Ct. 218, 220 (1988) (citing *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-09 (Ct. Cl. 1967)) (emphasis added); *see also Mitchell II*, 463 U.S. at 216; *Testan*, 424 U.S. at 398; *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) [hereinafter *Fisher II*].[10]

Furthermore, for the Tucker Act to confer jurisdiction upon this court, the underlying statute must be a "separate source of substantive law that creates the right to money damages." *Fisher II*, 402 F.3d at 1172 (citing *Mitchell II*, 463 U.S. at 216; *Testan,* 424 U.S. at 398). "In the parlance of Tucker Act cases, that source must be money-mandating." *Id.* This is because the Tucker Act, itself, waives sovereign immunity only to the extent that the underlying substantive statute "can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s]." *Mitchell II*, 463 U.S. at 219.

As the Federal Circuit pointed out in *Fisher II*, the so-called "fair interpretation rule" was affirmed by the Supreme Court in *White Mountain Apache*. *Fisher II*, 402 F.3d at 1173 (citing *White Mountain Apache*, 537 U.S. at 472-73). In *White Mountain Apache*, the Supreme Court characterized the fair interpretation rule as:

> [A] showing demonstrably lower than the standard for the initial waiver of sovereign immunity . . . . It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do.

*White Mountain Apache*, 537 U.S. at 472-73 (citation omitted).

The court notes that there is an apparent tension between *White Mountain Apache*'s interpretation of the fair interpretation rule as merely requiring a "fair inference" and the general requirement of the sovereign immunity doctrine that its waiver "cannot be implied but must be unequivocally expressed." *King*, 395 U.S. at 4; *Ledford*, 297 F.3d at 1381. Indeed, the Federal Circuit in *Fisher II* noted the conflict and observed that four dissenting justices in *White Mountain*

---

[10] *Fisher I* and *Fisher II* involved a soldier's suit under Tucker Act alleging that he should have been found unfit for continued service while he was on active duty because of physical disability, and, therefore, allowed to retire for disability, with appropriate retirement pay. In *Fisher v. United States*, 364 F.3d 1372 (Fed. Cir. 2004) [hereinafter "*Fisher I*"], the Federal Circuit held that the underlying statute, 10 U.S.C. § 1201, was reasonably amenable to being read as mandating compensation, and was thus sufficient to give Court of Federal Claims subject matter jurisdiction under Tucker Act. *Fisher I*, 364 F3d. at 1380. On a petition by the United States for rehearing, the Federal Circuit vacated *Fisher I*, for the limited purpose of clarifying the procedure for determining Tucker Act jurisdiction. *Fisher v. United States*, 403 F.3d 1307, 1308 (Fed. Cir. 2005) (order granting petition for rehearing enbanc). In *Fisher II*, while still holding that 10 U.S.C. § 1201 was money-mandating, the Federal Circuit specifically overruled a two-step approach to determining whether a particular statute is money-mandating for Tucker Act jurisdiction. *Fisher II*, 402 F.3d at 1173.

*Apache* criticized the majority for establishing a new, more lenient test for jurisdiction. *Fisher II*, 402 F.3d at 1174. *See White Mountain Apache*, 537 U.S. at 487 (Thomas, J., dissenting). The Federal Circuit in *Fisher II* also observed that two justices concurring in *White Mountain Apache* had the same criticism and that these justices further noted that in *United States v. Navajo Nation*, a Supreme Court opinion decided the very same day as *White Mountain Apache*, applied the fair interpretation rule" in what the Federal Circuit believed to be the traditional manner. *Fisher II*, 402 F.3d at 1174 (citing *White Mountain Apache*, 537 U.S. at 479 (Ginsburg, J., concurring) and *United States v. Navajo Nation*, 537 U.S. 488 (2003)).

While *Fisher II* did not resolve this matter, *see Fisher II*, 402 F.2d at 1173-74 (observing that the resolution of the exact meaning of the fair interpretation rule must await further resolution by the Supreme Court), and the parties have not briefed (let alone raised) this issue; the scope of this rule, its application to this case, and how it relates to the traditionally strict sovereign immunity waiver doctrine is of obvious, paramount importance. Upon careful consideration, this court concludes that while *White Mountain Apache*'s more lenient "inference" test may be appropriate to determine if a statute is money mandating," it is inapplicable to the issue of whether a statute unambiguously applies to the United States.

The court agrees with and, in part, adopts the analysis of Judge Wolski in *Contreras v. United States*, 64 Fed. Cl. 583 (2005). Although in a different setting, the court in *Contreras* thoroughly reviewed applicable precedent, which shed light on the genesis of the fair interpretation rule, and concluded that in the context of those cases, the words "fair" and "fairly," were used as synonyms for "correct" or "rightly," the word "interpretation" was used in the context of statutory interpretation—the result being a mere requirement for application of a "correct interpretation." *See Contreras*, 64 Fed. Cl. at 590-92. Furthermore, the court noted that this conclusion was buttressed by six justices in *White Mountain Apache* (four dissenting, and two concurring) who rejected the more lenient approach. *Id*. at 589. The import of all this is that arguments by inference, such as plaintiff proffers, should not be employed in a "fair interpretation" setting.

Nevertheless, whatever the merit of this position, it must be pointed out that every court that has referenced the "fair interpretation" language has done so in the context of whether a provision is "money-mandating," not whether the statute unambiguously applies to the sovereign. *See White Mountain Apache*, 537 U.S. at 472-73; *Mitchell II*, 463 U.S. at 217; *Eastport S.S. Corp.*, 372 F.2d at 1009. In the latter situation, it appears that the clear statement requirement of the traditional sovereign immunity waiver rule still applies. *See White Mountain Apache*, 537 U.S. at 472 ("Jurisdiction over any suit against the Government requires a clear statement . . . waiving sovereign immunity . . . ."); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in the statutory text and will not be implied."); *Testan*, 424 U.S. at 399 ("[A] waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'") (quoting *King*, 395 U.S. at 4).

In this situation, this court is unwilling to apply a more lenient inferential test in place of the ancient "clear statement" requirement of the doctrine of sovereign immunity. *See United States v. Lee*, 106 U.S. 196, 205 (1882) (observing that the doctrine of sovereign immunity, applying to both the federal and state governments, arose from the reign of Edward the First, when it was accepted

that the English Crown could not be subject to suit unless the suit was specifically consented to). To do so, given this long tradition, would create the absurdity of a statute requiring the United States as sovereign to pay money damages "merely because it arguably can be read to require the government to pay money damages." *Contreras*, 64 Fed. Cl. at 592. Without a clear, unambiguous statement in the underlying statute that it specifically applies to the sovereign, it would defy logic to consider the Tucker Act's waiver applicable. *See Testan*, 424 U.S. at 399.[11] It would defeat the specificity requirement and, thus, the very purpose of the doctrine of sovereign immunity.

Accordingly, the "United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted). Thus, it is black letter law that for sovereign immunity to be waived, the waiver "cannot be implied but must be unequivocally expressed." *King*, 395 U.S. at 4; *see White Mountain Apache*, 537 U.S. at 472 ("Jurisdiction over *any suit against the Government* requires *a clear statement* from the United States waiving immunity . . . .") (emphasis added); *Testan*, 424 U.S. at 399; *Britell v. United States*, 372 F.3d 1370, 1376 (Fed. Cir. 2004); *Christopher Village, L.P. v. United States*, 560 F.3d 1319, 1327 (Fed. Cir. 2004); *Liberty Mut. Ins. Co. v. United States*, 70 Fed. Cl. 37, 41 (2006).

**B. Why Plaintiff's Arguments Fail to Meet the Standard for Waiver of Sovereign Immunity.**

But what does this mean in practice? Fearing, in Cicero's words, that the "strictest law often causes the most serious wrong,"[12] plaintiff, in essence, erroneously argues that waiver can be found by implication, through both interpreting the meaning of various phrases and through the interplay or construction of various provisions. To make its argument, plaintiff first points the court to

---

[11] In *Testan*, for instance, the Supreme Court rejected respondents' argument that "where there has been a violation of a substantive right [here the Classification Act, 5 U.S.C. §§ 5101, 5596], the Tucker Act waives sovereign immunity . . . ." *Id.* at 400. The court could "find no provision in the Classification Act that *expressly makes the United States liable for pay lost through allegedly improper classifications*." *Id.* at 399 (emphasis added). Consequently, it is only in the context of where the statute had already been found to expressly apply to the United States that the Court applied the "fair interpretation rule" to the existence of a money mandating provision. *See Testan*, 424 U.S. at 400 (quoting *Eastport S.S. Corp.*, 372 F.2d at 1009).

To be sure, for sovereign immunity to have been waived under the Tucker Act, the Federal Circuit likewise requires that a plaintiff identify "a separate source of substantive law that creates the right to money damages." *Fisher II*, 402 F.3d at 1172; *see also Texas Peanut Farmers v. United States*, 409 F.3d 1370, 1373 n.3 and 1372 (Fed. Cir. 2005) (characterizing the Tucker Act, *inter alia*, as requiring "that the action be a claim against the United States" and that simply naming the United States is not enough because it must be the "real party in interest") ("It is settled that this court [must look] 'to the true nature of the action in determining the existence or not of jurisdiction'") (quoting *Natl. Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997)).

[12] Marcus Tullius Cicero, Roman statesman, orator and author (106 BC - 43 BC), *quoted in* http://www.quotationspage.com/quotes/Cicero/31 (last visited June 29, 2006).

language in DMCA § 1201(e):

> **Law Enforcement and Intelligence Activities.** This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with such entities.

17 U.S.C. § 1201(e). Based on this language, plaintiff maintains that:

> [I]f the sovereign is completely immune from suit for any and all violations . . . then the agents of the sovereign share that immunity when conducting 'lawfully authorized' activities . . . . Exceptions for the United States employees and contractors, acting pursuant to lawfully authorized activities would be superfluous unless the United States itself were subject to suit under these sections.

Pl. Resp. 5.

This argument suffers from two deadly maladies. The first is that the plain meaning of this language may not necessarily comport with plaintiff's proffered interpretation. The respective statutory provisions may merely reflect a concern by Congress that the Act might be construed in such a way as to interfere with federal, state, and local law enforcement officials and their agents, and lawful intelligence activities by federal, state, and local officials or their agents.[13]

Perhaps traditional rules of statutory construction may favor plaintiff's derivation of meaning,[14] *see generally* NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY

---

[13] *See* S. REP. NO. 105-190, at 31-32.

[14] But the court raises an additional doubt. Plaintiff's argument that DMCA § 1201(e) provides a waiver of sovereign immunity is undercut by language of this section which indicates that the provision applies not only to the United States, but also to "a State, or a political subdivision of a State." 17 U.S.C. § 1201(e). If plaintiff is correct that these sections provide a waiver of sovereign immunity, it would be one sweeping in scope, waiving the sovereign immunity for monetary damages not only the United States, but also every State. Since the DMCA allows suits for violations of §§ 1201 and 1202 to be brought in federal court, *see* 17 U.S.C. § 1203(a) ("Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation."), plaintiff's interpretation of DMCA § 1201(e) would permit suits for monetary damages, not only against the United States, but also against a State in federal court in violation of the Eleventh Amendment.

While the Eleventh Amendment does permit suits against the States to ensure the enforcement of federal law, such suits may only be for prospective injunctive relief against state officials acting in violation of federal law. *Ex parte Young*, 209 U.S. 123 (1908). "Federal courts may not award retrospective relief, for instance money damages or its equivalent, if the State invokes its immunity." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Thus, interpreting § 1201(e) as not waiving sovereign immunity is the only way to avoid a possible violation of the

CONSTRUCTION § 47:02 (6th ed. 2001) (and cases cited therein) (canons of statutory construction may be used to ascertain meaning of words where meaning, even in context, is ambiguous), but this case involves more than ascertaining the meaning of certain provisions. The doctrine of sovereign immunity is implicated here with its requirement of a direct, clear showing that the federal government had, voluntarily and purposefully, given up its right.

This leads the court to the second deadly malady found in plaintiff's argument—it suffers from an inherent contradiction. On one hand, plaintiff applies a traditional, common law rule of construction to divine meaning when such meaning is not plain.[15] Then, on the other hand, plaintiff commences to use this implicitly-derived meaning to buttress a rule of law that, to the contrary, requires a clear, unambiguous demonstration. To be sure, the issue before the court is not the efficacy of plaintiff's interpretive paradigm in determining the meaning of the clause, but whether that clause, when coupled with the Tucker Act, demonstrates that waiver is clear and express. Accordingly, while plaintiff's use of a legal tool to infer meaning may bring some order out of the chaos of ambiguity, it does not by definition meet the traditional requirement that waiver must be shown to have been expressly made.

Simply put, because of the doctrine of waiver's paramount role in the protection of rights and the enforcement of duties, the law requires that when a right or duty is voluntarily relinquished, such a waiver must be explicit, and not construed through indirection or by legal fictions. *See, e.g.*, *White Mountain Apache*, 537 U.S. at 472; *Lane*, 518 U.S. at 192 ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in the statutory text and will not be implied.");[16] *Marathon Oil Co.*, 374 F.3d at 1127 ("A waiver of sovereign immunity 'must be

---

Constitution. *Jones v. United States*, 526 U.S. 227, 239 (1999) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.") (quoting *United States ex rel. Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)).

[15] *See, e.g.*, *United States v. Barnes*, 222 U.S. 513, 518-19 (1912) (rule of statutory construction should not be applied mechanistically where there is no ambiguity); *see also PSI Energy, Inc. v. United States*, 59 Fed. Cl. 590, 600 (2004), *rev'd on other grounds*, 411 F.3d 1347 (Fed. Cir. 2005) ("[O]nly where there is an ambiguity, where words are reasonably susceptible to two or at least a finite few meanings, may courts resort to these aids or rules.").

[16] The significance of the clear statement rule is rooted in the constitutional separation of powers. It prevents courts from trespassing on Congress' legislative prerogatives. U.S. CONST. art. I. It also plays a prophylactic role in the deliberative process, thus furthering the rule of law:

> [The] clear statement rule is an implied limitation on otherwise unambiguous general terms of the statute. . . . Implied limitation rules avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter. In these instances, the absence of a clear congressional statement is, in effect, equivalent to a statutory qualification . . . . These clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation.

unequivocally expressed,' or a court must infer that Congress did not intend to create a waiver."). This requires that the fact and extent of the waiver be indicated in the language of the statutory text. *Zatuchni v. Sec'y of Health & Human Servs.*, No. 94-58V, 2006 WL 1499982, at *10 (Fed. Cl., May 10, 2006); *see also*, *Orff v. United States*, 125 S. Ct. 2606, 2611 (2005) (comparing the clear statements waiving sovereign immunity in the language of the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Little Tucker Act, 28 U.S.C. § 1346(a)(2), to the lack of any clear waiver statement in the language of the Reclamation Reform Act, 43 U.S.C. § 390uu).

Plaintiff asserts yet another statutory construction argument that sovereign immunity was waived in the DMCA. This is predicated upon DMCA § 1203, which provides civil remedies for violations of the DMCA. In particular, plaintiff references DMCA § 1203(b)(4), which provides:

> **§ 1203. Civil remedies.**
>
> (a) Civil Actions. Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.
>
> . . . .
>
> (b) Powers of the court. In an action brought under subsection (a), the court -
>
> . . . .
>
> (4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

17. U.S.C. § 1203(b)(4). Similar to its law enforcement and intelligence officials exemption argument, plaintiff contends that the language of DMCA § 1203(b)(4) denying costs awarded against the United States and its officials, would be superfluous if the United States retained its sovereign immunity and could not be subject to suit for violations of DMCA §§ 1201 and 1202 at all, let alone for any costs under DMCA § 1203.

Plaintiff's argument suffers from the same flaws as its previous one. Indeed, one could interpret DMCA § 1203(b)(4) as another form of statutory "overkill"—that because no costs could be awarded against the United States and its officials while costs could in the discretion of the court be awarded to other parties, Congress is both corroborating and attempting to guarantee the notion that sovereign immunity had *not* been waived. This alternative explanation "is enough to establish that a reading imposing monetary liability on the Government is not 'unambiguous' and, therefore, should not be adopted." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37 (1992). In any event, such endeavors to indirectly infer meaning run counter to the "clear statement" requirement necessary to affect a waiver of sovereign immunity. *See, e.g.*, *White Mountain Apache*, 537 U.S. at 472; *Lane*, 518 U.S. at 192.

---

*Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 125 S. Ct. 2169, 2182 (2005). *See generally* SINGER, § 65A:14 at 728 ("Clear statement rules can help Congress when it drafts legislation" because such rules render "statutory interpretation more predictable, regular, and coherent . . . .").

These two related inference arguments, paradoxically, would be corroborated (although it would render the issue moot) if a waiver of sovereign immunity had independently been established. For instance, if DMCA § 1203, the civil remedies provision, had explicitly referenced the United States (or perhaps a federal agency) as a party, plaintiff's use of statutory construction to divine meaning would have greater validity because it would render any other competing interpretation of DMCA §§ 1201(e) and 1203(b)(4) meaningless. *Cf. Lane*, 518 U.S. at 192-93 (29 U.S.C. § 794a(a)(2) granting remedies to any person aggrieved by a "Federal provider" waives sovereign immunity for suits against a federal agencies that act as a "Federal provider").

But the Act, throughout, defines a party merely as "any person." For example, DMCA § 1203(a) provides that "[a]ny person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation." *See also* DMCA § 1201(a)(1)(A) ("No person shall circumvent a technological measure that effectively controls access to a work protected under this title."); DMCA § 1201(b)(1) ("No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof . . . ."); DMCA § 1202(a) ("No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement . . . ."); DMCA § 1203(c)(1) ("Except as otherwise provided in this title, a person committing a violation of section 1201 or 1202 is liable for either . . . .").

This leads the court to the paramount issue, can the term "any party" in the context of the DMCA refer to the United States? A secondary issue that arises as to the jurisdiction of the Court of Federal Claims is what is the effect of the civil liability provision expressly providing jurisdiction, as is the case in DMCA § 1203, to only an "appropriate United States district court?"

The previously cited *White Mountain Apache* Supreme Court case gives an answer to the first inquiry. There, an Indian tribe brought suit, alleging that the United States breached its fiduciary duty to manage land and improvements held in trust for the tribe but occupied by the United States. *White Mountain Apache*, 537 U.S. at 469. The tribe relied on the Indian Tucker Act, 28 U.S.C. § 1505, to provide for the necessary waiver of sovereign immunity. *Id.* at 472. That Act provides, in pertinent part:

> The United States Court of Federal Claims shall have jurisdiction of *any claim against the United States* accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims . . . .

28 U.S.C. § 1505 (emphasis added). The Supreme Court noted that the language of the Indian Tucker Act contained the type of clear statement necessary for waivers of sovereign immunity. *White Mountain Apache*, 537 U.S. at 472. And, in examining the language of this clear statement, it is noticeable that the sovereign is *specifically* referenced, leaving no doubt as to the waiver.

In other cases where the Supreme Court found a clear statement waiving sovereign immunity, the legislation at issue either specifically mentioned the sovereign in some manner, or specifically referenced another statute mentioning the sovereign. *See Dolan v. U.S. Postal Service*, 126 S. Ct. 1252, 1256 (2006) (The language of 39 U.S.C. § 409(c), which states all provisions of the Federal Tort Claims Act "shall apply to tort claims arising out of activities of the Postal Service," waves sovereign immunity.); *United States v. Olson*, 126 S. Ct. 510, 511 (2005) (The language of 28 U.S.C. § 1346(b)(1), which authorizes private tort actions against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred" is a waiver of sovereign immunity.); *West v. Gibson*, 527 U.S. 212, 215 (1999) ("no dispute" that sovereign immunity waived by the language of the Compensatory Damages Amendment, 42 U.S.C. § 1981a(a)(1), which states "In an action brought by a complaining party under section 706 [dealing with discrimination by private employers] or 717 [dealing with discrimination by the Federal Government] against a respondent who engaged in unlawful intentional discrimination . . . the complaining party may recover compensatory . . . damages . . . .").

This, of course, does not mean that specific, "magic words" are required to waive sovereign immunity. *See Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 333-34 (2001) (Scalia, J., dissenting on other grounds). Rather, a clear statement rule requires that "it must be plain to anyone reading the Act" that it waives sovereign immunity. *Id.* at 334. "The cases where the clear statement requirement was not met" are those where the statutory intent to eliminate sovereign immunity "was not clear." *Id.*

Compared to these examples of clear statements waiving sovereign immunity, the language in the DMCA offers nothing similar. As stated, DMCA only contains references to "any party" when providing for damages and other remedies. DMCA § 1203(b)(4) (The court "in its discretion may allow the recovery of costs by or against any party other than the United States or officer thereof . . . ."). Likewise, the substantive provisions of the DMCA, §§ 1201 and 1202, do not refer to the sovereign as a party to monetary damages or statutory awards in any form whatsoever. Instead, these provisions contain the phrase "no person shall." *See* DMCA §§ 1201(a)(1)(A), (b)(1), 1202(a), 1203(c)(1). To apply the DMCA to the United States would, therefore, require construing the word "person" to include the term "the sovereign." Although the better view is that, by itself, the term "person" does not encompass "the sovereign," *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000); *see also Will v. Michigan Dept. of State Police*, 491 U.S. 58, 64 (1989) (noting "the often-expressed understanding that 'in common usage, the term "person" does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it'"), plaintiff's "waiver-through-statutory construction" arguments show that whether the statutory word "person" encompasses "the sovereign" is *at best* ambiguous—not enough to constitute a waiver of sovereign immunity. *Lane*, 518 U.S. at 195 ("In light of our established practice of construing waivers of sovereign immunity narrowly in favor of the sovereign, however, we decline [plaintiff's] invitation to read the statutory language so broadly.").

This leads to the next question, what is the effect of the reference in DMCA § 1203(a) to the federal district courts as the forum to adjudicate claims under the Act. In other words, because only the district courts are named, does this preclude the Court of Federal Claims from asserting jurisdiction over claims under the Act? *See Chertkov v. Office of Personnel Mgmt.*, 52 F.3d 961, 966

(Fed. Cir.1995) ("The jurisdiction of this court, therefore, is 'limited to those subjects encompassed within a statutory grant of jurisdiction.'"). To be sure, without statutorily conferred authority, a federal court "may not, even in the interests of justice, extend its jurisdiction beyond the congressional mandate." *Chertkov*, F.3d at 966.

Consequently, the general rule is when jurisdiction is explicitly conferred on a designated court, such as here to the "district courts," such designation bars other courts from entertaining claims under that statute. *See LeBlanc v. United States*, 50 F.3d 1025, 1030 (Fed. Cir. 1995) (language in 31 U.S.C. § 3730(h), which states: "An employee may bring an action *in the appropriate district court of the United States* for the relief provided in this subsection," does not provide for jurisdiction in the Court of Federal Claims). *See also Matson Navigation Co. v. United States*, 284 U.S. 352, 359-60 (1932) (holding that the Court of Claims did not have jurisdiction over a contract whose subject matter was covered by the Suits in Admiralty Act, 46 U.S.C. § 742 (1932), providing for jurisdiction in federal district courts); *Texas Peanut Farmers*, 409 F.3d at 1373 (holding that 7 U.S.C. § 1508(j)(2)(A), which states "an action on the claim may be brought against the Corporation or Secretary only in the United States district court for the district in which the insured farm is located," specifically requires that suits be brought in the district courts—not the Court of Federal Claims); *Ledford*, 297 F.3d at 1382 (holding that 26 U.S.C. § 7432(a), which states "such taxpayer may bring a civil action for damages against the United States in a district court of the United States," provides solely for jurisdiction in the district courts—not the Court of Federal Claims); *Marlin v. United States*, 63 Fed. Cl. 475, 476 (Fed. Cl. 2005) (holding that the Court of Federal Claims does not have jurisdiction to consider civil rights claims brought pursuant to 42 U.S.C. §§ 1981, 1983, or 1985 because the statute provides jurisdiction to the "district courts").

Plaintiff argues that because the word "exclusively" is not used in DMCA § 1203(a) to modify the grant of jurisdiction to the district courts, this court may construe the DMCA as granting jurisdiction to it to hear claims against the United States under the Act. Pl. Supplemental Br. 1-2. But to accept plaintiff's argument would be to not only skirt plaintiff's requirement that it demonstrate an explicit waiver of sovereign immunity, but that this court ignore binding precedent. *See, e.g.*, *Ledford*, 297 F.3d at 1382. In *Ledford*, the plaintiff brought a claim seeking damages flowing from the allegedly unlawful collection activities of the IRS. *Id.* at 1380. The Court of Federal Claims dismissed the claim for lack of jurisdiction and the plaintiff appealed. The Federal Circuit looked specifically at the language of 26 U.S.C. § 7433(a), which provided that "such taxpayer may bring a civil action for damages against the United States in a district court of the United States." *Id.* at 1382 (quoting 26 U.S.C. § 7433(a)). Referring to the language of § 7433(a), the Federal Circuit stated:

> Congress has provided that claims for damages such as those alleged by Mr. Ledford must be brought exclusively before a district court of the United States. The Court of Federal Claims is not a district court of the United States, and therefore it lacks subject matter jurisdiction over Mr. Ledford's damages claims.

*Id.* at 1382. Significantly, just like § 1203(a) of the DMCA, 26 U.S.C. § 7433(a) did not contain the word "exclusively" or any other specific limiting terminology. The text of a statutory jurisdictional or remedy provision mentioning only the "district courts" is therefore all that is required to exclude this court's jurisdiction.

Accordingly, this court must conclude that the DMCA does not contain a clear statement waiving sovereign immunity which is necessary for plaintiff to have jurisdiction in this court.

**C. Does Plaintiff's "Piggy-Back" Argument Demonstrate Waiver of Sovereign Immunity?**

Finally, this court rejects plaintiff's final argument, that the DMCA must be construed within the context of underlying copyright provisions that waive the sovereign immunity of the Unites States. Particularly, plaintiff points to 28 U.S.C. § 1498(b), which provides in part that:

> (b) Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement.

28 U.S.C. § 1498(b). Plaintiff maintains that copyright infringement lies in tort and is akin to the tort of intentional trespass. Pl. Resp. 7. According to plaintiff, § 1498(b) is therefore best viewed as a liability clause for trespass on a copyright owner's exclusive rights under 17 U.S.C. §§ 106 and 106A of the Copyright Act. Since a violation of the DMCA has been referred to as a "digital trespass" of a copyright, *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1196 (Fed. Cir. 2004) ("[T]he DMCA created circumvention liability for "digital trespass" under § 1201(a)(1)."), plaintiff argues that violations of the DMCA should be construed to be a subset of general trespass of copyright infringement. Pl. Resp. 8. Plaintiff argues that it would be illogical for Congress to grant a general waiver of sovereign immunity for "trespassing" under § 1498(b) and then exclude from that waiver a subset of trespass—"digital trespass"—contained in the DMCA. *Id.*

Plaintiff errs, however, in arguing that liability for "digital trespass" under the DMCA is best viewed as a subset of liability for copyright infringement. The Federal Circuit made this point clear:

> [C]ircumvention is not a new form of infringement but rather a new violation prohibiting actions or products that facilitate infringement . . . . [T]he Congressional decision to create liability and consequent damages for making, using, or selling a 'key' that essentially enables a trespass upon intellectual property need not be identical in scope to the liabilities and compensable damages for infringing that property . . . .

*Chamberlain Group*, 381 F.3d at 1197-98. Since the DMCA created a new violation and not merely a new subset of infringement, plaintiff's argument has no force. *Id.* Thus, no contradiction or inconsistency is created by finding that, while Congress chose to waive sovereign immunity under § 1498(b) for copyright infringement, Congress did not explicitly waive sovereign immunity for what

is, in essence, a non-copyright violation under the DMCA.[17]

## III. Conclusion

"When jurisdiction is lacking, 'the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Chertkov*, 52 F.3d at 966 (quoting *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). Such is the case here. There is no clear statement waiving sovereign immunity on the part of the government for claims arising under the DMCA. Without such an express waiver of sovereign immunity, this court has no jurisdiction to hear plaintiff's DMCA claim.

Therefore, defendant's Motion for Partial Summary Judgment on Count II of Plaintiff's Complaint is **GRANTED**.

s/ Lawrence J. Block
Lawrence J. Block
Judge

[17] To be sure, even assuming the validity of plaintiff's "piggy-back" argument, the court's decision would remain the same because liability for a "digital trespass" most probably *would* sound in tort, over which this court has no jurisdiction under the Tucker Act. *See* 28 U.S.C. § 1491(a)(1) (providing jurisdiction in the U.S. Court of Federal Claims for contract, statutory and constitutional damage, but expressly not tort, claims against the United States). *See Porter v. United States*, 473 F.2d 1329, 1337 (5th Cir. 1973) (noting that it has always been held that infringement of copyright constitutes a tort); *Turton v. United States*, 212 F.2d 354, 354 (6th Cir. 1954) ("[A]n action for damages by reason of infringement of a copyright is likewise one sounding in tort."); *Curtis v. United States*, 168 F. Supp. 213, 216 (Ct. Cl. 1958) (copyright infringement is a tort for which the government has not consented to be sued); *Lanman v. United States*, 27 Ct. Cl. 260 (1892) (dismissing a copyright infringement claim for lack of jurisdiction since the claim was "sounding in tort"). Hence, it is ironic that no jurisdiction under the Tucker Act would lie if the court were to adopt plaintiff's position that a "digital trespass" is a tort. Pl. Resp. 7.