IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUEPORT COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1622C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence J. Block |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**


PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

OF COUNSEL:

CHUN-I CHIANG
Air Force Legal Operations Agency
Department of the Air Force


September 29, 2006

# TABLE OF CONTENTS


I. INTRODUCTION . . . . . 1

II. ARGUMENT . . . . . 2

A. The Court and the Parties must Focus on AUMD Version 2.1D . . . . . 2

B. Blueport's Claim is Barred by the Limitations Incorporated into Section 1498(b) . . . . . 5

1. The Section 1498(b) Limitations are Jurisdictional in Nature . . . . . 6

2. Mark Davenport Actually Influenced and Induced the Government's Use of the AUMD Program . . . . . 9

3. Mark Davenport Prepared the AUMD Program as a Part of His Official Functions . . . . . 14

a. Mr. Davenport's official duties encompassed continued development of the AUMD program . . . . . 15

b. Blueport's improperly relies on a narrow interpretation of Mr. Davenport's duties . . . . . 19

4. Mr. Davenport Used Government Time, Material, and Facilities to Create the AUMD Program . . . . . 22

C. The Government Did Not Infringe Blueport's Copyright . . . . . 25

1. The Government's Modification of the AUMD Program is Noninfringing . . . . . 26

a. The government held an implied license to use AUMD . . . . . 26

b. The government copied and adapted AUMD as an essential step in the utilization of the program – 17 U.S.C. § 117 . . . . . 28

2. The MARS Programs Are Noninfringing . . . . . 30

a. The government and SAIC did not have access to the AUMD source code . . . . . 31

b. The MARS program is not substantially similar to the AUMD program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

c. The government fairly adapted the AUMD program in the context of SAIC's efforts to reverse engineer the AUMD program – 17 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . 36

D. Assuming Infringement, Compensation is Limited to Minimum Statutory Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1. Reasonable and Entire Compensation Under Section 1498(b) . . . . . . . . 39

2. Blueport Failed to Establish Actual Damages . . . . . . . . . . . . . . . . . . . . . 40

3. Blueport's Maximum Recovery is $750 . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

Abeshouse v. Ultragraphics, Inc.,
754 F.2d 467 (2d Cir. 1985) . . . . . . . . . . 40

Amini Innovation Corp. v. Anthony California, Inc.,
439 F.3d 1365 (Fed. Cir. 2006) . . . . . . . . . . 25

Apple Computer, Inc. v. Microsoft Corp.,
35 F.3d 1435 (9th Cir. 1994) . . . . . . . . . . 33

Apple Computer, Inc. v. Microsoft Corp.,
821 F. Supp. 616 (N.D.Cal. 1993) . . . . . . . . . . 32

Apple Computer, Inc. v. Microsoft Corp.,
799 F. Supp. 1006 (N.D.Cal. 1992) . . . . . . . . . . 34, 35

Atari Games Corp. v. Nintendo of America Inc.,
975 F.2d 832 (Fed. Cir. 1992) . . . . . . . . . . 36 - 37

Aymes v. Bonelli,
47 F.3d 23 (2d Cir. 1995) . . . . . . . . . . 30

Bateman v. Mnemonics, Inc.,
79 F.3d 1532 (11th Cir. 1996) . . . . . . . . . . 37

BMG Music v. Gonzalez,
430 F.3d 888 (7th Cir. 2005) . . . . . . . . . . 44

Boyle v. United States,
200 F.3d 1369 (Fed. Cir. 2000) . . . . . . . . . . 5

Breton v. Evans,
No. 04-1239, Slip Op. (D.D.C. 2006) . . . . . . . . . . 25

Childress v. Taylor,
798 F. Supp. 981 (S.D.N.Y.1992) . . . . . . . . . . 40

Commission For Creative Non-Violence v. Reid,
490 U.S. 730 (1989) . . . . . . . . . . 20

Computer Assocs. Int'l, Inc. v. Altai, Inc.,
982 F.2d 693 (2d Cir. 1992) . . . . . . . . . . 34

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,
447 U.S. 102 (1980) . . . . . . . . . . 43

Creations Unlimited, Inc. v. McCain,
112 F.3d 814 (5th Cir. 1997) . . . . . . . . . . 4

Data General Corp. v. Grumman Systems Support Corp.,
36 F.3d 1147 (1st Cir. 1994) . . . . . . . . . . 40

Decca Ltd. v. United States,
640 F.2d 1156 (Ct. Cl. 1980) . . . . . . . . . . 40

DSC Communications Corp. v. Pulse Communications, Inc.,
170 F.3d 1354 (Fed. Cir. 1999) . . . . . . . . . . 29

Effects Assocs., Inc. v. Cohen,
908 F.2d 555 (9th Cir. 1990) . . . . . . . . . . 26, 27

Encyclopaedia Britannica Educ. Corp. v. Crooks,
558 F. Supp. 1247 (W.D.N.Y. 1983) . . . . . . . . . . 45

Feist Publ'ns, Inc. v. Rural Telephone Services Co.,
499 U.S. 340 (1991) . . . . . . . . . . 25

Folio Impressions, Inc. v. Byer California,
937 F.2d 759 (2d Cir. 1991) . . . . . . . . . . 4

Gates Rubber Co. v. Bando Chemical Indus.,
9 F.3d 823 (10th Cir. 1993) . . . . . . . . . . 34

Genzmer v. Public Health Trust of Miami-Dade County,
219 F. Supp. 2d 1275 (S.D.Fla. 2002) . . . . . . . . . . 21 - 22

Gnossos Music v. Mitken, Inc.,
653 F.2d 117 (4th Cir. 1981) . . . . . . . . . . 44

Herbert v. United States,
36 Fed. Cl. 299 (1996) . . . . . . . . . . *passim*

Hohn v. United States,
524 U.S. 236 (1998) . . . . . . . . . . 44

Hughes Aircraft Co. v. United States,
534 F.2d 889 (Ct. Cl. 1976) . . . . . 7

Int'l Trade Mgmt. v. United States,
1 Cl. Ct. 39 (1982) . . . . . 5

Kawaauhau v. Geiger,
523 U.S. 57 (1998) . . . . . 44

King v. Ames,
179 F.3d 370 (5th Cir. 1999) . . . . . 4

Krause v. Titleserv, Inc.,
402 F.3d 119 (2d Cir. 2005) . . . . . 28 - 30

Lane v. Pena,
518 U.S. 187 (1996) . . . . . 6

Leesona v. United States,
599 F.2d 958 (Ct. Cl. 1979) . . . . . 39, 40

Lotus Development Corp. v. Borland Intern., Inc.,
49 F.3d 807 (1st Cir. 1995) . . . . . 35

Mackey v. Lanier Collection Agency & Service, Inc.,
486 U.S. 825 (1988) . . . . . 44

Maddog Software, Inc. v. Sklader,
382 F. Supp. 2d 268 (D.N.H. 2005) . . . . . 35 - 36

Marathon Oil Co. v. United States,
374 F.3d 1123 (Fed. Cir. 2004) . . . . . 6, 45

Marshburn v. United States,
20 Cl. Ct. 706 (1990) . . . . . 25, 31

Miller v. CP Chemicals, Inc.,
808 F. Supp. 1238 (D.S.C. 1992) . . . . . 20 - 22

Myers v. United States,
147 Ct. Cl. 485 (1959) . . . . . 19, 22

Novak v. National Broadcasting Co., Inc.,
716 F. Supp. 745 (S.D.N.Y. 1989) . . . . . 4, 5

Palmer v. United States,
168 F.3d 1310 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Perrin v. United States,
444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Polar Bear Productions, Inc. v. Timex Corp.,
384 F.3d 700 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Quinn v. City of Detroit,
23 F. Supp. 2d 741 (E.D.Mich. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 42

Sega Enterprises Ltd. v. Accolade, Inc.,
977 F.2d 1510 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Sony Computer Entm't, Inc. v. Connectix Corp.,
203 F.3d 596 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Stern Electronics, Inc. v. Kaufman,
669 F.2d 852 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Sterpetti v. E-Brands Acquisition, LLC,
2006 WL 1046949 (M.D.Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Strategical Demolition Torpedo Co. v. United States,
96 F. Supp. 315 (Ct. Cl. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Strategical Demolition Torpedo Co. v. United States,
110 F. Supp. 264 (Ct. Cl. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Trek Leasing, Inc. v. United States,
66 Fed. Cl. 8 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 33

United States v. James,
478 U.S. 597 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wechsberg v. United States,
54 Fed. Cl. 158 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44 - 45

## STATUTES

17 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

17 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

17 U.S.C. § 117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 - 30

17 U.S.C. § 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

17 U.S.C. § 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 43

28 U.S.C. § 1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## OTHER AUTHORITIES

American Heritage College Dictionary (3d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

American Heritage Dictionary of the English Language (4th ed. 2000) . . . . . . . . . . . . . . . . . . . . 3

Federal Rule of Civil Procedure 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Federal Rule of Civil Procedure 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

H.R. Rep. No. 94-1476 (1976, reprinted in 1976 U.S.C.C.A.N. 5659) . . . . . . . . . . . . . . . . . . . . 44

Nimmer on Copyright (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Random House Unabridged Dictionary (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Restatement (Second) of Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 - 22

S. Rep. No. 1877 (86th Cong., 2nd Sess. 1960, reprinted in 1960 U.S.C.C.A.N. 3444) . . . . . . . . 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUEPORT COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1622C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence J. Block |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to the Court's Order of August 10, 2006, Defendant, the United States ("the government"), hereby respectfully submits its Post-Trial Brief.

## I. INTRODUCTION

Blueport brought this case against the United States pursuant to 28 U.S.C. § 1498(b), claiming that the government infringed Blueport's copyright. Blueport alleges that it is entitled to compensation for the unauthorized copying and use of a computer program known as the AUMD program.

The AUMD program was written by an Air Force Technical Sergeant named Mark Davenport, who worked as an Air Force Manpower Data Manager when he wrote the program. The AUMD program provided an interface to the Air Force's Manpower database ("MDS") that allowed users to download data from the database and format it into standard and customized reports. At the end of 1999, a dispute arose between Mr. Davenport and the Air Force over the ownership of the source code to the AUMD program. During the spring of 2000, the Air Force contracted with Science Applications International Corporation ("SAIC") to develop a different program that offered functionality that was similar to the AUMD program. The replacement program is known as the

MARS program. Mr. Davenport subsequently assigned all rights to the AUMD program to Blueport, a company that was formed by Mr. Davenport and his uncle, Robert Gunter. On March 9, 2000, Blueport registered its copyright for version 2.1D of AUMD. On November 18, 2002, Blueport filed a Complaint against the government, contending that the reproduction and use of the MARS program, as well as the unauthorized use of the AUMD program, infringed its copyright. The parties participated in a trial on all issues in the case between July 24-28, 2006.

This Court must resolve three issues: (1) whether the Section 1498(b) limitations relating to Mr. Davenport's creation of the program during his employment are applicable; (2) whether Blueport can prove infringement; and (3) assuming infringement, what is the reasonable and entire compensation under Section 1498(b). Based on the evidence, each of these issues must be resolved in the government's favor.

## II. ARGUMENT

### A. The Court and the Parties must Focus on AUMD Version 2.1D

As a matter of primary importance, the proper focus in this case must be on AUMD Version 2.1D, the only registered work in this case, and the only alleged infringed work in this case. See Amended Complaint; PX 90 (Copyright Registration and Deposit). This focus is mandated by Section 1498(b) and by reference to the relevant provisions of Title 17. See 28 U.S.C. § 1498(b); see also 17 U.S.C. § 101 ("where the work has been prepared in different versions, each version constitutes a separate work"). The specific version of the copyrighted work is critical to each of the three main issues in this case.

First, with respect to the Section 1498(b) limitations, the specific registered version affects the analysis of Mr. Davenport's activities with respect to the creation of that version. Even though

the development of the first version of AUMD – known as Beta 0.9 – took place over a period of two weeks in May 1998, the development of the registered version – AUMD 2.1D – incorporated the development times from each of the pre-existing versions. See DX 3 (Email Page 64 of 68) (providing release dates and indicating that AUMD 2.1D was the eighth version of the AUMD program, released approximately 18 months after Beta 0.9). Mr. Davenport testified that each new version of the AUMD program, up to the registered version, included new features and refinements. See Tr. at 346 ("[E]ach version evolved until we got to 2.1.D. 2.1.D was where the program stopped evolving."). As such, when evaluating the Section 1498(b) limitations, this Court must analyze whether: (1) AUMD 2.1D was prepared as part of Mr. Davenport's official functions; (2) Mr. Davenport was in a position to influence the use AUMD 2.1D; and (3) Mr. Davenport used government time, material, or facilities in the preparation of AUMD 2.1D.

Second, for the purposes of infringement, Blueport is obligated to produce and introduce a copy of the specific registered work. Blueport never produced or introduced into evidence a copy of AUMD 2.1D in Microsoft Access .mdb format. Instead, Blueport introduced two other items into evidence: (1) a copy of the "Visual Basic Text" for AUMD 2.1D; and (2) a copy of AUMD 2.1F in Microsoft Access .mdb format. With respect to the former item, Blueport and one of its experts repeatedly argued that the "Visual Basic Text" does not constitute the complete source code for a Visual Basic program in Microsoft Access; instead, the .mdb file is the only complete source code. See Tr. at 668-69, 673, 678, 698-99.[1] With respect to the latter item, Blueport argued that AUMD

[1] Blueport's definition of source code is contrary to several dictionary definitions. See Random House Unabridged Dictionary (2006); The American Heritage Dictionary of the English Language (4th ed. 2000). In addition, Blueport's definition is contrary to the description given by Mr. Davenport, who stated that the .mdb file included source code as a component, as well as forms and other information. See Tr. at 200-01; see also Tr. at 96 (stating that he "designed the screens,"

2.1F should be used as a substitute for AUMD 2.1D. Contrary to Blueport's approach, however, several cases that have stated that the fact-finder must compare the registered work to the accused works, rather than a unregistered, related work. According to the Fifth Circuit:

> [A] side-by-side comparison must be made between the original and the copy . . . . While a determination of substantial similarity should typically be left to the fact-finder, the Creations Unlimited[, Inc. v. McCain, 112 F.3d 814 (5th Cir. 1997)] decision contemplates that a fact-finder will have the opportunity to view the two works side-by-side. Indeed, as our sister circuit has found, copying is an issue to be determined by comparison of works, not credibility. See Folio Impressions, Inc. v. Byer California, 937 F.2d 759, 766 (2d Cir. 1991). King's failure to adduce evidence for such a comparison vitiates her claim.

King v. Ames, 179 F.3d 370, 376 (5th Cir. 1999) (some citations omitted). Similarly, the Southern District of New York held that the proper focus for a side-by-side comparison was the registered scripts of comedy sketches, rather than the unregistered performances of those sketches. See Novak v. National Broadcasting Co., Inc., 716 F. Supp. 745, 750 -751 (S.D.N.Y. 1989) ("[I]t is the scripts that were copyrighted and it is the scripts that must be infringed for [plaintiffs] to recover."); see also Creations Unlimited, 112 F.3d at 816 (holding that the district court did not err by comparing registered drawings, rather than rendition of drawings on tee-shirts). Assuming that the "Visual Basic text" is not the complete source code, Blueport's failure to produce the complete source code for AUMD 2.1D has effectively precluded the government and the Court from conducting a side-by-side comparison with any of the alleged infringing works.

Finally, assuming that Blueport is entitled to compensation, the specific registered version is key to assessing the proper time period for compensation and the proper amount. For example, as part of the Consolidated Statement of Facts, the government admitted that it had used a modified

---

and then programmed source code "behind" the screens).

version of AUMD 2.1D up until May 17, 2000. See Consol. Facts ¶¶ 21-23 (also admitting that a modified version of AUMD 2.1F was subsequently used). Because AUMD 2.1D is the only registered and alleged infringed work, it is the proper focus for damages purposes. See 28 U.S.C. § 1498(b); Novak, 716 F. Supp. at 751; Int'l Trade Mgmt. v. United States, 1 Cl. Ct. 39, 40-41 (1982) (holding that registration is a jurisdictional prerequisite to suit); see also 17 U.S.C. § 412 (prohibiting statutory damages and attorney's fees prior to registration).

**B. Blueport's Claim is Barred by the Limitations Incorporated into Section 1498(b)**

Section 1498(b) of Title 28 codifies the government's limited waiver of sovereign immunity for copyright infringement, and it establishes the Court of Federal Claims's jurisdiction over such claims. See Boyle v. United States, 200 F.3d 1369, 1372-73 (Fed. Cir. 2000). The plain language of Section 1498(b) allows a government employee to maintain an action against the government, if the employee meets three statutorily-enumerated criteria:

> . . . a Government employee shall have a right of action . . . except where he was in a position to order, influence, or induce use of the copyrighted work by the Government. *Provided, however*, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States, where the copyrighted work was prepared as a part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used . . . .

28 U.S.C. § 1498(b). Pursuant to the statute, no cause of action exists where: (1) the copyrighted works were prepared as part of the plaintiff's official functions; (2) the plaintiff was in a position to influence the use of its works; or (3) the plaintiff used government time, material, or facilities in the preparation of its works. "The use of the word 'or' in the statute indicates that satisfaction of any one of these conditions is sufficient to deny a right of action." Herbert v. United States, 36 Fed. Cl. 299,

305 (1996). Collectively, this Brief will refer to these three conditions as the "Section 1498(b) limitations" or the "creation limitations."[2]

### *1. The Section 1498(b) Limitations are Jurisdictional in Nature*

As an initial matter, the plain language of Section 1498(b) and the relevant case law demonstrate that the creation limitations are jurisdictional in nature, rather than affirmative defenses. Because Section 1498(b) incorporates the government's waiver of sovereign immunity, it must be interpreted in the narrowest manner. See Lane v. Pena, 518 U.S. 187, 192 (1996). Section 1498(b) explicitly excludes the creation limitations from the waiver of sovereign immunity. The statute permits a "right of action" by an employee against the government "*except where* he was in a position to order, influence, or induce use." 28 U.S.C. § 1498(b) (emphasis added). In addition, Section 1498(b) states that it "*shall not* confer a right of action" with respect to the other creation limitations. Id. A plaintiff cannot assert a claim where the waiver specifically excludes a right of action. Since these exceptions were explicitly attached by Congress as a condition of the government's waiver of sovereign immunity, the creation limitations must be treated as jurisdictional.

The plain language of Section 1498(b) is unambiguous and conclusive in this respect, without resorting to inferences or the legislative history. See United States v. James, 478 U.S. 597, 606 (1986); see also Marathon Oil Co. v. United States, 374 F.3d 1123, 1132 (Fed. Cir. 2004) ("[T]he existence of a plausible reading under which Congress has not waived sovereign immunity

[2] Note that Section 1498(b) also explicitly declines to waive sovereign immunity in several other circumstances that do not relate to the creation of the copyright work. See 28 U.S.C. § 1498(b) (barring suit in the absence of authorization and consent, or where the alleged infringements occurred more than three years prior to suit). None of these issues is involved in this case.

means that we are obliged to conclude from the plain language of the statute that Congress did not intend to waive sovereign immunity."). Even if other legal authorities are consulted, however, these external authorities all support the interpretation that the creation limitations are jurisdictional in nature. For example, the explanation in the legislative history mirrors the language in the statute:

> The bill further provides that a government employee shall also have a right of action against the government, except in those instances where he was in a position to order, influence, or induce use of the copyrighted work by the government. The bill does not, however, confer a right of action on any copyright owner or any assignee with respect to any copyrighted work prepared by a person while in the employment of the United States where the copyrighted work was prepared as a part of the official functions of the employee or in the preparation of which government time, material, or facilities were used.

S. Rep. No. 1877 (86th Cong., 2nd Sess. 1960, reprinted in 1960 U.S.C.C.A.N. 3444, 3446-47). Thus, the inference is that Congress intended to retain sovereign immunity in these circumstances.

This issue is analogous to the treatment of authorization and consent within Section 1498. The Court of Federal Claims treats the issue of authorization and consent as jurisdictional for the government, rather than as an affirmative defense. Under Section 1498(a), (b), and (d), the government waives sovereign immunity and assumes liability for the acts of its contractors if it authorizes and consents to their actions. See 28 U.S.C. § 1498. In Hughes Aircraft, the Court of Claims considered authorization and consent to be jurisdictional in nature:

> The second paragraph of s 1498(a) . . . sets forth a two-part test **for determining whether this court has jurisdiction** in the first instance over a particular claim. Under this test, **a finding of jurisdiction is conditioned upon** a showing that (1) the accused use or manufacture was undertaken for the Government . . .; and (2) the Government gave its authorization or consent for the accused use or manufacture.

Hughes Aircraft Co. v. United States, 534 F.2d 889, 897-98 (Ct. Cl. 1976) (emphasis added). Given that both the creation limitations and the authorization and consent clause were explicitly attached

by Congress as conditions of the government's waiver of sovereign immunity, the creation limitations should be treated as jurisdictional.

The creation limitations may not deprive the Court of Federal Claims of subject matter jurisdiction to hear a case and decide its merits. Instead, the creation limitations are specific elements that a plaintiff must prove in order to have a right of action.[3] Thus, assuming a well-pleaded complaint, the Court of Federal Claims has jurisdiction to determine whether plaintiff's claim fits within the scope of the waiver. The Federal Circuit addressed this concept by distinguishing between a:

> . . . court's general power to adjudicate in specific areas of substantive law, on the one hand, and the question of whether in a specific case a court is able to exercise its general power with regard to the facts peculiar to the specific claim, on the other. The former is a question of a court's subject matter jurisdiction, and is properly raised by a Fed.R.Civ.P. 12(b)(1) motion; the latter is properly addressed as a question of whether the plaintiff has stated a claim upon which relief can be granted, and is raised by a Fed.R.Civ.P. 12(b)(6) motion.

Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). Thus, under Section 1498(b), a government-employee plaintiff must establish that the copyrighted work was created outside the scope of the creation limitations as essential elements of its case.

This interpretation is consistent with the Court of Federal Claims's decision in Herbert. In Herbert, the government initially argued that the successful assertion of a creation limitation created a royalty free license in the copyrighted work. Id. at 304. The Court of Federal Claims rejected that argument, stating that Section 1498(b) "is a jurisdictional statute which considers the right of action,

---

[3] While Section 1498, like Section 1491, supplies subject matter jurisdiction, it also includes a substantive cause of action, unlike Section 1491.

not the conferring of a license, royalty-free or otherwise." Id. The remainder of the analysis of the creation limitations in Herbert considers whether a "right of action" exists. Id. at 304-07.

This interpretation is also consistent with the Court of Claims's decision in the Strategical Demolition Torpedo cases in 1951 and 1953. See Strategical Demolition Torpedo Co. v. United States, 96 F. Supp. 315 (Ct. Cl. 1951); Strategical Demolition Torpedo Co. v. United States, 110 F. Supp. 264 (Ct. Cl. 1953). In the first case, the court granted the government's motion to dismiss because the complaint admitted that one of the co-inventors was a government employee at the time of creation. Strategical Demolition, 96 F. Supp. at 316. The court upheld the dismissal in the second case, holding that Congress's expansion of the waiver of sovereign immunity to include the creation limitations was not retroactive. See Strategical Demolition, 110 F. Supp. at 265-67.

Accordingly, since Mr. Davenport was a government employee at the time the AUMD program was created, Blueport must prove that Mr. Davenport's conduct is outside the scope of the creation limitations. This is the only interpretation that is consistent with the statutory language, the legislative history, and the relevant case law.

#### ***2. Mark Davenport Actually Influenced and Induced the Government's Use of the AUMD Program***

Even assuming, *arguendo*, that the government bears the burden of proof on the creation limitations, the facts of this case demonstrate that Mr. Davenport actually influenced and induced the government's use of the AUMD program. Note that Mr. Davenport's role far exceeds the threshold set by the statute. The plain language of Section 1498(b) merely requires that the author have been *in a position* to order, influence, or induce the use of the work. See 28 U.S.C. § 1498(b); see also Herbert, 36 Fed. Cl. at 307.

Mr. Davenport's direct influence over the government's use of the AUMD program is proved by his: (1) free and widespread distribution of the AUMD program throughout the Air Force Manpower community; (2) demonstrations of the program to others; (3) unfailing support of the program as part of his official job duties up until the early part of the year 2000; and (4) failure to restrict the use of the program. Mr. Davenport began distributing the AUMD program to other Air Force personnel almost as soon as he finished creating the beta version. See DX 48 (Response to Interrog. 17) ("Out of generosity, [Mr. Davenport] shared the program with interested individuals."); Tr. at 157-58. Mr. Davenport testified that after he finished creation of the beta version in May 1998, he shared a copy of the beta program with his friend, Chief Luckie. See Consol. Facts ¶ 16; Tr. at 103-104. Chief Luckie distributed the program to other personnel within his Major Air Command, and Mr. Davenport distributed the program to other personnel within the PACAF. See Tr. at 158 ("And then I had sent the ones to my command, the users there, and then that's where as those people started moving around the phone calls came."); Tr. at 495 (Chief Dant testifying that he first learned of the AUMD program when Mr. Davenport showed it to him). Specifically, Mr. Davenport testified that he distributed AUMD version 2.1D to "[A]ll the manpower users throughout the Air Force" by means of the PACAF website:

> THE COURT: Okay. And who was [the registered version] distributed to?
> THE WITNESS: All the manpower users throughout the Air Force. It was on my webpage there at headquarters PACAF to where they could just come get it. I didn't go out and e-mail it to everybody. The people who were going to use it came and downloaded it themselves.

Tr. at 156-57.

Mr. Davenport also influenced the use of the AUMD program by making it available through a variety of channels. Initially, Mr. Davenport distributed the program to others by means of a disk.

See Tr. at 877 (Mr. Hendricks testifying that he initially received the program from Mr. Davenport by disk). Two witnesses testified that Mr. Davenport personally installed the program on their computers. See Tr. at 495 (Chief Dant); Tr. at 508 (Col. Manning). He distributed later versions of the program by posting it on a military website for downloading. See Tr. at 156-57 (testifying that he distributed AUMD 2.1D by means of PACAF's website); see also Tr. at 169-70, 877.

In addition, Mr. Davenport directly influenced the use of the AUMD program by demonstrating it to other potential users in the Air Force. In July 1998, two months after he created AUMD Beta 0.9, Mr. Davenport demonstrated the program at three PACAF Air Force locations in Alaska and Japan. See Tr. at 113-14, 334-35; DX 48 (Response to Interrog. 18). Two months after these demonstrations within PACAF, he demonstrated the program to Air Force Command Manpower directors in San Antonio, Texas. See Consol. Facts ¶ 17; Tr. at 112; see also Tr. at 509 (describing Mr. Davenport as an "invited guest"). His demonstrations were persuasive. After Mr. Davenport demonstrated the AUMD program in San Antonio, the program became much more widely-used throughout the Air Force manpower community. See Tr. at 350; see also Tr. at 507 ("Sergeant Davenport . . . essentially publicized the fact that we had this tool."). As stated by Mr. Davenport's senior supervisor in a performance report, Mr. Davenport "[p]resented his creation at worldwide conference – absolutely sold his audience – now a must have tool." DX 30 (1999 EPR); see also Tr. at 391-92 (stating that the senior supervisor was referring to the AUMD program).

Furthermore, Mr. Davenport influenced the use of the AUMD program by supporting it, adding new features to the program at the request of other Air Force users, and by incorporating those features and bug fixes into new versions of the program. After other Air Force personnel began using the AUMD program, Mr. Davenport began providing support for the program by

telephone and email. See Tr. 105-06 (receiving calls for support). In order to facilitate support for the program, Mr. Davenport had initially included his home phone number and email in the AUMD program. See Tr. at 347. Due to the increasing popularity of the program and due to requests for support at odd hours of the morning, Mr. Davenport replaced his personal contact information with his work contact information. Id. Subsequently, Mr. Davenport's office became the support "call center" for the Air Force with respect to the program:

> Q A witness has suggested that at some point because of these programs the PACAF at Hickam became sort of a call center for everybody who wanted to use the AUMD programs. Is that your recollection?
> A Yes. Sergeant Davenport developed the tool, and then as people were interested he would provide it to them, and he would maintain the currency of the tool for them so that they would have the most current software and capability. So he would maintain it from our office and allow others to use it in that fashion.

Tr. at 504 (Col. Manning); see also Tr. at 495 (Chief Dant). Many of the witnesses testified that they requested new features for future versions of the AUMD program. See Tr. at 346-47; Tr. at 472 (Chief Dant); Tr. at 805-06 (Maj. Meaker). Where feasible, Mr. Davenport incorporated those new features into new versions of the program. See Tr. at 346-47. Sometimes, new versions of the program would also include fixes for errors. See Tr. at 129-30 (bug fixes). To help reduce the amount of time that he spent supporting the program, Mr. Davenport programmed an automatic expiration date function into later versions of AUMD. See Tr. at 352; see also Consol. Fact ¶ 14 ("If a user of a copy of the AUMD program attempted to use the program after the automatic expiration date, the program would stop running, and would display a message that directed the user to 'contact your MAJCOM Data Manager,' or to go to a website managed by Mr. Davenport 'to download the most current version.'").

Mr. Davenport's participation in the MDS Users Group ("MUG") is another example of his influence over the use of the AUMD program. As described by Mr. Davenport, MUG was composed of "key" representatives from each Air Force command. See Tr. at 115. MUG provided guidance for MDS and for the various Manpower offices using MDS. Id. MUG members specifically debated whether to use Mr. Davenport's program as an official tool with MDS. See PX 138; Tr. at 883-84. Even though MUG never formally adopted the AUMD program, Mr. Davenport's membership within the group and his interaction with other members of the group likely served to increase the use of the program:

> Q And earlier you said that you remember people talking about the AUMD program at Manpower Users' Group meetings?
> A Yes, sir.
> Q What did you mean by that?
> A Mark had brought the program or demonstrated it to different ones what the capabilities were. And at the time, and I think that was, I think it was the second Users' Group meeting after we fielded MDS.

Tr. at 883; see also Tr. at 877 (detailing how Mr. Hendricks first learned about the AUMD program). The above facts demonstrate that Mr. Davenport directly influenced and induced the use of the AUMD program by encouraging his friends and coworkers to use the program.

Finally, Mr. Davenport never attempted to discourage others from using his program by limiting the distribution of the program. See Tr. at 358-59 (testifying that he never attempted to limit distribution prior to Blueport's inception). Mr. Davenport's actions with respect to the AUMD program stand in stark contrast to his actions with respect to two other programs he created. See DX 3 (Email at Page 3 of 68) (limiting distribution of the MDS Error Checking program and the Project Listing program). He could have kept it as his own private project, and not given it out to friends. He could have refused to demonstrate the program. He could have refused to post the program on

the website. He could have stopped making new versions of the program, and let the initial versions expire.

The Herbert court held that the plaintiff's cause of action was denied on facts that were much more limited than in this case. The court held that as a member of the Food and Nutrition Board, the plaintiff was clearly in a position to influence his appointment to a later committee, and "thereby in a position to influence the Committee's use of his works." Herbert, 36 Fed. Cl. at 307. As a member of the committee, he knew that his written works would be published. Id. Thus, the court held that he was in a position to influence the use of his works. Id.

Accordingly, Blueport's claim of infringement must be denied. Mr. Davenport was in a position to influence and induce the use of the AUMD program, and actually did influence and induce the use of the AUMD program.

### *3. Mark Davenport Prepared the AUMD Program as a Part of His Official Functions*

With respect to the second creation limitation, it is clear that Mr. Davenport created the AUMD program within the scope of his employment with the Air Force. This conclusion is supported by: (1) his job responsibilities with respect to databases and computer programs; (2) the recognition he received for creating, distributing, and supporting the AUMD program; and (3) his desire to assist the Air Force by creating the program.

In addition, an important concept with respect to the both the "official duties" and "government resources" creation limitations is that computer programming consists of several different activities. Blueport presupposes that creation of a computer program consists of only one activity: writing code. See Tr. at 24, 1109-10, 62. This is demonstrably false. Dr. Rudd, Blueport's damages expert, testified that several activities are part of developing any computer program:

> Q And what are those different categories associated with each of those different numbers [in Plaintiff's Exhibit 111]?
> A **Planning, analysis, design, development, testing, and documentation.**
> Q So for example, if someone tests a program, would that be considered part of a program's development?
> A Yes.
> Q And with respect to the other activities that are listed there, the other non-coding activities, are all those considered part of the development, as well?
> A I'm not sure what they mean by planning . . . . But yes, the other parts of that are typically involved in developing software.

Tr. at 775 (emphasis added); see also PX 111 (SOW at 4). As will be discussed in the Sections below, other cases have cited non-coding activities in concluding that the creation of a computer program occurred within the scope of employment.

*a. Mr. Davenport's official duties encompassed continued development of the AUMD program*

Plaintiff's Exhibit No. 125 generally describes Mr. Davenport's duties at Hickam Air Force Base. Among other tasks, a Manpower data systems manager, such as Mr. Davenport,

> Designs, operates, and maintains manpower data systems at base major command . . . . Develops and prepares manpower documents . . . . Prepares and maintains manpower reports.

PX 125 (AFMAN 36-2108). The official written description demonstrates that proficiency with computers was a required part of the job. See PX 125 (AFMAN 36-2108) ("uses industrial engineering and computer techniques to facilitate work measurement," "revises manpower documents," "maintains manpower portion of the wartime computer system."); see also PX 125 (Knowledge Requirements); PX 65 (CFETP at 45: "Operate Database Software"); PX 59 ("V" prefix used for personnel "with the ability to design, analyze, supervise, or monitor the computer applications"). Mr. Davenport verified that many of these responsibilities were part of his official duties. See Tr. at 77 (updating data in MDS, training others in the use of computer tools, printing

reports); Tr. at 320-21 (creating the Unit Manpower Document). Mr. Davenport's key responsibilities with respect to MDS and computer proficiency were echoed in each of his Enlisted Performance Reports:

> Manages the command manpower database . . . . Directs the daily operation of the manpower data system (MDS) throughout PACAF theater. Supervises execution of the manpower data system . . . . Provides resource information to customers across the Air Force . . . . Prepares command strategic plan for manpower data systems architecture to complete the transition to the new manpower data system operating platform. Quality assurance evaluator for . . . computer support contract.

DX 30 (1999 EPR); see also DX 28; DX 29; DX 31. Thus, as described in the official written descriptions of his duties, Mr. Davenport was responsible for: working with MDS, obtaining data from MDS, updating data in MDS, printing reports from information in MDS, and working with computers.

Even though the specific act of creating a computer program to create manpower reports is not expressly listed in Mr. Davenport's written job descriptions, it is the type of activity that was inherently connected and incidental to his job as a Manpower Data Systems Manager. Mr. Davenport admitted that he had created Net Worth, an earlier Microsoft Access program, while at work. See Tr. at 91 ("[Net Worth] was, you know, my very first Access program, and I'm sure I did some things there at work on it."). He authored database queries as part of his job. See DX 31 (2000 EPR) ("Authored several data code queries to ensure most accurate reflection of information within both manpower and personnel data systems"). He attended a computer class on object-oriented design in relational databases. See Tr. at 69-70. Mr. Davenport taught a colleague how to program at work. See Tr. at 360-61 (admitting Tyler Yeager developed a good knowledge of creating applications in Microsoft Access with Mr. Davenport's assistance).

After other people in the Manpower community began using the AUMD program, maintenance, support, and refinement of the program quickly became Mr. Davenport's normal and expected duties at work.[4] As noted in Section II.B.2 of this Brief, Mr. Davenport supported the program while at work. He added features to AUMD at the request of other users, including his supervisors. He demonstrated the program while on duty, during trips funded by the Air Force. He reviewed and edited the user manual to the AUMD program while at work. See Tr. at 315-16.

In addition, Mr. Davenport received official recognition for his efforts in creating, distributing, and supporting the AUMD program. The most direct recognition appears in Mr. Davenport's performance report from 1999:

> - Foresaw delays fielding critical MDS functionalities – single-handedly rectified problem for the Air Force
>   - Designed, tested, implemented two database programs – used off-the-shelf software at no cost to PACAF
>   - Selflessly passed programs to other MAJCOMs – now employed AF wide – outstanding contribution

DX 30 (1999 EPR) (also mentioning that Mr. Davenport "[p]resented his creation at worldwide conference – absolutely sold his audience"). Mr. Davenport was also explicitly recognized for his efforts with respect to the AUMD program in his performance report from 2000. See DX 31 ("Devised a method allowing all MAJCOMs to download and use data from MDS central location"). Beyond specific recognition for his work on the AUMD program, Mr. Davenport was widely recognized in every one of the performance reports in evidence for his mastery of the Air Force's

---

[4] Mr. Davenport acknowledged that the scope of his official duties was potentially much greater than the official written description. See Tr. at 337 ("Q So . . . you had official duties beyond what is explicitly referenced in these documents? A My official duties were what my supervisor directed me to do . . . . [The written job description] wasn't down to the detail of specifics of what and how a job was done.").

database systems, his computer proficiency, and his ability to troubleshoot problems. See, e.g., DX 28 ("Drawing on his extensive computer background . . . completely restructured PACAF manpower resource tracking procedures, including writing some experimental programs for analysts," "Designed a query to produce manpower data by unit, then taught technicians how to customize it"); DX 29 ("possesses superb professional and technical knowledge of manpower database and computer systems," "tirelessly solves problems and provides invaluable computer support); DX 30 ("Absolutely masterful data system manager; "go to" troubleshooter for entire AF manpower community"); DX 31("Recognized as the AF authority on MDS," "Authored several data code queries to ensure most accurate reflection of information within both manpower and personnel data systems"). Every testifying supervisor of Mr. Davenport verified their respective performance report comments, and stated that they factored the comments into their overall evaluation of Mr. Davenport. See Tr. at 496-97 (Chief Dant); Tr. at 525-26 (Col. Manning); Tr. at 799-803 (Maj. Meaker).

Finally, Mr. Davenport created the program as an effort to help himself in his day-to-day tasks, to help other people in the Air Force's Manpower community, and to help the Air Force as a whole. As discussed in Blueport's Response to an Interrogatory, Mr. Davenport created AUMD:

> as a response to his expectation that the Air Force's official MDS program would not work satisfactorily . . . Mr. Davenport thought it would be interesting to see if he could create a program that would be better than the official MDS that would potentially allow bases in PACAF to still be able to provide Unit Manpower Documents to each of their customers.

DX 48 (Response to Interrog. 15); see also Tr. at 92. In Blueport's Response to a Request for an Admission, Blueport admitted that the intended users of the AUMD programs were Air Force personnel in the Manpower community. See DX 50 (Response to Req. for Adm. 12). At trial, Mr.

Davenport testified that he created new versions of AUMD to "[m]ake it easier to do things around work." Tr. at 348.

*b. Blueport's improperly relies on a narrow interpretation of Mr. Davenport's duties*

Blueport argues Mr. Davenport's official duties did not include computer programming, based on the fact that he was not classified as a computer programmer. See Tr. at 16-17. Yet Blueport's assertion ignores that computer programming was related and incidental to Mr. Davenport's duties at the time he created AUMD Beta 0.9, and that continued maintenance and support of the program had become a normal and expected duty of his by the time he created AUMD 2.1D. Blueport's assertion also ignores the relevant case law, which holds that: (1) reliance on specific tasks is misplaced; (2) official functions can include general and incidental activities; and (3) the analysis provided by the Restatement of Agency is appropriate to use.

In Herbert, the Court of Federal Claims cited several identical facts to support its decision that the plaintiff had created the copyrighted works within the scope of his official duties. See Herbert, 36 Fed. Cl. at 305 (citing excellent performance reports, and reputation as an expert). Furthermore, the court flatly rejected the contention that "writing and publishing the [written works] was not a specific duty or condition of his employment . . . and therefore could not be considered part of his official duties or functions." Id. The court held that the plaintiff's reliance on "specific" tasks was misplaced, and that where the employee's official functions included the activity generally, the employee may still be barred a right of action for infringement. Id. at 305-06 (citing Myers v. United States, 147 Ct. Cl. 485, 489 (1959)).

Outside the context of Section 1498, other courts have held an employee's general work activities fall within the scope of employment for the purpose of ownership of a copyright. In

Miller, the District Court for the District of South Carolina ruled that an employee created a computer program within the scope of his employment with similar facts to this case. Miller v. CP Chemicals, Inc., 808 F. Supp. 1238 (D.S.C. 1992).[5] The court held that the program was created within the scope of the plaintiff's employment by applying the general common law of agency. See id. at 1242-43; see also Commission For Creative Non-Violence v. Reid, 490 U.S. 730, 741 (1989). According to the Restatement of Agency:

> Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits; [and]
> (c) it is actuated, at least in part, by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1958).

Similarly, the Middle District of Florida recently applied the law of agency to a copyright case, and held that an employee of a restaurant created cooking manuals within the scope of his employment. See Sterpetti v. E-Brands Acquisition, LLC, 2006 WL 1046949 (M.D.Fla. 2006). The plaintiff was initially hired as a cook, without a formal contract. Id. at *1. With respect to the first Restatement factor, the court held that even though the plaintiff was not specifically hired to create the manuals, his job changed during the course of his employment to include that task. Id. at *5. Turning to the second factor, the court held that even though the plaintiff assembled and formatted the cooking manuals outside of work, that fact was outweighed by the "essential" and "directly related" tasks that the plaintiff did while at work. Id. at *6. Finally, the court held that the third factor was satisfied because the plaintiff created the cooking manuals for his employer. Id. at *7.

[5] The government discussed this case in greater detail in its Memorandum of Contentions of Fact in Law. See Gov't Pre-Trial Memo at 24.

Finally, the Southern District of Florida held that a doctor had created a computer program within the scope of his employment in a case with remarkably similar facts to the present case. Genzmer v. Public Health Trust of Miami-Dade County, 219 F. Supp. 2d 1275 (S.D.Fla. 2002). In Genzmer, the plaintiff was hired to instruct staff on critical care medicine, take care of patients, and conduct research projects. See id. at 1276. During the plaintiff's research period, he created a computer program[6] to computerize the employer's consultation reports. See id. at 1277. The plaintiff "wrote the program, at least in part, on his own time, during nonbusiness hours, and using his home computer." Id. The plaintiff's supervisor provided input with respect to the appearance of the program, and the plaintiff tested the computer program while at work. See id. As a result of his work on the computer program, the plaintiff received positive performance evaluations. See id. The program subsequently became inoperable, because the plaintiff "had programmed a 'bug' to disable the software after the termination of his employment." Id. at 1278.

The court applied the Restatement test and held that the plaintiff had created the program within the scope of his employment under Title 17. See id. at 1283. First, the court concluded that computer programming was a task the plaintiff was employed to perform because of the broadly written job description, and programming was incidental to the plaintiff's research objectives. See id. at 1281. The court also noted that the positive performance evaluations provided "strong support . . . that the work was of the kind [the plaintiff] was employed to perform." Id. at 1281 n.6. The court then held that the second Restatement factor was met. Even though plaintiff had initially created the program at home, that fact alone was unimportant because the plaintiff created the

[6] The purpose of the program was to generate reports. See id. The program was named "MedicalQuickForms," and was comprised of two subprograms. See id. 1277 n.3.

program "during the time period in which he was employed . . . to complete the research program."[7] Id. at 1281-82. The fact that plaintiff had beta-tested his program at work and incorporated changes into his program as a result of that testing "also supports the conclusion that [plaintiff] performed his work within the authorized time and space limits." Id. at 1282. The court held that the final Restatement factor had been met because the plaintiff created the program with the employer's assistance, to meet the employer's needs. Id. at 1282-83.

Ultimately, the analysis of Herbert and Myers under Section 1498 converges with the analysis of Miller, Sterpetti, and Genzmer under Title 17. Under either body of law, a reliance on "specific" tasks is misplaced. Instead, courts must examine whether the employee's official functions include the activity generally or incidentally. In this context, the Restatement of Agency is instructive. Mr. Davenport's creation of the AUMD program fell within the scope of his official duties because of his day-to-day responsibilities; the recognition he received for creating, distributing, and supporting the AUMD program; and the ultimate purpose of the program – to benefit the Air Force and to simplify his job.

***4. Mr. Davenport Used Government Time, Material, and Facilities to Create the AUMD Program***

With respect to the third creation limitation, it is clear that Mr. Davenport relied on government data, computers, and personnel in order to create the AUMD program. Many of the facts discussed above are equally applicable here. Mr. Davenport's use of government time, material, and facilities falls into two broad categories: (1) his personal use of government resources;

---

[7] The court's conclusion in this instance is relevant to a discussion between the Court and counsel for the government during closing arguments. See Tr. at 1144-46 (debating the scope of employment *vis à vis* one's employment during the time period the work was created).

and (2) other use of government resources on behalf of Mr. Davenport. Again, non-coding activities, such as testing and documentation, must be considered part of AUMD's development. See Tr. at 775.

First, Mr. Davenport personally used government data to test and debug his program. After allegedly creating the beta version of AUMD with a dummy database, Mr. Davenport stated that he brought the program into work, and began using it with PACAF's data. See Tr. at 329-331. Other people began to provide Air Force data to Mr. Davenport to use. Glen Hendricks testified that he first learned about the program when he was asked to provide a data extract to Mr. Davenport for Mr. Davenport's program. See Tr. at 876-77, 888-89. Mr. Davenport also took Air Force manpower data from work to his home, in order to use it with the AUMD program. See Tr. at 354.

The Air Force data was not publicly available, and the Air Force restricted access to the data by issuing usernames and passwords with restricted privileges to the appropriate personnel. Mr. Davenport used his username and password to access data in MDS. See Tr. at 364. Presumably, the other individuals who provided data to Mr. Davenport also used their usernames and passwords to obtain that data. See Tr. at 866-68 (discussing access to MDS and the access privileges of personnel). At some point, Mr. Davenport requested and obtained a database administrator ("DBA") username and password to MDS Central. See Tr. at 367, 369-70.[8] When other Air Force personnel discovered that Mr. Davenport had DBA access to MDS Central, they determined that Mr. Davenport should not have had such access, and he was not allowed to keep the DBA account. See

[8] MDS Central was an overall snapshot of the data from each of the Major Air Force Commands throughout the Air Force. See Tr. at 365-66. At the time he had the DBA account, Mr. Davenport could not access MDS Central with his own username and password. See Tr. at 367.

Tr. at 370; Tr. at 872; Tr. at 896-97 ("Not even the people that were over in the testing arena or in management should have ever had any access to any of those systems.").

The facts discussed in the two previous sections of this Brief also support a finding that Mr. Davenport personally used government resources to create the AUMD program. He supported the program while at work, such that his office became the "call center" for support for the Air Force. See Tr. at 504 (Col. Manning); see also Tr. at 495 (Chief Dant). He beta-tested the program at work. See Tr. at 105; see also 160-61 (discussing the purpose of a beta version).

Second, other people used government resources on behalf of Mr. Davenport. Chief Luckie helped beta-test the AUMD program at work, against data from his Major Air Command at Scott Air Force Base. See Tr. at 329-31. Chief Luckie also drafted the user manual for the AUMD program for Mr. Davenport. See Tr. at 315-16. In addition, several witnesses testified that they requested new features for future versions of the AUMD program. See Tr. at 346-47; Tr. at 472 (Chief Dant); Tr. at 805-06 (Maj. Meaker). Other users of AUMD provided feedback to Mr. Davenport. See Tr. at 347. By obtaining this critical assistance from other government employees while they were being paid by the government, Mr. Davenport's actions are no different than if he had simply done the work on his own while he was at work. Mr. Davenport's reliance on Chief Luckie, as well as his reliance on the Manpower community as a whole, consumed government time, materials, and facilities.

In Herbert, the court concluded that it was likely that the plaintiff had produced the works while on government time, and that the parties had stipulated that government facilities were used. See Herbert, 36 Fed. Cl. at 306. In this case, Mr. Davenport produced AUMD while relying on other government employees who were working on government time, using government materials,

in government facilities. In the related context of determining government rights to an employee-created invention, other courts have held that the threshold for use of government resources is modest. For example, the District Court for the District of Columbia upheld the ruling that the plaintiff's "use of $475 in government funds and materials" supported government ownership in an invention that measured pollution levels. Breton v. Evans, No. 04-1239, Slip Op. (D.D.C. 2006) (citing other decisions holding in favor of government ownership based on minimal use of government resources).

In conclusion, the government has established the existence of each of the creation limitations. Blueport has not met its burden of proof of showing that these limitations do not apply, and its claim for copyright infringement must be barred.

**C. The Government Did Not Infringe Blueport's Copyright**

In order to prove copyright infringement, Blueport had the burden of proving that the government copied "constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Telephone Services Co., 499 U.S. 340, 361 (1991). "Copying requires evidence that a defendant literally copied the [work] or, alternatively, that a defendant had access to the protected [work] before creating the accused [products] with an additional showing of substantial similarity not only of the general ideas but of the expression of those ideas as well." Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1368 (Fed. Cir. 2006) (applying Ninth Circuit law) (citation omitted); see also Herbert, 36 Fed. Cl. at 303; Marshburn v. United States, 20 Cl. Ct. 706, 709 (1990). Even if a defendant copies protected elements without authorization, that copying may be noninfringing pursuant to the limitations on infringement in Sections 107 through 122 of Title 17. See 17 U.S.C. §§ 107-122.

Blueport did not meet its burden of proving infringement. Blueport alleges that the government infringed its copyright in two different ways. First, Blueport alleges that the government infringed its copyright by modifying the binary code of the AUMD program. Second, Blueport alleges that the government infringed its copyright by authorizing its contractor to create the MARS programs. For the reasons discussed below, these alleged activities are noninfringing.

***1. The Government's Modification of the AUMD Program is Noninfringing***

The government admits that authorized its contractor to modify the binary code of both AUMD 2.1D and AUMD 2.1F. See Consol. Facts ¶¶ 22-23. These modifications, however, are noninfringing because: (1) the government held an implied license to use AUMD; and (2) the copying and adaptation of the programs were an essential step in the utilization of AUMD.

*a. The government held an implied license to use AUMD*

Through Mr. Davenport's conduct, the government held at least an implied license to use the AUMD program.[9] With respect to AUMD 2.1D, the registered version, government users were given copies of the program by Mr. Davenport, with no restrictions on any type of use. Thus, with respect to this version, Mr. Davenport's unrestricted conveyance created an implied license. The Court of Federal Claims addressed the factors necessary to create an implied license in Herbert:

> An implied license is one derived from the conduct of the parties. The existence and scope of such an implied license depends upon the facts of the individual case, but courts have found such licenses to exist where, for example, a person voluntarily submitted a work for publication. Delivery of a copy of the work is one type of conduct that demonstrates the existence of an implied license. In [Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990)], the Ninth Circuit Court of

[9] In an Interrogatory Response, Blueport stated that the alleged copyright infringement "began on May 15, 2000." See DX 47 (Response to Interrog. No. 7); see also Blueport Law ¶ 5 (stating that the "Air Force may have had a fully revocable implied license to use the compiled version of the AUMD software prior to May 15, 2000").

> Appeals found that by creating a work at defendant's request and conveying it to him, intending that it be copied and distributed, plaintiff necessarily conveyed a license because otherwise the conveyance would have been of minimal value. In the present case, as in Cohen, plaintiff and others worked on the 10th RDA at the Academy's request, and voluntarily created and conveyed their writings to the Academy. In doing so, the court finds that Dr. Herbert necessarily transferred a nonexclusive license for his works as well as the manuscript to the Academy.

Herbert, 36 Fed. Cl. at 310 (citations omitted). Mr. Davenport's widespread distribution of AUMD is equivalent to the "delivery" and "conveyance" discussed in the Herbert case. See Tr. at 358-59 (testifying that he never limited the distribution of the program). His support of AUMD and his reliance on other employees for troubleshooting and features are other indicia that an implied license existed.

In its Pretrial Memorandum, Blueport argued that the government did not have any implied license to use the AUMD program after May 15, 2000, based on the expiration date function of AUMD 2.1D. See Blueport Law ¶¶ 5. Mr. Davenport testified, however, that his intent in including the expiration date function had nothing to do with restricting use of AUMD:

> The intent of the automatic expiration wasn't to cut people off so they couldn't use the program. It was to, as we talked, as the program evolved things changed, and if the data structure of the database is changed and they tried to open it with an old version, either unexpected results would happen or the program would crash, and it caused a lot more phone calls and things like that.
>
> So I instituted the automatic expiration process so that, and I always extended that date out well enough that there would be a new version out there and people could go get it when theirs did expire.

Tr. at 352. In other words, Mr. Davenport used the expiration date function to reduce the amount of time he supported the program at work. Mr. Davenport's also testified that expired versions of the program remained on the users' hard drives, and that people could continue to use the program by changing the date on the computer. See Tr. at 352-53. Therefore, Mr. Davenport conveyed an implied license by his conduct. See also Quinn v. City of Detroit, 23 F. Supp. 2d 741, 749

(E.D.Mich. 1998) ("[Plaintiff's] conduct of installing [the copyrighted computer program] on the computers in the Law Department and allowing the Law Department employees to use it granted the City an implied license by conduct.").

*b. The government copied and adapted AUMD as an essential step in the utilization of the program – 17 U.S.C. § 117*

Even though the government, through its contractor, copied and adapted the AUMD program for an extremely short period,[10] that activity is not a copyright infringement. Pursuant to Section 117 of Title 17, the owner of a copy of a computer program may make non-infringing copies or adaptations of the computer program if the copies or adaptations are:

> created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

17 U.S.C. § 117(a)(1). To put it another way, the government did not infringe Blueport's copyright because it: (1) owned copies of the AUMD program; (2) adapted AUMD as "an essential step in the utilization of" the AUMD program "in conjunction with a machine"; and (3) "used [the adaptation] in no other manner." Id.

First, the government owned copies of the AUMD program. The same facts that support the existence of the implied license support the finding that the government owned copies of the AUMD program. The issue of ownership of a copy was discussed at length in the Second Circuit's decision in the recent Titleserv case. Krause v. Titleserv, Inc., 402 F.3d 119 (2d Cir. 2005). In Titleserv, the plaintiff had previously worked as a computer programmer for the defendant. See id. at 120. After a falling out, the plaintiff terminated the business relationship, and left the defendant with only the

[10] AUMD version 2.1D (relabeled as 2.1E) was used without authorization for approximately two days. See Consol. Facts ¶ 22.

executable object code for several programs. See id. at 120-21. The defendant later modified the code to enable the continued use of the programs. See id. The court held that the defendant's adaptation of the source code of the computer programs was non-infringing within the scope of Section 117(a)(1) of Title 17. See id. at 130. In reaching its decision, the Second Circuit held that Section 117 does *not* require formal title in a copy of the computer program. See id. at 123 (citing DSC Communications Corp. v. Pulse Communications, Inc., 170 F.3d 1354 (Fed. Cir. 1999)). The Second Circuit cited the following six facts in support of its conclusion that the defendant owned copies of the copyrighted work, in the absence of formal title: (1) the defendant was free to discard or destroy the copies at any time; (2) the plaintiff customized the software to serve the defendant's operations; (3) the copies were stored on a server owned by the defendant; (4) the plaintiff never reserved the right to repossess the copies; (5) the plaintiff agreed that the defendant had the right to continue to possess and use the programs; and (6) the defendant paid the plaintiff substantial consideration to develop the programs for its sole benefit. See id. In the case at hand, the first four facts are equally present with Mr. Davenport, the Air Force, and the AUMD program. In addition, the sixth fact is similar, in that Mr. Davenport was paid a salary as a Manpower Data Manager and that the AUMD program was created for the benefit of the Air Force. Thus, the government should be considered the owner of copies of the AUMD program for the purposes of Section 117.

Second, the government adapted AUMD as an essential step in the utilization of the program in conjunction with a machine. See 17 U.S.C. § 117(a)(1). The government's sole reason for adapting AUMD was to continue using the program beyond May 15, 2000. The government sought to do this in order to keep the program functioning until SAIC could create the replacement MARS program. See Tr. at 904-05 (Glen Hendricks); see also Tr. at 457 (Peggy Gast: "we asked the

contractor SAIC if they could do a fix so that people could still run the [program]"). According to Titleserv, actions taken to allow the use of the program within the purpose of the program are allowable. See Titleserv, 402 F.3d at 125 (citing Aymes v. Bonelli, 47 F.3d 23 (2d Cir. 1995)). The court cited activities such as troubleshooting, and keeping the program up to date as "essential" activities within the meaning of Section 117. See id. Similarly, the government's sole modification to the AUMD program – extending the expiration date in the object code – was an "essential" step in continuing to use the AUMD program.

Third, the government used the adaptation of AUMD "in no other manner" within the scope of Section 117. Again, this issue looks at the purpose of the program, and whether the adaptation changed the purpose of the program. See id. at 129. The government adapted AUMD solely to keep the program operational. Accordingly, the government's copying and adaptation of the AUMD program cannot be considered an infringement under Section 117.

### *2. The MARS Programs Are Noninfringing*

In the absence of evidence of direct copying, copyright infringement may be found when "defendant had access to the copyrighted materials and that there is substantial similarity between the alleged infringing [work] and the copyrighted [work]." Herbert, 36 Fed. Cl. at 303; see also Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 11 (2005). The MARS programs cannot be found to infringe the AUMD program because: (1) there is no evidence that either the government or SAIC had access to the source code of AUMD; (2) MARS and AUMD are not substantially similar with respect to any original elements; and (3) SAIC's reverse engineering of the AUMD program was fair.

*a. The government and SAIC did not have access to the AUMD source code*

Blueport cannot controvert that the government and SAIC never had access to the source code for any version of the AUMD program, including version 2.1D. In the Consolidated Statement of Facts, Blueport agreed that "Mr. Davenport never brought the source code from his home to work, and never copied the source code to his work computer." Consol. Facts ¶ 25. Every other witness who testified regarding this matter verified that SAIC and the government never had access to the AUMD program in .mdb format. <u>See</u> Tr. at 236-38 (Ted Meyers); 457-58 (Peggy Gast); 903 (Glen Hendricks). Blueport did not produce any evidence that the government or SAIC ever had access to the source code of the AUMD program. Thus, Blueport cannot prove an essential element of its infringement assertion. "Without a showing of access, the plaintiff will not be able to establish [its] case." <u>Marshburn</u>, 20 Cl. Ct. at 709.

*b. The MARS program is not substantially similar to the AUMD program*

Blueport, despite bearing the burden of proving infringement, did not prove that any of the MARS programs were substantially similar to AUMD 2.1D. First, Blueport did not identify any source code that was substantially similar with respect to protected expression. Second, Blueport's expert's analysis was improperly subjective. Third, to the extent that the screen displays contain some modicum of protected expression, Blueport did not identify any substantial similarity.

"In the usual case, a plaintiff must prove that the defendant's work is 'substantially similar' to the protectable portions of its work." <u>Trek Leasing</u>, 66 Fed. Cl. at 11. Looking only at the text of the source code, however, Blueport did not identify **any** similarities of original expression. Dr. Orr specifically cited one example of similar source code in his expert report and during his

testimony, but he agreed that the source code should have been filtered out of his analysis. See PX 91B (Orr Report at ¶ 14, Exhibit B); compare with Tr. at 687-91 ("Actually, I would filter out all this code. Because I don't think the code, I don't think the code we're talking about is similar."). Even if Blueport had identified several lines of similar source code, that amount would not qualify as "substantial." See Apple Computer, Inc. v. Microsoft Corp., 821 F. Supp. 616, 623 (N.D.Cal. 1993). Having failed to meet its burden by identifying similarities in the source code, Blueport presented Dr. Orr's testimony that the screen displays in AUMD and MARS were similar. But see Stern Electronics, Inc. v. Kaufman, 669 F.2d 852, 857 (2d Cir. 1982) (noting that a sequence of images on a computer "might contain so little in the way of particularized form of expression as to be only an abstract idea portrayed in a noncopyrightable form").

But Dr. Orr's subjective testimony that the AUMD and MARS screen displays are similar is completely unhelpful. Dr. Orr repeatedly testified that his analysis was subjective. See Tr. at 561-62, 581, 589, 598, 605, 610, 639 ("I tried to be analytical and objective at first, and I did use numbers. But in the final analysis it became a very subjective thing with me."). Dr. Orr's methods also do not appear to be particularly reproducible. See Tr. at 716-721 ("On one day you might have a different number. You look at it, and you make a decision one way or the other."). Purely subjective testimony, such as Dr. Orr's, is a basis for exclusion under the Federal Rules of Evidence. See FRE 702, 2000 Amendments Commentary ("The more subjective . . . the expert's inquiry, the more likely the testimony should be excluded as unreliable."). Even in the absence of the Federal Rules, Dr. Orr's testimony subjective evaluation of screen displays is unhelpful because it impermissibly violates the traditional ordinary observer test. As discussed by the Ninth Circuit in Apple:

> We have traditionally determined whether copying sufficient to constitute infringement has taken place under a two-part test having "extrinsic" and "intrinsic" components. [Originally], the extrinsic prong was a test for similarity of ideas based on external criteria; analytic dissection and expert testimony could be used, if helpful. **The intrinsic prong was a test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance**. As it has evolved, however, the extrinsic test now objectively considers whether there are substantial similarities in both ideas and expression, whereas **the intrinsic test continues to measure expression subjectively**.

Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir. 1994) (emphasis added); see also Trek Leasing, 66 Fed. Cl. at 15 (applying the ordinary observer test and citing Apple). In contrast, the government's expert, Mr. Keohane, attempted to apply objective criteria to compare the source code as much as possible. Tr. at 984, 993 (using established third-party tools to analyze the software). Therefore, to the extent that the Court considers the expert testimony for either infringement expert, the Court must consider it only in the context of the external, objective analysis. Dr. Orr's subjective testimony regarding similarity of screen displays is irrelevant.

Even considering the screen displays independently of the source code, Blueport did not identify any specific original elements that had been copied. Dr. Orr's report indicates that he believes that the visual similarity between AUMD 2.1F and MARS 1H / 1L "ranges from 40% to 100%." PX 91B (Orr Report ¶¶ 4, 7, 16).[11] This conclusion appears to be based on a series of short documents attached to his initial report. See PX 128 (CD, "Comparison Reports" directories); PX 91B (Orr Report Exhibit B). Many of these documents do not identify the visual elements Dr. Orr considered; the documents that do identify the visual elements do not consider whether those elements are protectible. Dr. Orr generally discussed features that he considered protectible, such

[11] The figure of 40% may be erroneous. According to Plaintiff's Exhibit 128, Dr. Orr stated that the visual similarity "between UMD21F 'frmPasListing' and QUERY 'frmSorts Tab 1'" was 0%. PX 128 (CD).

as the existence of a button and a text box. See, e.g. Tr. at 579-80 (testifying that he disregarded font typeface and appearance). Blueport's failure to identify specific, original features that had been copied on specific screens is fatal to its case.

Even if Blueport had identified specific original elements that had been copied, the doctrines of *scenes a faire* and merger would have precluded protection for those elements. See Apple Computer, Inc. v. Microsoft Corp., 799 F. Supp. 1006, 1020 (N.D.Cal. 1992) ("If the similarity of the works in suit stems solely from unprotectible features, then the plaintiff's case is missing an essential element of infringement."). Typically, courts use these two doctrines to filter out unprotectible elements of a copyright during the filtration step of the abstraction-filtration-comparison test.[12] *Scenes a faire* denies "protection to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting," or to "elements of a program that have been dictated by external factors." Gates Rubber, 9 F.3d at 838. Merger denies protection of "expression that is inseparable from or merged with the ideas, processes, or discoveries underlying the expression." Id. To apply these doctrines to this case, *scenes a faire* would preclude consideration of the common appearance of an electronic address book or an email form. Compare PX 128 (assessing visual similarity of the address book in frmEmailSelect at 100%). Merger would preclude protection for forms whose elements could only be displayed in one of a few different ways. For example, Dr. Orr concluded that the AUMD and MARS forms named Defaults were 100% visually similar, but both forms depict two lines for setting a default directory, and

[12] The abstraction-filtration-comparison test was discussed in the government's Pre-Trial Memorandum. See Gov't Pre-Trial Memo at 35-37; see also Gates Rubber Co. v. Bando Chemical Indus., 9 F.3d 823, 834 (10th Cir. 1993); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 707 (2d Cir. 1992). The parties and the Court agreed that this test is the proper test to use to separate unprotectible ideas from protectible expression in the AUMD program. See Tr. at 827, 1088, 1148.

"save" and "close" buttons. See PX 128 (CD file frmDefaults.gif). In general, other unoriginal expression should always be excluded. See, e.g., PX 128 (CD Report frmSplash, considering the use of ClipArt designed by Microsoft); Tr. at 347 ("I would see other programs that were working on the internet, things like that, and the features that they had in them I thought was pretty cool, so I incorporated that.").

Blueport's approach has been rejected in a number of copyright cases considering the protectibility of screen displays. See, e.g., Apple, 799 F. Supp. at 1016-47; Lotus Development Corp. v. Borland Intern., Inc., 49 F.3d 807, 816, 819 (1st Cir. 1995). A recent district court case with similar facts to the present case provides insight with respect to determining substantial similarity between two Microsoft Access programs. In the Maddog Software case, an employer moved for a preliminary injunction against a former employee, claiming that the employee's Microsoft Access program infringed the employer's Access program. See Maddog Software, Inc. v. Sklader, 382 F. Supp. 2d 268, 271 (D.N.H. 2005). The former employee had created the original program, but after leaving the company, had modified the program. Id. at 271-73. The employee testified that he had created the original program "simply by using the familiar 'Wizard' function" and then he allowed Access to "generate[ the] source code, *i.e.*, a series of instructions to a computer rendered in a language comprehensible to humans, corresponding to that form." Id. at 273. The court held that the plaintiff's failure to identify any original, copied material – other than a generally asserting "the design, selection and arrangement of the screens, directories, macros and other data" – was fatal to its motion. Id. at 279. For the sake of completeness, the court analyzed plaintiff's legal claims, and held that the merger doctrine preclude protection of "mathematical formulae that cannot be expressed any other way . . . rendering any such forms unprotectable" and that standard

industry practices "largely dictated the categories of information which each form includes." Id. at 280-81. Finally, the court rejected plaintiff's allegation that screen displays of the programs were "pixel for pixel" similar, because the screen displays were products of the copyrighted work, rather than the copyrighted work itself. Id. at 281. As such, "[a]ny similarity between the screen displays is therefore immaterial to [plaintiff's] claim that [defendant] has infringed its copyright in [the computer program]." Id. at 282.

In conclusion, Blueport failed to prove both essential elements of its infringement assertion. The evidence demonstrated that the government did not have access to the source code of the AUMD program, and that the MARS programs are not substantially similar to any protectible expression within the AUMD program.

*c. The government fairly adapted the AUMD program in the context of SAIC's efforts to reverse engineer the AUMD program – 17 U.S.C. § 107*

Because the Copyright Act does not protect ideas, the Copyright Act permits "fair use" of a copyrighted work in certain circumstances:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment . . . scholarship, or research, is not an infringement of copyright.

17 U.S.C. § 107; see also Atari Games Corp. v. Nintendo of America Inc., 975 F.2d 832, 842 (Fed. Cir. 1992) ("Under the Act, society is free to exploit facts, ideas, processes, or methods of operation in a copyrighted work."). Section 107 lists four factors for courts to consider for fair use – the purpose and character of the use; the nature of the copyrighted work; the amount and substantiality of the portion used; and the effect upon the market for the copyrighted work. 17 U.S.C. § 107.

In the Federal Circuit's Atari case, the court analyzed the fair use defense in the context of a claim of reverse engineering a computer program. The court held that reverse engineering a computer program's object code to discern unprotectable ideas is a fair use. See Atari, 975 F.2d at 843 ("When the nature of a work requires intermediate copying to understand the ideas and processes in a copyrighted work, that nature supports a fair use for intermediate copying."). The court discussed the potential application of the fair use defense to two different situations. First, the court held that Atari's acquisition of the source code from the Copyright Office was not a fair use, because Atari obtained and used the source code without authorization. See id. Second, the court held that Atari's efforts to obtain the source code from the embedded computer chip through dissection and analyzation qualified as fair use. See id. at 843-44. The distinction is that Atari owned a copy of the embedded computer chip, and copied only what was necessary to reverse engineer the chip. The Ninth and Eleventh Circuit have employed nearly identical approaches to the issue of fair use. See Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1520-28 (9th Cir. 1992); Sony Computer Entm't, Inc. v. Connectix Corp., 203 F.3d 596, 602-08 (9th Cir. 2000); Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1540 n.18 (11th Cir. 1996) (adopting the Sega court's application of the fair use doctrine to reverse engineering activities).

The government and SAIC's use of the AUMD program to create the MARS programs was similarly a fair use. First, as discussed above, the government had an implied license to use its copies of the AUMD program. Second, the government and SAIC never had access to the source code of the AUMD program. Third, the witnesses testified that SAIC's use of the AUMD program was restricted to the minimum amount necessary. Ted Meyers, Peggy Gast, and Glen Hendricks all testified that SAIC reverse engineered the AUMD program. See Tr. at 206, 454. Asked to explain

further, Ted Meyers specifically stated that SAIC examined the output of the AUMD program in order to create the MARS program, and that, besides the date code, no other modifications were made to the AUMD program:

> Q Earlier you mentioned the phrase "reverse engineering". What did you mean by that phrase?
> A By that phrase, I mean looking at the output, primarily the screens and the reports that PACAF system provided, and going back and developing source code that would do that same thing, that would produce that same output so that it would draw data from tables or from wherever it needed to and massage it as necessary to produce that screen.
> Q Besides modifying the date code of the AUMD program, did SAIC modify the AUMD program in any other way?
> A No, we did not.

Tr. at 234-35. Glen Hendricks also verified this account, stating:

> . . . . And for [SAIC] to start [reverse engineering the AUMD program] I needed the relationship of data and everything and then to use [AUMD] and start reverse engineering what it did, where it came from, and then come back to us why does this occur? Well, there is this piece over here that causes a relationship with that.
>
> And so it was again, you know, several months of sorting through ways of trying to figure out how the code worked to make sure that they understood and then could start giving us a usable program.

Tr. at 904-05. Thus, even if MARS did copy features from the AUMD program, it copied only the unprotectable features of the AUMD program through the process of reverse engineering. Thus, SAIC and the government fairly used the AUMD program by reverse engineering it for the MARS program.

### D. Assuming Infringement, Compensation is Limited to Minimum Statutory Damages

Based on the evidence at trial and the issues discussed above, Blueport is not entitled to any compensation under Section 1498(b). The Court, however, suggested that the government address what the appropriate compensation would be, assuming infringement. See August 10, 2006 Order.

### *1. Reasonable and Entire Compensation Under Section 1498(b)*

Section 1498(b), the sole jurisdictional basis for this lawsuit, invokes the eminent domain principles of the Fifth Amendment by allowing the recovery of "reasonable and entire compensation":

> the exclusive action . . . shall be . . . for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17.

28 U.S.C. § 1498(b). Although Congress specifically referenced Section 504(c) of Title 17, Congress did not reference Section 504(b). Therefore, to the extent that the Court requests an analysis of "appropriate amount of damages under . . . 17 U.S.C. § 504(b)," the government contends that Section 504(b) is not an appropriate source of damages, in the absence of a waiver of sovereign immunity. See August 10, 2006 Order ¶ 9; see also Leesona v. United States, 599 F.2d 958, 968-71 (Ct. Cl. 1979) (holding that Section 1498 does not incorporate all damage provisions of Title 35). This distinction between Section 1498(b) and Section 504(b) is important in at least one respect. Section 504(b) permits a recovery of profits, whereas Section 1498(b) does not mention profits as a measure for compensation. Pursuant to the principles of sovereign immunity and eminent domain, profits are unavailable as a remedy under Section 1498(b).

In other respects, however, the analysis for actual damages under Section 504(b) is very similar to the analysis of reasonable compensation under Section 1498(b). Section 504(b) requires that the actual damages be suffered "as a result of the infringement." 17 U.S.C. § 504(b). Thus, the damages must be a proximate consequence of the infringing activity. See Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004) ("[I]t is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages

and profits . . . a plaintiff in a § 504(b) action must establish this causal connection."); Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1171 (1st Cir. 1994) (stating that plaintiff must prove "that, but for the defendant's infringement, the plaintiff would not have suffered the loss"). In addition, under Section 504(b) actual damages may not be based on "undue speculation." Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir. 1985); see also Childress v. Taylor, 798 F. Supp. 981, 991-92 (S.D.N.Y.1992) (declining to award actual damages because copyright owner's play was a commercial failure and estimates of damages were unduly speculative).

These two principles are applicable in the context of Section 1498(b). Under Section 1498, the United States is not an ordinary infringer, but rather a compulsory, nonexclusive licensee. See Motorola, Inc. v. United States, 729 F.2d 765, 768 (Fed. Cir. 1984) (discussing reasonable compensation under Section 1498(a)); Leesona, 599 F.2d at 968. Thus, the proper focus is "what the owner has lost, not what the taker has gained." Leesona, 599 F.2d at 969. Because patent or copyright infringement by the government is akin to the taking of a compulsory, nonexclusive license, the Court must ascertain the value of the license at the time of the taking to determine compensation. See Decca Ltd. v. United States, 640 F.2d 1156, 1167 (Ct. Cl. 1980).

As discussed below, Blueport failed to demonstrate that the AUMD program had any value at the time of the alleged infringement. Accordingly, Blueport's compensation is the minimum statutory damages under Section 504(c) – $750.

***2. Blueport Failed to Establish Actual Damages***

Blueport completely failed to establish a nexus between the infringement and any economic harm. First, the AUMD program does not have any economic value independent from the Air Force and the Air Force's data. Blueport admits that it never sold a single copy or license of the AUMD

program. See DX 50 (Response to Req. for Adm. 19); Tr. at 54-55. In addition, Blueport admits that it has never received any income from the AUMD program. See DX 50 (Response to Req. for Adm. 20); Tr. at 54-55.

Second, Blueport could not have sold its program to the Air Force, so it had zero economic value with respect to the Air Force. Blueport admits that it did not submit a proposal in response to the Air Force's official solicitation for contractors. See DX 50 (Response to Req. for Adm. 21). Even if Blueport could have submitted a proposal, it is unlikely that they could have fulfilled the contract, because Mr. Davenport was unwilling to release the source code. See Tr. at 396. The Air Force specifically required its contractor to provide the source code in order to make future modifications to the program:

> 2.2.1 The Air Force manpower community has a Manpower Data System (MDS) report system (existing system), written in Microsoft Access 97 . . . . We only have the restricted database (.mde) application files. We do not have the source database (.mdb) files. Without the source database (.mdb), we can not make future modifications to the system.
> 2.2.2 The service provider shall provide us with the source database (.mdb) for this system, which will then be called the Manpower Access Report System (MARS).

PX 111 (SOW at 1-2); compare with Blueport Pre-Trial Fact ¶ 17 (stating that, despite the offer of money, Mr. Davenport "expressed his interest in maintaining control over the AUMD program and indicated that he would not release its source code to the government").

Third, the amount that the government paid to SAIC for the MARS programs has no relationship to any loss suffered by Blueport. The MARS programs and the AUMD programs are not directly comparable. MARS was created by professional programmers with government input, specifications, and oversight. See, generally, PX 15, 16, 18, 19, 32, 34 (MARS reports). The MARS programs ultimately contained more features than AUMD. See Tr. at 905. Blueport does

not account for these differences. In addition, SAIC created at least 23 different versions of MARS. Blueport completely fails to distinguish between these versions, and broadly assumes that every version of MARS infringes the AUMD copyright. Thus, Blueport's argument that AUMD and MARS are equivalent for damages purposes is unduly speculative.

Fourth, Dr. Rudd's analysis is fundamentally flawed. Dr. Rudd's opinion with respect to the "cost to recreate" the AUMD program is completely irrelevant to reasonable compensation under Section 1498 and to actual damages under Title 17.[13] See Tr. at 740, 750-51; PX 70 (Rudd Report at 2, 5-6, 13). In Quinn, a district court rejected this argument in a case with similar facts. See Quinn, 23 F. Supp. 2d. at 750 ("Quinn's *only* proposed calculation of damages is the amount it allegedly would have cost the City of Detroit to create a so-called comparable data management system. This method of calculating damages is not recognized under the Copyright Act."). The court also held that the plaintiff failed to "prove the existence of a causal connection between the City's alleged infringement and some loss of anticipated revenue." Id. at 751 ("The plaintiff must show that the infringement was the cause-in-fact of its loss by showing with reasonable probability that 'but for' the defendant's infringement, the plaintiff would not have suffered the loss."). The court held that plaintiff's theories of recovery were unduly speculative, and awarded no damages. Id. at 752-53.

[13] In addition, as discussed in the government's Pre-Trial Memorandum, Dr. Rudd's methodology of arriving at the "cost to recreate" is flawed. See Gov't Pre-Trial Memo at 43-44 (discussing counting lines of code). Furthermore, if the "cost to recreate" was the proper measure of damages, there is evidence in the record of Mr. Davenport's actual costs of creation. See DX 3 (Email at Page 41 of 68) ("I put 600 man-hours and around $3000 into the development of [all versions of] the program.").

Thus, with respect to Section 1498(b), Blueport failed to demonstrate that: (1) the AUMD program had any fair market value; and (2) the government's actions directly caused economic harm to Blueport.

### *3. Blueport's Maximum Recovery is $750*

In the absence of actual damages, Blueport's maximum recovery is governed by the plain language of Section 1498(b), which allows "minimum statutory damages as set forth in section 504(c)" as a measure for reasonable compensation. 28 U.S.C. § 1498(b). The only interpretation of this phrase that does justice to the words of the statute is that minimum statutory damages is $750.

The starting point for interpreting "minimum statutory damages" is the language of the statute itself. See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979). "Minimum" is defined as "[t]he least possible degree or quantity" and "[a] lower limit permitted by law or other authority." American Heritage College Dictionary 868 (3d ed. 2000). Therefore, under the current statutory limits, the plain meaning of "minimum" is $750 based on the ordinary, common meaning of the word. See 17 U.S.C. § 504(c)(1) (establishing the range of statutory damages, with the minimum amount set at $750, and the maximum amount set at $30,000). In discussing actions brought under Section 1498(b), Nimmer on Copyright notes that "remedies against the United States are limited, in that costs and an injunction cannot be awarded, and other relief is limited as well.” 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.01[E][1] (2005). The wording of Section 1498(b) makes it "appear that, in actions against the government, the court

lacks discretion . . . to increase statutory damages above the minimum amount of $750 . . . ." Id. at § 12.01[E][1] n.162.

This conclusion is at odds with the Court of Federal Claims's conclusion in the Wechsberg case. See Wechsberg v. United States, 54 Fed. Cl. 158, 165-66 (2002). The Wechsberg court, in *dicta*, construed "minimum statutory damages" the entire range of statutory damages.[14] Id. To support this, the court suggested that the word "including" should be read "but at least." Id. This interpretation, however, reads out the word "minimum" from the plain language of the statute, because anything other than $750 is not "minimum statutory damages." The court's interpretation of the statute renders that portion superfluous, in violation of the principles of statutory interpretation. See Hohn v. United States, 524 U.S. 236, 249 (1998); Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998) (quoting Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837 (1988)). In addition, the court's incorrectly substituted its judgment for Congress's by inferring that plaintiffs would have "no logical reason" to choose minimum statutory damages if they were limited to $750. Wechsberg, 54 Fed. Cl. at 166; compare with H.R. Rep. No. 94-1476 (1976, reprinted in 1976 U.S.C.C.A.N. 5659, 5777) (stating that a copyright infringement plaintiff is "not obligated to submit proof of damages and profits and may choose to rely on the provision for minimum statutory damages"); BMG Music v. Gonzalez, 430 F.3d 888, 892 (7th Cir. 2005) (affirming award of minimum statutory damages, and defining $750 per work as "the statutory minimum award"); Gnossos Music v. Mitken, Inc., 653 F.2d 117, 118 (4th Cir. 1981) (noting that the plaintiffs "waived

[14] The parties in Wechsberg never briefed this issue. The court's interpretation of "including the minimum statutory damages" is pure *dicta* because the court did not award any statutory damages whatsoever. See id. at 167. As a result, the government could not appeal the court's conclusions.

any recovery in excess of the $250.00 minimum statutory damages" and that plaintiffs seeking minimum statutory damages are "relieved of the often difficult burden of proving actual damages or infringer's profits"); Encyclopaedia Britannica Educ. Corp. v. Crooks, 558 F. Supp. 1247, 1252, 1256 (W.D.N.Y. 1983) (awarding minimum statutory damages to plaintiffs seeking the same where plaintiffs contended actual damages were incalculable and where plaintiffs offered no proof of damages). Because Section 1498(b) is susceptible to a plausible reading under which sovereign immunity is not waived for statutory damages above $750, the statute fails to establish an unambiguous waiver for statutory damages above $750 and sovereign immunity therefore bars statutory damages above $750. See Marathon Oil, 374 F.3d at 1127. For this reason, this Court should adopt the plain meaning of the statute and decline to follow Wechsberg.

**CONCLUSION**

In view of the foregoing, the government's use of the AUMD programs and the MARS programs did not infringe Blueport's copyright. Blueport is not entitled to any damages.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

s/Scott Bolden
SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

OF COUNSEL:

CHUN-I CHIANG
Air Force Legal Operations Agency
Department of the Air Force

September 29, 2006

Attorneys for the United States