No. 02-1622C
(Judge Lawrence J. Block)

# In the United States Court of Federal Claims

BLUEPORT COMPANY LLC

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**PLAINTIFF'S POST TRIAL BRIEF**

KURT M. RYLANDER
*Attorney at Law*
MARK E. BEATTY
*Attorney at Law*

RYLANDER & ASSOCIATES PC
406 West 12th Street
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 397-0473

Attorneys for Plaintiff

COMES NOW Plaintiff and submits this, its Post Trial Brief, in accordance with the Court's Order dated August 10, 2006.

SPECIFIC QUESTIONS

1. Are the defenses set out in 28 U.S.C. § 1498(b) jurisdictional in nature? Is the burden, therefore, on plaintiff to show that the defenses are not applicable and that jurisdiction is appropriate, or is the burden on defendant to show that the defenses are applicable and bar plaintiff's claim. Since cases addressing the jurisdictional nature of 28 U.S.C. § 1498(b) are limited, the parties should draw comparisons with other jurisdictional statutes in making their arguments.

This direction addresses three issues: (1) are the defenses jurisdictional? (2) who has the burden of proof on the defenses? (3) must the Court address the defenses before any other item? The presentation of the defenses in 1498(b) is very similar to the presentation of the discretionary function exception to jurisdiction in the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680. The treatment of that exception guides this Court on how the 1498(b) defenses should be treated here.

The discretionary function exception is jurisdictional. United States v. Gaubert, 499 U.S. 315, 113 L.Ed. 2d 335 (1991)). However, the government bears the burden of proving the discretionary function exception. Prescott v. United States, 973 F.2d 696, 701-02 (9th Cir. 1992) Laurence v. United States, 851 F. Supp. 1445, 1450 (N.D. Cal. 1994) (citing Prescott); see also Autery v. United States, 992 F.2d 1523, 1526 (11th Cir. 1993), cert. denied 114 S. Ct 1829 (1994); Carlyle v. United States, 674 F.2d 554, 556 (6th Cir.1982); Stewart v. United States, 199 F.2d 517, 520 (7th Cir.1952). All circuits to address the issue have concluded that the burden of proving the discretionary function exception lies with the government. Prescott, 973 F.2d at 701 (9th Cir. 1992); Carlyle, 674 F.2d at 556 (6th Cir.1982); Stewart , 199 F.2d 517, 520 (7th Cir.1952); Autery, 992 F.2d at 1526 (11th Cir. 1993). "Only after a plaintiff has successfully invoked jurisdiction

by a pleading that facially alleges matters not excepted by § 2680 does the burden fall on the government to prove the applicability of a specific provision of § 2680." Carlyle, 674 F.2d at 556 *quoted in* Prescott, 973 F.2d at 702 n. 4.

In Prescott, the court addressed, among other things, the burden of proof on the jurisdictional defense, the discretionary function, under the Federal Tort Claims Act. Under the FTCA, the plaintiff can only invoke jurisdiction if the complaint is outside of the exceptions of Section 2680, which includes the discretionary function exception. Id. at 701-702. This does not require the plaintiff to disprove every exception. Id. Instead, the plaintiff may not invoke jurisdiction by pleading matters that plainly fall within the exception. Id. If the plaintiff ahs facially plead matters that do not fall within the exception, the burden falls upon the government to prove the applicability of a specific provision. Id.; accord Carlyle, 674 F.2d at 556; Martinez v. United States, 740 F. Supp. 399, 401 (D.S.C. 1990); Berman v. United States, 565 F. Supp. 1353, 1404-05; contra. Waymire v. United States, 629 F. Supp. 1396, 1397 D.Kan. 1986); Porter v. United States, 619 F. Supp. 137, 142 (S.D. Ohio 1985). The Ninth Circuit explained:

> "Because an exception to the FTCA's general waiver of immunity, although jurisdictional on its face, is analogous to an affirmative defense, we believe the Sixth and Seventh Circuits correctly placed the burden on the United States as the party which benefits from the defense. Today, we follow these two circuits and adopt the rule as set forth by the Sixth Circuit in Carlyle. We thus hold explicitly that the United States bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity. As the Seventh Circuit reasoned in Stewart, placing the burden on the plaintiff would 'impose upon the plaintiff the burden of proving [thirteen] negative averments. Such a result would border on the preposterous.'"

Prescott, id. at 702 (citing Carlyle and Stewart) (block quote in original). The Ninth Circuit in Prescott specifically examine the Supreme Court's decision in Gaubert. In Gaubert, the Supreme Court appeared to impose the burden on the tort plaintiff to show

that the government's conduct is not protected under the discretionary function exception. "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of a regulatory regime." Gaubert, 111 S. Ct. at 1274-75. The Ninth Circuit, in Prescott, held that Gaubert does not conflict with its ruling that the government bears the burden of proof because Gaubert requires plaintiffs only to allege facts sufficient to state a claim under the FTCA, but does not deal specifically with the burden of proof issue. Prescott, 973 F.2d at 702 n. 4. The Tenth Circuit has questioned the approach taken in Prescott, but has not made a formal ruling on the issue. Kiehn v. United States, 984 F.2d 1100, 1105 n. 7 (10th Cir. 1993).

Moreover, a separate doctrine further underscores placing the burden of establishing the defenses on the Government. Where the government's challenge to jurisdiction implicates the elements of the plaintiff's cause of action, i.e., where the "jurisdiction is so intertwined with the merits that its resolution depends on resolution of the merits", the trial court should find that jurisdiction exists and deal with the challenge as a direct attack on the merits of the plaintiff's case, for purposes of judicial economy. Williamson v. Tucker, 645 F.2d 404, 415-16 (5th Cir. 1981), cert denied 454 U.S. 897, 70 L.Ed.2d 212 (1981); Careau Group v. United Farm Workers, 940 F.2d 1291, 1293 (11th Cir. 1991); Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 734 (11th Cir. 1982); Allen v. United States, 527 F. Supp. 476, 486-88 (D. Utah 1981); Schalk v. Associates Anesthesiology Practice, 316 F. Supp. 2d 244, 248-49 (D. Maryland 2004); United States v. North Carolina, 180 F.3d 574, 580-81 (4th Cir. 1999); Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039-40 (9th Cir. 2004)

2. <u>Address each of the 28 U.S.C. § 1498(b) defenses that are relevant in this matter. Specifically whether Mr. Davenport: (a) influenced or induced the government's use of the AUMD program; (b) prepared the AUMD program as part of his official functions; (c) used government time, material and facilities to create the AUMD program. The parties are specifically asked to explore the nature and extent of an employer's rights in copyrighted materials produced by an employee during the period of the employee's employment. Are there analogous situations whose law might be helpful, such as employment law, covenants not to compete, etc., that may shed light on this issue? If so, how?</u>

Plaintiff has met the burden of proof to overcome the § 1498(b) defenses, regardless of whether they are jurisdictional or merely affirmative defenses. The evidence presented at trial by Plaintiff established that:

(1) Mark Davenport was a junior enlisted person not in a position to order or influence decisions on the adoption of his AUMD software, nor the derivative work MARS;

(2) Mark Davenport did not induce the Air Force to use the AUMD or MARS software, but its use spread by actions of his superiors and word of mouth due to superior performance;

(3) software programming was never a type of work that was part of Mark Davenport's official functions or duties; and,

(4) Mark Davenport did not use government time, materials or facilities to create the AUMD software.

A. <u>Davenport was not in a position to order, influence, nor induce the use of AUMD or MARS.</u>

As a junior enlisted person Davenport was never in a position to order, influence or induce the use of his software. Mark Davenport was a Technical Sergeant

in the Air Force, a Manpower Specialist, paygrade E-6[1], when he created the AUMD programs at issue in this suit in May of 1998. *Trans., pp.91, 470*. Davenport retired at the same paygrade in May 2001 after twenty years of service. *Trans., p429; Pl. Exh. 94*. The most junior Manpower Specialists were paygrade E-5, only one paygrade below Davenport. *Trans., pp 63, 465, 471*. His official position during that time was a Manpower Data Manager in the Pacific Air Force Command (PACAF). *Trans., p74-5*. At no time during his Air Force career was Davenport a reporting senior over anyone, nor was he a direct supervisor over anyone. *Trans., p75*. Davenport did not possess contracting authority to issue or modify contracts, although he was occasionally responsible for monitoring existing contracts. *Trans., p82; Pl. Exh. 101*.

Statutory construction is an issue of law for the court. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Engine Mfrs. Ass'n v. South Coast Air Quality Mgt. Dist., 541 U.S. 246, 252-3 (2004) (citing Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, (1985)) (using WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1945) to define words of statute according to their ordinary meaning). Nothing in the text of 28 U.S.C. § 1498 indicates other than the ordinary meaning for the terms "order, influence, or induce." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1981) defines "order" as (in relevant part): "2a: to issue commands : COMMAND... b: to give or place an order."

[1] The rank structure of the Air Force progresses from enlisted personnel through commissioned officer ranks. Enlisted ranks are: E-1 Airman Recruit; E-2 Airman Apprentice; E-3 Airman; E-4 Sergeant; E-5 Staff Sergeant; E-6 Technical Sergeant; E-7 Master Sergeant; E-8 Senior Master Sergeant; E-9 Chief Master Sergeant. Officer ranks proceed as: O-1 Second Lieutenant; O-2 First Lieutenant; O-3 Captain; O-4 Major; O-5 Lieutenant Colonel; O-6 Colonel; O-7 Brigadier

WEBSTER'S at 1588. Similarly, "influence" is defined as: "1: to affect or alter the conduct, thought, or character of by indirect or intangible means: SWAY... 2: to have an effect on the condition or development of : determine partially : MODIFY... 3 *obs*: INDUCE, INFUSE..." WEBSTER'S at 1160. And "induce" is defined as: "1a: to move and lead (as by persuasion or influence)...: prevail upon: INFLUENCE, PERSUADE... [1b]: to inspire, call forth, or bring about by influence or stimulation..." WEBSTER'S at 1154. "Induce" is further defined by synonym:

> "syn: PERSUADE, PREVAIL: INDUCE may indicate overcoming indifference, hesitation, or opposition, usu. by offering for consideration persuasive advantages or gains that bring about a desired decision... PERSUADE may suggest a winning over by an appeal, entreaty, or expostulation addressed as much to feelings as to reason... PREVAIL may be used in situations in which strong opposition or reluctance is overcome by sustained argument and entreaty..."

WEBSTER'S at 1154. The clear implications of the ordinary meanings of "order, influence, or induce" are therefore to require a position of decision making authority, or to actively exert pressure to overcome opposition. All the evidence presented at trial demonstrates that Davenport did not do this – in fact quite the opposite was demonstrated. These words should not be interpreted to deny compensation to low level government employees for work outside their expected duties, for which they have not received compensation through salary or benefits commensurate with the work. Ironically, the Air Force officially agrees with Plaintiff's interpretation.

The Air Force has had the opportunity to evaluate and explain its position concerning this very language previously in the context of 28 U.S.C. § 1498(a) (a subsection with an identical provision). In <u>Matter of Government Acquisition of License</u>

---

General; O-8 Major General; O-9 Lieutenant General; O-10 General. The most junior officer (2d Lt.) outranks the most senior enlisted (CMS).

to Employee's Invention, B-199,026, 60 Comp. Gen. 248, 1981 WL 22453 (Comp. Gen. Feb. 11, 1981), in response to an inquiry about the propriety of a licensing agreement between an Air Force employee (Mr. Jeffers) and the Air Force, the Comptroller General stated that a licensing agreement would not be proper if the employee was in a position to order, influence or induce use of an invention, but that if the "employee can be insulated from decision to use patented device…the Air Force may enter into the licensing agreement. Id. at 248. The Comptroller General explained:

> "The purpose of Section 1498 is to prevent an employee who is in a position to order, influence or induce the government to use his invention and thus infringe his patent from successfully suing the government for patent infringement. *** The issue as we see it is whether the inventor can be insulated form the decision making process. We have no objection to his assisting in the testing and use of the invention if he is in no way in a position to determine whether, or how many, items involving his patent are procured."

Id. at 251. Just as Mr. Jeffers' case, above, Davenport was never in a decision making position where he could determine, or even affect, the outcome of a decision to adopt or reject a license for the AUMD software. At no time was Davenport in a position to order anyone to use the AUMD software. He was not even the ranking enlisted person in his work group, much less of sufficient rank to give orders to Manpower Specialists throughout the Air Force. Davenport provided copies personally to those he worked with when requested, but was not in charge of those he provided copies to and did not force or even encourage them to do so.

The reason AUMD became widely used was that it was so effective, not because Davenport promoted it. Glendon Hendricks, a Defense witness described AUMD as "Very slick. Very good." *Trans., p. 890*. In fact, the testimony was that it was Davenport's superiors and other senior officers who actually promoted the distribution of

AUMD due to its superior qualities. Col. Manning testified:

> "Q [Mr. Rylander]: ***Now, to your knowledge, at any time when Technical Sergeant Davenport was in your chain of command was he trying to get people to use the program who didn't want to?***
>
> A [Col. Manning]: ***No, he was not.***
>
> Q: A witness has suggested that at some point because of these programs the PACAF at Hickam became sort of a call center for everybody who wanted to use the AUMD programs. Is that your recollection?
>
> A: Yes. Sergeant Davenport developed the tool, and then ***as people were interested he would provide it to them, and he would maintain the currency of the tool for them*** so that they would have the most current software and capability. So he would maintain it from our office and allow others to use it in that fashion."
>
> ***
>
> Q [The COURT]: I want to ask you about distribution, about how it was distributed and why this program was distributed based on your knowledge.
>
> A [Col. Manning]: Why it was distributed would be that people saw value in the program in that it was able to provide information within minutes and/or seconds that would normally have taken about a day to a half-day to acquire....
>
> ***
>
> THE COURT: Okay. The Pacific Command is pretty big.
>
> THE WITNESS: That's correct.
>
> THE COURT: Okay. How did people learn about it? How did they know about it?
>
> THE WITNESS: You would probably have --
>
> THE COURT: Based on your knowledge.
>
> THE WITNESS: That's correct, and again as you work in the course of a normal day, our technicians are interacting with our bases, and they are pulling data, and interaction with the base manpower function, and would say, you know, we have a tool up here that pulls this data, and as we work

> your issues do you see any conflict.
>
> So I think the word spread that this tool was being used as technicians talk to one another on a daily basis throughout the command. ***Also, there was a manpower conference that was typically done annually, and a colonel as a matter of fact at training command learned of this tool, and asked Sergeant Davenport to come to the conference and brief it to all the colonels that were at this conference because he was so impressed by it***..."

*Trans., pp. 504-7*. Maj. Meaker, a Defense witness, corroborated the fact that Davenport's seniors, his chain-of-command, were the source of pushing distribution of the AUMD software, not Davenport. When asked how he knew that use of AUMD was widespread by the time he left PACAF, Maj. Meaker responded:

> "Well, when I left there, I, of course, knew the program, trusted the program, and ***I tried to implement it as much as possible when I was in my last job, the requirements branch. I tried to get every technician to know about it, to be able to build their what we call manpower change requests using the system***. And I think Mr. Davenport was also somewhat helpful or ambitious into getting this out for folks to use it as much as possible, and so designed the program so that people, instead of putting manpower change requests on paper and submitting it into someone's in basket, could actually send an e-mail that once it was approved could be uploaded into, and make the changes directly to the Command Manpower Data System.
>
> *So it was a, you know,* ***I had direct oversight over people who were using this. And I know it was my intention to get as many of the technicians using this program as possible. And it wasn't because of any benefit I saw, other than it was a better system, a cleaner system.*** You needed less people, you'd do more work with less, you'd get stuff done faster. You know, everything a manager might like in a software improvement.
>
> ****
>
> Q What do you mean by Mr. Davenport being aggressive in getting the program out?
>
> THE WITNESS: ***That might be bad terminology on my part. I want to find a word that suggests he was very receptive, and very helpful in getting things changed, you know.*** Mr. Davenport was very smart, and often he got to thinking he was smarter -- he came across, or he let other

people know.

> So when you came up with an idea, he'd say hey, I think we can do that. And he'd already been thinking of that idea. ***But he wasn't a supervisor, so he may not have pushed it, you know, been aggressive, but he'd certainly been helpful in getting changes implemented.***"

*Trans., pp. 794-6* (emphasis added). Being "helpful" to senior officers who are trying to distribute your software is not to "order, influence, or induce." This was a pull-system, where people requested from Davenport, not a push-system where Davenport campaigned for implementing AUMD. Mr. Hendricks' testimony did not contradict this. Any knowledge that Mr. Hendricks had relating to how the AUMD software came to be distributed was not certain at best, and based on second hand knowledge and assumptions.

Even where Davenport presented the programs at the San Antonio "conference of Colonels," it was at the direction of his superiors or the requests of others, not at his own initiative or request, and so acts of inducement or influence cannot be attributed to him. Col. Manning testified that TSgt Davenport was "invited" to a Manpower annual conference by a Col. Jensen from the Air Education and Training Command (AETC), but that as a junior enlisted person Davenport was not in a position to refuse the invitation. *Trans., pp. 508-11.* Col Jensen had requested Davenport's presentation because Col. Jensen had seen the software in operation and was impressed by its efficiency – not because Davenport had contacted the Colonel. *Trans., pp. 506-7.* Davenport also testified that he made presentations on AUMD at several air bases during visits scheduled for training on MDS, but only at the request of the recipients and not of his own initiative.

There was also testimony regarding Davenport's participation in the Manpower

User Group, or "MUG." Davenport testified that the MUG was merely a group that passed requests or wish lists up to the decision makers. *Trans., pp. 115-16.* At some point it appears that MUG evaluated AUMD to determine if it should be adopted as an official program – this was rejected. *Trans., pp. 116-18; Pl. Exh. 110c.* However, if MUG did evaluate Davenport's AUMD software, then Davenport was not a part of that – he was not even aware that this had happened. *Trans., pp. 116-20; Pl. Exh. 110C; Pl. Exh. 138.* Mr. Hendricks' testimony did not contradict Davenport's testimony on these points. Clearly, this would not amount to "influence" or "inducement".

B. AUMD was not prepared as a part of the official functions of Davenport.

Whether a copyrighted work was prepared as a part of the official functions of a government employee is a question of fact that must be established by evidence. The analysis of the "official functions" defense is analogous to, but narrower than, the analysis of the "work made for hire" doctrine in the Copyright Act. 17 U.S.C. § 101 (definition of work made for hire: "a work prepared by an employee within the scope of his or her employment.") The Supreme Court has held that courts should look to common law agency principles, as delineated in the RESTATEMENT (SECOND) OF AGENCY § 228, to determine whether a person is an "employee" under 17 U.S.C. § 101, based on the assumption that Congress intended to use the term according to its ordinary meaning. See Community For Creative Non-Violence v. Reid*,* 490 U.S. 730, 739-40 (1989). However, courts have not looked to general principles of agency law to interpret the term "official functions" used in 28 U.S.C. § 1498. See Herbert v. U.S., 36 Fed. Cl. 299, 305-6 (1996) (research scientist employed by Veterans Administration to do research); Meyers v. U.S., 177 F.Supp. 952, 955 (C.Cl. 1959) (aeronautical engineer in

design bureau assigned to research and development tasks); Rogallo v. U.S., 475 F.2d 1, 2-3 (4th Cir. 1973) (aeronautical engineer employed by the Government at a research center for aerospace research and development).

The simple reason is that common law agency principles are not needed in this context because the government – especially in the case of the Air Force – provides clear definitions of an employee's "official functions." Congress, in enacting § 1498(b), could have made reference to the work for hire definition provided in the Copyright Act just as Congress had referenced "infringement" and "statutory damages set forth in Section 504(c) of Title 17" in the same subsection. *See* 28 U.S.C. §1498(b). Congress however, chose to use more narrow and specific language than "scope of employment" by referring to works "prepared as a part of the official functions of the employee." 28 U.S.C. § 1498(b). Civilian employees in business may tend to have undefined or poorly defined duties, necessitating a more general approach. For government employees this is not the case, even for military members. The Air Force publishes detailed training and performance requirements for its members. *See Pl. Exhs. 60, 63A & 63B* (defining duties and responsibilities for Manpower AFSC's)*; Pl. Exhs. 59* (defining requirements for "V" prefix on AFSC)*; Pl. Exhs. 65 & 66* (Career Field Education and Training Plans for Manpower field). These publications are considered official Air Force policy by Air Force personnel, and are used for planning, budgeting, training, and manpower distribution purposes.

> "This Career Field Education and Training Plain (CFETP) is a comprehensive education and training document that identifies life-cycle education/training requirements, training support resources, and minimum core task requirements for this specialty. The CFETP will provide personnel a clear career path to success and will instill rigor in all aspects of career field training."

*Pl. Exh. 65, at Part I, ¶ 1* (Pl. Exh. 66 uses identical language). CMS Dant explained the CFETP as the "job description" for the Manpower field. *Trans., p. 480*. We should therefore look to the Air Force's own policies to define the "official functions" of a Manpower Specialist, paygrade E-6, in the Air Force, not common law principles.

The leading case on this issue is Herbert v. U.S., 36 Fed.Cl. 299, (Fed. Cl. 1996). Herbert is more telling in the differences than any similarities. In Herbert, the Plaintiff was a member of the Committee on Dietary Allowances (the Kamin Committee) specifically empanelled to produce the 10th Edition of the *Recommended Daily Allowances* (10th RDA) that the Government had contracted the National Academy of Sciences to produce. Herbert v. U.S., 36 Fed.Cl. 299, 302 (Fed. Cl. 1996). Dr. Herbert's primary duties were "research, teaching, and patient care" as the director of the Hematology and Nutrition Laboratory at the Bronx Veterans Administration Hospital, a Federal facility. Herbert at 305. Dr. Herbert's supervisors testified at trial that his specific duties included "conducting research in his field of expertise and publishing the results." Herbert at 305. The court found that even if the specific research task had not been assigned by the Government, the fact that Herbert's primary duties included research, the subjects of which could be chosen at his discretion, meant that any research which was even related to his employment at the VA was part of his official functions. Herbert at 306. The Herbert court emphasized the fact that Herbert's colleagues viewed their own work on the Kamin Committee as part of their official government duties. Herbert at 306. Not only was Herbert a research scientist in the employment of the VA, but Herbert's work on the Kamin Committee was under a government contract specifically intended to generate the RDA guidelines which Herbert

produced, and which were the subject of the infringement action. Herbert at 306, (quoting 28 U.S.C. § 1498(b)) (emphasis original). "Plaintiff knew that the 10th RDA project was funded by the government, through contract with the Academy." Id. at 306. In addition to all of this, the Herbert court specifically found that Herbert's superior performance evaluations, awards and promotions were based in large part on his research work generally, and his work for the Kamin Committee in particular. Id. at 305.

The present cases is easily and markedly distinguishable. The evidence presented at trial demonstrated conclusively that Davenport was a data operator, and that his duties did not in any way involve computer programming or research. Each and every witness with knowledge of Davenport's official duties at trial testified that they did not consider software programming part of Davenport's duties, and that they considered Davenport's AUMD software to be his personal work.[2] Additionally, the Air Force denied Davenport training in programming based on his official functions.

(1) Davenport's superiors did not consider programming part of his duties.

CMS Dant's testimony was particularly noteworthy. CMS Dant is one of the most senior enlisted personnel in the Manpower community, with over 21 years of experience in the field, and is now the Enlisted Career Field Manager for the Manpower community – i.e. he is responsible for producing the CFETP and other

[2] Keohane's Expert Report, *Def. Exh. 44*, throws out an opinion relating to official functions. However, Keohane has no expertise in this area, his voire dire did not indicate any experience in military personnel matters, and Defendant represented in response to Plaintiff's objections to this portion of Keohane's report that Defendant would not rely on Keohane's opinion in this matter as evidence. Beyond this, Keohane made the same error that the Air Force made in denying Plaintiff's administrative claims – he looked at the C-CS specialty code job duties, which the Air Force uses to classify computer programmers. Thus, the Court may not even consider his opinion, and if it does then his opinion must be given no weight.

documents defining the duties and responsibilities of Manpower Specialists. *Trans., pp 475, 479-80.* CMS Dant, therefore, possesses a uniquely authoritative perspective on the expected duties of other enlisted personnel in the Manpower community.

> "Q [Mr. Rylander]: Are you a supervisor for a number of manpower user career codes now?
>
> A [CMS Dant]: I'm not a direct supervisor. My function right now is I am – my career field, the manpower career field's enlisted career field manager. My responsibility is directing the training, the usage, the proper usage, proper training of all manpower enlisted folks in the Air Force.
>
> So I have what the military would refer to as general supervisory role over all of them, but I do not directly supervise or write performance reports or anything like that on these folks."

*Trans., pp. 474-5*

> "Q: ... You're one of those individuals who actually would be in charge of creating a high-level document like a CFETP?
>
> A: Correct.... It's the Career Field Education and Training Plain, and every Air Force specialty has one for that specialty, and bottom line it's a list of tasks that an enlisted person in that particular specialty should be able to do to be a fully functioning military member in that specialty.
>
> Q [THE COURT]: So it's the military equivalent of a job description?
>
> A: Yes, sir.
>
> Q [Mr. Rylander]: Now, in your experience... in the manpower career field in the last 21 years and as a chief master sergeant, in the 1998-1999 time frame would it have been your expectation that someone in a 3U51 or 3U71 or 3U91 career code, "V" or otherwise, would write software programs to be used by Manpower?
>
> A: No. No.
>
> Q: And why is that?
>
> A: Because as long as I've been in the career field, we have an activity – it's slowly going away down at Gunter Annex in Montgomery, Alabama, and those folks are the ones who have been charged with developing computer programs and things of that nature, and they are the

ones who developed Command Manpower Data System, the Manpower Data System, and the other systems that we've used while I've been in the career field."

*Trans., pp. at 479-81*. CMS Dant also specifically refuted the notion that the "V" prefix added to TSgt Davenport's Manpower AFSC ("V3U071") incorporated computer programming into the type of work that he was expected to perform:

"Q [Mr. Rylander]: ... By adding that [V] to the prefix for a 3U071, does that convert that person into someone who would be a programmer for the Air Force?

A [CMS Dant]: Not necessarily. It just means someone who can help manage data systems, the Manpower Data System. At each major command we have a – normally have a shop that runs the data system for that major command, for that MAJCOM. Most of those folks who end up in those positions have that 'V' prefix, and it doesn't mean that they are programmers, it means the existing program that's normally produced by the folks at Gunter, they help operate the system."

*Trans.. p. 482*. Also telling is Dant's testimony regarding his own programming skills (or lack thereof):

A [CMS Dant]: "... So many times I had suggestions or things that I thought would make the program [AUMD] more user friendly, and I would bring those to him [Davenport].

Q [Mr. Rylander]: Okay, and is there a reason why you didn't program that yourself?

A: I didn't' have the technical ability.

Q: Did you not know how to program?

A: Oh, absolutely not.

Q: What about today?

A: Oh, no, no.

Q: They didn't train you to do that?

A: No.

Q: Now, did Technical Sergeant Davenport adopt every

suggestion that you made to him?

A: No. No."

*Trans., pp. 472-3*. There was no hesitation in CMS Dant's response – he didn't know how to program and he was never expected to know how to program. This is a senior enlisted person with twenty-four years of Air Force service, twenty-one of those years in the Manpower career field. In fact, CMS Dant is rather unusual in that he has such longstanding experience in the Manpower field. *See Trans., pp. 465-66*.

Not only was programming not a part of Davenport's official duties, but none of his superiors ever ordered Davenport to produce the programs, nor would they have felt it was their place to do so. When asked why "it would not have been appropriate for me [Dant] to direct him to do those types of things," CMS Dant responded:

> "Because this was something that I knew because on numerous occasions when I asked him that, at times he would frustrate me because he would say, hey, that's a good idea. I'll work on it this weekend. You know, things that I thought might be quick fixes that he could do right now, and he would say, yeah, I'll take a look at it later. I can't do it here. I'll do it this weekend or tonight, or something along those lines.
>
> "So I had the complete impression that this was something he was doing at home on his time, and it would not have been appropriate for me even in a supervisory or military capacity to try to direct him to do something to it."

*Trans., p. 474*.

Even the Government's own witnesses, Maj. Meaker and Glendon Hendricks, supported the Plaintiff's case. Maj. Meaker testified that he did not believe it was his place to direct Davenport, then a Technical Sergeant of paygrade E-6, to add features or fix problems related to the AUMD software, because it was considered Davenport's personal work. Maj. Meaker merely "asked", and TSgt Davenport was free to decline: "... if he said no, you know, this was never something that I saw as something that he

had to do. And I always did it asking him, you know, do you think you can make this change, or is it too hard." *Trans., p. 805*. If the commissioned officers in Davenport's direct chain of command believed a project was part of an enlisted person's official duties they would have had no hesitation in directing him to perform those duties.

Mr. Hendricks, a Defense witness, did not contradict this testimony. Although Mr. Hendricks testified that many personnel donated their work to the Air Force as part of various projects, he did not testify that this was a requirement. Further, he related that these were projects initiated at the Air Force's request, and that these efficiency improvement projects were then turned over to an "programming shop" to develop into software for distribution.

> "Q [Mr. Bolden]: And what do you mean by your programming shop?
>
> A [Mr. Hendricks]: We had a small cadre of programmers that were trained programmers starting out in BASIC, COBOL, FORTRAN. And then they were brought up under the new system. They could do HTML which is one of the last ones that we used before I left. Any of the modern languages we sent them to school to do those different things.
>
> And our requirements of programming outgrew our capability we went out to the outside resources and contracted contractors to take this system and put it into code and standardize it and give us the documentation."

*Trans., p. 853*. Mr. Hendricks referred again, later, to the fact that personnel within the Air Force Manpower community were specifically designated and trained to do computer programming work. *Trans., p. 858*. Mr. Hendricks' testimony therefore emphasizes the fact that Davenport's work was not part of his official duties: the AUMD was initiated by Davenport without direction; Davenport did all programming; Davenport was not listed as a computer programmer by the Air Force; other software development projects were developed by "engineering shops" with personnel trained in software;

when the Air Force decided to develop a derivative program from AUMD they selected a software development contractor – not a Manpower Specialist from the Air Force.

CMS Lucky was listed as a Defense witness on the issue of Davenport's official job functions but was not called by Defendant, although present in the courthouse. The Court should infer that his testimony would have been harmful to the Government or they would have called him, because he was a witness listed by the Government, and as a member of the Armed Forces in the unique control of the Government,. A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1400 FN9, 230 USPQ 849, 855 FN9 (Fed. Cir. 1986) ("When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable."); Hughes v. U.S., 71 Fed.Cl. 284, 304 (Fed. Cl. 2006).

(2) Defendant denied Davenport's requests for programmer training.

Davenport's requests for programming training were denied by the Air Force, which is further support that programming was not part of Davenport's official functions. Davenport testified that he requested training on multiple occasions, through different supervisors, but was denied each time because, as explained by CMS Ralph Jones (at the time a Senior Master Sergeant (SMS)), Davenport was a Manpower person, not a programmer, and since programming was not part of his AFSC the Air Force would not spend the money. These denials occurred when Davenport was assigned to Gunter Annex (later Gunter Air Force Base) as a Manpower functional assisting the development of the MDS system. *Trans., p. 72-3.* Davenport's testimony on this is credible because it is corroborated by CMS Jones' later emails which

expressed frustration that Davenport had developed an alternative program and was running his own "data shop" in competition with the official Air Force system. *Trans., p. 894; Def. Exh. 7* ("In addition, I am concerned that you have assumed the unenviable role of operating in essence an ad hoc reports and query 'hobby shop' for the Manpower Community." *Pl. Exh. 7, p. G000104*.)

Davenport went ahead and taught himself how to program by purchasing software and books with his own money, and spending his personal off-duty time learning to program: "Just a hobby. I liked it. I enjoyed it." *Trans., p. 74*. Davenport was motivated to write AUMD in order to learn to program, and chose a practical real-world application to make it a more effective learning tool.

> "Q [Mr. Beatty]: And was that part of your motivation for writing the program?
>
> A [Davenport]: Yes. To learn, the knowledge. I have a -- most people define it a sickness, but I love working with databases, and the more I could get, the more I wanted to get.
>
> Q. You could have done programming exercises from the textbooks. Why didn't you just use those to learn Access as a learning tool?
>
> A. I don't find it as easy to learn, you know, like grabbing something like the textbooks. When you get into them, they talk about building a phone book and, you know, doing simple tasks like that, and I don't learn well that way. I need a practical application to apply and come out with some real results; otherwise, I feel like I'm wasting my time.
>
> Q. So was part of this then a personal motivation just to learn the programming skills on your own?
>
> A. Yes, sir."

*Trans., p. 93*.

Davenport learned anyway, on his own initiative, his own time, with his own money – now the Air Force wants to claim he was a programmer all along and take

possession of his hard work for free. The Air Force wants it both ways – the law says they cannot do that.

(3) Davenport's high marks were not based on AUMD.

The Government's own witness, Maj. Meaker, testified that Davenport would have received the highest marks regardless of his work on AUMD – because he was a stellar performer. *Trans., p. 801*. This is distinguished from Herbert, where the court found it important that Herbert's supervisors testified that his high performance evaluations and advancement were predicated on his *research* work and his work for the Kamin Committee – the subject of the infringement claim - in particular. Herbert, 36 Fed.Cl. at 306.

(4) Even under agency law principles, AUMD was not within Davenport's "scope of employment."

The "work made for hire doctrine" of the Copyright Act (17 U.S.C. § 101) is similar to, although not strictly analogous with, the "official functions" analysis under section 1498. Courts look to the common law of agency to determine the scope of employment in such circumstances. Roeslin v. Dist. of Columbia, 921 F.Supp. 793, 797-8 (D.D.C. 1995); Quinn v. City of Detroit, 988 F.Supp. 1044, 1051 (E.D. Mich. 1997) (citing Roeslin and Miller v. C.P. Chemicals, Inc., 808 F.Supp. 1238 (D.S.C. 1992)). RESTATEMENT (SECOND) OF AGENCY § 228, which the Supreme Court relied upon in Community for Creative Non-violence, supra, defines scope of employment:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is within the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; ***and***

(c) it is actuated, at least in part, by a purpose to serve the master."

(emphasis added). All three elements must be present to deny the Plaintiff.

Both Roeslin and Quinn are especially instructive in the present case, if the Court looks to work-made-for-hire as analogy, because both involved government workers – albeit city workers. In Roeslin the court found the copyrighted software, written by an economist with a college degree working on salary, was not a work made for hire.

> "[D]eveloping computer software is not the kind of work plaintiff was employed to perform. Plaintiff was hired as a labor economist, not as a computer programmer. There is no reference in his job description to computer programming; nor was his supervisor aware of whether plaintiff had any programming skills when he was hired. Plaintiff was hired to improve certain aspects of the CES survey [relating to employment statistics] and develop projections based on that survey. He was not hired to create a computer program that would assist the entire office and receive, process, and transmit the survey results."

Roeslin, 921 F.Supp. at 799. Similarly, in Quinn the court found that the first and second prongs of the Restatement test were not present.

> "Quinn was an attorney and a manager for the City's Law Department. His job description did not require him to create computer software, his employer never requested him to develop software, Quinn had no prior computer programming experience and in fact, the City had its very own computer programming department to do programming of the type Quinn decided on his own to do."

Quinn, 988 F.Supp. at 1051. Quinn specifically distinguished this from Miller, where all three prongs were found present. Particularly, the Quinn court noted that in Miller, the employee "was a supervisor responsible for organizing and updating a laboratory at CP Chemical, Inc." Quinn, 988 F.Supp. at 1050. Additionally the court noted that, "In Miller, the employee was specifically requested by his employer to computerize the quality control laboratory of which he was in charge..." Quinn, 988 F.Supp. at 1051. Both Quinn and Roeslin, and Miller as well, are basically in accord with cases such as Herbert, Meyers, and Rogallo which interpreted section 1498. In each of these cases

infringement claims were denied where the plaintiffs were engineers or scientists engaged for the purpose of research, Herbert, Meyers, Rogallo, or in supervisory roles, Miller, or assigned specifically to produce computer programs, Miller. However, claims were not denied where personnel were working outside of their job descriptions, Roeslin, Quinn, where they had never been tasked with that type of work, Roeslin, Quinn, and where they had actually been discouraged from learning and doing programming work, Roeslin.

In this case, while Plaintiff concedes that Davenport's program was created primarily as a personal project to learn and develop programming skills, he was secondarily motivated to develop the programs in an effort to improve efficiency in the Manpower community. However, the first two prongs are completely lacking here. Davenport, as established by all of the testimony at trial and the documentary evidence, was not a programmer nor was he expected or desired to be a software developer. The Air Force, and particularly the Manpower community, had its own separate programming shops. Davenport was discouraged from learning to program. Beyond this, the evidence at trial was conclusive that none of the work on AUMD was conducted during work hours, or using government time material or facilities (see discussion below). This was uncontradicted by Mr. Hendrickson's testimony.

Beyond this, the weight given to whether an employee was motivated at least in part to serve the master must be tempered in the context of determining the writes of an author in this case. The test of agency/scope of employment was developed in large part to determine if the master or employer should be held liable by third parties for actions taken by the servant. In other words, the principle was that if the servant was

honestly acting in what they believed to be the interests of the employer, and the employer was a beneficiary, then the employer should be liable to third parties for damages. The employee probably would not even have taken such actions or been put in such a situation if not for their status of employment – thus it would only be fair for the employer to assume liability. This is a far cry from the situation here, where an employer is attempting to deny the employee a right of action based on the fact that an employee gratuitously and selflessly acted in the interests of the employer. The employer should not be permitted to benefit from work by the employee for which he was neither compensated nor even encouraged to produce by that same employer. The idea that an employer owns all the personal output and energies of an employee no matter what is repellant to our sense of personal liberty and independence, enshrined in the 5th and 13th Amendments.

Therefore, if the Court looks to work-made-for-hire law as an analogous guide in the present case, the conclusion is clear: Davenport's work would not be considered a work-made-for-hire. Blueport's claim is not be barred under either the narrower standards of Section 1498, nor the broader standards of work-made-for-hire doctrine.

In short, all of the evidence demonstrates that AUMD was not created as part of Davenport's official functions or duties. Nothing contradicts this. Regardless of who carries the burden of proof on this point, Plaintiff has produced substantial evidence and Defendant has produced no evidence to rebut, so this Court must find that AUMD was not created as part of Davenport's official functions or duties.

C. <u>Davenport did not use government time, material, or facilities to create AUMD.</u>

Whether government time, material, or facilities were used is a question of

fact which must be established by evidence. Plaintiff produced substantial evidence at trial that no government time, material, or facilities were used in the preparation of the AUMD programs. Defendant produced no evidence to directly rebut this.

(1) Davenport created AUMD exclusively through his own resources.

Testimony at trial was that Davenport programmed AUMD only at home, on his personal time. Davenport was adamant on this point and his testimony was corroborated by senior Air Force personnel with direct knowledge of the circumstances. Again, this case is distinguishable from Herbert. There, the court found that Dr. Herbert conducted all of the relevant research and *actually wrote the guidelines* within government facilities – i.e. his office at the Bronx VA. Herbert, 36 Fed. Cl. at 306. The court did not find that Herbert did any creative work outside the physical boundaries of the government facilities. Id. And, again, the court looked specifically to the time "during their creation", i.e. the "preparation of his 10th RDA writings." Herbert, 36 Fed. Cl. at 307. Here, Davenport testified that he developed and tested his AUMD software at all times at home, without any government data, by creating a dummy database with fake data. *Trans., pp. 99 & 100-102*. Davenport did not have any connection to government databases while developing the AUMD software at home. *Trans., p. 99.* The testimony of CMS Dant and Col. Manning both support Davenport's testimony, and nothing else contradicted this. The mere fact that Davenport used his general knowledge gained through work to create the dummy database at home does not translate into use of government facilities or resources. Davenport's brain is not a government facility. Furthermore, this clearly excludes the development of the MARS software and infringing activities after May 15, 2000, using modified copies of AUMD,

from the defenses, since these occurred when Davenport was either officially excluded from participation or after he had retired.

Mr. Hendricks did not contradict Davenport's testimony regarding use of government time, material, or facilities. For one thing, Mr. Hendricks' recollection of dates versus computer programs was fuzzy at best. He recalled a Mr. Jerry Hayes calling him in 1997 to request a "data extract" to send to Mark Davenport, "And that's how we, how it worked out that knew [sic] that Mark was working on a program doing different things." *Trans., p. 876*. However, Mr. Hendricks was not sure of the year, and was not clear as to the use for this extract and the date indicates that if it was actually for any program developed by Davenport it was the "Net Worth" program – which Davenport donated to the Air Force. *Trans., pp. 911; 89-90; Pl. Exh. 101 page 100030*. Other witnesses corroborated Davenport's testimony that the AUMD did not come into existence until spring of 1998 at the earliest. Later Hendricks also confused Davenport's IDEA suggestion to use ODBC drivers rather than the Oracle product, for cost savings, with Davenport's AUMD software. *Trans., pp. 884-86 & 893*. Other evidence presented made clear that Davenport never submitted AUMD for an IDEA award, but rather he submitted an IDEA for using ODBC drivers in place of Oracle Discovery drivers. *Trans., p. 134-5, 892-4; Def. Exh. 6*. Hendricks also testified that he thought Davenport presented AUMD to a Manpower Users Group meeting, but he did not testify that he was present, and this was simply what he assumed. *Trans., p. 883*. Thus, his testimony on this point must be discounted.

Col. Manning and CMS Dant testified directly on this point, and no other witnesses contradicted their testimony. CMS Dant testified that during his time working

with Davenport he was in frequent and close contact with Davenport throughout the day: they worked in shoulder-high cubicles; their desks were within a 10-15 feet of one another; Dant passed by Davenport's desk approximately "30-40 times a day". *Trans., p. 469*. Col. Manning also testified that to his knowledge all of the development and programming of the AUMD software was done by Davenport at home and not on government computers: *Trans., p. at 503.* And later:

> Q Now, you indicate that people from the Air Force Manpower and Innovation Agency and the Gunter Design Center were calling and demanding that Technical Sergeant Davenport provide them with his programs.
>
> Q Were they calling you, sir?
>
> A No, they were not.
>
> Q Who were they calling?
>
> A They were calling Sergeant Davenport direct and emailing him direct. They may have been sending emails to Chief Dant. I'm not aware. I specifically saw an email that went to Sergeant Davenport from the Gunter Design Center, so I specifically remember that one.
>
> Q Do you recall what it said?
>
> A It basically requested that Sergeant Davenport provide the software to the Gunter Design Center. It was signed by a Senior Master Sergeant Ralph Jones, and the reason I remember that was it struck me as a bit strange that a senior master sergeant would be making that type of a request to a technical sergeant in another command without coming through the chain of authority.
>
> Q So this should have been something that would be colonel to colonel, or lieutenant colonel to lieutenant colonel?
>
> A Yes. Something as significant as we are talking about you would think would be brought up through the chain of command and over to probably the colonel or lieutenant colonel level.
>
> Q Did you indicate that people did not understand that Sergeant Davenport created the program on his own time after duty on his own computer? Did you ever take the opportunity to familiarize people with that fact?

A Yes, that seemed to be a primary issue at the time. For some reason people that were not in the Pacific thought that he had to have developed this in the office on government computers, on government time. And being there in the Pacific with him, it was clear to me that that was not the case, so I was a bit puzzled as to why they would think that when they are in Alabama, and not in the Pacific. But that seemed to be a significant issue that they said, hey, this was developed in the office on government equipment, on government time, and therefore it's a government piece of property.

And given I knew that it wasn't developed in that manner, it brought the question to bear as to what was true and what was false in this case."

*Trans., pp. 518-19*. CMS Dant's testimony concurs with Col. Manning's recollections.

"Because this was something that I knew because on numerous occasions when I asked him that, at times he would frustrate me because he would say, hey, that's a good idea. I'll work on it this weekend. You know, things that I thought might be quick fixes that he could do right now, and he would say, yeah, I'll take a look at it later. I can't do it here. I'll do it this weekend or tonight, or something along those lines.

So I had the complete impression that this was something he was doing at home on his time, and it would not have been appropriate for me even in a supervisory or military capacity to try to direct him to do something to it."

*Trans., p. 474*. Later CMS Dant confirmed this again.

Q Now, it indicates here you had a three-year period of working in close proximity to Mr. Davenport?
A Right.
Q And it is correct, to your knowledge, that you never saw him working or programming on the AUMD programs during the duty hours?
A Correct.
Q And it remains your belief it created it at home or while on vacation?
A Yes. Yes, sir."

*Trans., p. 479*.

Again, the Government listed CMS Lucky as a witness concerning "whether government time, material, and/or facilities were used in the preparation of the AUMD program." CMS Lucky, a witness uniquely in the control of the Government, was

present in the courthouse but not called by the Government. The Court should infer therefore, that his testimony would have been that NO government time, material, and/or facilities were used in the preparation of the AUMD program.

(2) Suggestions by other personnel do not amount to government time, materials, or resources.

Defendant made much of the fact that many Air Force personnel made suggestions for features were provided to Davenport and many of those features were incorporated by Davenport. However, these were suggestions were just that – suggestions. Each witness who testified to providing suggestions to Davenport also made clear that Davenport decided what features would be incorporated, and that Davenport did all the programming, and that Davenport did this programming on his own time rather than at work.

CMS Dant testified that he made suggestions to Davenport, but that Davenport himself chose what to incorporate and rejected many of the suggestions, despite the fact that CMS Dant was Davenport's direct supervisor for "eight or nine months", *Trans., p. 468,* and Davenport "was still subordinate to me [Dant] in the chain of command" even after (then Master Sergeant - MSgt) Dant was superceded by Maj. Meaker as supervisor. *Trans., pp. 471-73*. Additionally, Defendant never once pointed out a specific function or feature that was incorporated due to the input of any person other than Davenport himself. If such is the case, then it was Defendant's burden to establish what those were and how they related to protectable portions of the copyrighted work. Maj. Meaker's testimony corroborated this.

Beyond this, even if some Air Force personnel provided suggestions for functions, it was Davenport who selected those features and Davenport who determined

how to convert those functions into expressive content – which is what is protected under the Copyright Act.

Based on all of the evidence presented at trial the only possible conclusions are:

(1) that Davenport was not in a position to order, influence, or induce the offending use of AUMD – and in fact he did not.

(2) That computer programming was not part of Davenport's official functions.

(3) That government time, materials, or facilities were not used in the development of AUMD.

(4) That even under common law analogy to work-made-for-hire doctrine, AUMD was not within the scope of Davenport's employment.

3. Whether the protections of the copyrighted AUMD 2.1d extend to version AUMD 2.1f?

The proper question is not merely whether the protections of 2.1d extend to 2.1f, but rather whether the protected elements of 2.1d alleged to have been copied were present in 2.1f in order to provide a comparison. The answer is yes. Gates Rubber Co. v. Bando Chem. Ind., Ltd., 9 F.3d 823, 832 (10th Cir. 1993).

> "[Infringement involves] two separate inquiries: (1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and (2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable. 3 Melville B. Nimmer, NIMMER ON COPYRIGHT § 13.01[B], at 13-8 to 13-15 (1993) (hereinafter "NIMMER"); see Arnstein v. Porter, 154 F.2d 464, 472-73 (2d. Cir. 1946)."

Id. See also Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 532-33 (5th Cir. 1994) (affirming copyright infringement based on derivation from third party copies of licensed extracts of copyrighted work); cert den'd 513 U.S. 820 (1994); CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337 (M.D.Ga. 1992) (finding

infringement from copying and derivation from lawfully obtained copies of software).

Kepner and CMAX are instructive on this issue. In Kepner the issue was whether a computer program developed by using algorithms and methods described in licensed training manuals, along with the explanations for such, could infringe the copyrights of the software from which the manuals were derived. The answer was YES – it did not matter whether the copied content came from the original work or a licensed derivative of the original work – it was still copying portions of the original.

> "LSI, however, insists that K-T never demonstrated that LSI literally copied the specific materials that were licensed to K-T. But LSI's dogged insistence is nonsensical. Even if LSI did lift the offending expression from third party sources, its reproduction of that expression for commercial purposes may be infringing. Language copied from those third party sources was itself copied or derived from K-T's Licensed Materials, and its legality depends on copyright law. In other words, even if LSI copied a copy of K-T's Licensed Materials, such copying may still constitute infringement. Copying a copy of copyrighted materials is a cognizable contravention of the Copyright Code"

Kepner, 12 F.3d at 532.

In the present case, Defendant seeks to escape liability by claiming somehow that if they copied the screens from version 2.1F rather than 2.1D then this did not infringe the copyright of 2.1D. Davenport testified that the 2.1D and F were virtually identical, the only difference being additional Visual Basic code in 2.1F. There was some dispute at trial as to how much code was added, but this is essentially irrelevant. Plaintiff has conceded that the Visual Basic code was not directly copied – it was reverse engineered by comparison of operations. However, the screens and the data tables – the heart and soul of the AUMD programs – were directly copied (even Defendant's expert agreed on this point). *Trans., pp. 148, 1038-1042; Pl. Exh. 111, ¶ 2.4*. The screens from 2.1D and F are the same. *Trans., pp. 171-193*. Therefore,

comparison of the screens in 2.1F provides the exact direct comparison for the screens in 2.1D – the registered software version. The screens are the issue – they are the essence of the program, providing the look and feel, the interface for the ordinary observer, and the main expressive content of the program. The Visual Basic code is just the plumbing. See discussion of substantial similarity below).

CMAX also provides a telling analogy. In CMAX the defendants decided to use copies of software they had obtained lawfully to create a replacement program when their relationship with the software supplier soured. The court there held that the fact that Defendant UCR copied only portions of the copyrighted software, including the screens and data structures, did not negate infringement. CMAX, 804 F.Supp. at 356-7. Other courts are in agreement that infringement may be found through copying only a portion of the protected work – so long as that portion encompasses protected expression. See e.g. Gates Rubber, above.

Copyright inheres at the moment that creative expression is fixed in a tangible medium of expression. 17 U.S.C. § 102(a). Therefore, the mere publication or distribution of a work which lawfully contains all or part of a registered copyrighted work, along with proper copyright notice, does not extinguish the underlying copyright in the original work. Thus, if a subsequent publication includes both the original work plus additional unregistered material, which can be segregated and is not subject to suit, then the court is able to compare the copyrighted work to the accused work. Indeed, as Gates, and other cases make clear, the court need only compare the accused portions – the entire copyrighted work does not need to be infringed.

4. Did the government have an implied license to use the AUMD program? If so, at what point did that license end?

Defendant bears the burden of proving the existence of any license as an affirmative defense to infringement, and if such existed, whether the license was irrevocable. "As the existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement, [Defendant] Dynegy bears the burden of proving that such a license exists." Carson v. Dynegy, Inc., 344 F.3d 446, 451 (FN5) (5th Cir. 2003) (citing Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc., 128 F.3d 872, 884 (5th Cir. 1997) and CMS Software Design Sys., Inc. v. Info Designs, Inc., 785 F.2d 1246, 1248 (5th Cir.1986)). Such a license arises when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Id. A non-exclusive license is fully revocable as a matter of law where it is not supported by consideration.

> "Assuming, arguendo, that a nonexclusive license was created, whether such a license was irrevocable rests solely with whether Carson received consideration. This principle finds support both from scholars and among our sister circuits. See 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 10.02[B][5] (2002); I.A.E., Inc. v. Shaver, 74 F.3d 768, 772 (7th Cir.1996); Avtec Sys., Inc. v. Peiffer, 21 F.3d 568, 574 n. 12 (4th Cir.1994); Keane Dealer Services, Inc. v. Harts, 968 F.Supp. 944, 947 (S.D.N.Y.1997); Johnson v. Jones, 885 F.Supp. 1008, 1012 n. 6 (E.D.Mich.1995). Carson v. Dynegy, Inc., 344 F.3d 446, 451 (FN5) (5th Cir. 2003)."

Lulirama, 128 F.3d at 884. Copyright licenses must be interpreted narrowly. Playmedia Sys. Inc. v. Am. Online, Inc., 171 F. Supp. 2d 1094, 1099 (C.D. Call. 2001). Copyright licenses are presumed to prohibit any use that is not expressly authorized. Id. at 1099.

Here, the evidence was conclusive that Davenport was never requested to create AUMD. Even so, if any such license existed it was fully revocable because it was not

supported by separate consideration – no evidence of any consideration was presented by Defendant. Thus, even if we assumed a license existed, it must have expired as of May 15, 2000, which is the date that the copies of the AUMD software expired, which Defendant acknowledged they had actual knowledge of, and the date that Blueport expressly declared to be the cutoff. *Pl. Exh. 57*. Beyond this, any suggestion that the Air Force had a license to develop the derivative work called MARS is simply ludicrous and is not supported by any evidence whatsoever.

No consideration was paid to Davenport. The Air Force never paid a dime to Davenport or Blueport for the software. Davenport's continued employment in the Air Force was based on an Enlistment Contract that was neither related to nor dependent upon production of any software, and as such simple continuation in employment cannot be construed as consideration. *See* Carson v. Dynegy, Inc., 344 F.3d at 451. In fact, Davenport's promotion and progress within the Air Force did not depend on production of any software either, and any such claim lies with Defendant to prove.

Davenport was not given promotion or pay raise based on the program, even if it was mentioned in his evaluations. First, Davenport was not promoted. Major Meaker also testified that Davenport would have received the same top rankings regardless of whether he wrote or distributed the AUMD software due to his superior technical skills, positive attitude, and team spirit. *Trans., pp. 800-801*. No other witness testified otherwise. Therefore, if an implied license for use of the software existed prior to May 15, 2000, it was fully revocable because it was not supported by consideration. UMG Recordings v. Disco Azteca Distr., Inc., 2006 WL 2354791, 11, -- F.3d -- (Slip Copy) (E.D. Cal. 2006); NIMMER at 10:03[A}, 10-38 (1991). And any such license was

explicitly revoked by Blueport's letter of March 31, 2006. *Pl. Exh. 57*.

Even if any such license were considered irrevocable, which clearly is not the case, it could not be considered unlimited. The course of dealing demonstrates that any license would not outlive the expiration date, or at the latest the retirement of Davenport. Even if it could be considered to outlive Davenport, it had to be limited to use of the existing copies – in no way could any implied license for creating a derivative work be construed by the course of conduct. Indeed, this development was begun long before the final expiration date and retirement of Davenport in response to the Air Force's inability to get the source code or extension from Davenport – completely inconsistent with either ownership or an unlimited license. If there was a license it was revocable due to lack of consideration. If it was irrevocable then it was only what was advertised – use until the final expiration date and retirement of Davenport. Even if it went beyond this it was not unlimited – and certainly did not extend to creation of derivative works such as MARS.

Nor does an estoppel argument assist Defendant, because Defendant has not proved the elements. Additionally, estoppel is an affirmative defense which was not pleaded by Defendant and is therefore waived. See Defendant's Answer and Defendant's First Amended Answer. RCFC 8(c); Rockwell Automation v. U.S., 70 Fed. Cl. 114, 122-23 (2006); Hess v. U. S., 210 Ct.Cl. 483, 537 F.2d 457, 461 (Ct. Cl. 1976) (decided under prior RUCC 37(b)).

5. Was the government's copying and adaptation of the AUMD program protected under 17 U.S.C. § 117?

Section 117 is recognized by courts as a narrow exception within a statute that favors copyright owners' exclusive rights. DSC Communications Corp. v. Pulse

Communications, Inc., 170 F.3d 1354, 1360 (Fed. Cir. 1999). This provision does not create a general reliance exception as Defendant seems to argue. To take advantage of the safe harbor of § 117(a) the copier must be an "owner of a copy of a computer program." 17 USC § 117(a); DSC, 170 F.3d at 1360; CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337, 356 (M.D. Ga. 1992). Further, §117(a)(1) specifically provides that any such copies or adaptation may be used in "no other manner" than as an "essential step in the utilization of [that] computer program." Thus, three issues present themselves within this question. First, were the copies provided by Davenport to various individuals in the Air Force "owned" by the Air Force, or were they the subject of a fully revocable license? Second, if the Air Force owned the copies, was the adaptation of the AUMD by changing the date an "essential step in the utilization of that computer program?" Third, was the use of the AUMD program to develop the derivative MARS program an "essential element" in the utilization of the *AUMD* program?

A. The Air Force did not own their copies of AUMD.

Determination of "ownership" is a question of law, but requires consideration of the incident facts as a whole. Krause v. Titleserve, Inc., 402 F.3d 119, 123-4 (2d Cir. 2005). Ownership has often been described as a bundle of sticks, each stick representing a specific right attendant to ownership. Krause, 402 F.3d at 122. "It is not clear from the text of § 117(a) how many and what kind of sticks may be removed from the bundle before the possessor of a copy of a computer program is no longer considered its owner for purposes of § 117(a). Krause, 402 F.3d at 122. Where a license agreement imposes restrictions on the licensee inconsistent with the rights of ownership then the licensee must be regarded as not a true owner of their copies under

§ 117. DSC, 170 F.3d at 1360-61.

In Krause the court found the possessors were "owners" under § 117 after consideration of several factors: (1) title ownership; (2) payment of "substantial consideration" for "customized" software; (3) storing copies on defendant's servers; (4) the agreed right to continued possession for an unlimited time period "regardless whether its relationship with Krause terminated"; and, (5) freedom to discard or destroy copies. Krause, 402 F.3d at 124 (citing DSC). The Krause court found particularly important the fact that the defendants were permitted continued possession of the program copies indefinitely. Krause, 402 F.3d at 123.

Analysis under Krause implies license rather than ownership. The first factor, "title ownership," is ambiguous in this case, since there was no bargained transaction in this case, but we can say the Air Force was in rightful possession until May 15, 2000. The third factor, storage on Defendant's servers, clearly supports Defendant in this case, as does the fifth factor – the right to discard or destroy copies. Factor five is not particularly significant in this case since virtually all copies were electronic copies. However, factors two and four clearly weigh against ownership in this case, and should be considered dispositive. No consideration was transferred to Davenport or Blueport in this case. And the expiration date, coupled with Davenport's declared intentions to take the AUMD software with him and let the copies expire with no support, clearly demonstrates that the Air Force did not own its copies for an "unlimited time." Thus, the factors discussed in Krause strongly favor a finding of license, rather than ownership.

In DSC, the Court of Appeals for the Federal Circuit (CAFC) found that copies were possessed pursuant to mere license, rather than ownership, and so § 117 was not

applicable. The court held that while transfer for an unlimited time period did not dispositively create an "owner" for § 117 purposes, transfer for an expressly limited time is a strong indication of lack of ownership. DSC, 170 F.3d at 1362. DSC was decided by the CAFC ostensibly under Fourth Circuit law but due to lack of Fourth Circuit precedent the CAFC applied its own reasoning. Although "ownership" is often an amorphous concept, ownership as expressed in § 117 goes beyond mere "rightful possession." DSC, 170 F.3d at 1360 (analyzing the legislative history of § 117). Although the DSC court held that a single transfer of money for an unlimited possessory time period was not dispositive to "ownership", the transfer of possession with a visible expiration date, along with clear declarations by the author and copyright owner that the expiration would not be extended beyond his personal service, coupled with refusal to provide source code for future self-support, are clear limitations on any purported ownership rights which should be considered dispositive. DSC, 170 F.3d at 1362.

The present case is factually analogous to DSC. The copies Davenport provided to Air Force personnel were personally transferred, and personally supported by Davenport. Davenport determined when and if to update versions, and then provided these new copies on his own initiative. The copies provided clear notice that they would expire on a specified date, and the Air Force was fully aware of this – which is why Defendant commenced development of MARS. Davenport refused to turn over source code and declared that the AUMD program would cease when he decided to retire. These facts are clearly inconsistent with the concept of ownership, but fully consistent with the concept of a personal license. *See Def. Exh. 15 (*where Davenport explains that he will have to stop providing his support service if he is not permitted continued

access to MDS database.) Thus, AUMD represented a personal license by Davenport, not ownership by the Air Force.

B. Adapting AUMD copies was not an essential step in the utilization of the programs.

Adaptation must be consistent with the permitted use of the copies in order to take advantage of § 117. Sega Enterprises v. Accolade, Inc., 977 F.2d 1510, 1520 (9th Cir. 1992); Aymes v. Bonnelli, 47 F.3d 23, 25-27 (2d Cir. 1995). Changing the expiration date on the AUMD software, which Defendant admits to, cannot be considered an essential step in their utilization because this violated the terms of their possession. Thus, if the Air Force owned their copies pursuant to an expiration date, then their ownership ceased to be lawful beyond that expiration date. The purpose of § 117 is to permit owners to upgrade lawfully owned software copies for compatibility with new hardware, new external software, or to fix bugs – not to extend the explicit terms of their ownership. DSC, 170 F.3d at 1360-62

The facts of the present case are analogous to DSC, but in sharp contrast with other cases where the court found that "adaptation" was not infringement. For example, in Aymes v. Bonnelli the court relied on the fact that a temporally unlimited possessory interest was granted, so adapting their software copies to accommodate new hardware and external software was permissible. Aymes, 47 F.3d at 25-27. However, use which violates explicit or implicit restrictions in the licensing or transfer agreement are beyond the protections of § 117. Id, at 27. No court has found that "adaptation" permits extending the possession and ownership of copies beyond an expiration date built in to, and noticed within, the software copies themselves. This is not adaptation, it is extension of possessory rights beyond what the copyright owner agreed, thus falling

outside the safe harbor of § 117.

Additionally, adaptation or continued use based on convenience or efficiency fall squarely outside § 117. The "necessary step" safe harbor does not include mere improved convenience or efficiency, but only that which is physically necessary to run the actual "copies" which are allegedly "owned" by the accused infringer. Madison River Mgt. Co., v. Bus. Mgt. Software Corp., 387 F.Supp.2d 521, 538, (M.D.N.C. 2005) (finding 117 defense inapplicable where accused infringer made nightly copies of a copyrighted database for the purpose of more efficient operations) (citing Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 261 (5th Cir. 1988), Sega Enterprises v. Accolade, Inc., 977 F.2d 1510, 1520 (9th Cir. 1992); and 2 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8.08[B][1]). Thus, extending expiration dates in order to provide time to create an unauthorized derivative work falls outside the safe harbor.

C. The creation of the derivative work MARS was clearly not "necessary" to utilize copies of AUMD.

It is axiomatic that if the Air Force was able to break into copies of AUMD to extend the expiration date, then modifying the software to create the MARS programs, completely new derivative works, was obviously not a necessary step. Even if they could legally have continued using AUMD by modifying the expiration date (adaptation), they could not make additional copies, nor distribute additional copies, nor could they use this to create a new derivative work called MARS. CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337 (M.D.Ga. 1992). Furthermore, while "exact copies" may be transferred only along with the original copies, and only as "part of the lease, sale, or other transfer of all rights in the program." 17 USC § 117(b). "Adaptations" may only be transferred with permission of the copyright owner. 17 USC § 117(b).

Thus, even the transfer of modified copies of AUMD to SAIC for the purpose of creating the MARS derivative would not fall under § 117 safe harbor provisions.

MARS involved not simply upgrading existing copies of AUMD software, but rather creating completely new works based on AUMD and distributing them without limitation. Although the screens were reproduced, they were reproduced by visual copying of the screens and their links, then separately reproducing the functionality behind some of the screen buttons. *Pl. Exh. 16, 34, 35, 75, 101, etc*. Thus, MARS was not a mere adaptation of existing copies, but creation of new copies in order to create a derivative work. In other words, this was not a case where a copy of the existing program was simply added to – e.g. by adding additional program modules which added functions, or additional screens– nor was this a case where interoperability features were added to allow operation with new hardware or external software - but rather, new copies were made which replaced the existing Visual Basic code with new code to both reproduce certain functionality and to add new functionality. Section 117 cannot be read to provide a safe harbor for this type of act.

CMAX is especially relevant on this point. CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337 (M.D.Ga. 1992). CMAX also involved a possessor of software copies creating a copy of that software in order to continue using it beyond the explicit terms of their agreement. The infringer copied user interfaces and data structures, then modified the Basic code within the programs for their purposes. CMAX, 804 F.Supp. at 341-45. The court refused to allow the infringers to hide behind § 117. "[Section] 117 expressly provides that the adaptation can be used in 'no other manner'" than what is "necessary" for continued use. CMAX, 804 F.Supp. at 356. Thus, any use which is inconsistent

with the express or implied terms of ownership is incompatible with § 117.

Even the most liberal reading of § 117 does not protect Defendant's actions here.

6. Was the government's copying of the AUMD program a fair use under 17 U.S.C. § 107?

Section 107 fair use does not protect Defendant's purposeful and intentional copying of Plaintiff's work. Fair use is a defense to copyright infringement which a defendant bears the burden of proving. Chicago Bd. of Educ. v. Substance, Inc., 354 F.3d 624 (C.A.7 (Ill.) 2003), cert. denied, 125 S.Ct. 54; Belmore v. City Pages, Inc., 880 F.Supp. 673 (D.Minn.1995).

Fair use is use for the purposes of "criticism, comment, news reporting, teaching…, scholarship, or research." 17 U.S.C. § 107. Factors examined include: (1) the "purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," and (4) "the effect of the use upon the potential market for or value of the copyrighted work." Id. Fair use "distinguishes between 'a true scholar and a chiseler….'"" Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 563 105 S.Ct. 2218 (1985) (omitting citations). ""Fair use presupposes 'good faith' and 'fair dealing.'" Id., 471 U.S. at 562.

Every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright. Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 105 S.Ct. 2218 (1985). "[T]he [Copyright] Act focuses on "the effect of the use upon the potential market for or value of the copyrighted work." This last factor is undoubtedly the single most important element of fair use.... 'Fair use, when properly applied, is limited to copying by others

which does not materially impair the marketability of the work which is copied.'" Id., 471 US at 566-67 (omitting citations)

Here, Defendant's use of Plaintiff's work never was for the purposes of criticism, comment, news, reporting, teaching, scholarship or research. Defendant used Plaintiff's work in a commercial context. Consequently, Defendant's commercial use is presumed to unfair use. Additionally, the nature of the work is the author's approach to the problems of how to sort through massive amounts of data in order to generate a Manpower report that he also created. *Trans., pp 95-96.* Plaintiff sought to solve the existing problems of too much information generated or the improper selections of information for use. *Id.* Moreover, Defendant used Plaintiff's work in its entirety, and drastically affected Plaintiff's market since Defendant was likely the largest market consumer for Plaintiff's work. Additionally, Defendant took the heart of Plaintiff's work, i.e., the arrangement and display of screens as well as the data structure. *Trans. pp. 754-57.* Defendant took more than insignificant portions and, in fact, took identical screens and data structure. *See Plaintiff's Exhibits 131, 132.*

The instance case is distinguished from that of Sega Enterprises, Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992), in which fair use was successfully argued since disassembly of computer object code of a copyrighted program "was the only way to gain access to the ideas and functional elements of the copyrighted program." Id.. Here, Defendant did not disassemble and copy Plaintiff's work but simply copied the interface and distributed copies throughout its operations. The ideas and functional elements were not hidden but clear in their structural arrangement in Plaintiff's interface.

7. To what extent are the AUMD program's screen displays protected expression under copyright law. Other cases such as *Apple Computer Inc. v. Microsoft*

*Corp.*, 821 F. Supp 616 (N.D. Cal. 1993) *aff'd* 35 F.3d 1435 (9th Cir. 1994), have examined the "look and feel" aspect of a computer program's images. The court asks the parties to specifically cite other cases examining graphical user interfaces and copyright protection.

Plaintiff's work is protected by copyright because screen displays, interactive graphical user interface based on those displays, and data structure compilation are protected expressions; Defendant's virtually identical copying of those expressions is copyright infringement under either broad or narrow protection. Plaintiff's screen displays and graphical user interface made up by the dynamic interactivity of those screens are protected expression under copyright law. The screen displays, which essentially are the code for the screens, are literal elements. Parts of the screens which are standard may be filtered out, leaving the selection of the fields and tables to be included on a page, the arrangement of the fields and tables on the page, and the interconnectivity of pages, literal elements which are protectable expression.

As an initial point, before discussing the various cases which have concerned copyrights in graphical user interfaces and/or screen displays of such interfaces, is the fact that only one of those cases, CMAX/Cleveland, Inc. v. UCR, Inc., 804 F. Supp. 337 (M.D. Ga. 1992), has addressed the unique issue presented here, where the literal code includes the screen displays themselves. As the testimony established, the coding for AUMD, and MARS, involves designing the screen layouts, making all the choices about what and how many screens to use on a topic, what goes into the screens, how the controls on the screens are arranged spatially and by function etc. MS Access then generates the code as property attributed within the Access system, which is why Access is needed on a computer to run the compiled programs. The second aspect of the source code is the actual Visual Basic line coding for the specific functions assigned

to the controls in the screens. Thus, this is not a case of screens being a product of the code, but the screens actually being the code for all intents and purposes, for that portion of the code that is represented by the screens as opposed to the functions of the controls. The point being, that the screen displays are not non-literal elements of the code, but instead are the literal elements of the code. So directly copying the screens is directly copying the literal elements of the program. In most cases that have discussed the screen displays or graphical user interfaces the courts have treated them as non-literal elements and required a virtual identity standard, such as Atari; Apple Computer. But here, in any case, the matter is moot because (the elephant in the room that Defendant ignored), Defendant did copy the screen displays essentially identically, and admitted that they did so. *Compare Pl. Exh. 130 (AUMD screens for GUI) with Pl. Exh. 131 (MARS screens for GUI); Trans. pp. 207, 212-13, 215-19, 577, 610-11, 619-20, 1038-42, 1169; Pla. Exh. 16, 34, 36, 36, 111.*

Here, Plaintiff alleges literal copying of its screen displays, user interface, table structure, and interactivity. The screen displays themselves are literal elements, the interactivity of the screen displays and the user interface are non literal elements. Thus, the evidence that there was literal copying of literal elements (the screens), and literal copying of non-literal elements (the interactivity of the screens and user interface).

In Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435 (9th Cir. 1994), the infringement claim was based on “claim of copying a computer program’s artistic look as an audiovisual work instead of program codes as a literary work.” Id. at 1439. The Court held that (1) a licensing agreement gave competitor right to transfer individual elements or design features using its “Windows” program; (2) in determining whether

manufacturer's GUI was infringed, district court properly compared works for virtual identity, rather than substantial similarity; and (3) remand was required to determine whether competitors were entitled to award of attorneys' fees. The court determined that graphical User Interfaces require the following steps to determine infringement: (1) plaintiff "must identify sources of alleged similarity," (2) "the court determines whether any of the allegedly similar features are protected by copyright" based on analytic dissection, expert testimony and the presence of a licensing agreement, and (3) the court determines the degree of copyright protection entitled to the work based on the alleged similarities and the range of possible expression, and using the determined degree of protection applies "the appropriate standard for a subjective comparison of the works as a whole." Id. at 1443. In Apple Computer, the single most dispositive fact was the existence of an express written licensing agreement which specifically covered the Graphical User Interface in the existing and derivative works. Id. at 1438, 1440. "The plain language of the Agreement disposes of Apple's argument." Id. at 1440. Again, "The fact that Apple licensed the right to copy almost all of its visual displays fundamentally affects the outcome of its infringement claims. Authorized copying accounts fro more than 90% of the allegedly infringing features…" Id. at 1442.

In CMAX/Cleveland, Inc. v. UCR, Inc., 804 F. Supp. 337 (M.D. Ga. 1992), the Court dealt with copyright infringement of a computer program, called MRMAX, designed for use by companies engaged in the rent-to-own business, and enabled companies to input, store, process, and retrieve information incident to the "rent-to-own" furniture and appliance businesses, including inventor, rental agreement, and accounting information. Id. at 340. The RMAX system had two components, RMAX

Remote Store System for individual store locations, and RMAX Host System to manage and monitor periodic and daily activity in the remote stores. Id. at 340. The Plaintiff alleged that the defendant infringed its copyright in the programs by among other things copying the field sequences in the screen layouts and in the reports. Id. at 355. The literal elements, the code, were different, and so the court bypassed the abstraction test and focused on filtration related to the nonliteral elements of the RMAX Systems' design. Id. at 345-55. The court fount that there was no merger because the data layouts in the screen layouts and reports could have been arranged in any number of ways, and thus they represented protected express. Id. at 355.. The defendant in copying used a code generator, described as a electronic paintbrush, which allows the programmer to create the screen, and the code generator then created the code for the screen based on the programmers design. Id, at 343. The court noted that "when using a code generator, the development of a software system consists almost entirely of the design of the system, while only a small portion of the process involves coding the system." Id. at 343. The defendant had decided to develop their own system that performed the same functions and exhibited the same capacities as the RMAX system. Id. at 343. Defendant had a copy of the RMAX system and studied how it ran, in particularly studying the files, screen layouts, and report formats. Id. at 343-44. They had computers set up running the RMAX system and the system under development side by side. Id. at 344. The defendant used the code generator to simply duplicate the RMAX system onscreen. Id. at 344. This process was used to develop many of the defendant's screens and reports. Id. at 344. The defendant 's programmers "would set up screens and reports for the system simply by copying the corresponding screens and

reports from the RMAX System." Id. at 344. The defendant's system's "screens and reports were laid out so that they had the same look and format, and included the same data elements in the same order, as comparable RMAX System screens and reports. Id. at 344. Thus, "[d]uring the development of the UCR System [the defendant's system], therefore, there generally was no need to design any of the files, screens, or reports." Id. at 344. Defendant "simply copied the designs of the existing RMAX Remote Store System files, screens or reports—using the same layouts and naming conventions—on to the portable computer on which the UCR System was designed using [the code generator]." Id. at 344.

In Autoskill, Inc. v. National Educational Support System, Inc., 994 F.2d 1476 (10th Cir. 1993), the court addressed a copyright infringement case in which the software alleged to be infringed was a program, AUTOSKILL, for use in teaching reading skills to students with reading disabilities, and was designed to identify students with reading difficulties in three types of categories. The court ruled that the defendant had infringed the program. The court found the program protectable because a keying procedure, which provides for students in three types of abilities to respond to audiovisual matching tests by pressing 1, 2 or 3 keys, this reflects at least a minimal degree of creativity, Id. at 1495, and non literal aspects of computer program can be protectable. Id. at 1495. The court performed the abstraction filtration comparison steps. Id. at 1490-94. The Defendant required its program "to be like AUTOSKILL" Id. at 1481. Defendant made changes to names and sequences, and minor format changes. Id. at 1490. Defendant had access to articles about Autoskill and an Autoskill brochure. Id. at 1483. While the Defendant programmers did not have

the Autoskill source code, Id, at 1481-82, they essentially had access because they had computers with AUTOSKILL loaded on them and articles about AUTOSKILL, and an AUTOSKILL brochure. Id. at 1483, 90 The function of modules or subroutines together with each modules relationships to other modules constituted the structure of the program which is the non literal aspect--the code is the literal aspect. Id. at 1492 n. 18. Plaintiff did not claim infringement of its source code. Id. at 1492 n. 18.

In Manufacturers Technologies, Inc. v. CAMS, Inc., 706 F. Supp. 984 (D. Conn. 1989) the court dealt with an allegation of copyright infringement of a software designed to enable a user to estimate the cost of machining manufactured parts through computer application. The court entered judgment for the Plaintiff on the copyright infringement claim. Id. at 1005. The court ruled that the screen displays in creating an estimate sequence constituted copyrightable expression. "That expression, reflects selection as to what should be made part of the status report, arrangement of the terms therein, assignment of numbers t specific operations/departments and tools, and coordination in the manner of building on the status report as the user progresses through various steps" and is "copyrightable and subject to protection." Id. at 996. The court also found that the job identification screen was sufficiently original because of the selection and arrangement of nine terms which the screen uses to identify a particular job, and their fore subject to copyright protection. Id. at 997. Other screens evidencing originality in selection and arrangement of components were found to be copyrightable protectable. Id. at 996-998. A single registration of the computer program accomplishes two interrelated yet distinct registrations: one of the program itself and one of the screen displays or user interface of that program, to the extent that each contains

copyrightable subject matter.[3] Id. at 993.

In Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222 (3d Cir. 1986), the court dealt with alleged copyright infringement of a computer program for dental laboratory record keeping. . The court held that the copyright protection for a computer program could extend beyond the programs' literal code to their non-literal components, the structure, sequence and organization and upheld the finding of substantial similarity affirming the judgment of copyright infringement. The suit in Whelan came before the Copyright Office decided that a single registration covered both the screen displays and user interface, as well as the source code. See Manufacturers Tech, 706 F. Supp. At 990-91. The Whelan court noted that at that time a separate registration was required and that only the source code registration as at issue, but that nevertheless the screen outputs were probative for infringement of the underlying code in any case. Whelan Associates, 797 F.2d at 1244. The plaintiff's expert testified as to the structure of the programs, and that most of the file structures, and the screen outputs were "virtually identical." Id. at 1228. The defendant's expert, however, compared just the source and object codes and testified at lengths about their differences, but did concede that the programs overall had structural similarities. Id. at 1228. The programs source code was different, but were substantially similar because the structure and overall organization were substantially similar. Id. at 1229. While the

[3] The Court discussed the fact that during the pendency of the lawsuit, the Copyright Office had issued a decision that it would not longer accept copyright applications separately for computer program source code and for screen displays and user interfaces, but that instead from that point forward a single copyright registration of a computer program would extend copyright protection not only to the literal elements of the program—its source and object codes—but also to the screen displays it generates to the extent they contain original creative authorship. Manufacturers Tech., 706 F. Supp. At 990-91 (citing 36 PAT. TRADEMARK & COPYRIGHT J. (BNA) 155 (1988)).

court did not ultimately use what is known as the abstraction part of the abstraction-filtration-comparison test, the court did go through abstraction of the computer program. Id. at 1229-30, from the highest level purpose, to the end level coding. Id. at 1229-30. As a case of the first impression to the circuit court, it adopted a substantial similarity inquiry, instead of an extrinsic/intrinsic test. Id. at 1232-33. The court noted the importance of separating expression from idea and that you could only compare expression, id. at 1235-36, and adopted an idea/expression dichotomy test. Id. The court than approved of the comparison that the district court made of the non-literal protectable expression between the programs. Id. at 1238-1248. The court agree with the district court that the structure of the copyrighted program was expression, not idea, because "there are other programs on the market…that perform the same functions but have different structures and designs." Id. at 1238.

In Broderbund Software, Inc. v. Unisorn World, Inc., 648 F. Supp. 1127 (N.D. Cal. 1986), the court examined a claim of copyright infringement of the "Print Shop" computer program for creating customized greeting cards, signs, banners and posters.. The court ruled that the organization, structure, sequence, and arrangement of screens in the menu drive "Print Shop" computer program for creating customized greeting cards involved expression separable from the underlying idea and this was afforded copyright protection. Id. at 1132-33. In Broderbund, the defendant directed its programmers to copy "Print Shop". Id. at 1135. The defendant copied the "Print Shop" user interface. Id. at 1135. The defendant had copies of the "Print Shop" software to model their program on. Id. at 1136. Thus, the defendant had access to the program, even though the defendant did not have access to the source or object cod, because the access to the

"literal components" was not necessary to copy the allegedly infringed portions of "Print Shop" Id. at 1136. In comparison, the screens between the two programs are substantially similar. Id. at 1137 An ordinary user would find the screens an "eerie resemblance between the screens of the two programs." Id. at 1137. The sequence of the screens and the choices presented the layout of the scenes, and the methods of feedback to the user are all substantially similar. Id. at 1137. "Put simply, 'Printmaster' looks like a copy of 'Print Shop', with a few embellishments scattered about in no particular order." Id. at 1137.

In Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1345-47 (5th Cir. 1994), the court ruled that when there are numerous ways in which either input or output formats could have been structured to achieve program's purpose, it is error to deny copyright protection. Copyright registration covers programs architecture, sequence, and arrangement, operation modules, and user interface, at least to the extent protectable. Id. at 1341.

In Brown Bag Software v. Symantec Corp., 960 F.2d 1465 (9th Cir. 1992), the court addressed a claim of copyright infringement for a software program for outlining. Registration of copyright entitled the plaintiff to a presumption of originality in its software copyright. Id. at 1474. The lower court properly compared screens and menus in comparing expressions in computer software. Id. at 1473, 1475-76. The court found the screens were not substantially similar. Id. at 1473. Out of six program aspects examined (five features, and then comparison of screens), the court found unprotectable the five features which were similar, and ruled that the screens simply were not substantially similar. Id. Where two works are similar without regard to scope

of copyright in plaintiff's work, source of similarity must be identified and determination made as to whether the source is covered by the plaintiff's copyright. Id. at 1475-76.

In Computer Access Technology Corp. v. Catalyst Enterprises, Inc., 2001 WL 34118030 (N.D. Cal. 2001) the court addressed, among other thing, alleged copyright infringement of a graphical user interface for computer peripheral protocol analyzers. The court ruled that individual components were not infringed, and that comparing the whole under the virtual identicallity standard, the user interfaces were not identical but had a obvious differences. The court noted that, even if all of the individual features are unprotectable, the program can be protected as a selection and arrangement of individual unprotected elements. Id; Fiest Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 362, 111 S. Ct. 1282, 113 L.Ed.2d 358 (1991); Brown Bag, 960 F.2d at 1476 n. 4. The court followed the rule that where a factfinder was dealing with a situation in which the individual components were unprotectable, but the selection or arrangement of the components were protectable, that only "thin" protection was afforded, and infringement would be found only if the GUI as a whole was virtually identical. Computer Access ; Brown Bag Apple, 35 F.3d at 1443, 1446-47.

In Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527 (5th Cir. 1994), the court addressed a unique copyright infringement case involving software where the defendant turned management training program materials into a software program. The court viewed the infringement at a high level of abstraction, clearly non-literal, and found infringement based on use of the central 5 of 8 questions for management training which were the "heart and soul" of the copyrighted material. Notably, the management training material was itself a licensed derivative, but non-registered work.

In Mitek Holdings, Inc. v. Ace Eng'g Co., Inc., 89 F.3d 1548 (11th Cir. 1996) the court dealt with alleged infringement of a wood truss drafting program. The visual displays differed and were not visually identical. 1559. For analyzing infringement of nonliteral elements of computer program, use "bodily appropriation of express" or "virtual identicality" standard. Accord Apple v. Microsoft, above, in the Ninth Circuit.

In Lotus Development Corporation v. Paperback Software International, 740 F. Supp. 37 (D. Mass. 1990), the court reviewed an action for copyright infringement for a computer spreadsheet program, Lotus 1-2-3, and held that the menu command structure, including the choice of command terms, the structure and order of thus terms, and their presentation of the screens and prompts, was copyrightable and that liability for infringement was established. The court ruled that the menu command structure was capable of being expressed in many ways and was thus copyrightable. Registration of computer spreadsheet programs extends to the screen displays of the program The defendants argued that copyright prot6ection extended only to literal components—the code. The plaintiff contended that copyright protection extend to nonliteral elements, including the "user interface." Id. at 45-46. The court ruled that computer user interfaces and other nonliteral aspects of programs can be protected. Id. at 54. The court noted that "the bulk of creative work in a program is in the conceptualization of a computer program and its user interface, rather than in its encoding, and that creating a suitable user interface is a more difficult intellectual task, requiring greater creativity, originality, and insight, then converting the user interface design into instructions o the machine." Id. at 56. The court engaged in an abstraction test. Id. at 59-61. The court focused its analyses on the user interface that the plaintiff advocated (the plaintiff had

stopped referring to it as the look and feel), and found, after engaging in the abstraction analysis, that some aspects of the interface were protectable, such as the structure, sequence and organization of the menu command system, and that others were not, such as the fact that all spreadsheet displays resemble a rotated "L" and that all menu command systems are involved by one of very few keys. Id. at 66-67. In looking at the structure, sequence and organization of the menu command system the Court examined it as a whole, properly noting that even if individual components were not copyrightable, the system could be copyrightable on the whole. Id. at 67-68. The court found the user interface of the menu command system to be copyrightable, and that it was a substantial part of the alleged copyrighted work. Id. at 68. This drove the result because ether defendant had admitted that it had copied the structure. Id. at 68-69. Defendant had specifically told its programmers to copy that structure. Id. a t 69.

In ILOG, Inc. v. Bell Logic, LLC, 181 F. Supp. 2d 3 (D. Mass. 2002), the court examined a copyright infringement claim related to a business rules editor software. The court examined the differences between literal copying and nonliteral copying, and copying of literal elements versus nonliteral elements, and noted that since there was no copying of the source code, but instead an allegation of copying of the structure, that the court was looking at copying of non literal elements, which it examined under both a literal copying and non-literal copying analysis. Id. at 6-14. The court determined that literal copying was governed by a Lotus analysis, but that nonliteral copying was governed by the abstraction-filtration-comparison test of Altai. The court determined that the features alleged to be copied were not protectable as they were ideas rather than expressions. The court cautioned, however, that it was not examining screen displays

which were not in issue, and stated "If the alleged copying was of the screen displays, then perhaps expression would be involved." Id. at 14.

In Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 34 USPQ2d (BNA) 1014 (1st Cir. 1995), judgment a'ffd by equally divided court, 516 U.S. 233, 133 L.Ed.2d 610 (1996), regarding a claim of infringement of Lotus 1-2-3 by Borland's Quattro and Quattro Pro, the Court ruled that the menu command hierarchies were methods of operation and therefore uncopyrightable, Id. at 818, but that the screen displays, on the other hand, had "little bearing on how users control the program" so were not uncopyrightable methods of operation. Id. at 816; see Escholar, LLC v. Otis Educational Systems, Inc., 2005 WL 2977569, 76 USPQ2d 1880 (S.D. N.Y. 2005) (discussing this aspect of Lotus Dev. Corp. v. Borland Int'l). "When faced with nonliteral-copying cases, courts must determine whether similarities are due merely to the fact that the two works share the same underlying idea or whether they instead indicate that the second author copied the first author's expression." Lotus v. Borland. However, the Court stated with respect to the screen displays "[a]s they are not before us on appeal, we take no position on whether the Lotus 1-2-3 screen displays constitute original expression capable of being copyrighted." d, 49 F.3d at 816 n. 10.

These software copyright infringement cases fall into three categories. One category is where what is alleged to be infringed is the code either literally or non-literally.. The second is where it is alleged that the screen display user interface is infringed, either as a non-literal aspect of the code, or as a literal aspect where the screens are the work.. The third is where the code is not literally alleged to be infringed, but that the non-literal elements of the code are copied either literally or non-literally.

The court can address the numerous copied screen displays in this case properly as literal elements, because the screen displays are essentially the coding by the programmer. And defendant directly, literally copied these literal elements. Now the structure and interactivity of the screen displays in the user interface are non-literal elements. Once again, Defendant literally copied these non-literal elements. The code for the modules and routines represented in the individual screen display selections, are literal elements which are alleged to be non-literally copied.

The type of software is clearly and interactive GUI, or interactive graphical user interface. *Trans., pp. 754.* The function of the software was to perform queries of the database (MDS, an Oracle database), both to transfer to and into the AUMD system and to satisfy requests for user reports. *Trans., pp. 757*

The creative programming process is as two stop process, where you develop the interface which defines the input and output and some of the program structure and then through the integrated development environment you add the behaviors of the interface by writing code. *Trans., pp. 552. 567.* As recognized by the courts, the design of the screens and graphical user interface, the structure and organization, is the overwhelming bulk of the work, the actual coding of specific functions within that system , testing and debugging, is a minor in comparison. <u>CMAX/Cleveland, Inc. v. UCR, Inc.</u>, 804 F. Supp. 337, 343 (M.D. Ga. 1992); <u>Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.</u>, 797 F.2d 1222, 1231 (3d Cir. 1986); <u>Lotus Development Corporation v. Paperback Software International</u>, 740 F. Supp. 37, 56 (D. Mass. 1990). In <u>CMAX/Cleveland</u>, the court noted that the "design is clearly the most substantial... most creative and most intellectually demanding phase in the development of a computer

software system. … [T]he design phase accounts for up to ninety percent of the time and intellectual input required to develop a system when a code generator is used. Both the coding phase of the process and the final testing phase accounts for a relatively small portion of the overall process." CMAX, 804 F.Supp. at 343 & 345-46 ( "when using a code generator, the development of a software system consisted almost entirely of the design of the system, while only a small portion of the process involves coding the system."). In Whelan Associates, the court pointed out that the coding process is "a comparatively small part of programming. By far the larger portion of the expense and difficulty in creating computer programs Is attributable to the development of the structure and logic of the program….rather than to the coding." Id. at 1231. That "[T]he 'look and feel' of a computer software product often involves much more creativity and often is of greater commercial value than the program code which implements the product." Id. at 1231 (quoting *InfoWorld*, Nov. 1, 1985 at 13). In Lotus Development Corporation, the court noted that "the bulk of creative work in a program is in the conceptualization of a computer program and its user interface, rather than in its encoding, and that creating a suitable user interface is a more difficult intellectual task, requiring greater creativity, originality, and insight, then converting the user interface design into instructions o the machine." Id. at 56.

Here, there was overwhelming evidence of the originality, creativity, the design choice that goes into designing the, in many cases highly complex, screen displays and graphical user interface, as well as his design of the table structures that he created that pulled selected 15-17 tables out of 100s of tables in the MDS Oracle Database. *Trans. p. 96-103, 190-192*. The screen design layout programming environment in Access

allows you to create very complicated screen designs. *Trans, pp. 657-58*. The original aspect is after you filter out system constrained standards such as public graphics (.jpgs, .bmp, .gif), e-mail forms, element shapes, color, standard control shapes, font, form names.. *Trans., pp. 561, 574-78, 588, 633, 635, 665-67, 709-10, 716, 724*. The originality, and the comparison, is the choice over which the designer had significant design discretion and control with many variable, such as choice and selection of controls, spatial arrangement and interactivity of controls, choice of what screens to include controls on, groups of controls on one or more screens dynamic flow of screens and controls, assignment of purpose and function to specific controls and compilation of those functions by selection on individual pages, dynamic changes created by choice of screens, type of tool chosen for individual controls, type of screen to use, interaction of screens and sub-screens, placement, how screens are represented, structuring of data tables. *Trans., pp. 565, 566, 567, 568-72, 574-78, 665-67*.

Moreover, these creations were not were not dictated by the original MDS system in any aspect, not in any existing specification or requirement of unit manpower documents. *Trans., pp. 96-100.* The AUMD user interface screens were created wholly by Davenport and were not standard screens. *Trans., pp. 103.* They did not come from the MDS system. *Trans., pp. 190-91.* They were his own design, the reports formats were his own design. *Trans., pp. 190-91*. None of the layouts were preexisting. *Trans., pp. 190-91.* There is nothing the in the Oracle database which defined how the AUMD programs screens or tables or file structures had to be set up. *Trans., pp. 621.* There is a lot of variability. *Trans., pp. 622.* You have a lot of choices the designer can choose from. *Trans., pp. 622.* In fact, Defendant's expert, Mr. Keohane, surprisingly admitted

that he knew nothing about the MDS system at all, that he did not run the MDS system and he doesn't know anything about it or what screens it had. *Trans., pp. 1048.* He knows nothing about he MDS interface. He was never given or informed about the MDS system. *Trans., pp. 1048.* Keohane admits that the Oracle databases or MDS would not have dictated the screen displays or layouts. *Trans., p. 1050.* MDS would not dictate what tables to select to be downloaded or what tables would be set up to be used by MARS or AUMD. *Trans., pp. 1050-51.* He admitted that the programmer can format his download tables in his own design choice. *Trans., pp. 1053-54.*

In this case, Plaintiff's work and Defendant's copies are not merely similar but are essentially identical. They both display the same screens, thus having identical source code in generating the screens. Furthermore, the interface of Plaintiff's work is identical to the interface of Defendant's copies. *See Plaintiff's Exhibits 131, 132.* Defendant could have written an entirely different program with entirely different interface and screens to perform the same report-generation utility of Plaintiff's program. Defendant could have even used the same Microsoft Access software to generate its own source code and user interface. Instead, Defendant copied the screens and data structure of Plaintiff's work.

In this case Defendant's copied user interface and screen displays is identical qualitatively and quantitatively to Plaintiff's user interface. These identical user interfaces utilize all the same buttons, search fields, tabs, and formats on the same screen in the same location to perform the exact same functions. *See Plaintiff's Exhibits 131, 132; Trans., pp. 577* (the screens, MARS and AUMD, when you superimpose one on the other, are identical, when you lien them up they are identical),

*606 (*compared the two systems, the visual layout, the visual design), *610-611* (there was a quite a bit of variability in how they might be done, and yet the two programs are very similar; there is a substantial similarly between the two systems, very , very similar to each other, a high degree of visual similarity); *619-20* (lined up identically).

SAIC was asked to make screen layouts and a graphical user interface that was identical to the existing, AUMD System. And that is what SIAC did. *Trans., pp. 207, 212-213, 215-16, 216-17, 219*. SAIC had access to the running AUMD software and in fact tested MARS by running AUDM and MARS side by side. *Trans., pp. 212-213, 236, 238-29. See also Pla. Ex. 34* (MARS will be "identical to the existing system's GUI environment with only textual changes as required by the government"; "transparently replace the existing system"*); Pla .Exh. 111* (Statement of Work for SAIC for MARS: *"*recreate the existing system so…Air Force can seamlessly substitute MARS for the existing system", "exactly the same user interface and function as the existing system and shall provide responses to user inputs within the same time constraints as the existing system"; "GUI environment shall be identical to the existing system's GUI environment with only textual changes as required by the government"; " transparently replace the existing system "); *Pla. Exh. 16* ("an identical copy"); *Pla. Exh. 35* (MARS "duplicate"; "exact replication", "same user interface"); *Pla. Exh. 36* ("exact replication of the current system in terms of functionality and user interface"; "exactly the same user interface and function as the existing system and shall provide responses to user inputs within the same time constraints as the existing system.").

Defendant's expert, Mr. Keohane, was required on cross-examination to compare the AUMD Screens/Interface and the MARS Screens/Interface and he was

forced to admit that they were essentially identical and that that was because the Government told the contractor to make theme the same. *Trans., pp. 1038-42.* Keohane was also forced to admit that he discounted that clear evidence of direct copying in his expert report because he excluded from consideration out all of the screens and visual interface because copying those was a requirement of the government contract. He then back tracked ad stated that he didn't mean to say that, even though that is what was said. *Trans., pp. 1043-44.* He admitted that if the screens and menus look similar then they will have the same source code if the programmer is using Microsoft Access. *Trans., p. 967, lns. 15-17, 19-21.*

MARS and AUMD were both programmed in Access. *Trans., pp. 664.* When you copy a screen created in Access using Access, you will get the same code. *Trans., pp. 614-615* When you copy the copy the user interface screens using the same integrated development environment, Access, then you are in fact copying most of he creative acts of the programmer. *Trans., pp. 614-616.* Indeed, there are programs that allow you to copy an Access screen that is running, and past it into the Access programming environment to duplicate that screen in a different program. *Trans., pp. 708-09.* To the point, on of the ways Dr. Orr compared MARS and AUMD running two computers side by side, MARS loaded and running on one, AUMD loaded and running on another. *Trans., pp. 619.* He went through all the screens, the interface, and they, lined up identically. *Trans., pp. 619-620.*

The Government admitted in closing that as to the screen designs, if the screens were visually identical, that the underlying property attribute representation of that code would be identical, would be therefore substantially similar. *Trans., pp. 1169*

8. To what extent the merger doctrine and *scenes a faire* are applicable.

The Merger Doctrine and *Scenes a Faire* do not apply to exclude creative expression in this case. When determining the infringement by the Air Force of the MARS programs, the court compares the protected work versus the infringing work. In determining the protected elements of the work, the Court filters out those items which are not protected because of the Merger Doctrine and/or because of the doctrine of *Scenes a Faire*.

There will be no exclusion under merger where there is no evidence that idea can be expressed in only one way. Autoskill, 994 F.2d 1476, 1494 (10th Cir. 1993) (denying merger); CMAX/Cleveland, Inc. v. UCR, Inc., 804 F. Supp. 337, 355 (M.D. Ga. 1992). (The court fount that there was no merger because the data layouts in the screen layouts and reports could have been arranged in any number of ways, and thus they represented protected express) *Scenes a faire* excludes matter that is stock, common, or standard or necessarily found in common theme. Autoskill, 994 F.2d at 1494.

Regarding merger, Defendant has proffered nothing whatsoever to suggest that the screen displays, graphical user interface, were required by anything, or that they were the only way that the task could be performed. To the contrary, the evidence established the highly complex screens, interface, and tables could be done in many different ways. *Trans., pp. 96-103, 190-92, 565-72, 574-78, 622, 657-58, 665-67.* The evidence established that the MDS System, which was still officially used, created unit manpower reports, and that MDS was not the same. The evidence established that nothing in the MDS systems whatsoever constrained how the AUMD screens, tables and interface could be created. *Trans. pp. 96-100, 103, 190-91, 621-22, 1050-51.* There is simply no evidence to base a claim of merger upon, and overwhelming

evidence to the contrary.

Regarding *scenes a faire*, standard background items, Dr. Orr explained the filtering out of standard objects to focus on originality of authorship, and that the screens, whether with or without the filtering, were absolutely identical. He filtered standards such as public graphics (.jpgs, .bmp, .gif), e-mail forms, element shapes, color, standard control shapes, font, form names.. *Trans., pp. 561, 574-78, 588, 633, 635, 665-67, 709-10, 716, 724*.. The screens still remained identical. And that is because of the elephant in the room: if you have two pictures of the Mona Lisa, and you filter out the background mountains, you still have identical Mona Lisa's.

Finally, the issues are mooted anyway by the identical copying. Even if there were complete merger, even if there were wholesale subtractions as scenes a faire, there would still be liability for virtually identical copying. And that is what occurred. Meridian Project Systems, Inc. v. Hardin Construction Co., 426 F. Supp.2d 1101, 1112 (E.D. Cal. 2006) (Under "merger doctrine," when idea and expression are indistinguishable, or "merged," that expression will only be protected against nearly identical copying); Apple Computer, 35 F.3d 1435, 1444("When an idea or an expression are indistinguishable, or 'merged,' that expression will only be protected against nearly identical copying." );[4] Meridian Project Systems, id, 426 F. Supp.2d at 1113 ("Scenes a faire" doctrine provides that, where certain features are, as practical matter, indispensable, or at least standard, in treatment of a given issue, they are treated like ideas, and thus protected only against virtually identical copying."):. Even if the *scenes a faire* doctrine applied to this case providing only a narrow range of

expression, Plaintiff prevails because Defendant's copies are identical to Plaintiff's work . Compare Plaintiff's Trial Exhibit 130 with 131. See Meridian Project Systems., 426 F. Supp.2d 1101, 1113 (E.D. Cal. 2006) (citing Landsberg v. Scrabble Crossword Game players, Inc., 736 F.2d 485 (9th Cir. 1984); Apple Computer, 35 F.3d at 1439).

In the present case, the programmer has innumerable options for displaying fields and tabs and screen order for running a variety of searches of the data. This case is not simply a single email screen with the necessary "to," "from," "re," etc… fields. This case involves 33 screens, each with a number of identified buttons and tabs in a specific format and order, all of which Defendant copied. *Plaintiff's Trial Exhibit 131* (counted all screens in exhibit = more or less?). Plaintiff need not have included each specific button or tab or placed the screens in their particular order because of function but chose to organize

Here, the Court can essentially short circuit the analysis under the Merger Doctrine and Scenes A Faire principle because, even if the idea and expressions in some, most, or all of Plaintiff's works were indistinguishable, because Defendant copied virtually every single screen display, and the interactivity, identically, Defendant is still liable, even in the application of the doctrines.

9. Should the court determine plaintiff's copyright was indeed violated, what is the appropriate amount of damages under 28 U.S.C. § 1498(b) and 17 U.S.C. § 504(b)?

Just and entire compensation includes consideration of several alternate methods for determination. Leesona Corp. v. U.S., 599 F.2d 958 (Ct.Cl. 1979); Wright v. U.S., 56 Fed.Cl. 350 (Fed. Cl. 2003); Hughes v. U.S., 86 F.3d 1566, (Fed. Cir. 1996),

---

[4] And mind you, we are not talking about choosing one single icon as a desktop metaphor as in Apple Computer, 35 F.3d at 1444, or similarly by overlapping windows, in which there are only

reh'g en banc denied , cert denied and judgment vacated on other grounds 520 U.S. 1183 (1997). The preferred method for infringement is to determine a reasonable royalty or license fee. Leesona, 599 F.2d at 973; Hughes, 86 F.3d at 1572. However, the Court may use other methods to determine the reasonableness of a proposed royalty or license fee, including savings to the Government. Leesona, 599 F.2d at 970-71. License fees negotiated under the shadow of litigation or continuing infringement should not be given significant probative weight due to the market distortion under the particular circumstances. Hughes, 86 F.3d at 1573 (citing cases). Statutory damages are within discretion of court where they reflect the reasonable and entire measure of compensation. Wechsberg v. U.S., 54 Fed. Cl. 158, 165-66 (Fed. Cl. 2002).

Separate damages issues are before the court. First, what is the reasonable and entire compensation due for infringing copying and distribution of the AUMD programs themselves? Second, what is the reasonable and entire compensation for copying, modification, and distribution of the AUMD programs with the expiration date removed or altered? Third, what is the reasonable and entire compensation for creation and distribution of the unauthorized derivative MARS software created by SAIC?.

Plaintiff produced Dr. Rudd's testimony and expert report relating to damages at trial. *Trans., pp. 740-782*; *Pl. Exh. 70 & 71*. Dr. Rudd produced several alternative methods of valuation to determine the market value of Davenport's software programs. To value the software Dr. Rudd treated both AUMD and MARS as civilian contract priced software for the personnel or human resources fields with an interactive Graphic User Interface (GUI). *Trans., pp 752-4*. Using the Capers Jones' methodology, based on the nature of the MARS software and the fact that it was developed from the earlier

two options to display multiple windows, overlapping or tiled. Id.

AUMD software, Dr. Rudd estimated the value at $763,750. *Trans., pp. 754.* Using a function point technique, based on the complexity of the software, Dr. Rudd made a "conservative" estimate of $942,780 after converting the number of estimated person-months of labor at $12,500 per person month. *Trans., pp. 757-8.* Dr. Rudd then applied what is known in the software industry as the "Cocomo technique" where the number of lines of software code is divided by 1,000 then raised to the 1.05 power to obtain the estimated number of person months. Using $12,500 per person-month as previously, Dr. Rudd estimated $763,125 for the cost of the software. The average of these three cost methods is $832,218. Thus, a reasonable estimate for the market value of the property taken from Blueport would be approximately $832,218.

The $832,000 estimate comports with the contracts actually let to SAIC to "duplicate" the AUMD software. *Pl. Exh. 76* shows the actual payments made to SAIC for duplicating the AUMD software. While the SAIC contracts did include some products which were not strictly software, and so might overestimate the value of the software itself, they also do not take into account the savings gained by starting with the AUMD software which had been developed and tested by Mr. Davenport over two years, and which included Mr. Davenport's solutions to significant user feedback over those two years. This development work by Davenport created a very user friendly interface and structure for the program, and included features which were not contemplated by the Air Force itself. The Air Force's own witness, Maj. Meaker, described the AUMD software as "quicker, cleaner." *Trans., pp. 791.* Mr. Hendricks described AUMD as "Very slick. Very good." *Trans., pp. 890*. Thus, SAIC and the Air Force started with a significantly developed product which is not reflected in the contract

valuation, so the estimated value of approximately $832,000 is a reasonable estimate of the market value of the software that was appropriated by the Air Force when compared to the replacement purchase price.

Dr. Rudd also established a reasonable per user licensing fee of $100 per user based on manpower/personnel software systems used commercially. *Trans., pp. 759-61.* This $100 price was valid for a license of approximately 2510 users of the AUMD Master and MARS Query & Report, and 78 users of the AUMD Admin and MARS Admin or Get Data. *Trans., pp. 763; Pl. Exh. 71.* Plaintiff's Exhibit 71 provided numbers of authorized users of each program provided by the Air Force, based on the number of user accounts. Based on these license fees, one could calculate a lost value of approximately $258,800. According to Dr. Rudd, these licensing fees would not account for, and would be in addition to, fees for customization, installation, and startup of the software. : "Now, that $250,000 didn't cover all the costs, or would not have bought all of what Mr. Davenport did."

Therefore, a reasonable sum of the just and entire compensation of the value of the AUMD and MARS software appropriated by the Government would be approximately $832,000.

## CONCLUSION

Based on the record produced, and the law, the Court should rule that Defendant infringed Blueport's protected work and is liable in the amount of $832,000.00.

DATED THIS September 29, 2006,

Respectfully submitted,

RYLANDER & ASSOCIATES PC

/s/ Kurt M. Rylander

KURT M. RYLANDER
Attorney at Law
MARK E. BEATTY
Attorney at Law

406 West 12th Street 206
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 750-9953
E-mail: rylander@pacifier.com
Of Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY under penalty of perjury of the laws of the Federal Court that on the date signed below I served a copy of the document to which this certificate is attached by electronic filing with the US Court of Federal Claims which filing serves this document upon attorneys of record for Defendant, Scott Bolden, U.S. Department of Justice, Civil Division-Commercial Litigation Branch, Washington, D.C. 20530, scott.bolden@usdoj.gov.

DATED THIS September 29, 2006

/s/ Kurt M. Rylander
KURT M. RYLANDER,
(360) 750-9931
Of Attorneys for Plaintiff

RYLANDER & ASSOCIATES PC
406 West 12th Street
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 750-9953
E-mail: rylander@pacifier.com