No. 02-1622C
(Judge Lawrence J. Block)

# In the United States Court of Federal Claims

BLUEPORT COMPANY LLC

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**PLAINTIFF'S POST TRIAL BRIEF**

KURT M. RYLANDER
*Attorney at Law*
MARK E. BEATTY
*Attorney at Law*

RYLANDER & ASSOCIATES PC
406 West 12th Street
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 397-0473

Attorneys for Plaintiff

TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................ i

TABLE OF AUTHORITIES ........................................ iv

SPECIFIC QUESTIONS ........................................ 1

1. Section 1498(b) Defenses and Jurisdiction ........................................ 1

2. Substantive Merits of Section 1498(b) Defenses ........................................ 3

A. Position to order, influence, or induce the use of AUMD ........................................ 3

B. AUMD was not prepared as a part of the official functions of Davenport ........................................ 7

(1) Davenport's superiors did not consider programming part of his duties ........................................ 10

(2) Defendant denied Davenport's requests for programmer training ........................................ 12

(3) Davenport's high marks were not based on AUMD ........................................ 13

(4) AUMD was not within Davenport's "scope of employment" ........................................ 13

C. No use of government time, material, or facilities to create AUMD ........................................ 16

(1) Davenport created AUMD exclusively through his own resources ........................................ 16

(2) Suggestions are not government time, materials, or resources ........................................ 18

3. The protections of the copyrighted AUMD 2.1d extend to version AUMD 2.1f. ........................................ 19

4. Was there an implied license to AUMD, anf if so, when did it terminate? ........................................ 21

5. Section 117 Defense. ........................................ 23

A. The Air Force did not own their copies of AUMD ........................................ 24

B. Adapting AUMD copies was not an essential step in the

utilization of the programs ........ 26

C. The creation of the derivative work MARS was clearly not "necessary" to utilize copies of AUMD ........ 27

6. Was the government's copying of the AUMD program a fair use under 17 U.S.C. § 107? ........ 28

7. To what extent are the AUMD program's screen displays protected expression under copyright law. The court asks the parties to specifically cite other cases examining graphical user interfaces and copyright protection. ........ 29

8. To what extent the merger doctrine and *scenes a faire* are applicable in this matter. ........ 41

9. The appropriate amount of damages? ........ 43

CONCLUSION ........ 45

# TABLE OF AUTHORITIES

Page

## United States Supreme Court Cases

Community For Creative Non-Violence v. Reid, 490 U.S. 730 (1989) ........................ 7,14

Engine Mfrs. Ass'n v. South Coast Air Quality Mgt. Dist., 541 U.S. 246 (2004) ........................ 4

Fiest Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 111 S. Ct. 1282, 113 L.Ed.2d 358 (1991) ........................ 35

Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 105 S.Ct. 2218 (1985) ........................ 28

Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189 (1985) ........................ 4

U.S. v. Gaubert, 499 U.S. 315, 113 L.Ed. 2d 335 (1991) ........................ 1, 2

## Federal Cases & Decisions

A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 230 USPQ 849 (Fed. Cir. 1986) ........................ 12, 18

Apple Computer Inc. v. Microsoft Corp., 821 F. Supp 616 (N.D. Cal. 1993) aff'd 35 F.3d 1435 (9th Cir. 1994) ........................ 1, 2

Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435 (9th Cir. 1994) ........................ 29, 42

Autoskill, Inc. v. National Educational Support System, Inc., 994 F.2d 1476 (10th Cir. 1993) ........................ 32, 41

Autery v. U.S., 992 F.2d 1523 (11th Cir. 1993), cert. denied 114 S. Ct 1829 (1994) ........................ 1

Aymes v. Bonnelli, 47 F.3d 23 (2d Cir. 1995) ........................ 26

Belmore v. City Pages, Inc., 880 F.Supp. 673 (D.Minn.1995) ........................ 28

Berman v. U.S., 565 F. Supp. 1353 ........................ 2

Broderbund Software, Inc. v. Unisorn World, Inc., 648 F. Supp. 1127 (N.D. Cal. 1986) ........................ 34

Brown Bag Software v. Symantec Corp., 960 F.2d 1465 (9th Cir. 1992) ........................ 34, 35

Careau Group v. United Farm Workers, 940 F.2d 1291 (11th Cir. 1991) ........................ 3

Carlyle v. U.S., 674 F.2d 554 (6th Cir. 1982) ........................ 1, 2

Carson v. Dynegy, Inc., 344 F.3d 446 (5th Cir. 2003) ........................ 21, 22

Chicago Bd. of Educ. v. Substance, Inc., 354 F.3d 624 (C.A.7 (Ill.) 2003) cert. denied, 125 S.Ct. 54 ........................ 28

CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337 (M.D.Ga. 1992) ........................ 19, 20, 279, 29, 31, 38, 41

CMS Software Design Sys., Inc. v. Info Designs, Inc., 785 F.2d 1246 (5th Cir.1986) ........ 21, 23

Computer Access Technology Corp. v. Catalyst Enterprises, Inc., 2001 WL 34118030 (N.D. Cal. 2001) ........ 35

DSC Comm. Corp. v. Pulse Comm., Inc., 170 F.3d 1354 (Fed. Cir. 1999) . 23, 24, 25, 26

Eaton v. Dorchester Dev., Inc., 692 F.2d 727 (11th Cir. 1982) ........ 3

Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335 (5th Cir. 1994) ........ 34

Escholar, LLC v. Otis Educational Systems, Inc., 2005 WL 2977569, 76 USPQ2d 1880 (S.D. N.Y. 2005) ........ 36

Gates Rubber Co. v. Bando Chem. Ind., Ltd., 9 F.3d 823 (10th Cir. 1993) ........ 19, 20

Herbert v. U.S., 36 Fed. Cl. 299 (1996) ........ 8, 9, 13, 15, 16

Hess v. U. S., 537 F.2d 457 (Ct. Cl. 1976) ........ 24

Hughes v. U.S., 71 Fed.Cl. 284 (Fed. Cl. 2006) ........ 12

Hughes v. U.S., 86 F.3d 1566, (Fed. Cir. 1996), reh'g en banc denied , cert denied and judgment vacated on other grounds 520 U.S. 1183 (1997) ........ 43

ILOG, Inc. v. Bell Logic, LLC, 181 F. Supp. 2d 3 (D. Mass. 2002) ........ 37

Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527 (5th Cir. 1994), cert den'd 513 U.S. 820 (1994) ........ 19, 20, 35

Kiehn v. U.S., 984 F.2d 1100 (10th Cir. 1993) ........ 2

Krause v. Titleserve, Inc., 402 F.3d 119 (2d Cir. 2005) ........ 24

Leesona Corp. v. U.S., 599 F.2d 958 (Ct.Cl. 1979) ........ 43

Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 34 USPQ2d (BNA) 1014 (1st Cir. 1995), judgment a'ffd by equally divided court, 516 U.S. 233, 133 L.Ed.2d 610 (1996) ........ 36

Lotus Dev. Corp. v. Paperback Software Int'l, 740 F. Supp. 37 (D. Mass. 1990) ........ 36, 38

Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc., 128 F.3d 872 (5th Cir. 1997) ........ 21

Laurence v. U.S., 851 F. Supp. 1445 (N.D. Cal. 1994) ........ 1

Madison River Mgt. Co., v. Bus. Mgt. Software Corp., 387 F.Supp.2d 521 (M.D.N.C. 2005) ........ 26

Manufacturers Technologies, Inc. v. CAMS, Inc., 706 F. Supp. 984 (D. Conn. 1989) ........ 32, 33, 34

Martinez v. U.S., 740 F. Supp. 399 (D.S.C. 1990) ........ 2

Matter of Government Acquisition of License to Employee's Invention, B-199,026, 60 Comp. Gen. 248, 1981 WL 22453 (Comp. Gen. Feb. 11, 1981) ........ 5

Meyers v. U.S., 177 F.Supp. 952 (C.Cl. 1959) ........ 8

Meridian Project Sys., Inc. v. Hardin Constr. Co., 426 F. Supp.2d 1101 (E.D. Cal. 2006) ........ 42
Miller v. C.P. Chemicals, Inc., 808 F.Supp. 1238 (D.S.C. 1992) ........ 13, 14, 15
Mitek Holdings, Inc. v. Ace Eng'g Co., Inc., 89 F.3d 1548 (11th Cir. 1996) ........ 35
Playmedia Sys. Inc. v. Am. Online, Inc., 171 F. Supp. 2d 1094 (C.D. Call. 2001) ........ 21
Porter v. U.S., 619 F. Supp. 137 (S.D. Ohio 1985) ........ 2
Prescott v. U.S., 973 F.2d 696 (9th Cir. 1992) ........ 1, 2
Quinn v. City of Detroit, 988 F.Supp. 1044 (E.D. Mich. 1997) ........ 13, 14, 15
Rockwell Automation v. U.S., 70 Fed. Cl. 114 (2006) ........ 23
Roeslin v. Dist. of Columbia, 921 F.Supp. 793 (D.D.C. 1995) ........ 13, 14, 15
Rogallo v. U.S., 475 F.2d 1 (4th Cir. 1973) ........ 8, 15
Safe Air for Everyone v. Meyer, 373 F.3d 1035 (9th Cir. 2004) ........ 3
Schalk v. Associates Anesthesiology Practice, 316 F. Supp. 2d 244 (D. Md 2004) ........ 3
Sega Enterprises, Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992) ........ 26, 28
Stewart v. U.S., 199 F.2d 517 (7th Cir. 1952) ........ 1
UMG Recordings v. Disco Azteca Distr., Inc., 2006 WL 2354791 (Slip Copy) (E.D. Cal. 2006) ........ 22
U.S. v. North Carolina, 180 F.3d 574 (4th Cir. 1999) ........ 3
Vault Corp. v. Quaid Software Ltd., 847 F.2d 255 (5th Cir. 1988) ........ 26
Waymire v. U.S., 629 F. Supp. 1396 (D.Kan. 1986) ........ 2
Wechsberg v. U.S., 54 Fed. Cl. 158, 165-66 (Fed. Cl. 2002) ........ 43
Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222 (3d Cir. 1986) ........ 33, 34, 38
Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981), cert denied 454 U.S. 897 (1981) ........ 2
Wright v. U.S., 56 Fed.Cl. 350 (Fed. Cl. 2003) ........ 43

Statutes, Regulations, and Rules

17 U.S.C. § 101 ........ 7
17 U.S.C. § 102(a) ........ 20
17 U.S.C. § 107 ........ 28
17 U.S.C. § 117 ........ 23-27
17 USC § 117(a) ........ 23, 24
17 U.S.C. §117(a)(1) ........ 23

17 USC § 117(b) .......... 17
28 U.S.C. § 1498.......... passim
28 U.S.C. § 1498(b) .......... passim
28 U.S.C. § 1498(a) .......... 5
28 U.S.C. § 2680.......... 1
Rules of the Court of Federal Claims 8(c) .......... 23

<u>Secondary Authority</u>

2 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8.08[B][1], 10:03[A] (1991).......... 23, 26
RESTATEMENT (SECOND) OF AGENCY § 228 .......... 7, 14
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1981) .......... 4

**PLAINTIFF'S TRIAL BRIEF**

COMES NOW Plaintiff and submits this, its Post Trial Brief, in accordance with the Court's Order dated August 10, 2006.

SPECIFIC QUESTIONS

1. Section 1498(b) Defenses And Jurisdiction

The defenses in 1498(b) are very similar in effect to the discretionary function exception to jurisdiction in the Federal Tort Claims Act (FTCA). See 28 U.S.C. § 2680. The treatment of that exception guides this Court on how the 1498(b) defenses should be treated here. The discretionary function exception is jurisdictional. U.S. v. Gaubert, 499 U.S. 315, 113 L.Ed. 2d 335 (1991). However, the government bears the burden of proving the discretionary function exception. Prescott v. U.S., 973 F.2d 696, 701-02 (9th Cir. 1992); Laurence v. U.S., 851 F. Supp. 1445, 1450 (N.D. Cal. 1994) (citing Prescott); see also Autery v. U.S., 992 F.2d 1523, 1526 (11th Cir. 1993), cert. denied 114 S. Ct 1829 (1994); Carlyle v. U.S., 674 F.2d 554, 556 (6th Cir.1982); Stewart v. U.S., 199 F.2d 517, 520 (7th Cir.1952). All circuits to address the issue have concluded that the burden of proving the discretionary function exception lies with the government. Prescott, 973 F.2d at 701; Carlyle, 674 F.2d at 556; Stewart, 199 F.2d at 520; Autery, 992 F.2d at 1526. "Only after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by § 2680 does the burden fall on the government to prove the applicability of a specific provision of § 2680." Carlyle, 674 F.2d at 556 *quoted in* Prescott, 973 F.2d at 702 n. 4.

In Prescott, the court addressed, among other things, the burden of proof on the jurisdictional defense, the discretionary function, under the FTCA. Under the FTCA, the plaintiff can only invoke jurisdiction if the complaint is outside of the exceptions of

Section 2680, which includes the discretionary function exception. Id. at 701-702. This does not require the plaintiff to disprove every exception. Id. If the plaintiff has facially plead matters that do not fall within the exception, the burden falls upon the government to prove the applicability of a specific provision. Id. (a contrary result “would border on the preposterous”); accord Carlyle, 674 F.2d at 556; Martinez v. U.S., 740 F. Supp. 399, 401 (D.S.C. 1990); Berman v. U.S., 565 F. Supp. 1353, 1404-05; contra. Waymire v. U.S., 629 F. Supp. 1396, 1397 D.Kan. 1986); Porter v. U.S., 619 F. Supp. 137, 142 (S.D. Ohio 1985). The Ninth Circuit in Prescott specifically examined Gaubert, in which the Supreme Court appeared to impose the burden on the tort plaintiff to show that the government's conduct is not protected under the discretionary function exception. Gaubert, 111 S. Ct. at 1274-75. The Ninth Circuit, in Prescott, held that Gaubert does not conflict with its ruling that the government bears the burden of proof because Gaubert requires plaintiffs only to allege facts sufficient to state a claim under the FTCA, but does not deal specifically with the burden of proof issue. Prescott, 973 F.2d at 702 n. 4. The Tenth Circuit questioned the approach taken in Prescott, but has not made a formal ruling on the issue. Kiehn v. U.S., 984 F.2d 1100, 1105 n. 7 (10th Cir. 1993).

Moreover, a separate doctrine further underscores placing the burden of establishing the defenses on the Government. Where the government’s challenge to jurisdiction implicates the elements of the plaintiff’s cause of action, i.e., where the “jurisdiction is so intertwined with the merits that its resolution depends on resolution of the merits”, the trial court should find that jurisdiction exists and deal with the challenge as a direct attack on the merits of the plaintiff’s case, for purposes of judicial economy. Williamson v. Tucker, 645 F.2d 404, 415-16 (5th Cir. 1981), cert denied 454 U.S. 897

(1981); Careau Group v. United Farm Workers, 940 F.2d 1291, 1293 (11th Cir. 1991); Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 734 (11th Cir. 1982); Schalk v. Associates Anesthesiology Practice, 316 F. Supp. 2d 244, 248-49 (D. Maryland 2004); U.S. v. North Carolina, 180 F.3d 574, 580-81 (4th Cir. 1999); Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039-40 (9th Cir. 2004)

2. Substantive Merits Of Section1498(b) Defenses

Plaintiff has met the burden of proof to overcome the § 1498(b) defenses, regardless of whether they are jurisdictional or merely affirmative defenses. The evidence presented at trial by Plaintiff established that: (1) Mark Davenport was a junior enlisted person not in a position to order or influence decisions on the adoption of his AUMD software, nor the derivative work MARS; (2) he did not induce the Air Force to use the AUMD or MARS software, but its use spread by actions of his superiors and word of mouth due to superior performance; (3) software programming was never a type of work that was part of his's official functions or duties; and, (4) he did not use government time, materials or facilities to create the AUMD software.

A. Position to order, influence, or induce the use of AUMD.

As a junior enlisted person Davenport was never in a position to order, influence or induce the use of his software. He was a Technical Sergeant in the Air Force, a Manpower Specialist, paygrade E-6, when he created the AUMD programs at issue in this suit in May of 1998. *Tr. 91, 470*. He retired at the same paygrade in 2001 after twenty years of service. *Tr. 429,; Pl. Exh. 94*. The most junior Manpower Specialists were paygrade E-5, only one paygrade below Davenport. *Tr. 63, 465, 471*. His official position during that time was a Manpower Data Manager in the Pacific Air Force Command (PACAF). *Tr. 74-5*. At no time was Davenport a reporting senior over

anyone, nor was he a direct supervisor over anyone. *Tr. p75*. Davenport did not possess contracting authority to issue or modify contracts, although he was occasionally responsible for monitoring existing contracts. *Tr. 82; Pl. Exh. 101*.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Engine Mfrs. Ass'n v. South Coast Air Quality Mgt. Dist., 541 U.S. 246, 252-3 (2004) (citing Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, (1985)) (using ordinary dictionary to define words of statute according to their ordinary meaning). Nothing in the text of 28 U.S.C. § 1498 indicates other than the ordinary meaning for the terms "order, influence, or induce." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1981) defines "order" as (in relevant part): "2a: to issue commands : COMMAND... b: to give or place an order." WEBSTER'S at 1588. Similarly, "influence" is defined as: "1: to affect or alter the conduct, thought, or character of by indirect or intangible means: SWAY... 2: to have an effect on the condition or development of : determine partially : MODIFY... 3 *obs*: INDUCE, INFUSE..." WEBSTER'S at 1160. And "induce" is defined as: "1a: to move and lead (as by persuasion or influence)...: prevail upon: INFLUENCE, PERSUADE... [1b]: to inspire, call forth, or bring about by influence or stimulation..." WEBSTER'S at 1154.

The clear implications of the ordinary meanings of "order, influence, or induce" are therefore to require a position of decision making authority, or to actively exert pressure to overcome opposition. All the evidence presented at trial demonstrates that Davenport did not do this – in fact quite the opposite was demonstrated. These words should not be interpreted to deny compensation to low level government employees for

work outside their expected duties, for which they have not received compensation through salary or benefits commensurate with the work. Ironically, the Air Force officially agrees with Plaintiff's interpretation.

The Air Force explained its position concerning this very language previously in the context of 28 U.S.C. § 1498(a) (a subsection with an identical provision). In Matter of Government Acquisition of License to Employee's Invention, B-199,026, 60 Comp. Gen. 248, 1981 WL 22453 (Comp. Gen. Feb. 11, 1981), in response to an inquiry about the propriety of a licensing agreement between an Air Force employee (Mr. Jeffers) and the Air Force, the Comptroller General stated that a licensing agreement would not be proper if the employee was in a position to order, influence or induce use of an invention, but that if the "employee can be insulated from decision to use patented device…the Air Force may enter into the licensing agreement. Id. at 248. The Comptroller General explained:

> "The purpose of Section 1498 is to prevent an employee who is in a position to order, influence or induce the government to use his invention and thus infringe his patent from successfully suing the government for patent infringement. *** The issue as we see it is whether the inventor can be insulated form the decision making process. We have no objection to his assisting in the testing and use of the invention if he is in no way in a position to determine whether, or how many, items involving his patent are procured."

Id. at 251. Just as Mr. Jeffers' case, above, Davenport was never in a decision making position where he could determine, or even affect, the outcome of a decision to adopt or reject a license for the AUMD software. He was never in a position to order anyone to use the AUMD software. He was not even the ranking enlisted person in his work group, much less of sufficient rank to give orders to Manpower Specialists throughout the Air Force. Davenport provided copies personally when requested, but was not in

charge of those he provided copies to and did not force or encourage them to do so.

The reason AUMD became widely used was that it was so effective, not because Davenport promoted it. Glendon Hendricks, a Defense witness described AUMD as "Very slick. Very good." *Tr. 890*. Col. Manning and Maj. Meaker testified that it was Davenport's superiors and other senior officers who actually promoted the distribution of AUMD due to its superior qualities. *Tr. 504-7 ; id.* ("Q. Now, to your knowledge, at any time when Technical Sergeant Davenport was in your chain of command was he trying to get people to use the program who didn't want to? A. No, he was not."). Maj. Meaker, a Defense witness, corroborated the fact that Davenport's seniors, his chain-of-command, were the source of pushing distribution of the AUMD software, not Davenport. *Tr. 794-6*. Being "helpful" to senior officers who are trying to distribute your software is not to "order, influence, or induce." This was a pull-system, where people requested from Davenport, not a push-system where Davenport campaigned for implementing AUMD. Mr. Hendricks' testimony did not contradict this. Any knowledge that Mr. Hendricks had relating to how the AUMD software came to be distributed was not certain at best, and based on second hand knowledge and assumptions.

Even where Davenport presented the programs at the San Antonio "conference of colonels," it was at the direction of his superiors or the requests of others, not at his own initiative or request, and so acts of inducement or influence cannot be attributed to him. Col. Manning testified that TSgt Davenport was "invited" to a Manpower annual conference by a Col. Jensen from the Air Education and Training Command (AETC), but that as a junior enlisted person Davenport was not in a position to refuse the invitation. *Tr. 508-11.* Col Jensen requested Davenport's presentation because Jensen

had seen the software in operation and was impressed by its efficiency – not because Davenport had contacted the Colonel. *Tr. 506-7.* Davenport also testified that he made presentations on AUMD at several air bases during visits scheduled for training on MDS, but only at the request of the recipients and not of his own initiative.

Davenport participated un the Manpower User Group, or "MUG", but he testified that the MUG was merely a group that passed requests or wish lists up to the decision makers. *Tr. 115-16.* At some point it appears that MUG evaluated AUMD to determine if it should be adopted as an official program – this was rejected. *Tr. 116-18; Pl. Exh. 110c.* However, if MUG did evaluate Davenport's AUMD software, then Davenport was not a part of that – he was not even aware that this had happened. *Tr. 116-20; Pl. Exh. 110C; Pl. Exh. 138.* Mr. Hendricks' testimony did not contradict Davenport's testimony on these points. Clearly, this would not amount to "influence" or "inducement".

B. AUMD was not prepared as a part of the official functions of Davenport.

Whether a copyrighted work was prepared as a part of the official functions of a government employee is a question of fact. The analysis of the "official functions" defense is analogous to, but narrower than, the analysis of the "work made for hire" doctrine in the Copyright Act. 17 U.S.C. § 101 (definition of work made for hire: "a work prepared by an employee within the scope of his or her employment.") The Supreme Court has held that courts should look to common law agency principles, as delineated in the RESTATEMENT (SECOND) OF AGENCY § 228, to determine whether a person is an "employee" under 17 U.S.C. § 101, based on the assumption that Congress intended to use the term according to its ordinary meaning. See Comm. For Creative Non-Violence v. Reid, 490 U.S. 730, 739-40 (1989). However, courts have not

looked to general principles of agency law to interpret the term "official functions" used in 28 U.S.C. § 1498. See Herbert v. U.S., 36 Fed. Cl. 299, 305-6 (1996) (scientist employed to do research); Meyers v. U.S., 177 F.Supp. 952, 955 (C.Cl. 1959) (aeronautical engineer assigned to research and development tasks); Rogallo v. U.S., 475 F.2d 1, 2-3 (4th Cir. 1973) (engineer employed for research and development).

Common law agency principles are not needed in this context because the government – especially in the case of the Air Force – provides clear definitions of an employee's "official functions." Civilian employees in business may tend to have undefined or poorly defined duties, necessitating a more general approach. Congress, in enacting § 1498(b), could have made reference to the "work for hire" definition but chose instead to use more narrow and specific language by referring to works "prepared as a part of the official functions of the employee." 28 U.S.C. § 1498(b). The Air Force publishes detailed training and performance requirements for its members. *See Pl. Exhs. 60, 63A & 63B* (defining duties and responsibilities for Manpower AFSC's)*; Pl. Exhs. 59* (defining requirements for "V" prefix on AFSC)*; Pl. Exhs. 65 & 66* (Career Field Education and Training Plans (CFETP) for Manpower field). These publications are considered official Air Force policy by Air Force personnel, and are used for planning, budgeting, training, and manpower distribution purposes. *Pl. Exh. 65, at Part I, ¶ 1* (Pl. Exh. 66 uses identical language) (CFETP). CMS Dant explained the CFETP as the "job description" for the Manpower field. *Tr. 480*. The Air Force's policies define the "official functions" of a Manpower Specialist, paygrade E-6, not common law principles.

The leading case on this issue is Herbert v. U.S., 36 Fed.Cl. 299, (Fed. Cl. 1996). Herbert is more telling in the differences than any similarities. In Herbert, the Plaintiff

was a member of the Committee on Dietary Allowances (the Kamin Committee) specifically empanelled to produce the 10th Edition of the *Recommended Daily Allowances* (10th RDA) that the Government had contracted the National Academy of Sciences to produce. Id. at 302. Dr. Herbert's primary duties were "research, teaching, and patient care" as the director of the Hematology and Nutrition Laboratory at the Bronx Veterans Administration Hospital, a Federal facility. Id. at 305. Dr. Herbert's supervisors testified that his specific duties included "conducting research in his field of expertise and publishing the results." Id.. The court found that even if the specific research task had not been assigned by the Government, the fact that Herbert's primary duties included research, the subjects of which could be chosen at his discretion, meant that any research which was even related to his employment at the VA was part of his official functions. Id. at 306. The Herbert court emphasized the fact that Herbert's colleagues viewed their own work on the Kamin Committee as part of their official government duties. Id.. Not only was Herbert a research scientist in the employment of the VA, but Herbert's work on the Kamin Committee was under a government contract specifically intended to generate the RDA guidelines which Herbert produced, and which were the subject of the infringement action. Id. Additionally, the court specifically found that Herbert's superior performance evaluations, awards and promotions were based in large part on his research work generally, and his work for the Kamin Committee in particular. Id. at 305.

The present case is markedly distinguishable. Davenport was a data operator, and his duties did not in any way involve computer programming or research. Every witness with knowledge of Davenport's official duties testified that they did not consider

programming part of Davenport's duties, and that they considered his AUMD software to be his personal work.[1] Additionally, the Air Force denied Davenport training in programming based on his official functions.

(1) Davenport's superiors did not consider programming part of his duties.

CMS Dant's testimony was particularly noteworthy. CMS Dant is one of the most senior enlisted personnel in the Manpower community, with over 21 years of experience in the field, and is now the Enlisted Career Field Manager for the Manpower community – i.e. he is responsible for producing the CFETP and other documents defining the duties and responsibilities of Manpower Specialists. *Tr. 475, 479-80.* CMS Dant, therefore, possesses a uniquely authoritative perspective on the expected duties of other enlisted personnel in the Manpower community. *Tr. 474-5, 479-81.* He testified, from his 21 years of experience and his supervisory experience, that soneon in Mr. Davenport's career field, "V" or otherwise, would never be exepeced to write software programs for use by Manpower—that that is something done by the dedicated programmers with different AFSC. *Tr. at 479-82*. Also telling is Dant's testimony regarding his own skills, that he didn't have the ability to program. *Tr. 472-3*. There was no hesitation in his response – he didn't know how to program and he was never expected to know how to program. *Id.* Not only was programming not a part of Davenport's official duties, but none of his superiors ever ordered Davenport to produce the programs, nor would they have felt it was their place to do so. *Tr. 474*.

[1] Keohane's Expert Report, *Def. Exh. 44*, throws out an opinion relating to official functions. However, Keohane has no expertise in this area, his voire dire did not indicate any experience in military personnel matters, and Defendant represented in response to Plaintiff's objections to this portion of Keohane's report that Defendant would not rely on Keohane's opinion in this matter as evidence. It should be given, and is entitled to, no weight whatsoever.

Even the Government's own witnesses, Maj. Meaker and Glendon Hendricks, supported the Plaintiff's case. Maj. Meaker testified that he did not believe it was his place to direct Davenport, then a Technical Sergeant of paygrade E-6, to add features or fix problems related to the AUMD software, because it was considered Davenport's personal work. Maj. Meaker merely "asked", and TSgt Davenport was free to decline: "... if he said no, you know, this was never something that I saw as something that he had to do. And I always did it asking him, you know, do you think you can make this change, or is it too hard." *Tr. 805*. If the commissioned officers in Davenport's direct chain of command believed a project was part of an enlisted person's official duties they would have had no hesitation in directing him to perform those duties.

Mr. Hendricks, a Defense witness, did not contradict this testimony. Although Mr. Hendricks testified that many personnel donated their work to the Air Force as part of various projects, he did not testify that this was a requirement. Further, he related that these were projects initiated at the Air Force's request, and that these efficiency improvement projects were then turned over to an "programming shop" to develop into software for distribution. *Tr. 853*. Mr. Hendricks referred again, later, to the fact that personnel within the Air Force Manpower community were specifically designated and trained to do computer programming work. *Tr. 858*. Mr. Hendricks' testimony thus emphasizes the fact that Davenport's work was not part of his official duties: the AUMD was initiated by Davenport without direction; Davenport did all programming; Davenport was not listed as a computer programmer by the Air Force; other software development projects were developed by "engineering shops" with personnel trained in software; when the Air Force decided to develop a derivative program from AUMD they selected a

software development contractor – not a Manpower Specialist from the Air Force.

CMS Lucky was listed as a defense witness on the issue of Davenport's official job functions but was not called by Defendant, although present in the courthouse. The Court can infer that his testimony would have been harmful to the defense or they would have called him, because he was a witness listed by the defense, and as a member of the Armed Forces in the unique control of the Government. A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1400 n. 9 (Fed. Cir. 1986) ("When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable."); Hughes v. U.S., 71 Fed.Cl. 284, 304 (Fed. Cl. 2006).

(2) Defendant denied Davenport's requests for programmer training.

Davenport's requests for programming training were denied by the Air Force, which is further support that programming was not part of Davenport's official functions. Davenport testified that he requested training on multiple occasions, through different supervisors, but was denied each time because, as explained by CMS Ralph Jones (at the time a Senior Master Sergeant (SMS)), Davenport was a Manpower person, not a programmer, and since programming was not part of his AFSC the Air Force would not spend the money. These denials occurred when Davenport was assigned to Gunter Annex (later Gunter Air Force Base) as a Manpower functional assisting the development of the MDS system. *Tr. 72-3*. Davenport's testimony on this is corroborated by CMS Jones' later emails which expressed frustration that Davenport had developed an alternative program in competition with the official Air Force system. *Tr. 894; Def. Exh. 7* ("In addition, I am concerned that you have assumed the

unenviable role of operating in essence an ad hoc reports and query 'hobby shop' for the Manpower Community." *Pl. Exh. 7, p. G000104*.)

Davenport went ahead and taught himself how to program by purchasing software and books with his own money, and spending his personal off-duty time learning to program: "Just a hobby. I liked it. I enjoyed it." *Tr. 74*. Davenport was motivated to write AUMD in order to learn to program, and chose a practical real-world application to make it a more effective learning tool. *Tr. 93*.

Davenport learned on his own initiative, his own time, with his own money – now the Air Force wants to claim he was a programmer all along and take possession of his hard work for free. The Air Force wants it both ways – the law says they cannot do that.

(3) Davenport's high marks were not based on AUMD.

The defenses' own witness, Maj. Meaker, testified that Davenport would have received the highest marks regardless of his work on AUMD – because he was a stellar performer. *Tr. 801*. This is distinguishes Herbert, where the court found it important that Herbert's supervisors testified that his high performance evaluations and advancement were predicated on his *research* work and his work for the Kamin Committee – the subject of the infringement claim - in particular. Herbert, id. at at 306.

(4) AUMD was not within Davenport's "scope of employment."

The "work made for hire doctrine" of the Copyright Act (17 U.S.C. § 101) is similar to, although not coextensive with, the "official functions" analysis under section 1498. Courts look to the common law of agency to determine the scope of employment in such circumstances. Roeslin v. Dist. of Columbia, 921 F.Supp. 793, 797-8 (D.D.C. 1995); Quinn v. City of Detroit, 988 F.Supp. 1044, 1051 (E.D. Mich. 1997) (citing Roeslin and Miller v. C.P. Chemicals, Inc., 808 F.Supp. 1238 (D.S.C. 1992)).

RESTATEMENT (SECOND) OF AGENCY § 228, which the Supreme Court relied upon in Community for Creative Non-violence, supra, defines a three-part test:

> "(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is within the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; ***and*** (c) it is actuated, at least in part, by a purpose to serve the master."

(emphasis added). All three elements must be present to deny the Plaintiff.

Both Roeslin and Quinn are especially instructive in the present case, if the Court looks to work-made-for-hire as analogy, because both involved government workers – albeit city workers. In Roeslin the court found the copyrighted software, written by an economist with a college degree working on salary, was not a work made for hire.

> "[D]eveloping computer software is not the kind of work plaintiff was employed to perform. Plaintiff was hired as a labor economist, not as a computer programmer. There is no reference in his job description to computer programming; nor was his supervisor aware of whether plaintiff had any programming skills when he was hired. Plaintiff was hired to improve certain aspects of the CES survey [relating to employment statistics] and develop projections based on that survey. He was not hired to create a computer program that would assist the entire office and receive, process, and transmit the survey results."

Roeslin, 921 F.Supp. at 799. Similarly, in Quinn (again a professional with advanced degree) the court found that the first and second prongs of the test were not present.

> "Quinn was an attorney and a manager for the City's Law Department. His job description did not require him to create computer software, his employer never requested him to develop software, Quinn had no prior computer programming experience and in fact, the City had its very own computer programming department to do programming of the type Quinn decided on his own to do."

Quinn, 988 F.Supp. at 1051. Quinn specifically distinguished this from Miller, where all three prongs were found present. Particularly, the Quinn court noted that in Miller, the employee "was a supervisor responsible for organizing and updating a laboratory at CP Chemical, Inc." Quinn, 988 F.Supp. at 1050. Additionally the court noted that, "In

Miller, the employee was specifically requested by his employer to computerize the quality control laboratory of which he was in charge..." Quinn, 988 F.Supp. at 1051. Both Quinn and Roeslin, and Miller as well, are basically in accord with cases such as Herbert, Meyers, and Rogallo which interpreted section 1498. In each of these cases infringement claims were denied where the plaintiffs were engineers or scientists engaged for the purpose of research, Herbert, Meyers, Rogallo, or in supervisory roles, Miller, or assigned specifically to produce computer programs, Miller. However, claims were not denied where personnel were working outside of their job descriptions, Roeslin, Quinn, where they had never been tasked with that type of work, Roeslin, Quinn, and where they had actually been discouraged from learning and doing programming work, Roeslin.

In this case, while Plaintiff concedes that Davenport's program was created primarily as a personal project to learn and develop programming skills, he was secondarily motivated to develop the programs in an effort to improve efficiency in the Manpower community. However, the first two prongs are completely lacking here. Davenport, as established by all of the evidence, was not a programmer nor was he expected or desired to be a software developer. The Air Force, and particularly the Manpower community, had its own separate programming shops. Davenport was discouraged from learning to program. Beyond this, the evidence was conclusive that none of the work on AUMD was conducted during work hours, or using government time material or facilities (see discussion below). This was uncontradicted by Defendant. Thus, if the Court looks to work-made-for-hire law as an analogous guide in the present case, the conclusion is clear: Davenport's work would not be considered a

work-made-for-hire.

In short, all of the evidence demonstrates that AUMD was not created as part of Davenport's official functions or duties, regardless of who carries the burden on this point, and Defendant has produced no evidence which rebuts Plaintiff's evidence. Therefore, AUMD was not created as part of Davenport's official functions or duties.

C. No use of government time, material, or facilities to create AUMD.

Plaintiff produced substantial evidence at trial that no government time, material, or facilities were used in the preparation of the AUMD programs. Defendant produced no evidence to directly rebut this.

(1) Davenport created AUMD exclusively through his own resources.

Testimony at trial was that Davenport programmed AUMD only at home, on his personal time. Davenport was adamant on this point and his testimony was corroborated by senior Air Force personnel with direct knowledge of the circumstances. Again, this case is distinguishable from Herbert. There, the court found that Dr. Herbert conducted all of the relevant research and *actually wrote the guidelines* within government facilities – i.e. his office at the Bronx VA. Herbert, 36 Fed. Cl. at 306. The court did not find that Herbert did any creative work outside the physical boundaries of the government facilities. Id. And, again, the court looked specifically to the time "during their creation", i.e. the "preparation of his 10th RDA writings." Herbert, 36 Fed. Cl. at 307. Here, Davenport testified that he developed and tested his AUMD software at all times at home, without any government data, by creating a dummy database with fake data. *Tr. 99 & 100-102*. Davenport did not have any connection to government databases while developing the AUMD software at home. *Tr. 99.*

The testimony of CMS Dant and Col. Manning both support Davenport's

testimony, and nothing else contradicted this. CMS Dant testified that during his time working with Davenport he was in frequent and close contact with Davenport throughout the day: they worked in shoulder-high cubicles; their desks were within 10-15 feet of one another; Dant passed by Davenport's desk approximately "30-40 times a day", and that he was sure Davenport did not develop AUMD while at work. *Tr. 469, 474 & 479*. Col. Manning also testified that to his knowledge all of the development and programming of the AUMD software was done by Davenport at home and not on government computers: *Tr. at 503, 518-19*.

Mr. Hendricks did not contradict Davenport's testimony regarding use of government time, material, or facilities. For one thing, Mr. Hendricks' recollection of dates versus computer programs was fuzzy at best. He recalled a Mr. Jerry Hayes calling him in 1997 to request a "data extract" to send to Mark Davenport, "And that's how we, how it worked out that knew [sic] that Mark was working on a program doing different things." *Tr. 876*. However, Mr. Hendricks was not sure of the year, and was not clear as to the use for this extract and the date indicates that if it was actually for any program developed by Davenport it was the "Net Worth" program – which Davenport donated to the Air Force. *Tr. 911; 89-90; Pl. Exh. 101 page 100030*. Other witnesses corroborated Davenport's testimony that the AUMD did not come into existence until spring of 1998 at the earliest. Later Hendricks also confused Davenport's IDEA suggestion to use ODBC drivers rather than the Oracle product, for cost savings, with Davenport's AUMD software. *Tr. 884-86 & 893*. Other evidence presented made clear that Davenport never submitted AUMD for an IDEA award, but rather he submitted an IDEA for using ODBC drivers in place of Oracle Discovery

drivers. *Tr. 134-5, 892-4; Pl, Exh. 136; Def. Exh. 6*. Mr. Hendricks also testified that he thought Davenport presented AUMD to a Manpower Users Group meeting, but Mr. Hendricks did not testify that he was present, and this was simply what he assumed. *Tr. 883*. Thus, his testimony on this point must be discounted.

Again, the defense listed CMS Lucky as a witness concerning "whether government time, material, and/or facilities were used in the preparation of the AUMD program." CMS Lucky, a witness uniquely in the control of the defense, was present in the courthouse but not called by the defense. The Court should infer therefore, that his testimony would have been that NO government time, material, and/or facilities were used in the preparation of the AUMD program. A.B. Dick Co., 798 F.2d at 1400.

The mere fact that Davenport used his general knowledge gained through work to create the dummy database at home does not translate into use of government facilities or resources. Davenport's brain is not a government facility. Further, this clearly excludes the development of the MARS software and infringing activities after May 15, 2000, using modified copies of AUMD, from the defenses, since these occurred when Davenport was either officially excluded from participation or after he had retired.

(2) Suggestions are not government time, materials, or resources.

Defendant pointed out that many Air Force personnel made suggestions for features to Davenport and many of those features were incorporated by Davenport. However, suggestions are just that–suggestions. Each witness who testified to suggestions made clear that Davenport decided what features would be incorporated, that Davenport did all the programming, and that Davenport did this programming on his own time rather than at work. *See, e.g., Tr. 468, 471-73.* Additionally, Defendant never once pointed out a specific feature that was incorporated due to the input of any person

other than Davenport himself. It was Defendant's burden to establish what those were and how they related to protectable portions of the copyrighted work. Beyond this, even if some Air Force personnel provided suggestions for functions, it was Davenport who selected those features and Davenport who determined how to convert those functions into expressive content – which is what is protected under the Copyright Act. Based on all of the evidence presented at trial the only possible conclusions are that: (1) Davenport was not in a position to order, influence, or induce the offending use of AUMD–and in fact he did not; (2) computer programming was not part of Davenport's official functions; (3) government time, materials, or facilities were not used in the development of AUMD; and (4) even under common law analogy to work-made-for-hire doctrine, AUMD was not within the scope of Davenport's employment.

3. <u>The protections of the copyrighted AUMD 2.1d extend to version AUMD 2.1f</u>

The proper question is not merely whether the protections of 2.1d extend to 2.1f, but rather whether the protected elements of 2.1d alleged to have been copied were present in 2.1f in order to provide a comparison. The answer is yes. <u>Gates Rubber Co. v. Bando Chem. Ind., Ltd</u>., 9 F.3d 823, 832 (10th Cir. 1993). <u>See</u> <u>also</u> <u>Kepner-Tregoe, Inc. v. Leadership Software, Inc</u>., 12 F.3d 527, 532-33 (5th Cir. 1994) (affirming copyright infringement based on derivation from third party copies of licensed extracts of copyrighted work); <u>cert</u> <u>den'd</u> 513 U.S. 820 (1994); <u>CMAX/Cleveland, Inc. v. UCR, Inc</u>., 804 F.Supp. 337 (M.D.Ga. 1992) (finding infringement from copying and derivation from lawfully obtained copies of software). Copyright inheres at the moment that creative expression is fixed in a tangible medium of expression so distributing copies of a work which lawfully contains all or part of a registered copyrighted work (i.e. AUMD version 2.1f), along with proper copyright notice, does not extinguish the underlying copyright in

the original work. 17 U.S.C. § 102(a). Thus, if a subsequent publication includes both the original work plus additional unregistered material, which can be segregated and is not subject to suit, then the court is able to compare the copyrighted work to the accused work. Indeed, as Gates, and other cases make clear, the court need only compare the accused portions–the entire work does not need to be infringed.

Kepner and CMAX are instructive. In Kepner the issue was whether a computer program developed licensed training manuals could infringe the copyrights of the original software from which the manuals were derived. The answer was YES – it did not matter whether the copied content came from the original work or a licensed derivative of the original work – it was still copying portions of the original. Kepner, 12 F.3d at 532. In CMAX the defendants decided to use copies of software they had obtained lawfully to create a replacement program when their relationship with the software supplier soured. The court there held that the fact that defendant UCR copied only portions of the copyrighted software, including the screens and data structures, did not negate infringement. CMAX, 804 F.Supp. at 356-7. Other courts agree that infringement may be found through copying only a portion of the protected work–so long as that portion encompasses protected expression. See e.g. Gates Rubber, above.

In the present case, Defendant seeks to escape liability by claiming somehow that if they copied the screens from version 2.1f rather than 2.1d then this did not infringe the copyright of 2.1d. Davenport testified that the 2.1d and f were virtually identical, the only difference being additional Visual Basic code in 2.1f. There was some dispute at trial as to how much code was added, but this is essentially irrelevant. Plaintiff conceded that the Visual Basic code was not directly copied – it was reverse

engineered by comparison of operations. However, the screens, data tables, and data table structures – the heart and soul of the AUMD programs – were directly copied (even Defendant's expert agreed on this point). *Tr. 148, 1038-1042; Pl. Exh. 111, ¶ 2.4*. The screens from 2.1D and F are the same. *Tr. 171-193*. Therefore, comparison of the screens in 2.1F provides the exact direct comparison for the screens in 2.1D – the registered software version. The screens and data structures are the issue – they are the essence of the program, providing the interface for the ordinary observer, and the main expressive content of the program. The Visual Basic code is just the plumbing.

4. Was there an implied license to AUMD, and if so, when did it terminate?

Defendant bears the burden of proving the existence of any license as an affirmative defense to infringement, and if such existed, whether the license was irrevocable. Carson v. Dynegy, Inc., 344 F.3d 446, 451 (FN5) (5th Cir. 2003) (citing Lulirama Ltd., Inc. v. Axcess Broadcast Svcs, Inc., 128 F.3d 872, 884 (5th Cir. 1997) and CMS Software Design Sys., Inc. v. Info Designs, Inc., 785 F.2d 1246, 1248 (5th Cir.1986)). Such a license arises when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Id. Moreover, a non-exclusive license is fully revocable as a matter of law where it is not supported by consideration. Lulirama, 128 F.3d at 884 (omitting numerous citations). Copyright licenses are interpreted narrowly. Playmedia Sys. Inc. v. Am. Online, Inc., 171 F. Supp. 2d 1094, 1099 (C.D. Call. 2001). Copyright licenses are presumed to prohibit any use not expressly authorized. Id. at 1099.

Here, the evidence was conclusive that Davenport was never requested to create AUMD so no implied license existed. Even if we assume a license existed it was fully

revocable because it was not supported by separate consideration ans so must have expired as of May 15, 2000 (which is the date that the copies of the AUMD software expired, which Defendant acknowledged they had actual knowledge of, and the date that Blueport expressly declared to be the cutoff). *Pl. Exh. 57*. Beyond this, any suggestion that the Air Force had a license to develop the derivative work called MARS is simply ludicrous and is not supported by any evidence whatsoever.

No consideration was paid to Davenport. The Air Force never paid a dime to Davenport or Blueport for the software. Davenport's continued employment in the Air Force was based on an Enlistment Contract that was neither related to nor dependent upon production of any software, and as such simple continuation in employment cannot be construed as consideration. Carson v. Dynegy, Inc., 344 F.3d at 451. In fact, Davenport's promotion and progress within the Air Force did not depend on production of any software either, and any such claim lies with Defendant to prove.

Davenport was not given promotion or pay raise based on the program, even if it was mentioned in his evaluations. First, Davenport was not promoted. Major Meaker also testified that Davenport would have received the same top rankings regardless of whether he wrote or distributed the AUMD software due to his superior technical skills, positive attitude, and team spirit. *Tr. 800-801*. No other witness testified otherwise. Therefore, if an implied license for use of the software existed prior to May 15, 2000, it was fully revocable because it was not supported by consideration. UMG Recordings v. Disco Azteca Distr., Inc., 2006 WL 2354791, 11 (Slip Copy) (E.D. Cal. 2006); NIMMER at 10:03[A], 10-38 (1991). And any such license was explicitly revoked by Blueport's letter of March 31, 2006. *Pl. Exh. 57*.

Even if any such license were considered irrevocable, clearly not the case, it could not be considered unlimited. The course of dealing demonstrates that any license would not outlive the expiration date, or at the latest the retirement of Davenport. Even if it could be considered to outlive Davenport, it had to be limited to use of the existing copies – in no way could any implied license for creating a derivative work be construed by the course of conduct. If there was a license it was revocable due to lack of consideration. If it was irrevocable then it was only what was advertised – use until the final expiration date and retirement of Davenport. Even if it went beyond this it was not unlimited – and certainly did not extend to creation of derivative works such as MARS.[2]

5. Section 117 Defense

Section 117 is recognized as a narrow exception within a statute that favors copyright owners' exclusive rights. DSC Comm. Corp. v. Pulse Comm., Inc., 170 F.3d 1354, 1360 (Fed. Cir. 1999). This provision does not create a general reliance exception as Defendant seems to argue. To take advantage of the safe harbor of § 117(a) the copier must be an "owner of a copy of a computer program." 17 USC § 117(a); DSC, 170 F.3d at 1360; CMAX, 804 F.Supp. 337, 356 (M.D. Ga. 1992). Further, §117(a)(1) specifically provides that any such copies or adaptation may be used in "no other manner" than as an "essential step in the utilization of [that] computer program." Thus, three issues present themselves within this question. First, were the copies provided by Davenport to various individuals in the Air Force "owned" by the Air Force, or were they the subject of a fully revocable license? Second, if the Air Force owned the copies, was the adaptation of the AUMD by changing the date an "essential

[2] Nor does an estoppel assist Defendant. Defendant did not plead it as an affirmative defense, did not prove the elements, and so waived it. See Def. Ans. and Def. First Am. Ans.. RCFC 8(c); Rockwell

step in the utilization of that computer program?" Third, was the use of the AUMD program to develop the derivative MARS program an "essential element" in the utilization of the *AUMD* program?

A. <u>The Air Force did not own their copies of AUMD</u>.

Determination of "ownership" is a question of law, but requires consideration of the incident facts as a whole. <u>Krause v. Titleserve, Inc</u>., 402 F.3d 119, 123-4 (2d Cir. 2005). "It is not clear from the text of § 117(a) how many and what kind of sticks may be removed from the bundle before the possessor of a copy of a computer program is no longer considered its owner for purposes of § 117(a). <u>Krause</u>, <u>id.</u> at 122. Where a license agreement imposes restrictions on the licensee inconsistent with the rights of ownership then the licensee must be regarded as not a true owner of their copies under § 117. <u>DSC</u>, 170 F.3d at 1360-61.

In <u>Krause</u> the court found the possessors were "owners" under § 117 after consideration of several factors: (1) title ownership; (2) payment of "substantial consideration" for "customized" software; (3) storing copies on defendant's servers; (4) the agreed right to continued possession for an unlimited time period "regardless whether its relationship with Krause terminated"; and, (5) freedom to discard or destroy copies. <u>Krause</u>, 402 F.3d at 124 (citing <u>DSC</u>). The <u>Krause</u> court found particularly important the fact that the defendants were permitted continued possession of the program copies indefinitely. <u>Krause</u>, <u>id.</u> at 123. The first factor, "title ownership," is ambiguous in this case, since there was no bargained transaction in this case, However, factors two and four clearly weigh against ownership in this case, and should be considered dispositive. Lack of consideration and an expiration date, coupled with

---

<u>Automation v. U.S.</u>, 70 Fed. Cl. 114, 122-23 (2006); <u>Hess v. U. S.,</u> 537 F.2d 457, 461 (Ct. Cl. 1976).

Davenport's declared intentions to let the copies expire with no support, clearly demonstrates that the Air Force did not own its copies.

In DSC, the Federal Circuit held that while transfer for an unlimited time period did not dispositively create an "owner" for § 117 purposes, transfer for an expressly limited time is a strong indication of lack of ownership. DSC, 170 F.3d at 1362. Although the DSC court held that a single transfer of money for an unlimited possessory time period was not dispositive to "ownership", the transfer of possession with a visible expiration date, along with clear declarations by the author and copyright owner that the expiration would not be extended beyond his personal service, coupled with refusal to provide source code for future self-support, are clear limitations on any purported ownership rights which should be considered dispositive. DSC, 170 F.3d at 1362.

The present case is factually analogous to DSC. The copies Davenport provided to Air Force personnel were personally transferred, and personally supported by Davenport. Davenport determined when and if to update versions, and then provided these new copies on his own initiative. The copies provided clear notice that they would expire on a specified date, and the Air Force was fully aware of this – which is why Defendant commenced development of MARS. Davenport refused to turn over source code and declared that the AUMD program would cease when he decided to retire. These facts are clearly inconsistent with the concept of ownership, but fully consistent with the concept of a personal license. *See Def. Exh. 15 (*Davenport explains that he will have to stop providing support if he is not permitted continued access to MDS database.) Thus, AUMD represented a personal license by Davenport, not ownership by the Air Force.

B. Adapting AUMD copies was not an essential step in the utilization of the programs.

Adaptation must be consistent with the permitted use of the copies in order to take advantage of § 117. Sega Ent. v. Accolade, Inc., 977 F.2d 1510, 1520 (9th Cir. 1992); Aymes v. Bonnelli, 47 F.3d 23, 25-27 (2d Cir. 1995). Changing the expiration date on the AUMD software, which Defendant admits to, cannot be considered an essential step in their utilization because this violated the terms of their possession. Thus, if the Air Force owned their copies pursuant to an expiration date, then their ownership ceased to be lawful beyond that expiration date. The purpose of § 117 is to permit owners to upgrade lawfully owned software copies for compatibility with new hardware, new external software, or to fix bugs – not to extend the explicit terms of their ownership. DSC, 170 F.3d at 1360-62; Aymes, 47 F.3d at 27 (finding adaptation to maintain hardware/software compatibility lawful on the facts, but noting that violation of explicit terms of ownership would be outside the scope of § 117). No court has found that "adaptation" permits extending the possession and ownership of copies beyond an expiration date built in to, and noticed within, the copies themselves.

Additionally, the "necessary step" safe harbor does not include mere improved convenience or efficiency, but only that which is physically necessary to run the actual "copies" which are allegedly "owned" by the accused infringer. Madison River Mgt. Co., v. Bus. Mgt. Software Corp., 387 F.Supp.2d 521, 538, (M.D.N.C. 2005) (finding 117 defense inapplicable where accused infringer made nightly copies of a copyrighted database for the purpose of more efficient operations) (citing Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 261 (5th Cir. 1988), Sega Ent., 977 F.2d at 1520, and 2 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8.08[B][1]). Thus,

extending expiration dates to get time to create an unauthorized derivative work falls outside the safe harbor.

C. The creation of the derivative work MARS was clearly not "necessary" to utilize copies of AUMD.

Clearly, if the Air Force was able to break into copies of AUMD to extend the expiration date, then modifying the software to create the MARS programs, completely new derivative works, was obviously not a "necessary step" in the utilization of AUMD. Even if they could legally have continued using AUMD by modifying the expiration date (adaptation), they could not make additional copies, nor distribute additional copies, nor could they use this to create a new derivative work called MARS. CMAX, 804 F.Supp. 337 (M.D.Ga. 1992). Further, while "exact copies" may be transferred only along with the original copies, and only as "part of the lease, sale, or other transfer of all rights in the program," "[a]daptations" may only be transferred with permission of the copyright owner. 17 USC § 117(b). Thus, even the transfer of modified copies of AUMD to SAIC for the purpose of creating the MARS derivative would not fall under § 117. *Pl. Exh. 16, 34, 35, 75, 101, etc*.

CMAX, 804 F.Supp. 337 (M.D.Ga. 1992), is especially relevant on this point. CMAX also involved a possessor of software copies creating a copy of that software in order to continue using it beyond the explicit terms of their agreement. The infringer copied user interfaces and data structures, then modified the Basic code within the programs for their purposes. Id. at 341-45. The court refused to allow the infringers to hide behind § 117. "[Section] 117 expressly provides that the adaptation can be used in 'no other manner'" than what is "necessary" for continued use. Id. at 356. Even the most liberal reading of § 117 does not protect Defendant's actions here.

6. Was the government's copying of the AUMD program a fair use under 17 U.S.C. § 107?

Section 107 fair use does not protect Defendant's purposeful and intentional copying of Plaintiff's work. Fair use is a defense to copyright infringement which a defendant bears the burden of proving. Chicago Bd. of Educ. v. Substance, Inc., 354 F.3d 624 (C.A.7 (Ill.) 2003), cert. denied, 125 S.Ct. 54; Belmore v. City Pages, Inc., 880 F.Supp. 673 (D.Minn.1995). Factors examined include: (1) the "purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," and (4) "the effect of the use upon the potential market for or value of the copyrighted work." Id; Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 563 105 S.Ct. 2218 (1985). Commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright. Harper & Row Publishers, id. at 562. "'Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied.'" Id. at 566-67 (omitting citations)

Here, Defendant used Plaintiff's work in a blatantly commercial manner; Defendant appropriated the core of Plaintiff's creative work – the screens, data tables and structures; and, Defendant's appropriation essentially destroyed the single most important market – the United States military. *Tr. 95-6 & 754-57; Pl. Exh. 131, 132.* No good faith redeems their actions. Finally, unlike Sega Ent., Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992), finding fair use exception in disassembly, here Defendant did not merely disassemble to develop compatible structures but bodily copied in order to replace the infringed work.

7. <u>To what extent are the AUMD program's screen displays protected expression under copyright law. The court asks the parties to specifically cite other cases examining graphical user interfaces and copyright protection.</u>

Plaintiff's work is protected by copyright because screen displays, interactive graphical user interface based on those displays, and data structure compilation are protected expressions. Defendant's virtually identical copying of those expressions is copyright infringement under either broad or narrow protection. The screen displays, which essentially are the code for the screens, are literal elements. Parts of the screens which are standard may be filtered out, leaving the selection of the fields and tables to be included on a page, the arrangement of the fields and tables on the page, and the interconnectivity of pages, literal elements which are protectable expression.

As an initial point, before discussing the various cases which have concerned copyrights in graphical user interfaces and/or screen displays of such interfaces, is the fact that only one of those cases, <u>CMAX</u>, 804 F. Supp. 337 (M.D. Ga. 1992), has addressed the unique issue presented here, where the literal code includes the screen displays themselves. As the testimony established, the coding for AUMD and MARS involved designing the screen layouts, making all the choices about what and how many screens to use on a topic, what goes into the screens, how the controls on the screens are arranged spatially and by function etc. MS Access then generates the code as property attributes within the Access system, which is why Access is needed on a computer to run the compiled programs. The second aspect of the source code is the actual Visual Basic line coding for the specific functions assigned to the controls in the screens. Thus, this is not a case of screens being a product of the code, but the screens actually being the code for all intents and purposes, for that portion of the code that is represented by the screens as opposed to the functions of the controls. The point being,

that the screen displays are not non-literal elements of the code, but instead are the literal elements of the code. So directly copying the screens is directly copying the literal elements of the program. In most cases that have discussed the screen displays or graphical user interfaces the courts have treated them as non-literal elements and required a virtual identity standard, such as Apple Computer. But here, in any case, the matter is moot because (the elephant in the room that Defendant ignored), Defendant admittedly copied the screen displays essentially identically. *Compare Pl. Exh. 131 (AUMD) with Pl. Exh. 132 (MARS); Tr. 207, 212-13, 215-19, 577, 610-11, 619-20, 1038-42, 1169; Pla. Exh. 16, 34, 36, 36, 111.*

In Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435 (9th Cir. 1994), the infringement claim was based on "claim of copying a computer program's artistic look as an audiovisual work instead of program codes as a literary work." Id. at 1439. The court determined that graphical User Interfaces require the following steps to determine infringement: (1) plaintiff "must identify sources of alleged similarity," (2) "the court determines whether any of the allegedly similar features are protected by copyright" based on analytic dissection, expert testimony and the presence of a licensing agreement, and (3) the court determines the degree of copyright protection entitled to the work based on the alleged similarities and the range of possible expression, and using the determined degree of protection applies "the appropriate standard for a subjective comparison of the works as a whole." Id. at 1443. The single most dispositive fact was the existence of an express written licensing agreement which specifically covered the Graphical User Interface in the existing and derivative works. Id. at 1438, 1440. "Authorized copying accounts for more than 90% of the allegedly

infringing features…" Id. at 1442.

In CMAX, supra, the court found infringement of a cusomized computer database program, called RMAX. CMAX, 804 F.Supp. at 340. The Plaintiff alleged that the defendant infringed its copyright in the programs by among other things copying the field sequences in the screen layouts and in the reports. Id. at 355. The literal elements, the code, were different, and so the court bypassed the abstraction test and focused on filtration related to the nonliteral elements of the RMAX Systems' design. Id. at 345-55. The court fount that there was no merger because the data layouts in the screen layouts and reports could have been arranged in any number of ways, and thus they represented protected express. Id. at 355..

Importantly here, the defendant in CMAX used a code generator, described as a electronic paintbrush, which allows the programmer to create the screen, and the code generator then created the code for the screen based on the programmers design. Id, at 343. The court noted that "when using a code generator, the development of a software system consists almost entirely of the design of the system, while only a small portion of the process involves coding the system." Id. at 343. The defendant had decided to develop their own system that performed the same functions and exhibited the same capacities as the RMAX system. Id. at 343. Defendant had a copy of the RMAX system and studied how it ran, in particularly studying the files, screen layouts, and report formats. Id. at 343-44. They had computers set up running the RMAX system and the system under development side by side. Id. at 344. The defendant used the code generator to simply duplicate the RMAX screens and report formats. Id. The defendant 's programmers "would set up screens and reports for the system simply by

copying the corresponding screens and reports from the RMAX System... so that they had the same look and format, and included the same data elements in the same order, as comparable RMAX System screens and reports.” Id. Defendant “simply copied the designs of the existing RMAX Remote Store System files, screens or reports—using the same layouts and naming conventions—on to the portable computer on which the UCR System was designed using [the code generator].” Id. at 344.

In Autoskill, Inc. v. National Educational Support System, Inc., 994 F.2d 1476 (10th Cir. 1993), the affirming a finding of infringement of a program, AUTOSKILL, used to teach reading skills to students with reading disabilities, the court compared the functions of modules or subroutines together with each modules relationships to other modules constituting the structure of the program – i.e. the non literal aspect rather than the source code. Id. at 1492 n. 18. Plaintiff did not claim infringement of its source code. Id. Applying the abstraction-filtration test, the court ruled found the program protectable because a keying procedure, which provides for students in three types of abilities to respond to audiovisual matching tests by pressing 1, 2 or 3 keys, reflected at least a minimal degree of creativity. Id at 1490-95. The Defendant required its program “to be like AUTOSKILL” Id. at 1481, and made changes to names, sequences, and minor format changes. Id. at 1490. While the Defendant’s programmers did not possess the AUTOSKILL source code, Id, at 1481-82, they effectively did had access because they had computers with AUTOSKILL loaded on them and program documentation. Id. at 1483, 90

In Manufacturers Tech., Inc. v. CAMS, Inc., 706 F. Supp. 984 (D. Conn. 1989) the court dealt with alleged copyright infringement of a software designed to enable a

user to estimate the cost of machining manufactured parts through computer application. The court entered judgment for the Plaintiff on the copyright infringement claim. Id. at 1005. The court ruled that the screen displays in creating an estimate sequence constituted copyrightable expression. Id. at 996. The court found that the job identification screen was sufficiently original because of the selection and arrangement of nine terms which the screen uses to identify a particular job, and their fore subject to copyright protection. Id. at 997. Other screens evidencing originality in selection and arrangement of components were also protected expression. Id. at 996-998. A single registration of the computer program accomplished two interrelated yet distinct registrations: one of the program itself and one of the screen displays or user interface of that program, to the extent each contains copyrightable subject matter.[3] Id. at 993.

In Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222 (3d Cir. 1986), the court dealt with alleged copyright infringement of a computer program for dental laboratory record keeping.[4] The plaintiff's expert testified that most of the file structures, and the screen outputs were "virtually identical", while defendant's expert compared just the source and object codes. Id. at 1228. While the court did not strictly apply the abstraction-filtration-comparison test, the court did go through abstraction, from the highest level purpose to the end level coding. Id. at 1229-30. The court applied the idea/expression dichotomy test, and approved of the comparison that the district

---

[3] The court noted that during the pendency of the lawsuit, the Copyright Office issued a decision that it would not longer accept copyright applications separately for computer program source code and for screen displays and user interfaces, but that instead from that point forward a single copyright registration of a computer program would extend copyright protection not only to the literal elements of the program—its source and object codes—but also to the screen displays it generates to the extent they contain original creative authorship. Manufacturers Tech., 706 F. Supp. At 990-91 (citing 36 PAT. TRADEMARK & COPYRIGHT J. (BNA) 155 (1988)).

court made of the non-literal protectable expression between the programs, agreeing that the structure of the copyrighted program was protectable expression because "there are other programs on the market…that perform the same functions but have different structures and designs." Id. at 1238-1248.

In Broderbund Software, Inc. v. Unisorn World, Inc., 648 F. Supp. 1127 (N.D. Cal. 1986), the court found copyright infringement of the "Print Shop" computer program for creating customized greeting cards, signs, banners and posters. The court ruled that the organization, structure, sequence, and arrangement of screens in the menu driven "Print Shop" program included protectable expression separable from the underlying idea. Id. at 1132-33. The defendant directed its programmers to copy "Print Shop" and the did so by copying the "Print Shop" user interface. Id. at 1135. Thus, the defendant had access to the program, though not the code, because the access to the "literal components" was not necessary to copy the allegedly infringed portions of "Print Shop" Id. at 1136. The court analyzed infringement from the standpoint of the ordinary user. Id at 1137. "Put simply, 'Printmaster' looks like a copy of 'Print Shop', with a few embellishments scattered about in no particular order." Id.

In Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1345-47 (5th Cir. 1994), the court ruled registration of source code covers programs architecture, sequence, and arrangement, operation modules, and user interface, at least to the extent protectable. Id. at 1341.

In Brown Bag Software v. Symantec Corp., 960 F.2d 1465 (9th Cir. 1992), the court held that registration of copyright entitled the plaintiff to a presumption of originality

[4] The suit in Whelan came before the Copyright Office decided that a single registration covered both the screen displays and user interface, as well as the source code. See Manufacturers Tech, 706 F. Supp.

and the district court properly compared screens and menus in comparing expressions in computer software but found the screens were not substantially similar and so non-infringing. Id. at 1473-76.

In Computer Access Tech. Corp. v. Catalyst Ent., Inc., 2001 WL 34118030 (N.D. Cal. 2001) the court addressed, among other thing, alleged copyright infringement of a graphical user interface for computer peripheral protocol analyzers. The court found that even if all of the individual features are unprotectable the program can be protected as a selection and arrangement of individual unprotected elements. Id.; Fiest Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 362, 111 S. Ct. 1282, 113 L.Ed.2d 358 (1991); Brown Bag, 960 F.2d at 1476 n. 4. However, only "thin" protection is afforded in such cases, and infringement would lay only if the GUI as a whole was virtually identical – and found they were not in that case. Computer Access Tech..; *see also* Brown Bag, Apple, 35 F.3d at 1443, 1446-47.

In Kepner-Tregoe, 12 F.3d 527, supra, the court addressed a unique copyright infringement case involving software where the defendant turned management training program materials licensed to a third party into a software program. The court viewed the infringement at a high level of abstraction, clearly non-literal, and found infringement based on use of the central 5 of 8 questions for management training which were the "heart and soul" of the original copyrighted work. Notably, the management training material was a non-registered work.

In Mitek Holdings, Inc. v. Ace Eng'g Co., Inc., 89 F.3d 1548 (11th Cir. 1996) the court dealt with alleged infringement of a wood truss drafting program where the visual displays differed. Id. at 1559. The court found no infringement, applying a "bodily

---

At 990-91

appropriation of expression" or "virtual identicality" standard for nonliteral elements. Id.

In Lotus Dev. Corp. v. Paperback Software Int'l, 740 F. Supp. 37 (D. Mass. 1990), the court reviewed an action for copyright infringement for a computer spreadsheet program, Lotus 1-2-3. The court held, among other things, that presentation of the screens and prompts was protected expression and that liability for infringement was established, and that registration of computer spreadsheet programs extends to the screen displays. Id, at 45-6. The court ruled that user interfaces and are protectable, and that they are the bulk of the design and creative work effort. Id. at 54-6. Applying abstraction, id. at 59-61, the court focused on the user interface finding the structure, sequence and organization of the menu command system finding them protectable, while the rotated "L" layout and fact that all menu command systems are invoked by one or very few keys were not protectable. Id. at 66-67. Even if individual components were not copyrightable, the system could be copyrightable on the whole. Id. at 67-68.

In Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 34 USPQ2d (BNA) 1014 (1st Cir. 1995), judgment a'ffd by equally divided court, 516 U.S. 233, 133 L.Ed.2d 610 (1996), again involving alleged infringement of Lotus 1-2-3, the Court ruled that the menu command hierarchies were methods of operation and therefore uncopyrightable, id. at 818, but that the screen displays, on the other hand, had "little bearing on how users control the program" so were not uncopyrightable methods of operation. Id. at 816; see Escholar, LLC v. Otis Educational Systems, Inc., 2005 WL 2977569, 76 USPQ2d 1880 (S.D. N.Y. 2005) (discussing this aspect of Lotus). The court stated, with respect to the screen displays "[a]s they are not before us on appeal, we take no

position on whether the Lotus 1-2-3 screen displays constitute original expression capable of being copyrighted." Id., 49 F.3d at 816 n. 10.

In ILOG, Inc. v. Bell Logic, LLC, 181 F. Supp. 2d 3 (D. Mass. 2002), concerning a business rules editor software, the court determined that literal copying was governed by a Lotus analysis (see discussion below), but nonliteral copying was governed by the abstraction-filtration-comparison test of Altai. The features alleged to be copied were not protectable as they were ideas rather than expressions, but cautioned it was not examining screen displays which weren't at issue. "If the alleged copying was of the screen displays, then perhaps expression would be involved." Id. at 14.

The court can address the numerous copied screen displays in this case properly as literal elements, because the screen displays are essentially the coding by the programmer. Defendant directly copied these literal elements. Defendant also copied the structure and interactivity of the screen displays in the user interface – i.e. the non-literal elements of the AUMD programs.

The evidence showed that the type of software in issue is clearly an interactive graphical user interface. *Tr. 754.* The function of the software was to perform queries of the database (MDS, an Oracle database), both to transfer to and into the AUMD system and to satisfy requests for user reports. *Tr. 757* The creative programming process has two steps: first one develops the interface which defines the input and output and some of the program structure, and then, through the integrated development environment, one adds the behaviors of the interface by writing code. *Tr. 552-567.* As recognized by the courts, the design of the screens and graphical user interface, the structure and organization, is the overwhelming bulk of the work. The

actual coding of specific functions within that system, testing and debugging, is minor in comparison. CMAX, 804 F. Supp. 337, 343 (M.D. Ga. 1992); Whelan, 797 F.2d 1222, 1231 (3d Cir. 1986); Lotus Dev. Corp. v. Paperback Software Int'l, 740 F. Supp. 37, 56 (D. Mass. 1990). In CMAX, the court noted that the "design is clearly the most substantial... most creative and most intellectually demanding phase in the development of a computer software system. … [T]he design phase accounts for up to ninety percent of the time and intellectual input required to develop a system when a code generator is used. Both the coding phase of the process and the final testing phase accounts for a relatively small portion of the overall process." CMAX, 804 F.Supp. at 343 & 345-46. In Lotus Dev. Corp., the court noted that "the bulk of creative work in a program is in the conceptualization of a computer program and its user interface, rather than in its encoding, and that creating a suitable user interface is a more difficult intellectual task, requiring greater creativity, originality, and insight, then converting the user interface design into instructions on the machine." Id. at 56; accord Whelan, 797 F.2d at 1231.

Here, there was overwhelming evidence of the originality, creativity, and the design choice that goes into designing the highly complex, screen displays and graphical user interface, as well as his design of the table structures that he created that pulled a select 15-17 tables out of hundreds of tables in the MDS Oracle Database. *Tr. 96-103, 190-192*. The screen design layout programming environment in Access allows you to create very complicated screen designs. *Trans, pp. 657-58*. The original aspect is after you filter out system constrained standards such as public graphics (.jpgs, .bmp, .gif), e-mail forms, element shapes, color, standard control shapes, font, form names.

*Tr. 561, 574-78, 588, 633, 635, 665-67, 709-10, 716, 724*. The originality, and the comparison, is the choice over which the designer had significant design discretion and control with many variable, such as choice and selection of controls, spatial arrangement and interactivity of controls, choice of what screens to include controls on, groups of controls on one or more screens dynamic flow of screens and controls, assignment of functions to specific controls and compilation of those functions by selection on individual pages, dynamic changes created by choice of screens, type of tool chosen for individual controls, type of screen to use, interaction of screens and sub-screens, placement, how screens are represented, structuring of data tables. *Tr. 565, 566, 567, 568-72, 574-78, 665-67*.

These creative components were not were not dictated by the original MDS system in any aspect, not in any existing specification or requirement of unit manpower documents. *Tr. 96-100.* The AUMD user interface screens were created wholly by Davenport and were not standard screens and the table formats and report formats were original to Davenport (with the exception of the email screen and the standard Unit Manpower Document report). *Tr. 103.* There is nothing in the Oracle database which defined how the AUMD programs screens or tables or file structures had to be set up. *Tr. 190-91, 621-2.* There were a lot of choices the designer can choose from. *Tr. 622.*

Defendant's expert, Mr. Keohane, acknowledged that he was unfamiliar with the MDS software itself, never ran MDS, and had no knowledge of pre-existing screen and report formats. *Tr. 1048.* Keohane also acknowledged that MDS would not have dictated the screen displays or report formats, nor the local tables and their formats used by AUMD and MARS. *Tr. 1050-51.* These were design choices. *Tr. 1053-54.*

In this case, Plaintiff's work and Defendant's copies are not merely similar but are essentially identical. SAIC was directed to make screen layouts and a graphical user interface that was identical to the existing, AUMD System, and that is what SIAC did. *Tr. 207, 212-213, 215-16, 216-17, 219*. They both display the same screens, thus having identical source code in generating the screens. Further, the interface of Plaintiff's work is identical to the interface of Defendant's copies. *Pl. Exh. 131, 132; Tr. 577, 606, 610-11, 619-20.* SAIC had access to the running AUMD software and in fact tested MARS by running AUDM and MARS side by side. *Tr. 212-213, 236, 238-29. See also Pla. Ex. 34* (MARS will be "identical to the existing system's GUI environment with only textual changes as required by the government"; "transparently replace the existing system"*); Pla .Exh. 111* (*"*recreate the existing system [to] … seamlessly substitute MARS for the existing system", "exactly the same user interface and function as the existing system and shall provide responses to user inputs within the same time constraints as the existing system"; "GUI environment shall be identical to the existing system's GUI environment with only textual changes as required by the government"; " transparently replace the existing system "); *Pla. Exh. 16* ("an identical copy"); *Pla. Exh. 35* (MARS "duplicate"; "exact replication", "same user interface"); *Pla. Exh. 36* ("exact replication of the current system in terms of functionality and user interface"; "exactly the same user interface and function as the existing system and shall provide responses to user inputs within the same time constraints as the existing system.").

Defendant's expert, Mr. Keohane, was required on cross-examination to compare the AUMD Screens/Interface and the MARS Screens/Interface and he was forced to admit that they were essentially identical and this was because the

Government told the contractor to make theme the same. *Tr. 1038-42.* He admitted that if the screens and menus look similar then they will have the same source code if the programmer is using Access.[5] *Tr. 967.*

Finally, the Government admitted in closing that as to the screen designs, if the screens were visually identical, that the underlying property attribute representation of that code would therefore be substantially similar. *Tr. 1169*

8. To what extent the merger doctrine and *scenes a faire* are applicable.

The Merger Doctrine and *scenes a faire* do not apply to exclude creative expression in this case. There will be no exclusion under merger where there is no evidence that idea can be expressed in only one way. Autoskill, 994 F.2d at 1494 (denying merger); CMAX/Cleveland, 804 F. Supp. at 355 (no merger because the data layouts in the screen layouts and reports could have been arranged in any number of ways). Similarly, s*cenes a faire* only excludes matter that is stock, common, or standard or necessarily found in common theme. Autoskill, 994 F.2d at 1494.

Regarding merger, Defendant proffered nothing whatsoever to suggest that the screen displays, graphical user interface, were required by anything, or that they were the only way that the task could be performed. To the contrary, the evidence established the highly complex screens, interface, and tables could be done in many different ways. *Tr. 96-103, 190-92, 565-72, 574-78, 622, 657-58, 665-67.* The evidence established that the MDS System, which was still officially used, created unit manpower reports, and that MDS was not the same. The evidence established that nothing in the

[5] MARS and AUMD were both programmed in Access. *Tr. 664.* When one copies a screen created in Access using Access, one gets the same code. *Tr. 614-16.* Indeed, there are programs that allow one to copy an Access screen that is running, and paste it into the Access programming environment to duplicate that screen. *Tr. 708-09.* To the point, one of the ways Dr. Orr compared MARS and AUMD was

MDS systems whatsoever constrained how the AUMD screens, tables and interface could be created. *Tr. 96-100, 103, 190-91, 621-22, 1050-51.* There is simply no evidence to base a claim of merger upon, and overwhelming evidence to the contrary.

Regarding *scenes a faire*, standard background items, Dr. Orr explained the filtering out of standard objects to focus on originality of authorship, and that the screens, whether with or without the filtering, were absolutely identical. He filtered standards such as public graphics (.jpgs, .bmp, .gif), e-mail forms, element shapes, color, standard control shapes, font, form names. *Tr. 561, 574-78, 588, 633, 635, 665-67, 709-10, 716, 724*.. The screens still remained identical. And that is because of the elephant in the room: if you have two pictures of the Mona Lisa, and you filter out the background mountains, you still have Mona Lisa.

The issues are mooted by the identical copying. Even with thin protection infringement lays where the entire work is copied exactly - and this is what occurred. Meridian Project Sys. Inc. v. Hardin Constr. Co., 426 F. Supp.2d 1101, 1112-13 (E.D. Cal. 2006) (when idea and expression are indistinguishable, or "merged," that expression will only be protected against nearly identical copying); Apple Computer, 35 F.3d 1435, 1439, 1444 ("When an idea or an expression are indistinguishable, or 'merged,' that expression will only be protected against nearly identical copying.")[6]

Here, the Court can essentially short circuit the analysis under the Merger Doctrine and *Scenes A Faire* principle because, even if the idea and expressions in some, most, or all of Plaintiff's works were indistinguishable, because Defendant copied

---

running two computers side by side, MARS loaded and running on one, AUMD loaded and running on another. *Tr. 619.*

[6] This is not a case about choosing one single icon as a desktop metaphor, or choosing tiled versus overlapping windows as in Apple Computer, 35 F.3d at 1444.

virtually every single screen display, and the interactivity, identically, Defendant is still liable, even in the application of the doctrines.

9. The appropriate amount of damages

Just and entire compensation includes consideration of several alternate methods for determination. Leesona Corp. v. U.S., 599 F.2d 958 (Ct.Cl. 1979); Wright v. U.S., 56 Fed.Cl. 350 (Fed. Cl. 2003); Hughes v. U.S., 86 F.3d 1566, (Fed. Cir. 1996), reh'g en banc denied , cert denied and judgment vacated on other grounds 520 U.S. 1183 (1997). The preferred method for infringement is to determine a reasonable royalty or license fee. Leesona, 599 F.2d at 973; Hughes, 86 F.3d at 1572. However, the Court may use other methods to determine the reasonableness of a proposed royalty or license fee, including savings to the Government. Leesona, 599 F.2d at 970-71. License fees negotiated under the shadow of litigation or continuing infringement should not be given significant probative weight due to the market distortion under the particular circumstances. Hughes, 86 F.3d at 1573 (citing cases). Statutory damages are within discretion of court where they reflect the reasonable and entire measure of compensation. Wechsberg v. U.S., 54 Fed. Cl. 158, 165-66 (Fed. Cl. 2002).

Separate damages issues are before the court. First, what is the reasonable and entire compensation due for infringing copying and distribution of the AUMD programs themselves? Second, what is the reasonable and entire compensation for copying, modification, and distribution of the AUMD programs with the expiration date removed or altered? Third, what is the reasonable and entire compensation for creation and distribution of the unauthorized derivative MARS software created by SAIC?.

Dr. Rudd produced several alternative methods of valuation to determine the market value of Davenport's software programs. *Tr. 740-782*; *Pl. Exh. 70 & 71*. To

value the software, he treated both AUMD and MARS as civilian contract priced software for the personnel or human resources fields with an interactive Graphic User Interface (GUI). *Trans., pp 752-4*. Using the Capers Jones' methodology, based on the nature of the MARS software and the fact that it was developed from the earlier AUMD software, Dr. Rudd estimated the value at $763,750. *Tr. 754.* Using a function point technique, based on the complexity of the software, Dr. Rudd made a "conservative" estimate of $942,780 after converting the number of estimated person-months of labor at $12,500 per person month. *Tr. 757-8.* Dr. Rudd then applied what is known in the software industry as the "Cocomo technique" where the number of lines of software code is divided by 1,000 then raised to the 1.05 power to obtain the estimated number of person months. Using $12,500 per person-month as previously, Dr. Rudd estimated $763,125 for the cost of the software. The average of these three cost methods is $832,218. Thus, a reasonable estimate for the market value of the property taken from Blueport would be approximately $832,218.

The $832,000 estimate comports with the contracts actually let to SAIC to "duplicate" the AUMD software. *Pl. Exh. 76* shows the actual payments made to SAIC for duplicating the AUMD software. While the SAIC contracts did include some products which were not strictly software, and so might overestimate the value of the software itself, they also do not take into account the savings gained by starting with the AUMD software which had been developed and tested by Mr. Davenport over two years, and which included Mr. Davenport's solutions to significant user feedback over those two years. This development work by Davenport created a very user friendly interface and structure for the program, and included features which were not

contemplated by the Air Force itself. The Air Force's own witness, Maj. Meaker, described the AUMD software as "quicker, cleaner." *Tr. 791.* Mr. Hendricks described AUMD as "Very slick. Very good." *Tr. 890*. Thus, SAIC and Defendant started with a significantly developed product which is not reflected in the contract valuation, so the estimated value of $832,000 is a reasonable estimate of the market value of the software that was appropriated when compared to the replacement purchase price.

Dr. Rudd also established a reasonable per user licensing fee of $100 per user based on manpower/personnel software systems used commercially. *Tr. 759-61.* This $100 price was valid for a license of approximately 2510 users of the AUMD Master and MARS Query & Report, and 78 users of the AUMD Admin and MARS Admin or Get Data. *Tr. 763; Pl. Exh. 71.* Plaintiff's Exhibit 71 provided numbers of authorized users of each program provided by the Air Force, based on the number of user accounts. Based on these license fees, one could calculate a lost value of approximately $258,800. According to Dr. Rudd, these licensing fees would not account for, and would be in addition to, fees for customization, installation, and startup of the software: " That $250,000 didn't cover all the costs, or would not have bought all of what Davenport did.

A reasonable sum of the just and entire compensation of the value of the AUMD software appropriated by the Government would be approximately $832,000.

CONCLUSION

Based on the record produced, and the law, the Court should rule that Defendant infringed Blueport's protected work and is liable in the amount of $832,000.00.

DATED THIS October 2, 2006,

Respectfully submitted,

RYLANDER & ASSOCIATES PC

/s/ Kurt M. Rylander

KURT M. RYLANDER
Attorney at Law
MARK E. BEATTY
Attorney at Law

406 West 12th Street 206
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 750-9953
E-mail: rylander@pacifier.com
Of Attorneys for Plaintiff