IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUEPORT COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1622C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence J. Block |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO BLUEPORT'S POST-TRIAL BRIEF**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

OF COUNSEL:

CHUN-I CHIANG
Air Force Legal Operations Agency
Department of the Air Force

October 20, 2006

## TABLE OF CONTENTS

I. The Creation Limitations are Jurisdictional . . . . . 1

II. Blueport's Claim is Barred by the Creation Limitations . . . . . 4

A. Mr. Davenport Induced and Influenced the Use of AUMD . . . . . 4

B. Mr. Davenport Created AUMD Within the Scope of His Duties . . . . . 9

C. Mr. Davenport Relied on Government Resources to Create AUMD . . . . . 15

III. The Government Did Not Infringe Blueport's Copyright . . . . . 17

A. The Government's Modification of the AUMD Program is Noninfringing . . . . . 17

1. The government held an implied license to use AUMD . . . . . 17

2. The government copied and adapted AUMD as an essential step in the utilization of the program – 17 U.S.C. § 117 . . . . . 18

B. The MARS Programs Are Noninfringing . . . . . 20

1. The MARS program is not substantially similar to the AUMD program . . . . . 20

2. The government fairly adapted the AUMD program in the context of SAIC's efforts to reverse engineer the AUMD program – 17 U.S.C. § 107 . . . . . 25

IV. Assuming Infringement, Compensation is Limited to Minimum Statutory Damages . . . . . 25

CONCLUSION . . . . . 29

## TABLE OF AUTHORITIES

### CASES

A.B. Dick Co. v. Burroughs Corp.,
798 F.2d 1392 (Fed. Cir. 1986) . . . . . . . . . . 14

Apple Computer, Inc. v. Microsoft Corp.,
35 F.3d 1435 (9th Cir. 1994) . . . . . . . . . . 21

Apple Computer, Inc. v. Microsoft Corp.,
799 F. Supp. 1006 (N.D.Cal. 1992) . . . . . . . . . . 20

Broderbund Software, Inc. v. Unison World, Inc.,
648 F. Supp. 1127 (N.D.Cal. 1986) . . . . . . . . . . 20

Carlyle v. United States,
674 F.2d 554 (6th Cir. 1982) . . . . . . . . . . 3

CMAX/Cleveland, Inc. v. UCR, Inc.,
804 F. Supp. 337 (M.D.Ga. 1992) . . . . . . . . . . 21

Computer Assoc. Int'l Inc., v. Altai, Inc.,
982 F.2d 693 (2d Cir. 1992) . . . . . . . . . . 20

Feist Publ'ns, Inc. v. Rural Telephone Services Co.,
499 U.S. 340 (1991) . . . . . . . . . . 21, 22

Gates Rubber Co. v. Bando Chemical Indus.,
9 F.3d 823 (10th Cir. 1993) . . . . . . . . . . 23, 24

General Universal Systems, Inc. v. Lee,
379 F.3d 131 (5th Cir. 2004) . . . . . . . . . . 20

Genzmer v. Public Health Trust of Miami-Dade County,
219 F. Supp. 2d 1275 (S.D.Fla. 2002) . . . . . . . . . . 14

Georgia-Pacific Corp. v. United States Plywood Corp.,
318 F. Supp. 1116 (S.D.N.Y. 1970) . . . . . . . . . . 28

Herbert v. United States,
36 Fed. Cl. 299 (1996) . . . . . . . . . . 8, 10, 17

ITT Corp. v. United States,
17 Cl. Ct. 199 (1989) . . . . . . . . . . 28

Johnston v. IVAC Corp.,
885 F.2d 1574 (Fed. Cir. 1989) . . . . . . . . . . 19

Kiehn v. United States,
984 F.2d 1100 (10th Cir. 1993) . . . . . . . . . . 3

Krause v. Titleserve, Inc.,
402 F.3d 119 (2d Cir. 2005) . . . . . . . . . . 18

Maddog Software, Inc. v. Sklader,
382 F. Supp. 2d 268 (D.N.H. 2005) . . . . . . . . . . 22

Manufacturers Techs., Inc. v. Cams, Inc.,
706 F. Supp. 984 (D.Conn. 1989) . . . . . . . . . . 20

Marathon Oil Co. v. United States,
374 F.3d 1123 (Fed. Cir. 2004) . . . . . . . . . . 1, 10

Matter Of: Government Acquisition of License to Employee's Invention,
B199026, 60 Comp. Gen. 248 (1981) . . . . . . . . . . 5

Miller v. CP Chemicals, Inc.,
808 F. Supp. 1238 (D.S.C. 1992) . . . . . . . . . . 11, 14

Myers v. United States,
147 Ct. Cl. 485 (1959) . . . . . . . . . . 10

Prescott v. United States,
973 F.2d 696 (9th Cir. 1992) . . . . . . . . . . 3

Quinn v. City of Detroit,
988 F. Supp. 1044 (E.D.Mich. 1997) . . . . . . . . . . 12 - 14

Quinn v. City of Detroit,
23 F. Supp. 2d 741 (E.D.Mich. 1998) . . . . . . . . . . 17, 25, 29

Richardson v. United States,
943 F.2d 1107 (9th Cir. 1991) . . . . . . . . . . 3

Roeslin v. Dist. of Columbia,
921 F. Supp. 793 (D.D.C. 1995) . . . . . . . . . . 12, 14

SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,
926 F.2d 1161 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Sterpetti v. E-Brands Acquisition, LLC,
2006 WL 1046949 (M.D.Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Stewart v. United States,
199 F.2d 517 (7th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Transwestern Publ'g Co. v. Multimedia Mktg. Assocs.,
133 F.3d 773 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Trek Leasing, Inc. v. United States,
66 Fed. Cl. 8 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

United States v. Gaubert,
499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Grogg,
9 F.2d 424 (W.D.Va. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. James,
478 U.S. 597 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Zimmerman v. United States,
422 F.2d 326 (3rd Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATUTES**

17 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

17 U.S.C. § 117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17 U.S.C. § 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

17 U.S.C. § 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 2680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

35 U.S.C. § 154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## OTHER AUTHORITIES

C.J.S. Evidence § 123 (May 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exec. Order No. 10,096, 15 Fed. Reg. 389 (Jan. 23, 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H. Rep. No. 82-1726 (reprinted in 1952 U.S.C.C.A.N. 2322) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Restatement (Second) of Agency (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

T. Capers Jones, Estimating Software Costs (McGraw-Hill 1998) . . . . . . . . . . . . . . . . . . . . 26, 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BLUEPORT COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-1622C |
| | ) | |
| THE UNITED STATES, | ) | Judge Lawrence J. Block |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO BLUEPORT'S POST-TRIAL BRIEF**

Pursuant to the Court's Order of August 10, 2006, Defendant, the United States ("the government"), hereby respectfully submits its Response to Blueport's Post-Trial Brief.

## I. The Creation Limitations are Jurisdictional

The creation limitations in Section 1498 are jurisdictional, and an employee-plaintiff (or assignee-plaintiff) bears the burden of proof that its conduct is outside the scope of the creation limitations. See Gov't Brief at 5-9. Blueport did not explicitly address whether the creation limitations are jurisdictional, but appears to concede the issue with its analogy to the discretionary function exception to the Federal Tort Claims Act ("FTCA"). See Blueport Brief at 1 ("The discretionary function exception is jurisdictional."); 28 U.S.C. §§ 1346(b); 2680(a). Blueport, however, claims that the government bears the burden of proving the creation limitations.

As an initial matter, Blueport did not address the issue of whether the statutory language of Section 1498 was ambiguous, such that external sources are necessary to determine Congressional intent. See United States v. James, 478 U.S. 597, 606 (1986); see also Marathon Oil Co. v. United States, 374 F.3d 1123, 1132 (Fed. Cir. 2004). The statute's unique use of the language "shall have

a right of action . . . except" and "shall not confer a right of action" demonstrates that Congress intended the creation limitations to be conditions on the waiver of sovereign immunity, the absence of which must be proved by a government-employee.

Even if the Court does look beyond than the language of the statute, the legislative history of the amendment absolutely settles the matter. The legislative history shows that, in the patent context, Congress rejected a competing amendment that would have broadly waived sovereign immunity for government employees, except where "the United States ha[d] rights to use the invention by operation of law." H. Rep. No. 82-1726 (reprinted in 1952 U.S.C.C.A.N. 2322, 2323). Congress's rejection of the competing amendment is important, because it shows Congress's concern with forcing the government to bear the burden of proof with respect to the narrow reservation of sovereign immunity:

> Due to the fact that a suit for patent infringement is rarely ever brought until many years after the actual date of the invention, **the Government would be handicapped in proving the exact conditions under which the invention was made**, whether or not the Government was entitled by 'operation of law' to a license or shop right, whether or not Government time, materials, and facilities were used, etc., so that many unjustified judgments might result . . . .

Id. at 2323 (emphasis added).[1] Congress ultimately adopted the current language, and indicated that a government-employee plaintiff would be required to establish the necessary preconditions before being afforded the right to sue:

> If title is in the employee and he is not in a position to influence or induce the use of the invention by the Government, he is accorded the right to bring a suit against the Government in the Court of Claims.

[1] The difficulty in proving the exact conditions of creation for a patent would be exacerbated for a copyright. Even though the three-year limitation on recovery is shorter for a copyright than the six-year limitation for a patent; the time period of protection for a copyright is at least 70 years, compared with a maximum of 20 years for a patent. See 17 U.S.C. § 302; 35 U.S.C. § 154.

Id. at 2324; see also Zimmerman v. United States, 422 F.2d 326, 328 (3rd Cir. 1970) ("Congress thereby relinquished governmental immunity and consented to suit in the Court of Claims **in carefully circumscribed situations** where the invention was not related to the official functions of the employee, or where government time, facilities, or materials were not used.") (emphasis added).

Furthermore, Blueport's reliance on the Ninth Circuit's decision in Prescott is misplaced. See Prescott v. United States, 973 F.2d 696 (9th Cir. 1992). As an initial matter, the two cases that Prescott cited do not appear to support the Ninth Circuit's conclusion. See Carlyle v. United States, 674 F.2d 554, 556 (6th Cir. 1982); see also Stewart v. United States, 199 F.2d 517, 520 (7th Cir. 1952) (appearing to address a different issue); compare with Richardson v. United States, 943 F.2d 1107, 1113 (9th Cir. 1991) ("[Stewart's] view of the Federal Tort Claims Act and its exceptions, however, is not followed in this circuit, or any other circuit including the Seventh."). Several other circuits that have declined to adopt Prescott's analysis, instead choosing to leave the issue unresolved. See Kiehn v. United States, 984 F.2d 1100, 1105 n.7 (10th Cir. 1993) ("[T]he reasoning of Prescott may be suspect in light of [United States v. Gaubert, 499 U.S. 315 (1991)]."); Autery v. United States, 992 F.2d 1523, 1526 n.6 (11th Cir.1993); Sharp v. United States, 401 F.3d 440, 443 n.1 (6th Cir. 2005) (noting that Carlyle was decided before Gaubert, acknowledging disagreement with Prescott, and choosing to leave the issue unresolved). The Ninth Circuit's decision appears to be based primarily on the concern that requiring the plaintiff to prove thirteen negative averments would be "preposterous." Prescott, 973 F.2d at 702. Regardless of the Ninth Circuit's justifications, Blueport's analogy with the FTCA exceptions is inapt because of the fundamental differences between Section 1498 and the FTCA. First, as discussed above, Congress signaled its intent to put conditions on the waiver of sovereign immunity with the key phrase "right of action" in Section

1498; that phrase is absent in Section 2680. Second, there is evidence of Congress's intent with respect to the burden of proof in the legislative history of Section 1498; there is no such evidence in Section 2680. Finally, requiring a government-employee to prove three negative assertions for Section 1498 is completely different than requiring every FTCA plaintiff to prove thirteen negative assertions. See, e.g., United States v. Grogg, 9 F.2d 424, 426 (W.D.Va. 1925) ("It is a familiar common-law rule that, where a right to relief is grounded on a negative assertion, or where a negative allegation is essential to the assertion of a right, the burden of proving the negative rests on the party asserting such right."); C.J.S. Evidence § 123 (May 2006) ("Whenever the establishment of an affirmative case requires proof of a material negative allegation, such as that the case does not come within an exception provided for, the party who bears the burden of establishing his case or who has made such allegation has the burden of proving it."). Thus, the burden rests on a government-employee plaintiff, or his or her assignee, to establish that the creation limitations are inapplicable.

## II. Blueport's Claim is Barred by the Creation Limitations

Whether or not Blueport bears the burden of proving that the creation limitations are inapplicable, the facts of this case demonstrate that Mr. Davenport: (1) induced and influenced the government's use of the AUMD program; (2) created AUMD within the scope of his employment; and (3) used government resources to create the program.

### A. Mr. Davenport Induced and Influenced the Use of AUMD

Blueport's arguments that Mr. Davenport was not in a position to influence or induce the use of AUMD are unsupported and speculative. As a first argument, Blueport argues that Mr. Davenport was never in a "decision making position." Blueport Brief at 3-6. Even if Blueport's

characterization were correct, it addresses only whether Mr. Davenport was in a position to *order* the use of AUMD. Mr. Davenport induced and influenced the government's use of AUMD by: (1) freely distributing AUMD throughout the Air Force Manpower community; (2) demonstrating the program to others; (3) supporting AUMD as part of his official job duties up until the early part of the year 2000; and (4) failing to restrict the use of the program. See Gov't Brief at 9-14.

In support of Blueport's first argument, Blueport cites a 1981 Comptroller General opinion, but this decision is factually distinguishable. See Matter Of: Government Acquisition of License to Employee's Invention, B199026, 60 Comp. Gen. 248 (1981). Unlike the present case, the main issue before the Comptroller General was whether it was legal and appropriate for the Air Force to acquire a license. See id. at 248. The inventor, a government employee, invented a high contrast lens for aircraft. See id. The Air Force conducted an invention rights determination, and held that the inventor was entitled to the entire right, title, and interest in the invention. See id. The inventor obtained a patent on the invention. See id. at 248-49. Nine years later, the Air Force expressed an interest in licensing the invention. See id. at 249.

The key fact in this case is that the Air Force was not using the invention at the time of the Comptroller General opinion. Thus, the question of whether the employee was in a position to order, influence, or induce the use of the invention was moot. See id. at 251 ("This situation does not exist in Mr. Jeffers' case where the Air Force seeks to purchase the right to use his invention."). As long as the inventor was completely removed from any decision regarding the Air Force's future use of the invention, it was legal and appropriate for the Air Force to acquire a license. See id.

As a result, the Comptroller General opinion is distinguishable from this case. In this case, the AUMD program was in widespread use in the Air Force's Manpower community, due to Mr.

Davenport's efforts to promote the use of the program. To put it another way, the Comptroller General case merely stands for the proposition that Section 1498 would not bar the Air Force from licensing AUMD if the Air Force had never used AUMD, if the program was developed outside the scope of Mr. Davenport's employment, and if the program was developed without the use of government resources.[2]

Blueport's second argument is that Mr. Davenport was not in a position of influence with respect to AUMD because he was ordered to demonstrate the programs to others.[3] See Blueport Brief at 6-7. This argument has no support in the record. Blueport puts quotation marks on the word "invited" in a dubious effort to portray Mr. Davenport as demonstrating the programs against his will, but Mr. Davenport used the same word, without the subtext, in his correspondence to Mr. Gunter. See DX 3 (Email at Page 40 of 68); see also DX 16 (stating that he was trying to obtain money from PACAF to attend a MUG meeting). In addition, Blueport claims that Col. Manning testified that Mr. Davenport "was not in a position to refuse the invitation," but the Court noted that Col. Manning's testimony was speculative in this regard. Blueport Brief at 6; compare Tr. at 510-12.

Blueport's depiction of Mr. Davenport as an unwilling participant in the dissemination of AUMD is contradicted by the evidence. Mr. Davenport described his singular role in promoting and distributing AUMD in response to several questions by the Court:

---

[2] Indeed, the Air Force's invention rights determination, referred to in the Comptroller General decision, demonstrated that the invention was not made in the performance of the employee's duties, or with government resources. See Exec. Order No. 10,096, 15 Fed. Reg. 389 (Jan. 23, 1950).

[3] Blueport's argument contradicts its claim that AUMD was not developed as part of Mr. Davenport's official functions. See Tr. at 337 ("My official duties were what my supervisor directed me to do . . . .").

> THE WITNESS: Well, I know that **I sent [AUMD Beta 0.9] to Butch [Luckie]**. And then I had it up there at my headquarters level, and Butch distributed that one amongst his command. And then **I had sent the ones to my command, the users there**, and then that's where as those people started moving around the phone calls came.
>
> . . . .
>
> THE COURT: Could we get back just to your command area? How did the people there know about it?
>
> THE WITNESS: They'd travel through. They'd come up to the headquarters or, you know, **I distributed it to them**. You know, **I had it on my web page**, but there was no icon that, you know, a normal user could come in and find it. **I had sent them an e-mail traffic that said, you know, here it is.** It's ready to go.
>
> They were all contacting me all the time trying to figure out, you know, how were they going to run their products because they couldn't log on or they couldn't get the data down. And **I had expressed to all of them that I was working on something that was going to give them the capability to do that.**
>
> So, as they kept calling and asking for these products, that's when **I would tell them that hey, this is ready. Go out here to this url on this web page and download this, the product.**

Tr. at 158-59 (emphasis added). Each of the knowledgeable witnesses verified this testimony. Colonel Manning testified that Mr. Davenport provided the program to interested people, and maintained the program from their office. See Tr. at 504. Colonel Manning also testified that Mr. Davenport presented AUMD at the San Antonio conference, and "essentially publicized the fact that [PACAF] had this tool." Tr. at 507. In Mr. Davenport's performance report from 1999, Major Meaker recognized that Mr. Davenport had "[s]elflessly passed [AUMD] to other MAJCOMs." DX 30 (1999 EPR). Major Meaker's comments in Mr. Davenport's performance report highlighted Mr. Davenport's initiative in creating the program and solving problems. See Tr. at 802 ("[T]his promotion report . . . would have been something we would want to show his initiative. And I think that was what I was trying to get to there. He looked forward, he saw problems, he figured out how to fix those problems."); see also Tr. at 795-96 (describing Mr. Davenport as "helpful," "ambitious," and "receptive" in his efforts to promote the use of the AUMD program). Chief Dant echoed these

comments by testifying that Mr. Davenport had showed AUMD to him, and that Mr. Davenport supported the program from their office. See Tr. at 495. Glen Hendricks testified that Mr. Davenport either brought the program to a MUG meeting or had previously demonstrated it to different MUG members. See Tr. at 883; see also Tr. at 877.

For its third argument, Blueport admits that Mr. Davenport participated in MUG, but claims that his participation cannot "amount to 'influence' or 'inducement'". Blueport Brief at 7. Blueport misses the point. Even though MUG never officially adopted AUMD, Mr. Davenport's membership within the group and his interaction with other members of the group served to increase the use of the program. See Tr. at 883-84 ("Mark had brought the program [to MUG] or demonstrated it to different ones what the capabilities were."). Blueport's representation that Mr. Davenport was unaware of MUG's evaluation of AUMD appears to be untrue. See Blueport Brief at 7; compare with DX 16 (Email) ("Hopefully we can address this at our up coming [*sic*] MUG and make what you've done the AF standard . . . ."). In addition, the critical question is whether Mr. Davenport was in a position to influence the use of the work. By virtue of his participation in MUG, he was in a position to influence the use of AUMD. See Herbert v. United States, 36 Fed. Cl. 299, 307 (1996) (finding that plaintiff was in a position to influence the use of a work because of his membership on a board and a committee).

Ultimately, Blueport's arguments are tantamount to saying that the Air Force would have used AUMD even without Mr. Davenport, but this is absolutely false. No one in the Air Force would have ever used AUMD, but for Mr. Davenport's actions. No one would have ever heard of the program, but for Mr. Davenport's efforts to promote the program. No one would have ever

received a copy of the program, but for Mr. Davenport's efforts to distribute the program to Chief Luckie, to PACAF, and to the Air Force's Manpower community.

**B. Mr. Davenport Created AUMD Within the Scope of His Duties**

With respect to the second creation limitation, the official functions of an employee include specific, general, and incidental duties. As discussed in the government's Post-Trial Brief, the relevant case law holds that: (1) reliance on specific tasks is misplaced; (2) official functions can include general and incidental activities; and (3) the analysis provided by the Restatement of Agency is appropriate to use. See Gov't Brief at 14-22. Blueport, however, argues that the second creation limitation examines only the employee's specific duties, and that general principles of agency law are inapplicable. See Blueport Brief at 7-10.

Blueport's assertion was explicitly rejected by Congress when the waiver of sovereign immunity in Section 1498 was expanded to allow suits by government employees. According to the legislative history, Section 1498 permits a suit only where the government employee creates the copyrighted work or invention "completely outside of his official function[s]":

> The amendment . . . will also permit a Government employee who makes an invention completely outside of his official function to maintain a suit against the Government **without penalizing the Government unduly by inviting the filing of numerous suits by the Government employee-patentees where the invention is made in the general line of duty**.

H. Rep. No. 82-1726 (reprinted in 1952 U.S.C.C.A.N. 2322, 2324) (emphasis added). The emphasized portion of the legislative history indicates that Congress viewed actions "in the general line of duty" as falling within the scope of official functions. Id. Congress intended to give "official

functions" the broadest possible scope, stating that government employees may only bring suit where the creation of the invention or work is "wholly unrelated to their official functions." Id.[4]

The Court of Federal Claims and the Court of Claims properly considered general and incidental tasks to be parts of "official functions" in Herbert and Myers. See Herbert, 36 Fed. Cl. at 305-06 ("the specific task need not be individually assigned in order to qualify as part of the official functions"); Myers v. United States, 147 Ct. Cl. 485, 489 (1959) ("This language does not require that the employee be specifically hired to make inventions or to make a specific invention, or even that he be hired as an inventor."). Thus, Blueport's assertion that Mr. Davenport never received a direct order to create AUMD is nearly meaningless with respect to the question of whether creating AUMD was a general or incidental task. See Blueport Brief at 10-12.

Blueport also asserts that the Air Force denied Mr. Davenport's alleged requests to receive training in computer programming. See Blueport Brief at 12-13. Not only is this assertion uncorroborated by any evidence besides Mr. Davenport's own testimony,[5] there is evidence that Mr. Davenport did take at least two computer classes with the Air Force. See Tr. at 69-70. In fact, one of the computer classes was an object-oriented design class with respect to relational databases – directly relevant to the AUMD program. See id.; PX 91A (Orr Report at ¶ 10) (identifying development in Microsoft Access as object-oriented).

[4] Even in the absence of the clear statement of intent in the legislative history, general principles of sovereign immunity require that "official functions" be given the widest possible interpretation in favor of the government. See generally Marathon Oil, 374 F.3d at 1132.

[5] Blueport claims that an email from Chief Jones supports its argument, but the email has nothing to do with a request for computer training. See Blueport Brief at 12-13; DX 7 (Email).

Blueport misses the point when it argues that computer programming was not a required task of Mr. Davenport's. Incidental tasks come within the scope of his employment. Pursuant to the Restatement, an incidental task is a task that is within the ultimate objective of the principal and "an act which is not unlikely that such a servant might do." Restatement (Second) of Agency § 228 cmt. b (1958). "The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive." Id.; see also Miller v. CP Chemicals, Inc., 808 F. Supp. 1238, 1243-44 (D.S.C. 1992) (applying the Restatement and holding that computer programming was "within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do"). The evidence shows that Mr. Davenport's computer programming was within the ultimate objectives of the Air Force and a "not unlikely" act for a Manpower Data Manager. Mr. Davenport's direct supervisor at one point was a computer programmer. See Tr. at 73. Over a year before the creation of AUMD, Mr. Davenport was recognized in his performance report for his computer programming skills. See DX 28 (1997 EPR) ("Drawing on his extensive computer background . . . [wrote] some experimental programs for analysts."). Prior to AUMD, Mr. Davenport and Chief Luckie created the NetWorth program, while at work. See Tr. at 88-91, 341-42 ("[I]n the roles that we talked about earlier [Chief Luckie] was kind of like the Manpower functional, and I was kind of like the programmer."). As described by Glen Hendricks, other Air Force personnel who were not classified as Computer Programmers wrote at least two other programs. See Tr. at 853-56.

In addition, Blueport devotes exactly two sentences to the assertion that Mr. Davenport's high performance ratings were not based on creating, supporting, and distributing AUMD. See Blueport Brief at 13. Blueport's argument, however, is contradicted by the record. Even though

Major Meaker commented that Mr. Davenport would have received a stellar rating, regardless of his work on AUMD, Major Meaker verified that he cited Mr. Davenport's work on AUMD to help get Mr. Davenport promoted. See Tr. at 801-02 ("[W]hen you add this part to it, you know, it just makes him that much more better of a person, and a person that the Air Force really should want to keep."). Every other testifying supervisor of Mr. Davenport certified their respective performance report comments, and stated that they factored the comments into their overall evaluation of Mr. Davenport. See Tr. at 496-97 (Chief Dant); Tr. at 525-26 (Col. Manning). The mere fact that Mr. Davenport did not actually receive a promotion does not automatically mean that the creation, support, and distribution of AUMD fell outside the scope of his employment. See, e.g., Tr. at 515-17 (stating that Mr. Davenport's promotion was based on a variety of factors). The official recognition that Mr. Davenport received for "design[ing], test[ing], implement[ing]" and "selflessly pass[ing]" the AUMD program is a strong indication that he created the program within the scope of his employment. DX 30 (1999 EPR).

Furthermore, the Roeslin and Quinn cases are factually distinguishable. Roeslin v. Dist. of Columbia, 921 F. Supp. 793 (D.D.C. 1995); Quinn v. City of Detroit, 988 F. Supp. 1044 (E.D.Mich. 1997). In Roeslin, the district court held that a labor economist did not create a computer program within the scope of his employment because: (1) his job description did not mention computer programming; (2) his supervisor was unaware of the plaintiff's programming skills when he was hired; and (3) his supervisor actively discouraged the plaintiff from creating the program. See Roeslin, 921 F. Supp. at 798. Similarly, in Quinn, the district court cited the same facts as in Roeslin, and noted that plaintiff's employer never requested him to develop software, and that the

computer program was "not specific to the Law Department . . . [i]t can be used in any law office, claims office or law department." Quinn, 988 F. Supp. at 1051.

In contrast to the two cases, Mr. Davenport's supervisors were well aware of Mr. Davenport's computer expertise prior to his creation of the AUMD program. Mr. Davenport's early performance reports contain many positive references to his computer programming and support skills:

> - Drawing on his extensive computer background . . . [wrote] some experimental programs for analysts
> . . .
> – Designed a query to produce manpower data by unit, then taught technicians how to customize it
> - Moved current and historical manpower data from a mainframe to a desk-top database format
> . . .
> – Mark successfully rises to this mission challenge with . . . extraordinary computer skills

DX 28 (1997 EPR).

> - Proven performer – possesses superb professional and technical knowledge of manpower database and computer systems – an acknowledged Air Force expert
> - Oversaw effort to change mainframe server from CONUS to overseas for PACAF manpower data system
> - Developed training course for the new manpower data system
> . . .
> - Single-handedly developed and implemented FASCAP initiative providing computer equipment required to support the new manpower data system
> - Tirelessly solves problems and provides invaluable computer support

DX 29 (1998 EPR). Before working as a Manpower Data Manager at Hickam Air Force Base, Mr. Davenport worked as a Manpower Functional at Gunter Air Force Base, helping test and design MDS. See Tr. at 67-70, 322-23. Presumably, Mr. Davenport's supervisors at PACAF were aware of his previous experience with computers and MDS as a Manpower Functional.

Roeslin and Quinn are factually distinguishable for other reasons. For example, unlike the situation in Quinn, the AUMD program is application-specific to the Air Force and to MDS. See Consol. Fact ¶ 10 ("Mr. Davenport designed the AUMD program as an application specific program tailored for use with the Air Force's Manpower database."). Contrary to Roeslin, Mr. Davenport's supervisors were supportive of his efforts to create the AUMD program, and helped Mr. Davenport by offering suggestions and feedback. See Tr. at 346-47; Tr. at 472 (Chief Dant); Tr. at 805-06 (Maj. Meaker).

The Sterpetti and Genzmer cases are much more analogous to the present case than Roeslin and Quinn.[6] Sterpetti v. E-Brands Acquisition, LLC, 2006 WL 1046949 (M.D.Fla. 2006); Genzmer v. Public Health Trust of Miami-Dade County, 219 F. Supp. 2d 1275 (S.D.Fla. 2002). The district courts in each of these cases considered and distinguished Roeslin and Quinn based on some of the same facts discussed above. Sterpetti, 2006 WL 1046949 at *5 n.20; Genzmer, 219 F. Supp. 2d at 1280-81.

Finally, Blueport's "missing witness" argument is completely frivolous. See Blueport Brief at 12, 18. Chief Luckie was a witness who was equally available to both parties; in fact, Blueport had listed Chief Luckie on its Trial Witness List, filed May 5, 2006. See Plaintiff's Trial Witness and Exhibit Lists (listing 33 trial witnesses). Since Chief Luckie was as equally available as any other witness, the missing witness inference cannot apply. See A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1400 n.7 (Fed. Cir. 1986) ("An unfavorable inference may not be drawn from the lack of testimony by one who is equally available to be called by either party."). Counsel for the

[6] These two cases were discussed in detail in the government's Post-Trial Brief. See Gov't Brief at 20-21.

government chose not call Chief Luckie as a witness because his testimony would have been completely duplicative of previous testimony.[7] For example, Mr. Davenport testified that he created the NetWorth program with Chief Luckie, while at work. See Tr. at 88-91, 341-42. Mr. Davenport testified that he distributed a copy of AUMD Beta 0.9 to Chief Luckie so that he could help beta-test the program at work. See Tr. at 103-04, 343-44. Chief Luckie also had access to different Air Force Manpower data than Mr. Davenport, and tested AUMD against that data. See Tr. at 330-31. Mr. Davenport testified that Chief Luckie authored the user manual for AUMD, with editing assistance from Mr. Davenport. See 315-16, 394-95. Finally, the government identified Chief Luckie as a witness so that he could sponsor the AUMD user manual into evidence. See July 6, 2006 Order ¶ 6; DX 32 (User Manual). After the Court allowed the user manual into evidence during Mr. Davenport's cross-examination, it was no longer necessary to call Chief Luckie as a sponsoring witness. See Tr. at 394-95; DX 32 (User Manual). Accordingly, Blueport's "missing witness" argument is meritless.

### C. Mr. Davenport Relied on Government Resources to Create AUMD

Mr. Davenport's reliance on government data, computers, and personnel precludes Blueport's right of action under Section 1498. Blueport attempts to establish that AUMD was created without government resources by citing Chief Dant and Colonel Manning, by purporting to discredit Glen Hendricks, and by arguing that testing, feedback, and suggestions by government employees do not

---

[7] On the day Chief Luckie was scheduled to testify, Blueport exceeded the time limit to conclude its case-in-chief by more than an hour. See July 6, 2006 Order ¶ 4. Given the late hour and the Court's expressed preferences, counsel for the government was especially reluctant to solicit duplicative testimony from a witness. See July 6, 2006 Order ¶ 3 ("The parties are reminded of the Court's preference that they not present duplicative testimony . . . . The Court expects that the parties will observe and self-enforce these time limits at trial.").

constitute the use of government resources. See Blueport Brief at 16-19. Blueport's arguments are unpersuasive.

As noted in the government's initial Brief, Blueport improperly restricts the creation of a computer program to one activity – writing code. See Gov't Brief at 14-15. The development of a computer program includes, *inter alia*, "planning, analysis, design, development, testing, and documentation." Tr. at 775 (Dr. Rudd).

Chief Dant and Colonel Manning both testified that they never witnessed Mr. Davenport programming AUMD while at work, but the narrow scope of their testimony is not determinative of the issue. Chief Dant testified that Mr. Davenport was already using AUMD when he moved into that office:

> During that same time frame he had already developed it or the program was already running when I moved into that office. So I don't know the exact date that he actually developed it and completed it and had it up and running. When I arrived in the resources shop, it was already in use.

Tr. at 470; see also Tr. at 471. So Chief Dant's testimony cannot be afforded much weight with respect to the question of whether Mr. Davenport programmed AUMD while at work. Furthermore, both Chief Dant and Colonel Manning testified that AUMD was supported by Mr. Davenport while at work. See Tr. at 504 (Col. Manning); see also Tr. at 495 (Chief Dant).

The record clearly shows that Mr. Davenport created AUMD with the use of government data. This data was obtained through several direct and indirect methods, including: (1) through Mr. Davenport's access to MDS; (2) through other personnel's access to MDS; and (3) through the use of an unauthorized Database Administrator ID and password. See Gov't Brief at 22-25. Blueport does not address the substance of this issue. Instead, Blueport repeats its "missing witness" argument and attempts to discredit Glen Hendricks. See Blueport Brief at 17-18. Glen Hendricks's

testimony is sound, and, despite Blueport's allegations, he clearly recollected providing a data extract to Jerry Hayes for Mr. Davenport to use with AUMD. See Tr. at 875-76 ("We called it the preprocessor at the time. It was a capability of using the ODBC to go in and extract from a MAJCOM the data and put it into a database that Access could use to display it different ways . . . ."); Tr. at 876-77, 888-90 (discussing AUMD); see also DX 16 (Email) (corroborating Jerry Hayes and Mr. Davenport discussing technical features of AUMD). Glen Hendricks's failure to specifically recall whether an event occurred eight or nine years ago has nothing to do with the substance of his testimony.[8]

## III. The Government Did Not Infringe Blueport's Copyright

### A. The Government's Modification of the AUMD Program is Noninfringing

#### *1. The government held an implied license to use AUMD*

Mr. Davenport's distribution and support of AUMD conveyed an implied license to the government. See Gov't Brief at 26-28. Even though Mr. Davenport's conduct is the key consideration for the existence of an implied license, Blueport does not address the topic. See Herbert, 36 Fed. Cl. at 310; Quinn v. City of Detroit, 23 F. Supp. 2d 741, 749 (E.D.Mich. 1998). Instead, Blueport claims that Mr. Gunter's March 31, 2006 letter revoked any implied license, based on the established expiration date of AUMD and that "no consideration was paid to [Mr.] Davenport." Blueport Brief at 22. Each element of Blueport's assertion is logically flawed. First,

---

[8] Mr. Davenport also incorrectly recalled when certain events occurred. See Tr. at 113-114 (stating that he demonstrated AUMD at Air Force bases in Alaska and Japan in 1999; compare Tr. at 334-335 (admitting that the demonstrations took place in 1998); see also Tr. at 159 (stating that he took created the first non-beta version of AUMD in spring 1999, at the time of the San Antonio conference); compare DX 3 (Email at 64 of 68) (identifying September 15, 1998 as the release date of the first non-beta version of AUMD); Consol. Fact ¶ 17 (identifying the San Antonio conference as taking place in September 1998).

as discussed in the government's Brief, Mr. Davenport testified that "[t]he intent of the automatic expiration wasn't to cut people off so they couldn't use the program." Tr. at 352. Second, Mr. Davenport was compensated for his work on AUMD, in the form of recognition in his performance reports, not to mention his regular salary. See DX 30 (1999 EPR). Mr. Davenport also freely distributed the program in order to obtain feedback, test results, and data. See, e.g., Tr. at 103-04 (distributing a copy to Chief Luckie for testing). Finally, the plain language of the March 31, 2006 letter does not support a revocation of an implied license. Rather than claim that no implied license existed, or that any license was revoked, Mr. Gunter admitted that the government "might have some sort of implied non exclusive right," and stated that it was Blueport's "understanding that the Air Force [was] aware that the software . . . will terminate on May 15, 2000." PX 57 (Letter). This language cannot support Blueport's claim of an explicit revocation. See Blueport Brief at 22. Accordingly, the Court should find that Mr. Davenport conveyed an unrevoked implied license through his conduct.

***2. The government copied and adapted AUMD as an essential step in the utilization of the program – 17 U.S.C. § 117***

The government's brief use of a modified version of AUMD 2.1D is not infringing. Section 117 of Title 17 allows the owner of a copy of a computer program to make non-infringing copies or adaptations of the computer program if the copies or adaptations meet three conditions. The government cannot have infringed Blueport's copyright if it: (1) owned copies of the AUMD program; (2) adapted AUMD as "an essential step in the utilization of" the AUMD program "in conjunction with a machine"; and (3) "used [the adaptation] in no other manner." 17 U.S.C. § 117(a)(1); see also Krause v. Titleserve, Inc., 402 F.3d 119, 122 (2d Cir. 2005).

For the reasons discussed above, and in the government's previous Brief, the government proved each of the three conditions. See Gov't Brief at 28-30. With respect to ownership of a copy, the analysis is similar to an implied license – the parties' conduct is the key. See Tr. at 158-59 (promotion and distribution of AUMD 2.1D); see also Tr. at 352-53 (expired versions remained in the possession of users and could be run by changing the computer's date); Tr. at 358-59 (testifying that he never attempted to limit distribution prior to Blueport's inception). In its Brief, Blueport argues that "AUMD represented a personal license . . . not ownership," but fails to support its factual allegations with citations to the record.[9] Blueport Brief at 25; see generally Johnston v. IVAC Corp., 885 F.2d 1574, 1581 (Fed. Cir. 1989) (stating that attorney argument cannot substitute for evidence).

The evidence also reflects that the government adapted AUMD as an essential step in the utilization of the program, and that it used the adaptation in no other manner. See Tr. at 904-05 (Glen Hendricks); see also Tr. at 457 (Peggy Gast: "we asked the contractor SAIC if they could do a fix so that people could still run the [program]"). Blueport implies that these conditions have not been met because the government allegedly violated "explicit terms" of ownership. See Blueport Brief at 26-27. Again, Blueport fails to support any claim of "explicit terms" of ownership with citations to the record. Furthermore, Blueport's references to the creation of MARS unnecessarily confuse the issue – the only issue is whether the modification of the expiration date in AUMD 2.1D can be considered infringing. As discussed below, MARS is noninfringing because of lack of access

[9] Blueport does cite to Defendant's Exhibit 15, where Mr. Davenport states that he will cease support of AUMD as a reaction to the revocation of his unauthorized access to MDS Central. See DX 15 (Emails). Mr. Davenport's threat to discontinue support, however, has nothing to do with the question of whether the government owned copies of AUMD.

to the copyrighted work, because it is not substantially similar with respect to protected expression, and because of the fair use defense.

**B. The MARS Programs Are Noninfringing**

Blueport apparently concedes that the government never had access to the source code of AUMD. See Blueport Brief at 20-21 ("The screens and data structures are the issue . . . . The Visual Basic code is just the plumbing."). Blueport does not contend that MARS infringes any literal element (i.e., source code) of AUMD. Instead, Blueport argues that MARS generally infringes the "screens, data tables, and data table structures." Blueport Brief at 21. Courts consider screens and data structures to be nonliteral elements of a computer program. See, e.g., General Universal Systems, Inc. v. Lee, 379 F.3d 131, 142 (5th Cir. 2004). Blueport claims that these non-literal elements are literal elements, without support. See Blueport Brief at 29-30, 37 ("[T]he screen displays are not non-literal elements of the code, but instead are the literal elements.").

***1. The MARS program is not substantially similar to the AUMD program***

Blueport, despite bearing the burden of proving infringement, has not met its burden of proving that any of the MARS programs were substantially similar to AUMD 2.1D. Blueport's lengthy citation of at least 14 different cases with respect to this issue is unhelpful, especially since several of the cases are contradictory. See, e.g., Broderbund Software, Inc. v. Unison World, Inc., 648 F. Supp. 1127 (N.D.Cal. 1986); compare with Manufacturers Techs., Inc. v. Cams, Inc., 706 F. Supp. 984 (D.Conn. 1989) (disagreeing with Broderbund); Computer Assoc. Int'l Inc., v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992) (declining to follow); Apple Computer, Inc. v. Microsoft Corp., 799 F. Supp. 1006 (N.D.Cal. 1992) (calling into doubt).

Blueport relies heavily on the CMAX decision, a case that is factually distinguishable from this case. CMAX/Cleveland, Inc. v. UCR, Inc., 804 F. Supp. 337 (M.D.Ga. 1992). In CMAX, the defendants repeatedly accessed the copyrighted source code in order to create a new program, and the defendants conceded the issue of access. Id. at 344-45, 51. The non-literal elements between the two programs were virtually identical, and the elements were not dictated by external factors. Id. at 355.

Since Blueport claims that the screen displays were infringed, the Court must first determine the amount of protection to afford the screen displays of AUMD. With respect to this issue, the Court of Federal Claims held that when a work is largely composed of uncopyrightable elements, the work is protected by a "thin" copyright:

> Plaintiff's work is composed almost entirely of elements that originate in either the USPS drawings or the BIA Pueblo Revival architectural style. The Court thus holds that Plaintiff's work, having some original aspects but taking much from other sources, is covered only by a "thin" copyright.

Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 17-18 (2005) (quoting Feist Publ'ns, Inc. v. Rural Telephone Services Co., 499 U.S. 340, 349 (1991)). Because a "thin" copyright is closely linked with unprotectible ideas, the standard for proving infringement is elevated, and the "thin" copyright "will only be protected from '**nearly verbatim copying** or a showing of **supersubstantial similarity**.'" Id. at 19 (quoting Transwestern Publ'g Co. v. Multimedia Mktg. Assocs., 133 F.3d 773, 776 (10th Cir. 1998) (emphasis added)).[10] The Court of Federal Claims's application of the supersubstantial similarity standard in Trek Leasing parallels the Ninth Circuit's analysis in Apple. See Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir. 1994) ("[C]onsidering

[10] In this way, courts seek to assure that a finding of infringement rests upon copying of expression, and not merely copying of ideas.

. . . the limited number of ways that the basic ideas of the Apple GUI can be expressed differently, we conclude that only 'thin' protection, against virtually identical copying, is appropriate.").

In addition, Blueport bears the burden of identifying specific, original elements that were copied from AUMD into MARS. See Maddog Software, Inc. v. Sklader, 382 F. Supp. 2d 268, 279 (D.N.H. 2005); see generally Trek Leasing, 66 Fed. Cl. at 11. Blueport's failure to identify any copied, protectible elements is nearly identical to the approach that was rejected by the district court in the Maddog case. See Blueport Brief at 21 ("[T]he screens, data tables, and data table structures – the heart and soul of the AUMD programs – were directly copied."); compare Maddog, 382 F. Supp. 2d at 279 ("Maddog simply asserts that the program's 'core of protectable expression' consists of 'the design, selection and arrangement of the screens, directories, macros and other data.'"). The district court held that the plaintiff's failure to identify specific elements was fatal:

> without any evidence or argument from Maddog directed at the abstraction step of the *Altai* test, the court cannot discern what is original about the "design, selection and arrangement" of FastFreight's elements so as to fall within the scope of the program's copyright protection. It follows that the court cannot determine whether Sklader infringed on that protection when he created IMX. Because Maddog bears the burden of demonstrating that Sklader has copied something original to FastFreight in order to succeed on its copyright claim, Maddog's failure to address this point is fatal to its motion for a preliminary injunction insofar as the motion is premised on that claim.

Id.

Blueport alleges that the data tables and data table structures of AUMD are protectible and were copied, but there is no evidence that is true. See Blueport Brief at 21, 28-29, 38-39. First, Blueport did not show that the data tables were protectible. See Feist, 499 U.S. at 344-45 (holding that facts and compilations of raw data were uncopyrightable). To the extent that Blueport claims that the "choice" of data was original, Jim Keohane, the government's expert, testified that the

"choice" of data tables was actually constrained by the functionality of the program, and would be filterable. See Tr. at 1050-53. Second, even if the data was protectible, Jim Keohane demonstrated that the data tables in each program were not objectively similar:

> And my expert opinion goes into showing about how the local tables in the AUMD and the MARS databases differ quite a bit, they're not identical. There's quite a bit of differences. In neither case was it identical tables created on the local database.
>
> Q Identical table names?
>
> A Identical table fields, data. Quite a few differences. And it's one of my exhibits . . . . I used a piece of established software that goes into MDB databases and one of the things it can do is extract all the tables, their names, the rows -- I mean the columns which are the fields or the attributes depending on your terminology, the names of those fields, their attributes, are they text, are they numeric. And that was all displayed and cited in my reference. And there are quite a few differences. They're not the same. It's not the same. Very significant differences.

Tr. at 1054-55; see also DX 44 (Keohane Report at 8-9, Ex. H). Blueport has not met its burden to identify any similarities – much less, supersubstantial similarities – of any protectible expression in data tables or structures.

Blueport claims that the doctrine of merger is inapplicable, because the "screens, interface, and tables could be done in many different ways." Blueport Brief at 41. Blueport's assertion is not supported by the facts. For example, Dr. Orr claimed that the screens in Figures 1 and 2 below were 100% visually similar. Even if this were true,[11] the screens would still be unprotectible because the idea in each of the images below can only be expressed in a limited number of ways, given the requirement for input of User ID, ODBC DSN, and Password. See Gates Rubber Co. v. Bando Chemical Indus., 9 F.3d 823, 838 (10th Cir. 1993) ("The merger doctrine . . . ensure[s] that courts

[11] The figure of 100% is incorrect, given the differences in color, sizing, shadowing, title bars, and spelling.

do not unwittingly grant protection to an idea by granting exclusive rights to the only, or one of only a few, means of expressing that idea.").







**Figure 1:** ADMIN frmGetPasswd.gif and UMDAdmin20a frmPassWord.gif (PX 128)




**Figure 2:** Query frmEmailSelect.gif and UMD21f frmEmailSelect.gif (PX 128)

Similarly, the doctrine of *scenes a faire* denies protection standard, stock, or common visual elements, or elements that were dictated by external factors. Gates Rubber, 9 F.3d at 838. Because both AUMD and MARS were programmed in Microsoft Access, to run on Microsoft Windows, to function similarly, the screens of each program will share unprotectible visual elements. Mr. Keohane filtered these common elements out of his analysis. See DX 44 (Keohane Report at 3-4,

6-7). In conclusion, Blueport failed to prove that the nonliteral elements of MARS are supersubstantially similar to the any protectible, nonliteral elements of AUMD.

***2. The government fairly adapted the AUMD program in the context of SAIC's efforts to reverse engineer the AUMD program – 17 U.S.C. § 107***

The government and SAIC fairly reverse engineered the AUMD program to create the MARS programs. As discussed above, the government and SAIC never had access to the source code of the AUMD program. Every testifying witness who had knowledge of the reverse engineering testified that SAIC's use of the AUMD program was restricted to the minimum amount necessary. Ted Meyers, Peggy Gast, and Glen Hendricks all testified that SAIC reverse engineered the AUMD program. <u>See</u> Tr. at 206, 234-35, 454, 904-05. Blueport concedes "that the Visual Basic code was not directly copied – it was reverse engineered by a comparison of operations." Blueport Brief at 20-21. Accordingly, the Court should find that the government's use of the AUMD program to develop the MARS programs was fair.

**IV. Assuming Infringement, Compensation is Limited to Minimum Statutory Damages**

Blueport argues, without support, that the proper compensation is: (1) the cost to recreate the AUMD program; or (2) a royalty of $100 per user. Both of these arguments are purely speculative. With respect to the first argument, as noted in the Government's Post-Trial Brief, Dr. Rudd's cost to recreate calculations are completely irrelevant to reasonable compensation under Section 1498 and to actual damages under Title 17. <u>See</u> Gov't Brief at 38-43. This approach was rejected in the <u>Quinn</u> decision. In <u>Quinn</u>, the district court held that the plaintiff was not entitled to actual damages because it failed to prove that the defendant proximately caused harm to the plaintiff's ability to market the program. <u>See</u> <u>Quinn</u>, 23 F. Supp. 2d at 750-52. The plaintiff in <u>Quinn</u>, like Blueport, argued that damages should be based on the amount that it would have cost

the defendant to create a comparable computer program. See id. at 750. According to the court, this method had no basis in the Copyright Act, and was completely speculative. See id. at 750-51.

In addition, Dr. Rudd's calculation of the cost to recreate the software is conceptually flawed. Dr. Rudd derived his methods from a book titled Estimating Software Costs. See DX 41 (excerpts). Yet the author of Estimating Software Costs, T. Capers Jones, repeatedly advises that "the results [of these methods] are only approximate and *should not be used for serious business purposes* such as contracts." DX 41 (Capers Jones at 201). Dr. Rudd used three calculations to estimate the cost of recreating the AUMD program, based on Capers Jones: (1) conceptual rules of thumb; (2) lines of code; and (3) function point estimates. See PX 70 (Rudd Report at 6-10). None of these calculations is appropriate for litigation. See PX 70 (Rudd Report at 6) (admitting that conceptual rules of thumb "are uncertain by a factor of +/-50%"); DX 41 (Capers Jones at 190) ("The physical lines of code metric has such wide and random variations . . . that it is not suited for sizing, for estimating or for any other serious purpose."); DX 41 (Capers Jones at 187) ("This very crude function point size approximation method is not recommended for any purpose other than estimating size prior to full requirements definition, when almost nothing is known about a software project and some form of sizing is needed to complete an early estimate.").

Dr. Rudd freely admitted that these calculations are generally used during the planning stage of a software program, rather than after a program is completed:

> Q And when do people typically employ conceptual rules of thumb to estimate software costs?
>
> A This would be right at the beginning of a project. There is not enough known yet about the detailed specifications or requirements to allow you to use a more sophisticated technique, so it would be at the very early planning stages.

Tr. at 776. Dr. Rudd also admitted that he had never used these techniques for these purposes. See Tr. at 743 (stating that this was the first time that he had estimated the value of a program in a copyright case); Tr. at 775 ("Q [B]efore this case have you ever used conceptual rules of thumb methods before? A Not officially. Just, you know – no.").

Dr. Rudd's cost to recreate conclusions were also based on an incorrect calculation of the lines of source code. Dr. Rudd estimated the lines of source code in the AUMD program by counting the lines on each page of the excerpt in the copyright deposit, subtracting comments and blank lines, and extrapolating that number to the entire program. See PX 70 (Rudd Report at 7-8). His method, however, is erroneous because longer lines of code were "word-wrapped" onto multiple lines, due to the font size and margins of the document. This method is contrary to Capers Jones and Roetzheim, who both advise that lines of code counts should be based on a complete logical statement, rather than a physical line of code. See DX 41 (Capers Jones at 190) ("The following rules of thumb are based on logical statements rather than physical lines."); DX 42 (Roetzheim at 2). In addition, the word-wrapping of the copyright deposit often separated single words onto multiple lines:

```
("' &=
WHER=
Me.unbMAJCO=
M & "',"
& "' AND "
ND "
```

PX 90 (Copyright Deposit at 100621-23). There is absolutely no justification for counting each of the above lines as a separate line of code. None of the above constitutes a complete statement. In contrast, Mr. Keohane used an established third-party tool to count the lines of code in the programs.

See DX 44 (Keohane Report at 25-26); see also DX 42 (Roetzheim, December 2000) ("[Y]ou should use a code-counting utility to physically count the lines of code in the existing program modules").

Furthermore, if the cost to recreate was the proper measure of damages, there is evidence in the record of Mr. Davenport's actual costs of creation. Mr. Davenport testified that he "put 600 man-hours and around $3000 into the development of [all versions of] the program." See DX 3 (Email at Page 41 of 68).

With respect to Blueport's second damages argument, there is absolutely no basis for assessing a royalty of $100 per user.[12] Except for Dr. Rudd's unsupported testimony, Blueport did not present any evidence of the cost of a license to use AUMD. Blueport admits that it never sold a single copy or license of the AUMD program. See DX 50 (Response to Req. for Adm. 19); Tr. at 54-55. In addition, Blueport admits that it has never received any income from the AUMD program. See DX 50 (Response to Req. for Adm. 20); Tr. at 54-55. Even if the reasonable royalty approach used in Section 1498(a) applies to Section 1498(b), Blueport has not attempted to show that its $100 per user royalty is based upon the established Georgia-Pacific test for determining a royalty. See Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120

[12] Nor does Dr. Rudd's testimony support a royalty rate of $100 per user in this situation. Dr. Rudd based his calculation on a 100-user license, and testified that the royalty rate for a 1,000-user license would drop by an order of magnitude:

> Presumably, if you bought a license for 1,000 users, then you know, they're still going to make money, so they'd probably sell that for $15 a user or something like that. So as you get larger and larger, you get quantity discounts basically. The more you sell, the cheaper that each copy gets.

Tr. at 762. As of August 1, 2003, there were approximately 2510 users of MARS Query & Report, and 78 users of MARS Get Data. See PX 71 (table of MARS users). Thus, if Dr. Rudd's testimony has any weight, it supports a maximum royalty rate of only $10 per user.

(S.D.N.Y. 1970); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1168 (Fed. Cir. 1991); ITT Corp. v. United States, 17 Cl. Ct. 199, 229-31 (1989). Instead, this situation is directly analogous to Quinn, where the district court rejected plaintiff's implied license theory because of an absence of evidence. See Quinn, 23 F. Supp. 2d at 750-51.

In the absence of actual damages, Blueport's maximum recovery is "minimum statutory damages as set forth in section 504(c)." 28 U.S.C. § 1498(b); 17 U.S.C. § 504(c). Thus, as discussed in the government's Post-Trial Brief, Blueport's recovery is $750. See Gov't Brief at 43-45.

**CONCLUSION**

In view of the foregoing, the government's use of the AUMD programs and the MARS programs did not infringe Blueport's copyright. Blueport is not entitled to any damages.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

s/Scott Bolden
SCOTT BOLDEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

OF COUNSEL:

CHUN-I CHIANG
Air Force Legal Operations Agency
Department of the Air Force

October 20, 2006

Attorneys for the United States