No. 02-1622C
(Judge Lawrence J. Block)

# In the United States Court of Federal Claims

BLUEPORT COMPANY LLC

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**PLAINTIFF'S POST TRIAL BRIEF IN RESPONSE**

KURT M. RYLANDER
*Attorney at Law*
MARK E. BEATTY
*Attorney at Law*

RYLANDER & ASSOCIATES PC
406 West 12th Street
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 397-0473

Attorneys for Plaintiff

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iv

ARGUMENT ..... 1

1. AUMD version 2.1D was presented for comparison by the court. ..... 1

2. The Government Bears the Burden of Proof on the § 1498 Defenses. ..... 1

A. Davenport was not in a position to order, influence, or induce the use in issue. ..... 8

B. Programming was in no way part of Davenport's official functions ..... 12

C. No government time, materials, or facilities were used. ..... 16

3. The Government infringed AUMD ..... 19

A. Any implied license was revoked ..... 19

B. Section 117 defense does not apply to the Air Force actions ..... 19

C. Defendant directly infringed AUMD at least until May 2001. ..... 21

D. MARS screens and interface are more than substantially similar. ..... 21

E. Fair Use does not save Defendant's conduct ..... 23

4. Plaintiff is entitled to its entire reasonable compensation ..... 24

CONCLUSION ..... 25

CERTIFICATE OF SERVICE ..... 26

# TABLE OF AUTHORITIES

Page

United States Supreme Court Cases

Fiest Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 111 S. Ct. 1282, 113 L.Ed.2d 358 (1991) ........ 23

Federal Cases & Decisions

Breton v. Evans, No. 04-1239, Slip Op. (D.D.C. 2006)........ 17
Bateman v. Mnemonics, Inc., 79 F.3d 1532 (11th Cir. 1996) ........ 23
Creations Unlimited, Inc. v. McCain, 112 F.3d 814 (5th Cir. 1997) ........ 3, 4
Genzmer v. Public Health Trust of Miami-Dade County, 219 F.Supp.2d 1275 (S.D.Fla. 2002) ........ 15, 16
Hughes Aircraft Co. v. U.S., 534 F.2d 889, 897-98 (Ct. Cl. 1976) ........ 7
King v. Ames, 179 F.3d 370 (5th Cir. 1999) ........ 3
Krause v. Titleserv, Inc., 402 F.3d 119 (2d Cir. 2005) ........ 19, 20
Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 34 USPQ2d (BNA) 1014 (1st Cir. 1995), judgment a'ffd by equally divided court, 516 U.S. 233, 133 L.Ed.2d 610 (1996) ........ 22
Lulirama Ltd., Inc. v. Axcess Broadcast Svcs., Inc., 128 F.3d 872 (5th Cir. 1997) ........ 19
Maddog Software, Inc. v. Sklader, 382 F.Supp.2d 268 (D.N.H. 2005) ........ 22
Matter of Government Acquisition of License to Employee's Invention, B-199,026, 60 Comp. Gen. 248, 1981 WL 22453 (Comp. Gen. Feb. 11, 1981) ........ 11
Novak v. National Broadcasting Co., Inc., 716 F.Supp. 745 (S.D.N.Y. 1989) ........ 4
Palmer v. U.S., 168 F.3d 1310 (Fed. Cir. 1999) ........ 5
Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992) ........ 23
Sony Comp. Entertainment, Inc. v. Connectix Corp., 203 F.3d 596 (9th Cir. 1998) ........ 23
Spruill v. Merit Sys. Protection Bd., 978 F.2d 679, 686-88 (Fed.Cir.1992) ........ 5
Sterpetti v. E-Brands Acquisition, LLC, 2006 WL 1046949 (M.D.Fla. 2006) ........ 14
Strategical Demolition Torpedo Co. v. U.S., 96 F.Supp 316 (Ct. Cl. 1951), (Torpedo 1) ........ 6, 9
Strategical Demolition Torpedo Co. v. U.S. 110 F.Supp. 264 (Ct. Cl. 1953) (Torpedo 2) ........ 6, 9

Statutes, Regulations, and Rules

Administrative Procedure Act ........ 17
17 U.S.C. § 101 ........ 4
17 U.S.C. § 107 ........ 23
17 U.S.C. § 117 ........ 19, 20
28 U.S.C. § 1498 ........ 4, 5, 6, 7, 8, 9
28 U.S.C. § 1498(a) ........ 6, 18
28 U.S.C. § 1498(b) ........ 4, 17, 18, 24
28 U.S.C. § 1498(c) ........ 24
37 CFR § 501.6(a)(3) ........ 17
U.S. Copyright Office, CIRCULAR 61 COPYRIGHT REGISTRATION FOR COMPUTER PROGRAMS (2006 Revision) ........ 1, 2

Secondary Authority and Legislative History

RESTATEMENT (SECOND) OF AGENCY ........ 14
*Hearing before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary*, U.S. Senate, 86th Congress 2d Session, on HR4059, (June 2, 1960), at p. 4-5. (Colloquy between Robert D. Wright, Chief Counsel of the Subcommittee, Robert J. Dodds, General Counsel of the Department of Commerce; Kenneth McClure, Assistant General Counsel of the Department of Commerce; and Senator Hart) ........ 19
*Hearing before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary*, U.S. Senate, 86th Congress 2d Session, on HR4059, (June 2, 1960) (George D. Cary, General Counsel, Copyright Office, Library of Congress) ........ 25

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| BLUEPORT COMPANY LLC,<br><br>Plaintiff,<br>-v-<br><br>THE UNITED STATES,<br><br>Defendant. | Case No. 02-1622C<br><br>Judge Lawrence J. Block |

COMES NOW Plaintiff and submits this, its Post Trial Brief in Response, in accordance with the Court's Order dated August 10, 2006.

ARGUMENT

1. AUMD version 2.1D was presented for comparison by the court.

Defendant is correct that the Court must focus on AUMD version 2.1D in this matter. Defendant is incorrect in asserting that the Court did not have 2.1D before it. Defendant continues to attempt to separate the source code of version 2.1D from the screens and interface of version 2.1D to assert that the interface is somehow not protected by the copyright registration. First, as a matter of law, it is the computer program that is protected by registering the source code, not simply the Visual Basic (VB) code. The VB code was submitted to the Copyright Office to comply with formalities, but the registration documents are not the limit of protection. See U.S. Copyright Office, CIRCULAR 61 COPYRIGHT REGISTRATION FOR COMPUTER PROGRAMS (2006 Revision):

> "The Copyright Office has consistently believed that a single registration is sufficient to protect the copyright in a computer program and related screen displays, including videogames, without a separate registration for the screen displays or a specific reference to them on the application for the computer program. An application may give a general description in the "nature of authorship" space, such as "entire work" or "computer program." This description will cover any copyrightable

> authorship contained in the computer program and screen displays, regardless of whether identifying material for the screen is deposited."

CIRCULAR 61 at p.3.

Second, as a matter of fact, the evidence demonstrates (and Defendant admits) that work on the derivative MARS programs, in which the screens and interface were copied wholesale, began well before the creation of AUMD version 2.1F. *Pl. Exh. 32 (MARS Weekly Status Report dated 15-22 April, 2000); Pl. Exh. 34 (MARS Draft Program Management Plan dated April 20, 1999); Pl. Exh. 76 (contracts); Pl. Exh. 111 (Statements of Work)*. Therefore, any attempt by Defendant to claim that they copied 2.1F and not 2.1D is simply incorrect.

Plaintiff also provided the Court with the screens and interface of 2.1D to compare to the MARS screens and interface – and they were virtually identical. *Pl. Exh. 131 & 132; Tr. at 1038-42 (testimony of Keohane)*. Plaintiff presented unrebutted evidence that the screen displays generated by the version 2.1F compiled ".mdb" files were identical to the screen displays generated by the version 2.1D program (i.e. the registered version). *See Def. Br. at p.3, quoting Tr. at 346*: "Each version evolved until we got to 2.1.D. 2.1.D was where the program stopped evolving." It is further corroborated by the fact that SAIC was directed to copy the screens *in toto* in creating MARS. *Pl. Exh. 6, 15, 16, 18, 19, 32, 34, 35, 36, etc., etc.* The mere fact that the screens were generated by running a compiled electronic file which incorporates version 2.1D plus additional VB code of version 2.1F does not negate the fact that they are the screens of version 2.1D, which is the registered version. Defendant has not actually claimed that the screens presented are different – because Defendant knows they are the same. This has not been rebutted in any way. The mere fact that the

registered work is contained electronically in a different computer file does not negate the fact that the Court does possess the work to be compared, and is able to do the comparison – quite easily. While the VB code between 2.1D and 2.1F did change somewhat, the VB code is admittedly not substantially similar and not relevant to comparison of the screen interfaces.

Cases cited by Defendant are not contrary. Creations Unlimited, Inc. v. McCain, 112 F.3d 814 (5th Cir. 1997), cited by Defendant, is easily distinguished. There the court compared the allegedly infringing designs on defendants' tee shirts to plaintiffs' copyrighted line drawings and concluded that no fact finder could find them substantially similar. Creations, 112 F.3d at 816. On appeal, the Fifth Circuit agreed, and found no jurisdiction on plaintiffs' claim that defendant infringed their tee shirt designs because plaintiffs' tee shirts were not separately registered *and were not similar to the registered works*. Creations, 112 F.3d at 816. That is not the case here, where infringing screens are nearly identical.

In King v. Ames, 179 F.3d 370 (5th Cir. 1999), cited by Defendant, it is not clear what the evidence was at trial. It appears that the plaintiff did not submit *any* recordings for comparison but merely presented testimony that the accused recordings were the same as the registered recordings. Id. at 376. This is not the case here. Blueport submitted the screens and the compiled code – i.e. the ".mdb file" - which contains the 2.1D program within it. Because the .mdb files and screens are not required to be deposited with the Copyright Office, it is permissible to use any source to produce the original works. The issue is not whether the Court must compare 2.1D or 2.1F, but whether the Court has the screens for 2.1D to compare to MARS. The answer is yes.

Novak v. National Broadcasting Co., Inc., 716 F.Supp. 745 (S.D.N.Y. 1989), cited by Defendant, is also clearly distinguishable. Novak brought suit alleging infringement of copyrighted scripts, but at trial produced only audiovisual works based on the scripts, so it was not possible to do a verbatim comparison of the scripts themselves. Additionally, performances are considered separate class of works from an underlying script under the Copyright Act. 17 U.S.C. § 101. Screen interfaces, by contrast, are protected under the same registration as the code deposited. The evidence here is that creating identical screens and interfaces in the same programming environment creates identical – or nearly identical – source code, thereby infringing the copyrighted code. *Tr. at 512-20*. Computer program audiovisual products may be separately copyrighted, but this is not required, to be protected as the product of the underlying code. For example, if the displays were not separately protected, and somebody made a cartoon or movie based on the screens, then they could not prove infringement based on registration of code. Likewise, if someone copied audiovisual displays by creating code in a wholly different programming language environment then this likely would not infringe the underlying code, because the code would not be recreated. Therefore, cases such as Novak and Creations Unlimited are inapposite here – they were cases where the plaintiffs attempted to prove infringement by submitting a wholly different class of work which did not contain the underlying literary work. Here, the compiled software *does* contain the underlying literary work – the screens and the code generating the screens, as well as the VB code.

2. The Government Bears the Burden of Proof on the § 1498 Defenses.

The question whether the defenses listed in § 1498(b) are jurisdictional is

ultimately a burden of proof question. Blueport established *prima facie* jurisdiction by pleading facts establishing jurisdiction and presenting evidence at trial supporting Plaintiff's position relating to each listed defense, thereby shifting the burden to the Government to overcome the presumption of jurisdiction by proving their affirmative defenses. Either way the "preponderance" standard makes the point moot because the court must weigh factual evidence as a whole.

Defendant cites Palmer v. U.S., 168 F.3d 1310 (Fed. Cir. 1999) for support that the affirmative defenses in § 1498 are jurisdictional, but a thorough reading of the case shows that if a *prima facie* jurisdictionally valid pleading is presented, supported by evidence, the burden shifts to the government to prove the affirmative defenses (whether or not they are treated as jurisdictional in nature). Id at 1312-13. The court upheld jurisdiction based on the fact the plaintiff had pleaded facts establishing jurisdiction, and presented evidence to support this *prima facie* case, which shifted the burden to the government, and the court properly approached this as addressing the claims on the merits. "Under the circumstances, the trial court's decision to treat the case on its merits rather than as a 12(b) motions case was eminently sound." Id at 1313 (citing Spruill v. Merit Sys. Protection Bd., 978 F.2d 679, 686-88 (Fed.Cir.1992) (noting that well-pleaded allegations in the complaint are sufficient to overcome a challenge to subject matter jurisdiction)).

The present case is another instance where the Government attempts to cloak arguments over the merits of the claims in a cloud of jurisdictional arguments. As in the Palmer case, this Court should reject such attempts and address the merits of the case, including the Government's assertion of affirmative defenses.

Strategical Demolition Torpedo Co. v. U.S. 110 F.Supp. 264 (Ct. Cl. 1953) (Torpedo 2), also cited by Defendant, supports Plaintiff's argument that this Court should address the affirmative defenses as a decision on the merits. The court there analyzed the legislative history of the 1952 amendments to § 1498(a), relating to patents but containing very similar language, which history demonstrated clearly and unequivocally that the burden lay with the Government to prove the exceptions after a plaintiff has made a *prima facie* showing.

> "Plaintiff's counsel have supplied us with a copy of the transcript of the hearings before the Subcommittee of the Committee on the Judiciary, of the House of Representatives, which considered H.R. 3975 and amended it into the form in which it was passed. After the suggested amendments, which were, in substance, embodied in the amended bill, had been discussed, Mr. Bryson, the Chairman of the Subcommittee, said: 'In other words, inherently, if this bill had been law as amended by your suggestion at the time of the hearing of the case in which Mr. Davies seems to have been interested, there still could not have been a recovery?'
>
> Mr. Davies was one of the plaintiff's counsel in the earlier case in this court. [The earlier case was Strategical Demolition Torpedo Co. v. U.S., 96 F.Supp 316 (Ct. Cl. 1951), hereinafter Torpedo 1.]
>
> Mr. Rose, the witness to whom the question was addressed, responded:
>
> 'There could have been a recovery in his case ***unless the Government could have shown*** that the invention related to the duties of the Government employee co-patentee or unless he was in a position at or about the time the invention was used to influence its use.'"

Torpedo 2, 110 F.Supp. at 267 (emphasis added). What is clear from this excerpt of legislative history is that the defenses listed in § 1498 are treated in the manner of affirmative defenses – whether they are jurisdictional or legal in nature is not particularly critical, but the burden shifting is. Torpedo 1 is in accord. In that case the court found that the pleadings themselves did not allege facts sufficient to overcome the defenses –

whatever their nature might be.

> "[T]he plaintiff's petition shows on its face that the plaintiff cannot maintain its action, because the petition, in its paragraph 6 says:... except that a portion of the said invention or discovery attributable to John H. Thomas who at the time of the said invention or discovery was an employee of the Government of the United States..."

Torpedo 1, 96 F.Supp at 316. Thus, the court dismissed the case based on a facially invalid pleading. The court did not concern itself whether the defenses were jurisdictional in nature. "[It] would be an interesting philosophical question. In any event, he could not sue... Our problem is that of applying the statute to the case." Id at 316. *Accord* Hughes Aircraft Co. v. U.S., 534 F.2d 889, 897-98 (Ct. Cl. 1976), finding that properly pleaded allegations of government action or authorization is required to establish prima facie jurisdiction (cited by Defendant).

This Court has the same "problem" to address here. So long as the Plaintiff has plead a facially valid complaint properly alleging jurisdiction, then the burden is on the Government to factually prove any affirmative defenses by a preponderance of the evidence. Plaintiff presented substantial credible evidence in the form of testimony and documentation that the AUMD software was created by Davenport through his own initiative, time, and resources. The evidence (the testimony of high ranking Air Force personnel and official Air Force documents) established that programming was a type of work neither expected from Davenport, nor encouraged by the Air Force for Davenport or others in his community. The evidence showed that no government time, materials, or resources were used to create AUMD. The evidence showed that Davenport was never in a position to order, influence, or induce adoption of AUMD by the Air Force, that he did not do so in fact, and that it was Davenport's superiors who ordered, influenced, and induced use of AUMD due to its perceived superiority over other Air

Force systems. Defendant did not produce any evidence which actually contradicted the testimony of these witnesses, and Defendant did not produce any witnesses who could contradict CMS Dant and Mr. Davenport's interpretations of the Air Force Manuals that programming was not an official function of a Manpower Specialist. Whether the § 1498 defenses are jurisdictional or not, and whomever has the burden of proof, Plaintiff established through evidence that the defenses do not apply so the Court must reach the merits of the infringement compensation claims.

A. Davenport was not in a position to order, influence, or induce the use in issue.

Davenport was at all times a low level enlisted person without significant influence in the Air Force. Defendant points out that Davenport supplied copies of AUMD to individuals. *Def. Br. at 11*. However, in each case it was at the request of the recipient. *See Tr. at 495 (Dant); 508 (Manning); 877 (Hendricks)*. Defendant notes that Davenport placed the software on his PACAF website, but this is not evidence of influence or inducement. *Def. Br. at 11*. Davenport placed the software on his personal section of the PACAF website so that inquiries about the software would not interfere with his official functions. The download site was not actually visible to any visitor, but was provided on a separate page requiring the user to type in the URL – i.e. it could not be navigated to through "point-and-click" actions. *Tr. at 158*. People requested information from Davenport, and he provided it, but upon request. If people were not interested, if they did not feel the program was useful, then they did not go looking for it. However, most everyone who used it found it to be superior and so they sought it out. The statute does not require that Plaintiff was obstructive, or played hide the ball, in

order to pursue a claim – only that he not be in a position to order, influence, or induce use. Cooperation and compliance are not ordering, influencing, nor inducing.

By Defendant's definition of influence every employee of the Federal Government is in a position of influence simply by virtue of being inside the organization.[1] The mere fact that one shows up for work at a government job everyday does not place them in a position to order, induce, or influence adoption of software. AUMD became widespread due to its superior performance and the initiative and direction of Davenport's superiors – not Davenport. *Tr. at 504-7; 794-96; 508-11*. These were high ranking career Air Force officers, with extensive knowledge and experience in the Manpower field as well as the military generally. They have no reason to lie on Blueport's behalf, and their testimony was unrebutted. Even Mr. Hendricks' testimony supports Plaintiff – when asked how he obtained a copy of AUMD Mr. Hendricks indicated he *requested* a copy from Davenport, or at least from somebody who relayed the request to Davenport, because he had heard about it through the grapevine. This is not ordering, influencing, or inducing – it is responding to requests from others. The Air Force leadership requested and directed Davenport to distribute AUMD, and now they seek to punish him by claiming it was Davenport's fault. This sort of behavior is what prompted Congress to amend § 1498 from the previous version which precluded any recovery by a government employee regardless of their position and duties. This Court should implement Congressional intent embodied in the affirmative defenses of § 1498 by acknowledging there are limits to what the Government may expropriate without compensation.

---

[1] In fact, Defendant's definition virtually eliminates the 1952 amendments discussed in Torpedo I and Torpedo II.

The presentations given by Davenport do not amount to influence or inducement, because in each case they were requested by the recipients based on prior knowledge or acquisition of AUMD. *Def. Br. at 11*. All of these presentations were add-ons to other scheduled training or presentations. All were made at the request of others who already had knowledge of the programs. *Tr. at 159-62; 336-37; 510-11*. The San Antonio "conference of colonels" is an example. The testimony was that Davenport was directed to attend this conference, that he in no way instigated his presentation, and more importantly that he would not have been present except for the request and urging of others. *Tr. at 112; Exh. 110E & F*. Thus, not only did he not actively seek the presentation, but he was not in a position to attend the conference – it was by invitation only. Defendant asserts "His demonstrations were persuasive." *Def. Br. at 11*. However, the testimony was that Mr. Davenport was shunted aside and the presentation was taken over by one of the Air Force Colonels attending the meeting – who had seen and used the AUMD program previously and was impressed by its superior operability and interface, but not so impressed by Davenport himself, apparently. Similarly, the presentations at various airbases demonstrates that he was not in a position to influence. His presence at these airbases was not related to his creation of AUMD, was directed by superiors, and his presentations were done by personal request. Nothing in the record indicates Davenport was in a position to demand an opportunity to perform this training. The audiences merely took advantage of the fact that he was there.

Defendant quotes an exchange with Col. Manning at page 12 of their Brief. What is clear from that exchange is that Davenport responded to requests, he did not act as a

promoter or cheerleader. "... as people were interested he would provide it to them, and he would maintain the currency of the tool for them..." *Tr. at 504*. Davenport was providing a service at the request of others – not from the position of a person pushing this tool out to the Air Force.

Defendant at p.13 quotes Mr. Hendricks' testimony for the proposition that AUMD was demonstrated by Davenport to the MUG. However, Mr. Hendricks testified as to his assumption – he had no direct knowledge. *Tr. at 876-78.*

Here, Defendant completely dances around a salient and determinative point. Plaintiff alleges infringement from May 15, 2000 and after by the Government through hacking and copying AUMD, and then through creation of MARS. This is the unauthorized use at issue. Davenport did not encourage, and tried to stop, Defendant from using AUMD both directly and in the creation of MARS, after May 15, 2000, but he was absolutely powerless to do so. He had no authority, influence, or ability to induce whatsoever with respect to the decision to hire SAIC to create MARS—he was totally against this and no one cared. Defendant produced no evidence whatsoever, as none exists, that for the use at issue Davenport was in a position to order, influence, or induce use. Instructive on this point is the Comptroller's Decision in Matter of Government Acquisition of License to Employee's Invention, B-199,026, 60 Comp. Gen. 248, 1981 WL 22453 (Comp. Gen. Feb. 11, 1981). In response to an inquiry about the propriety of a licensing agreement between an Air Force employee (Mr. Jeffers) and the Air Force, the Comptroller General stated that a licensing agreement would not be proper if the employee was in a position to order, influence or induce use of an invention, but that if the "employee can be insulated from decision to use patented

device…the Air Force may enter into the licensing agreement." Id. at 248. The Comptroller General explained:

> "The purpose of Section 1498 is to prevent an employee who is in a position to order, influence or induce the government to use his invention and thus infringe his patent from successfully suing the government for patent infringement. *** The issue as we see it is whether the inventor can be insulated form the decision making process. We have no objection to his assisting in the testing and use of the invention if he is in no way in a position to determine whether, or how many, items involving his patent are procured."

Id. at 251. To say that Mr. Davenport was insulated after May 15, 2000, a point after which the Air Force was threatening his court martial, is an understatement.

B. Programming was in no way part of Davenport's official functions

Programming is not simply a specific task, but a completely different category and level of work than what Davenport's duties included. Defendant continues to focus on the fact that Davenport used computers in his job function, that he entered and maintained data as part of his job, and therefore writing computer programs is part of his official functions ("computer proficiency"). However, virtually every job in government requires that the person be proficient with computers at an operator level, by running standard programs, inputting records in a prescribed format, searching for records in a prescribed manner, using word processors, etc. Computer programming is a wholly different category of job function apart from operating a computer. A General's personal driver operates automobiles as part of his job. The driver is not therefore expected to design a new automobile transmission simply because he operates a car. Federal judges and judicial clerks operate computers and computer programs frequently – often relatively sophisticated data management programs requiring generating complex queries. But that does not imply that the judge expects the law clerk to write a

computer program that is superior to the existing data management programs. The implication is ludicrous. Defendant's contention also does not hold water. The mere fact that someone operates a computer program does not imply that creating computer programs out of whole cloth is within their official functions – if so then computer programmers would not be as valuable as they seem to be in this world.

Defendant at p.16 of their brief cites Davenport's creation of Net Worth as somehow demonstrating that programming was part of his official duties. It does not. What this testimony does do is demonstrate Mr. Davenport's integrity and credibility as a military member and a witness. Davenport testified that he created Net Worth at the suggestion or request of CMS Luckie. *Tr. at 91*. He testified that he worked on that program while at work. And he testified that he donated this program – because he worked on it at work, on government time, using government facilities, at the request of a government employee. Net Worth was also a successful and useful program, widely used throughout the Air Force, and therefore presumably valuable. However, when Davenport felt he had no rights to the program he was willing to accept that and honest enough to not assert ownership. Therefore, when he testifies now that he did not use government time, materials, or facilities to create AUMD the Court can confidently credit those statements – Davenport has demonstrated his integrity.

Defendant also refers to what they characterize as object oriented database programming training. *Def. Br. at 16*. Davenport testified that the functionals were trained on this to kill time while waiting on the project to catch up. They sat in a room, without computers, and threw a ball back and forth to each other. The training was to understand – conceptually – what was happening when they operated the MDS

computer program. It was operator level training for operators – not training in computer programming. The analogy to driving is again apt here – a driver's education class does not turn a driver into a mechanical engineer designing new transmissions. It doesn't even turn the driver into a mechanic for that matter.

Defendant argues that programming was "incidental" to his duties. *Def. Br. at 19*. The Court should ignore theoretical arguments that the scope of official duties was "potentially much greater than the official written description." *Def. Br. at 17, FN4*. The people who were in the position to know what Davenport's duties were – whether by interpreting the Air Force documents or based on day-to-day expectations of his superiors – all testified that programming was not part of his duties. These were senior Air Force personnel, with vast experience in the Air Force generally and the Manpower field in particular, and they all testified that programming was not part of his duties. Whatever praise Davenport may have received for exceeding his duties is irrelevant – he was not promoted, he received no pay raise or bonuses, for this work. Admiration does not change a low level government employee's official functions.

Defendant's reliance on the Restatement (Second) of Agency definition of scope of employment does not assist Defendant. *Def. Br. at 20*. Defendant conveniently ignores the conjunctive "and" in the Restatement definition. Here it was established that programming was not the type of work Davenport was employed to perform AND that all the programming occurred entirely outside the authorized time and space boundaries. Therefore, even the Restatement definition gives Defendant no relief. Cases cited by Defendant don't help them either.

Sterpetti v. E-Brands Acquisition, LLC, 2006 WL 1046949 (M.D.Fla. 2006), cited

by Defendant, is completely inapposite on its facts. Sterpetti was initially hired as a line cook, but was specifically removed from those duties and specifically tasked by the restaurant owners to produce a training manual on pasta production and preparation. Id at 1-2. "Although he originally worked in the preparation area or on 'the line,' Tarantello and Chef Robin asked him to 'head up' the pasta program, and more specifically, Sterpetti was asked to create a manual for use at Timpano's restaurants." Id at 5. Sterpetti was given a promotion as part of his tasking on the "fresh pasta program." Id at 1. The recipes in the manual were from the restaurant chefs, not Sterpetti, and the photographs in the book were taken by restaurant employees, not Sterpetti. Id at 2. Each version of the Manual at issue was edited heavily by, and approved by, the employers. Id at 5. And, although some of the work on the Manuals was performed off-site, a significant portion was done on-site. Id at 6-7. The differences in the facts here are stark. All of the evidence demonstrated that Davenport was never, at any time, by any person, "directed" to produce AUMD. Davenport's duties were never changed. Davenport was not promoted. Davenport was not trained to program computers, whereas Sterpetti was hired as a chef in training.

Genzmer v. Public Health Trust of Miami-Dade County, 219 F.Supp.2d 1275 (S.D.Fla. 2002), also cited by Defendant, is equally striking in its factual differences. Genzmer's duties as a doctor and full time fellow in the Pulmonary and Critical Care Department of Jackson Memorial Hospital included:

> "...instructing house staff on pulmonary and critical care medicine, taking care of patients, taking progress notes, ordering treatments, and *conducting research projects related to the field of pulmonary and critical care medicine*. Additionally, the [employment] manual stated, 'The fellows will acquire skills required to organize, administer, and direct a critical care unit, and to work effectively as a member of a multidisciplinary team... The

> employment manual states that the responsibilities of the research fellows 'is *original pulmonary research* under the supervision of an attending or full-time Ph.D."

Id at 1276-77 (emphasis added). "The Division Chief has confirmed that fellows have been ***required*** to program computers as part of their duties." Id at 1277 (emphasis added). Genzmer was directed to produce the computer programs as part of his research fellowship. Id at 1277. Genzmer's advisor determined what the output and report formats should look like. Id at 1277. Genzmer had received negative evaluations which became positive specifically due to his work on the computer programs. Id at 1277. Davenport received excellent evaluations, but would have received the same marks ***even without the AUMD programs***. *Tr. at 801*. The court in Genzmer relied heavily on the fact that Genzmer was hired as a researcher. Id at 1281. A research fellow in a Ph.D. program, already possessing a medical degree, specifically required to program computers and conduct original research in a highly technical field, only serves to demonstrate how far Davenport was working from his expected areas of work.

C. No government time, materials, or facilities were used.

Defendant makes much of the fact that CMS Luckie created a User Manual for AUMD, but the AUMD User's Manual developed by CMS Luckie is not at issue in this case. Plaintiff is not seeking compensation based on infringement by creating the User's Manual. In fact, it is unlikely that Plaintiff could even establish the User's Manual as infringing under any circumstances, and therefore Plaintiff could not have prevented the development and publication of the Users' Manual. Defendant has implied that by allowing the creation of the User's Manual Davenport somehow induced use of the programs – but Davenport could not have legally prevented the creation of the User's Manual because it did not illegally copy the program. Use of screen

representations was minimal to explain how to operate the program and so would likely be considered a Fair Use exception. Since Davenport could not have prevented the creation and distribution of the manual, such creation and distribution cannot act as proof of inducing or influencing use of the AUMD software. Furthermore, Blueport admits that use prior to May 15, 2000 was permissive and is not in issue. Moreover, the fact of permission does not equate to influence and inducement. Davenport's acquiescence in the creation of the AUMD Software Users' Manual is simply part of the permissive license by which the Air Force used AUMD prior to May 15, 2000.

Breton v. Evans, No. 04-1239, Slip Op. (D.D.C. 2006), cited by Defendant (*see Def. Br. at 25*), although not directly on point as it was decided under 37 CFR § 501.6(a)(3) and the Administrative Procedure Act, is instructive in this case. There the court noted: "When an inventor is not employed to perform research-related tasks, as described by § 501.6(a)(3), employee ownership is presumed." Id at 1. Breton was a mechanical engineer with extensive technical training in the field in which he worked – not a high school graduate working in an administrative position. Id at 1-2. Davenport did not use any government resources to create the software – he did it on his own. All of the protectable expression in the AUMD programs belongs to Davenport. The Air Force was free to use ideas and concepts embodied in the software – but the creative expression was Davenport's alone. Any testing which may have occurred on Air Force computers is the same as any software would have to go through – but does not negate infringement in this case just as it would not negate infringement in any other case.

Defendant discusses the legislative history of § 1498(b). However, the legislative history clearly shows that the defenses of § 1498(b) were intended to parallel those of §

1498(a), relating to patents, and apply only against employees who were in "research positions". The hearings of the Patents, Trademarks, and Copyrights Subcommittee of the Senate Judiciary Committee are revealing. In a colloquy between Robert D. Wright, Chief Counsel of the Subcommittee, Robert J. Dodds, General Counsel of the Department of Commerce; Kenneth McClure, Assistant General Counsel of the Department of Commerce, and Senator Hart, regarding the similarities and differences between 1498(a) & (b) defenses, the thrust was that the drafters intended the researcher orientation of 1498(a) to apply to 1498(b) as well:

> "Mr. McClure: Well, what I was thinking about is this sentence of section 1498 that says this section shall not confer a right of action on any patentee or any assignee, and so forth, with respect to any invention discovered or invented by the person while in the employment or service of the United States, where the invention was related to the official functions of the employee in cases where such functions included research and development, or in the making of which Government time, materials or facilities were used. It seems to me that is a rather close parallel.
>
> Mr. Wright: Well, you feel that this definition is substantially the same as the patent one? I had thought that there was a deliberate choice of somewhat different words to define the copyrights.
>
> Mr. McClure: I think the purpose was identical.
>
> Mr. Wright: There was no intention to establish a somewhat different standard with respect to –
>
> Mr. McClure: No, sir.
>
> Mr. Wright: To employee ownership of copyright material?
>
> Mr. McClure: This is my understanding, Mr. Wright.
>
> Mr. Wright: Because you will note section 1498 does refer to the nature of the duties of producing that kind of material.
>
> Mr. McClure: As will be involved in research and development.
>
> Mr. Wright: And I gather you did not feel, or whoever prepared the bill

did not feel, there was any need to parallel that language with respect to copyrighted work.

Mr. McClure: That is my understanding, Mr. Wright.

*Hearing before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary*, U.S. Senate, 86th Congress 2d Session, on HR4059, (June 2, 1960), at p. 4-5.

3. The Government infringed AUMD

A. Any implied license was revoked

Defendant asserts that they had an implied license to possess and use AUMD. *See Def. Br. at 26*. However, an implied license is fully revocable unless supported by consideration – which is completely lacking in this case. Lulirama Ltd., Inc. v. Axcess Broadcast Svcs., Inc,, 128 F.3d 872, 884 (5th Cir. 1997). Any implied license was revoked, not simply by the expiration date of the AUMD software (as Defendant asserts), but also explicitly by the letter from Blueport LLC to the Air Force. *Pl. Exh. 57*. Defendant presented no evidence of consideration in exchange for license to use AUMD.

B. Section 117 defense does not apply to the Air Force actions

Section 117 does not save Defendant because: (1) Defendant did not own its copies of AUMD, but merely possessed them pursuant to a revocable license; and (2) they did not adapt AUMD as an essential step. The § 117 defenses were addressed extensively in Plaintiff's initial Post Trial Brief. Defendant asserts that Davenport was "paid a salary as a Manpower Data Manager" which equates to being paid "substantial consideration to develop the programs for its sole benefit." *Def. Br. at 29* (citing Krause v. Titleserv, Inc., 402 F.3d 119, 123 (2d Cir. 2005)). This assertion is unsupportable.

Davenport never received any consideration for AUMD. His enlisted pay was the same whether or not he produced AUMD; he received no promotions; he received no bonuses. Whatever praise he received in his evaluations, his grades were not determined by AUMD because he would have received the highest grades even had he not created AUMD. *Tr. at 801*. Nor was Davenport a programmer, hired to produce computer programs. Titleserve, 402 F.3d at 120.

Nor was AUMD adapted as an essential step in its utilization. Defendant would have the Court create an exception under § 117 which would allow a possessor to extend its possessory rights beyond any agreed license, which is not the purpose of § 117. Section 117 allows an owner to modify a program to maintain compatibility with new equipment or other software, not extend its possessory rights, and certainly not to create a entire new derivative work. Beyond this, since the Air Force was able to modify the expiration date built in to AUMD, then development of MARS cannot be described as "necessary" to continue using AUMD – even if the Air Force "owned" its copies of AUMD. Section 117 permits use in accordance with the original grant of possessory rights, not expansion of those rights.

While the specific intent of the expiration date may have changed over time, at all times it was used by Davenport to control the software versions, as acknowledged by Defendant. *Def. Br. at 26-7*. This does not negate the fact that Davenport maintained personal control over the AUMD software versions and development, support, and dissemination, and was never under obligation to either support or disseminate any software at all – which is incompatible with ownership by the Air Force.

C. Defendant directly infringed AUMD at least until April 2001.

Defendant admits to use of AUMD version 2.1D from May 15-17, 2000, but no further than that. *Def. Br. at 26*. Defendant fails to account for the fact that they used this modified version of AUMD until the distribution of beta copies of the derivative program MARS – which occurred in April-May of 2001. *Tr. at 151-2*. Defendant produced no evidence to account for this magical gap from May 17, 2000 until May of 2001. Defendant's unauthorized and infringing use of the modified AUMD software was continuous from May 15, 2000 until at least April of 2001.

D. MARS screens and interface are more than substantially similar.

Plaintiff has conceded that the Visual Basic (VB) code of the MARS software is not substantially similar to the AUMD VB code. However, the screens and interface are essentially identical, and the screens include protectable creative expression – they are the heart and sole of the programs. Each witness with knowledge of the AUMD programs testified that the interface was the key to its acceptance and popularity. The Air Force already had a program capable of crunching data and producing specific reports in MDS, but it was cumbersome and not user friendly. Davenport's AUMD was "slick" (the testimony of Mr. Hendricks) and so intuitive that even an Air Force colonel could use it. The interface – the screens – was the key, and that is why the Air Force directed SAIC to copy the interface exactly. To the lay observer the interfaces are identical.

Plaintiff's witnesses asserted that the screens were created by Davenport and contained original expression. Defendant asserts that the screens may have contained non-original expression or were not protectable – but provided no evidence to support

their arguments. If the screens were copied from MDS the burden was on the Air Force to show this – they did not because the screens were not copied. Defendant's expert Mr. Keohane opined on this, but admitted that he had never operated nor even observed MDS, nor any reports generated by MDS. His testimony in this regard is therefore meaningless. Defendant produced no evidence.

This case is distinguishable from cases such as Maddog Software, Inc. v. Sklader, 382 F.Supp.2d 268 (D.N.H. 2005) and Lotus Dev. Corp. v. Borland Int'l, Inc, 49 F.3d 807 (1st Cir. 1995). Lotus was discussed in detail in Plaintiff's Post Trial Brief. Maddog, cited in Defendant's Post Trial Brief at pp.43-4, demonstrates what Defendant failed to prove. In Maddog the evidence in the record (Maddog was a decision on motion for preliminary injunction, not a trial on the merits) established that the programmer designed the screens using the forms "Wizard function." Id at 273. Davenport testified that he created the screens and layouts himself, including the report formats. In Maddog the evidence showed that "industry practices" largely dictated the information content and layout of the screens. Id at 279-80. Here, Davenport determined this himself, based on his own preferences. And no one asserts that mathematical formulae are at issue here, as was the case in Maddog. Id at 280-81.

Defendant has not produced a single document or witness who can show that any portion of the AUMD interface, other than specific Air Force terms used to identify major commands, etc., was copied from anywhere. Vague allegations that some parts of a work might have been copied from somewhere are not evidence. Plaintiff produced credible evidence of original creation. Defendant produced no evidence to rebut this, only conjecture. Plaintiff has therefore carried his burden of proof.

Defendant copied the screens in their entirety; Plaintiff's witnesses testified to their originality. The burden lies with Defendant to demonstrate that the screens are utterly devoid of any modicum of originality such that they are unprotectable. *See* Feist Publications, Inc. v. Rural Tel. Services Co., 499 U.S. 340, 359-61 (1991).

E. Fair Use does not save Defendant's conduct

Fair Use is not a defense to blatant copying for commercial purpose. 17 U.S.C. § 107. Defendant's cases related to reverse engineering do not help them. Fair Use is a defense to copying through reverse engineering only where the reverse engineering was done to develop other programs that were compatible with the original work – not to create a derivative work to replace the original by copying substantial portions and reverse engineering *other* portions. Reverse engineering to create a derivative work used to replace the original copyrighted work has never been accepted as Fair Use. In Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1992), the court found Fair Use based on creation of intermediate copies and decompiling game software with intent to produce game cartridges compatible with the game console hardware, not to produce replacement programs. Id at 1520-21. In Sony Comp. Entertainment, Inc. v. Connectix Corp., 203 F.3d 596 (9th Cir. 1998) the court again found that intermediate copying and decompilation of BIOS programs (software embedded on computer chips which allows them to operate and communicate with external devices and programs) to create compatible software and hardware was permissible fair use. Id at 603-5. Bateman v. Mnemonics, Inc., 79 F.3d 1532 (11th Cir. 1996), also cited by Defendant, is also a case of reverse engineering to ensure compatibility of their programs with the plaintiffs' board operating systems and computer

chips – not to develop infringing replacement programs. Defendant points to no cases where direct copying in order to create an infringing replacement program or derivative work – in order to avoid having to purchase or license the same software from a copyright owner – is protected under Fair Use.

4. <u>Plaintiff is entitled to its entire reasonable compensation</u>

Defendant's assertion that damages are limited to the minimum statutory damages of $750 is unsupportable. Congress addressed this very question directly in the legislative history. During Senate hearings on the proposed resolution which was enacted as 28 U.S.C. 1498(b) and (c), George D. Cary, General Counsel, Copyright Office, Library of Congress, addressed the statutory damages language:

> "Mr. Cary: Well, the damage provisions of the copyright law which would apply, incidentally, to this legislation, in certain cases give the judge the right to determine damages, and if it is an innocent infringement, I think it is highly likely that the judge is not going to slap on any maximum damages. He will use minimum damages. This has been done in the past.
>
> As a matter of fact, I recall once a case where there was infringement involved, and the court held they were bound to say that the copyright had been infringed. They gave the minimum amount of damages possible.
>
> Mr. Wright: ***You do not think there is anything about the Court of Claims jurisdiction which would prevent it from applying these same applicable principles that might apply in private actions*?**
>
> Mr. Cary: ***No***. The bill specifically states that the claimant may recover his entire compensation as damages for such infringement, including minimum statutory damages as set forth in section 101(b) of title 17 [later recodified at 17 U.S.C. 504(c)]. So this is the provision of the copyright law about which I was speaking. So this would be applicable.
>
> Mr. Wright: Even in the case of innocent infringement, the Government would not be relieved would it, of liability for the minimum statutory damages, right?
>
> Mr. Cary: Well, it would depend on the facts, I would think. They could get it."

*Hearing before the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary*, U.S. Senate, 86th Congress 2d Session, on HR4059, (June 2, 1960), supra, at pp. 19-20 (emphasis added). The clear import of this exchange is that the statutory language establishes a floor, not a ceiling, just as in "private actions." Establishing the maximum recovery at $750 would render any plaintiff's rights illusory. Where statutory damages are a reasonable measure of compensation, the Court may apply the full range of statutory damages. However, in this case, Plaintiff established that the actual value of the AUMD software was approximately $832,000, arrived at by several different methods.

## CONCLUSION

Based on the record produced, and the law, the Court should rule that Defendant infringed Blueport's protected work and is liable in the amount of $832,000.00.

DATED THIS October 20, 2006,

Respectfully submitted,

RYLANDER & ASSOCIATES PC

/s/ Kurt M. Rylander

KURT M. RYLANDER
Attorney at Law
MARK E. BEATTY
Attorney at Law

406 West 12th Street 206
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 750-9953
E-mail: rylander@pacifier.com
Of Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY under penalty of perjury of the laws of the Federal Court that on the date signed below I served a copy of the document to which this certificate is attached by electronic filing with the US Court of Federal Claims which filing serves this document upon attorneys of record for Defendant, Scott Bolden, U.S. Department of Justice, Civil Division-Commercial Litigation Branch, Washington, D.C. 20530, scott.bolden@usdoj.gov.

DATED THIS October 20, 2006

/s/ Kurt M. Rylander

KURT M. RYLANDER,
(360) 750-9931
Of Attorneys for Plaintiff

RYLANDER & ASSOCIATES PC
406 West 12th Street
Vancouver, Washington 98660
Tel: (360) 750-9931
Fax: (360) 750-9953
E-mail: rylander@pacifier.com