# The United States Court of Federal Claims

**No: 02-1622 C**
**May 7, 2007**

---

**BLUEPORT COMPANY, LLP,**

        *Plaintiff*,

    v.

**THE UNITED STATES,**

        *Defendant*.

**Copyright Infringement; Waiver of Sovereign Immunity; 28 U.S.C. § 1498(b); Affirmative Defense; Jurisdiction; Work Made for Hire Doctrine.**

---

*Kurth M. Rylander* and *Mark E. Beatty*, Rylander & Associates, PC, for the plaintiff.

*Scott D. Bolden*, Commercial Litigation Branch, United States Department of Justice, and *Chun-I Chiang*, Air Force Legal Operations Agency, United States Department of the Air Force, for the defendant.

## OPINION AND ORDER

### Block, *Judge*.

General Matthew B. Ridgway once observed that, "what throws you in combat is rarely the fact that your tactical scheme was wrong . . . but that you failed to think through the hard cold facts of logistics."[1] This is especially true for the United States Air Forces ("USAF"). For example, the few hundred aviators and ground special forces who initially engaged the Taliban and al Qaeda were the "teeth" in the recent Afghanistan campaign. These "teeth," however, would have no bite without a "tail" of thousands of U.S. personnel flying reconnaissance, running ships, transporting supplies, processing intelligence, and moving information. It is this "tail" that allows the USAF to reach halfway around the world, commence almost immediate combat operations in an unexpected, austere

---

[1] Lt. Col. James C. Rainey, USAF Ret., Cindy Young, & Roger D. Golden, *The Dimensions of Logistics*, Air Force J. of Logistics, Fall 2006, at 84, 84, *available at* http://www.aflma.hq.af.mil/lgj/10_Dimensions.pdf.

theater and then succeed on an extremely chaotic battlefield.[2]

Making sure the USAF has the appropriate "teeth" and "tail" personnel is the responsibility of the Air Force Manpower Agency ("AFMA").  AFMA is a field operating agency[3] within the USAF and provides USAF leaders with the tools necessary to identify the essential manpower required for supporting USAF operations.  "Manpower" is the term used to specifically refer to personnel assigned to work in AFMA, who have been trained and assigned to deal exclusively with the technical study of how many spaces or positions are needed to perform specific tasks or functions throughout the USAF.[4]  These "manpower personnel" in AFMA determine personnel requirements, develop programming factors, manage performance management programs, assist with the execution of competitive sourcing initiatives, and conduct special studies.[5]  All this is done with the final goal of making sure the USAF personnel are efficiently assigned and utilized.

Frequently, AFMA relies on computer databases and programs to help conduct its mission. For example, at one point most of the manpower data for the USAF was stored in a database called the Manpower Data System ("MDS").  Like many computer systems, the MDS had certain limitations.  A computer program specifically written to increase the functionality of the MDS is the subject of the instant action. Written by a Technical Sergeant Davenport allegedly on his off-duty hours, the AUMD program allowed AFMA personnel to more easily access local databases storing all types of manpower data, such as the number of particular positions at a local bases and the number of personnel authorized to perform a particular task of work.  The AUMD program also enabled AFMA personnel to print reports containing needed data quicker and also to create customized reports.  The program preformed well and was soon used by AFMA personnel stationed around the world.  To be sure, so impressed was the Air Force with the program, Technical Sergeant Davenport was asked to provide training and answer questions about the program at various bases in the United States and throughout the Pacific.

Over the next year and a half, Davenport continued to revise and update the AUMD program with improving the program's functionality with the input of AFMA colleagues and other USAF

---

[2] Col. John Jogerst, USAF, *What's So Special about Special Operations? Lessons from the War in Afghanistan*, Aerospace Power J., Summer 2002, at 98, 101, *available at* http://www.airpower.maxwell.af.mil/airchronicles/apj/apj02/sum02/sum02.pdf.

[3] Field operating agencies are subdivisions of the USAF that report directly to Headquarters, U.S. Air Force ("HQ USAF").  They are assigned a specialized mission that is restricted in scope when compared to the mission of a major command.  Field operating agencies carry out activities under the operational control of HQ USAF.  United States Air Force, Factsheet: The U.S. Air Force, http://www.af.mil/factsheets/ (follow "The U.S. Air Force" hyperlink) (last visited Feb. 9, 2007).

[4] As Glendon Hendricks, a man who spent almost his entire military and civilian career in the manpower field, explained at trial, manpower determined the number of spaces necessary to perform work and then personnel would "match up faces [people] with the spaces."  Tr. 864.

[5] "United States Air Force, Factsheet: Air Force Manpower Agency, http://www.af.mil/factsheets/ (follow "Air Force Manpower Agency" hyperlink) (last visited Feb. 9, 2007).

personnel.  Occasionally, Davenport would release a new version of the AUMD program, which incorporated all the most recent changes.  In all, Davenport produced ten versions of the AUMD program from May 1998 to January 2000.

Seeing the AUMD's success and wishing to profit from the program, Davenport and his uncle established the Blueport Company, LLP ("Blueport") in February 2000—some twenty months after Davenport had produced the first version of the AUMD.  Davenport then registered for a copyright for version 2.1d of the AUMD program in March 2000 and in the same month assigned all rights in the program to Blueport.  Blueport, in turn, sought a licensing agreement with the USAF for the continued use of the AUMD program.

Desiring to own outright such a program rather than pursuing a licensing agreement, the USAF procured the services of a private contractor to "reverse engineer" the AUMD program, in order to recreate the AUMD's functionality.  As part of the process of recreating the computer program's functionality, the USAF instructed the contractor to "hack"[6] into the AUMD program and disable the program's automatic expiration date—the date when the program would automatically cease operation.  Disabling the automatic expiration date allowed the USAF to continue using the AUMD program, while its contractor sought to write a new program to replace the copyright-protected AUMD.

Jilted by the USAF, Blueport filed a two-count complaint with this Court.  The first count is based on the alleged infringement of Blueport's copyright by the United States.  28 U.S.C. § 1498(b).  Specifically, Blueport maintains that the use by the USAF of the AUMD program after the expiration date constituted the infringement.  Blueport also contends that the new computer program written by the contractor—the so-called MARS program—also constitutes unlawful infringement because this program of the USAF directly copied Blueport's copyrighted AUMD program.  Blueport contends in the complaint's second count that the disabling of the AUMD's automatic expiration date violated the Digital Millennium Copyright Act of 1998 ("DMCA").  17 U.S.C. § 1201 *et seq.*

In an opinion issued on June 29, 2006, the Court granted the government's summary judgment motion on the second count, holding that the United States Court of Federal Claims lacks jurisdiction under the DMCA to hear the claim.  *See Blueport Company*, 71 Fed. Cl. at 768.  The Court then conducted a trial in Portland, Oregon, from July 24 to July 28, 2006, regarding issues related to the copyright infringement count of Blueport's complaint.  As explained fully below, because Blueport fails to make the requisite jurisdictional showing necessary for a copyright infringement claim against the United States, the Court holds for the defendant.  *See* 28 U.S.C. § 1498(b).

---

[6] Hack (*v*): (a) to write computer programs for enjoyment; (b) to gain access to a computer illegally.  Merriam-Webster OnLine Dictionary, http://m-w.com/.  *See also Blueport Co., LLP v. United States*, 71 Fed. Cl. 768, 770 n.4 (2006) (noting the definition of "hack" as "To modify a program, often in an unauthorized manner, by changing the code itself.").

# FACTUAL BACKGROUND[7]

Information on work profiles for each unit in the USAF—how many airmen are required, at what rank and what level of training are necessary—used to be stored in a database known as the MDS, housed at Gunter Air Force Base in Alabama.  CSPFF ¶ 10.  The MDS database was developed in the 1990s and replaced an antiquated system that had relied on magnetic tapes and punch cards to store information.  Tr. 67.  The data in the MDS included skill profiles for each position in the USAF, as well as the training, rank and skill levels of all USAF personnel.  *Id.* Manpower personnel constantly accessed the information stored in the MDS to manage the current and future personnel needs of the USAF.  *Id.*

Mark Davenport enlisted in the USAF in 1981, and after four years of service, began working in the manpower career field.  *Id.* at 63.  Around July of 1991, Davenport was transferred to Gunter, and soon thereafter, in 1992, began working on preparing the transition for manpower personnel to use the MDS system.  *Id.* at 68-69.

During the beta testing[8] of the MDS, Davenport—then a Technical Sergeant—observed that the system did not allow manpower personnel at local USAF bases throughout the Pacific Air Forces ("PACAF")[9] to print reports.  *Id.* at 92.  Instead, manpower personnel at local bases had to send their report requests via e-mail to PACAF headquarters at Hickam Air Force base in Hawaii and wait for other manpower technicians there to respond to the message with a copy of the requested report attached—a process that could take several hours.  *Id.*  Davenport also noticed that the official

---

[7] Facts from this section are drawn from: Consolidated Statement of Proposed Findings of Fact ("CSPFF"); Trial Transcripts ("Tr."); Plaintiff's Trial Exhibits ("Pl.'s Trail Ex."); and Defendant's Trial Exhibits ("Def.'s Trial Ex.").

[8] A beta test is a test of a computer product prior to the program's general or commercial release. Beta testing is the last stage of testing, and normally can involve sending the product to beta test sites outside the program developers for real-world exposure.  *See* Merriam-Webster OnLine Dictionary, http://m-w.com/.

[9] The USAF is organized into major commands ("MAJCOM") each representing a major Air Force subdivision and each having a specific portion of the Air Force mission.  Each MAJCOM is directly subordinate to HQ USAF.  MAJCOMs are interrelated and complementary, providing offensive, defensive, and support elements.  In the United States, MAJCOMs are organized on a functional basis, while overseas MAJCOMs are organized on a geographical basis.  The USAF is currently organized into nine MAJCOMs (seven functional and two geographical) reporting to HQ USAF. United States Air Force, Factsheet: The U.S. Air Force, http://www.af.mil/factsheets/ (follow "The U.S. Air Force" hyperlink) (last visited Feb. 9, 2007).

PACAF is one of two geographical MAJCOMs in the USAF and represents the air component of the U.S. military in the Pacific.  PACAF's area of responsibility extends from the west coast of the United States to the east coast of Africa and from the Arctic to the Antarctic, covering more than one hundred million square miles.  United States Air Force, Factsheet: Pacific Air Forces, http://www.af.mil/factsheets/ (follow "Pacific Air Forces" hyperlink) (last visited Feb. 9, 2007).

manpower report was a very cluttered document, containing significant amounts of superfluous information. *Id.* at 95-96.

Seeking to find a way to alleviate these MDS shortcomings, Davenport began experimenting with writing his own computer program that would allow USAF manpower personnel to run and print their own customized reports. *Id.* at 93. At no time was Davenport ordered by his superiors to write such a program. *Id.* at 91, 503, 518. Indeed, the USAF never provided Davenport with any formal computer programming training, despite repeated requests for such training. *Id.* at 69-70, 72-73. It appears that Davenport's motivation was the desire to more efficiently access the MDS and to gain experience in writing his own computer program. *Id.* at 93-94.

Technical Sergeant Davenport entitled the program the AUMD program. CSPFF ¶ 6. The AUMD, created in Microsoft Access 97 using the Visual Basic programming language, actually consisted of two separate computer programs tailored for use with the MDS. *Id.* ¶¶ 11, 13; Tr. 97-98. The first program, known as the AUMD Admin, downloaded data stored in the MDS and incorporated that data into a local database. CSPFF ¶ 11; Tr. 97-98. The second program, known as the AUMD Master, allowed users to manipulate the data in the local MDS database into standard reports and user-customized reports. CSPFF ¶ 11; Tr. 97-98. This allowed manpower personnel to use their office computers to access the information they needed and print reports containing that information to their office printer. The AUMD program literally saved manpower personnel hours of time in printing reports, since requests to print reports no longer had to be sent to PACAF headquarters and the result sent back to the user. Tr. 92.

The first "beta" version of the AUMD program took Davenport approximately two weeks to write, working in the evenings after returning home from work, and on the weekends. Tr. 92. This beta version was completed on or about May 28, 1998. CSPFF ¶ 15. Davenport then provided a copy of this "beta" program to his friend Master Sergeant William Luckie in June 1998, for review and comment. *Id.* ¶ 16.

Davenport and Master Sergeant Luckie conducted the beta testing of the AUMD at their individual work stations during their working hours. *Id.*; Tr. 104. This was necessitated by the fact that the MDS was a closed database, only accessible from the USAF computers on USAF bases. Tr. 328-30. Thus, it was only by drawing data directly from the MDS that AUMD could create a local database which individual users could access to run customized reports. *Id.* at 328.

While Master Sergeant Luckie was reviewing the AUMD program at his work station, one of his superiors saw him using it. Tr. 104. Recognizing the AUMD could address the shortfalls in the MDS, Master Sergeant Luckie's superior asked Luckie to provide the other manpower personnel at his base with a copy of the program. *Id.* Shortly after this, Luckie began preparing an instruction manual on how to use the program. *Id.* at 315-16.

Use of the AUMD quickly spread throughout the manpower personnel in the PACAF and the USAF in general. The rapid dissemination of the AUMD occurred as a result of manpower personnel from local bases coming to PACAF headquarters for conferences or transferring to new assignments. *Id.* at 336. These personnel would see Davenport or other manpower technicians using the AUMD program. *Id.* Recognizing the benefits of the program, many of the visiting manpower personnel requested copies of the program to take back to their local bases. *Id.*

The AUMD program spread so quickly that by July 1998, while traveling to several local bases in the PACAF, as part of his regular duties to provide instruction on the new MDS, Davenport was asked by manpower personnel to provide training on the AUMD program. *Id.* at 113, 334-36.

During this time, Davenport continuously upgraded and refined the AUMD program to improve its functionality and usefulness. Occasionally, Davenport would come across an interesting feature in another program that he would incorporate into the AUMD. *Id.* at 347. Significantly, Davenport began to receive numerous suggestions from USAF manpower personnel on how the AUMD program could be improved. *Id.* If Davenport considered a suggestion useful, he would incorporate it into the AUMD. *Id.* at 415.

By September 1998, Davenport had made enough changes to the AUMD program to warrant the issue of a new version of the program, version 1.0 AUMD.[10] *Id.* at 331-32. By this time, most of the USAF bases in PACAF were using the AUMD program. *Id.* at 109-10. Also, in September 1998, Davenport was asked by his commanding officer to give a presentation on the AUMD program for senior AFMA officers at a manpower conference in San Antonio. *Id.* at 111-12. This presentation was before the heads of the entire USAF manpower community, and Davenport's talk was extremely well received. *Id.*

After Davenport's September 1998 presentation, use of the AUMD increased significantly. *Id.* at 350. The earliest versions of the AUMD contained an "about screen" with Davenport's personal e-mail and home telephone number. *Id.* at 347. However, after Davenport began receiving calls regarding the AUMD program late at night, he changed the information on the "about screen" to list only his work e-mail and telephone number. *Id.* Davenport was soon overwhelmed with calls seeking support for the AUMD. *Id.* at 350. The situation became such that he could not both perform his regular duties and provide all the technical support being requested. *Id.*

To alleviate the demands for his support with the program, Davenport began to work more closely with manpower data managers in other USAF commands. *Id.* While Davenport continued to provide user support for the AUMD program to manpower personnel in PACAF, manpower

---

[10] Ten total versions of the AUMD program would eventually be produced. Tr. 345. These versions and their release dates are as follows:

| | |
|---|---|
| Beta 0.9 | May 1998 |
| 1.0 | September 15, 1998 |
| 1.5 | February 1, 1999 |
| 1.8 | April 22, 1999 |
| 1.9 | August 13, 1999 |
| 2.0a | September 29, 1999 |
| 2.0b | October 2, 1999 |
| 2.1d | November 18, 1999 |
| 2.1e | January 2, 2000 |
| 2.1f | January 5, 2000 |

Def.'s Trial Ex. 3; Tr. 345.

personnel in other MAJCOMs were instructed to first contact the manpower data manager in their MAJCOM headquarters for support before contacting Davenport.  *Id.*  Davenport kept these manpower data managers appraised of changes to the AUMD program and appraised them of when new versions of the program would be issued.  *Id.*

Additionally, to cut back on inquires from personnel using outdated versions of the AUMD program, Davenport incorporated an automatic expiration date into the program.  *Id.* at  351-52.  Upon expiration, the program ceased to function and a screen appeared instructing the user to contact the manpower data manager at their MAJCOM headquarters for the latest version of the AUMD program.  *Id.*

While everyone who worked with MDS agreed that the AUMD program was an extremely useful program, some officials in the USAF felt some unease at its widespread use.  *Id.* at 891-92.  This unease allegedly resulted from the USAF's lack of possession of documentation revealing the program's source codes[11] or even explaining its workings.  *Id.* at 891.  As a result of this unease, concerns were raised that manpower personnel were becoming increasing reliant on performing their daily duties with a program over which the USAF had no control, particularly since it was supported and updated solely by Davenport.  *Id.* at 891-92, 899.  Concerns also grew that if anything should happen to Davenport—should he decide to retire, become sick, or be hit by the proverbial "Mack truck"—manpower personnel would be dependent on a computer program that no one was capable of supporting.  *Id.* at 899, 902.

As a result of these concerns, shortly after the September 1998 manpower conference in San Antonio, the USAF began requesting that Davenport provide the USAF with the source codes to the

---

[11] Computer software contains two types of code: machine readable object code and human readable source code.  Object code uses the two digits 0 and 1 as on (0) and off (1) switches.  All instructions and data in the software are reduced to series of these numerals.  Since it is impractical for most people to reduce data and instructions to strings of 0's and 1's, computer programming languages have developed.  Instead of using only 0's and 1's, these programming languages use numerous symbols and syntax to convey meaning—making them much easier for people to understand.  These programming languages effectively enable people to write instructions and data in software.  Source code is the text of software written in these programming languages.  Software's human readable source code commands are translated into machine readable object code commands which are executable by the computer.  *See Universal City Studios, Inc., v. Reimerdes*, 111 F. Supp. 2d 294, 305-06 (S.D.N.Y. 2000) (giving a detailed description of object and source codes).

Users of software cannot readily modify the machine readable object code since strings of 0's and 1's are difficult to comprehend.  In contrast, the human readable source code is much easier to modify.  For this reason software developers will often only provide the software users with the object code, insuring that the users continue to rely on the software developers for changes in the software.  Software developers will also seek to copyright their source codes.  And to further protect the software from being copied, software developers will often take technical steps to prevent others from trying to discern the  source code from the basic object code.  *See*  Theodore C. McCullough, *Understanding the Impact of the Digital Millennium Copyright Act on the Open Source Model of Software Development*, 6 Marq. Intell. Prop. L. Rev. 91, 94 (2002).

AUMD program. *Id.* at 397. Davenport, however, did not wish to turn over the source code to the USAF. *Id.* Davenport considered the AUMD program his personal program, since he believed he had initially conceived of the idea and created it at his home in his spare time. *Id.* He was also concerned at what might happen to the program once the USAF took over its operation. *Id.* Davenport believed that, in the past, when the USAF had taken over other computer programs developed independently by USAF personnel, the result was a loss of functionality due to the changes the USAF insisted on incorporating into the program. *Id.* He allegedly wanted to avoid repeat performance with the AUMD. *Id.*

Throughout 1999, USAF officers repeatedly asked Davenport to turn over the source codes to the AUMD, to no avail. *Id.* at 901-02. Unable to obtain the source code from Davenport, the USAF determined its only option was to have a private contractor "reverse engineer" the program. *Id.* at 902. On January 11, 2000, the USAF issued a solicitation requesting bids from private contractors to recreate the AUMD program. CSPFF ¶19.

At the same time, Davenport sought an avenue to financially benefit from the AUMD program. On February 7, 2000, Davenport and his uncle, Mr. Robert Gunter, formed Blueport. CSPFF ¶ 7. The two men hoped this company would provide them with a vehicle to sell a licence to the USAF for use of the AUMD program. This formation occurred almost two years after the Beta version was released and after the program was widely used by Air Force Manpower divisions. *Id.*

As part of his efforts to form Blueport, on March 3, 2000, Davenport submitted an application to the United States Copyright Office to obtain a copyright for the AUMD program. Pl.'s Trial Ex. 90. In exchange for a fifty percent share of Blueport, Davenport assigned all rights to the AUMD program to Blueport on March 6, 2000. CSPFF ¶ 8; Pl.'s Trial Ex. 103; Tr. 47, 61. Blueport's copyright of the AUMD program, titled "UMD Admin Program V.2.0A and Master Program V.2.1D," was registered on March 9, 2000, as Registration No. TX 5-159-682. *Id.* ¶ 3; Pl.'s Trial Ex. 139; Tr. 47-48.

On March 31, 2000, Blueport approached the USAF about acquiring a license to the AUMD program. Tr. 50-51; Pl.'s Trial Ex. 57, 105. Blueport indicated that the USAF's rights to use the program would terminate on May 15, 2000, the expiration date of the latest version of the AUMD program. Tr. 51; Pl.'s Trial Ex. 57.

Instead of entering into negotiations with Blueport, the USAF on April 10, 2000, selected Science Applications International Corporation ("SAIC") to recreate the functionality of the AUMD program through reverse engineering. CSPFF ¶ 20; Tr. 206. However, SAIC did not have time to complete its tasks before the latest version of the AUMD would reach its expiration date of May 15, 2000. CSPFF ¶ 21.

Mindful of the USAF's intention to have a private contractor reverse engineer the AUMD, Davenport did not prepare any further versions of the AUMD program and was unwilling to assist the USAF in changing the automatic expiration of the version then in use. *Id.*; Tr. 900. Faced with the situation of being unable to use the computer program the manpower community had come to

rely upon and not yet having an alternative program to replace it, the USAF instructed SAIC to hack into the AUMD program and change the automatic expiration date from May 15, 2000 to February 15, 2001.  CSPFF ¶ 23; Tr. 234.  This allowed the USAF to keep the AUMD program operational until SAIC created a replacement program—the MARS program.  Tr. 905.

On May 23, 2001, Blueport submitted to the Air Force Legal Services Agency an administrative claim for compensation for the USAF's copyright infringement of the AUMD program.  Pl.'s Trial Ex. 107; CSPFF ¶ 28.  On January 11, 2002, the Air Force Legal Services Agency denied Blueport's administrative claim.  Pl.'s Trail Ex. 104; Tr. 52-53.  Blueport then filed its complaint with this Court on November 18, 2002.

There are primarily four issues raised and responded to by the parties.  For instance, the parties dispute whether the protections of the copyrighted AUMD version 2.1d extend also to latter non-copyrighted versions of the AUMD, specifically AUMD version 2.1f.  It is further disputed whether the government held an implied license to use the AUMD program and whether any copying and adaptation of the AUMD program by the government was an essential step in utilizing the program, pursuant to 17 U.S.C. § 117.  Another issue is whether the MARS program is substantially similar to the AUMD program and if the government's use of the AUMD program constituted "fair use" under 17 U.S.C. § 107.  Finally, the issue of the jurisdiction of this court to adjudicate this action has been raised. This is predicated on certain criteria found in 28 U.S.C. § 1498(b), which acts as a waiver of sovereign immunity for copyright infringement actions against the United States.  As explained in greater detail below, because the Court finds that these statutory criteria are mandatory jurisdictional requirements not met by plaintiff, it is not necessary to address the numerous other issues and arguments presented by this case.

## DISCUSSION

Typically, for copyright infringement, a plaintiff must show ownership of a valid copyright and copying of the protected work.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Under the Copyright Act, copyright ownership initially vests with the person who created the work.  17 U.S.C. § 201(a); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Copyrights are presumptively valid and a certificate of copyright registration is considered prima facie evidence of a valid copyright.  *Herbert v. United States*, 36 Fed. Cl. 299, 303 (1996) (citing 17 U.S.C. § 410(c)).[12]  Here, it is undisputed that Davenport was the creator of the original AUMD program and that he has assigned his rights to plaintiff.  CSPFF ¶¶ 6, 8.  Plaintiff, by producing the certificate of copyright registration for the AUMD program version 2.1d, asserts it has established ownership of a presumptively valid copyright.  *Id*.  Pl.'s Ex. 117, 139.

But, we proceed not under the Copyright Act, but under 28 U.S.C. § 1498(b), which acts as a waiver of sovereign immunity and vests this Court with jurisdiction to adjudicate copyright

---

[12] The same court issued two opinions in *Herbert*.  The first decision denied the defendant's motions for summary judgement.  *Herbert v. United States*, 32 Fed. Cl. 293, 296-97 (1992) (hereinafter *Herbert I*).  The second decision, issued two years later after a trial on the merits, dismissed plaintiff's complaint.  *Herbert*, 36 Fed. Cl. at 305-07 (hereinafter *Herbert II*).

infringement claims against the government.   Section §1498(b) contains explicit exceptions (characterized as "provisos" or "conditions" in this opinion) to the waiver—where the government was "induced" by plaintiff into using the copyrighted work or where the ownership of the copyright by plaintiff is placed at issue because it in essence constitutes what is termed "government work" under copyright jurisprudence.  *See Matthew Bender & Co., v. West Publ'g Co.*, 158 F.3d 674, 679 (2d Cir. 1998) (holding that the works of the federal government, such as the text of judicial decisions, are not subject to copyright protection and may therefore be copied at will).  As to the latter contingency, there can be no "presumption" of ownership for jurisdictional purposes under 28 U.S.C. § 1498(b) because, unlike the Copyright Act, the substantive factual issue of "government work" goes to the initial determination of the jurisdictional waiver of sovereign immunity itself.

# I. JURISDICTION OF THE COURT OF FEDERAL CLAIMS

It is beyond doubt that the United States Court of Federal Claims "has jurisdiction only where and to the extent that the government has waived its sovereign immunity, and any waiver of sovereign immunity cannot be implied but must be unequivocally expressed."  *Ledford v. United States*, 297 F.3d 1378, 1381 (Fed. Cir. 2002).  There exists two categories of jurisdictional cases facing this court.  In the majority of cases, the requirement of subject matter is fulfilled simply because the plaintiff has filed a well-pled complaint alleging the appropriate jurisdictional facts. *E.g., Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005); *Spruill v. Merit Sys. Protection Bd.*, 978 F.2d 679, 686-88 (Fed. Cir. 1992) (noting that well-pleaded allegations in the complaint are sufficient to overcome a challenge to subject matter jurisdiction).  Plaintiff has met this "allegation" burden in the present case.

If the validity of the jurisdictional facts alleged in the complaint are challenged, however, a second, yet rarer in practice, category of cases emerges whereby the court must consider relevant evidence in order to resolve the factual dispute.  *E.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting each jurisdictional "element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").  *See, e.g.*, *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) (citing *Land v. Dollar*, 330 U.S. 731, 735 (1947)). Ultimately, in these cases, the plaintiff must prove jurisdiction by a preponderance of the evidence. *Reynolds*, 846 F.2d at 748; *Zunamon v. Brown*, 418 F.2d 883, 886 (Ct. Cl. 1969) ("[T]he court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence." (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005).  Because the factual predicate for jurisdiction has been challenged, the Court now proceeds to address this matter.

## A. The "Provisos" of 28 U.S.C. § 1498(b): Jurisdictional or Affirmative Defenses?

An issue arose at trial whether the exceptions to a plaintiff's right of action listed in § 1498(b) should be treated as jurisdictional, that is as conditioning the Court of Federal Claims' limited copyright infringement jurisdiction, or merely as affirmative defenses.  Tr. 1064-65.  The genesis of the problem arises from the language of § 1498(b), for this section not only vests this

Court with exclusive jurisdiction through a waiver of sovereign immunity,[13] but also sets out certain exceptions, provisos, to a copyright owner's right of action:

> *Provided*, That a Government employee shall have a right of action against the Government under this subsection except where he was in a position to order influence, or induce use of the copyrighted work by the Government: *Provided, however*, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States, where the copyrighted work was prepared as part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used . . . .

28 U.S.C. § 1498(b) (emphasis original).  Thus, a government employee's right of action is denied in any one of three circumstances: (1) the employee was in a position to order, influence, or induce the use of the copyright work by the government; (2) the copyrighted work was prepared as part of employee's "official function"; or (3) the copyrighted work was prepared using government time, material or facilities.  "The use of the word 'or' in the statute indicates that satisfaction of any of these conditions is sufficient to deny a right of action."  *Herbert II*, 36 Fed. Cl. at 305 (examining the three exceptions listed in § 1498(b)).

It is well understood that copyright jurisdiction differs for the federal district courts and the Court of Federal Claims.  While the federal district courts are vested with jurisdiction to hear copyright infringement actions pursuant to 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks.") the Court of Federal Claims jurisdiction is established by § 1498(b), which codifies a limited waiver of sovereign immunity for copyright infringement claims against the government and establishes this court as the exclusive forum to hear such claims.  28 U.S.C. § 1498(b) ("[T]he exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims . . . .").  *See Boyle v. United States*, 200 F.3d 1369, 1373 (Fed. Cir. 2000) ("The plain language of [§ 1498(b)] states that the United States has waived sovereign immunity . . . .").

---

[13] The first half of 28 U.S.C. § 1498(b) provides:

> Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17, United States Code: . . . .

In federal district court, the private sector's analogue to the second "official function" proviso in § 1498(b) is the Copyright Act's "work made for hire" doctrine. 17 U.S.C. §§ 101, 201(b). 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.13(b)(2) at 5-98 (2006) ("That formulation parallels the definition of 'work made for hire' consisting of 'a work prepared by an employee within the scope of his or her employment.'").[14] This statutory exception to infringement liability has been treated as an affirmative defense by the federal district courts with the burden of persuasion placed on the defendant. *See Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 105 (2d Cir. 2002) (noting the federal district court dismissed the defendants' affirmative defense that a computer program belonged to the employer under the "work made for hire" doctrine); *Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998) (agreeing with the federal district court that the defendant asserting the work made for hire defense failed to present the requisite credible evidence that the author's work was done at the "instance and expense" of the employer).

Of course, the issue of the waiver of sovereign immunity is not implicated in the Copyright Act, where infringement actions are between private parties. Consequently, the similarity between that Act's exception and the conditions or provisos contained in § 1498(b) does not by itself negate the jurisdictional problem. That the conditions in § 1498(b) are jurisdictional can readily seen. That same section clearly waives the sovereign immunity of the United States for copyright infringement suits, as was noted above. The provisos in § 1498(b) can viewed as conditions to that waiver. In other words, the argument is that if Congress can open the door fully to lawsuits against the government, it certainly can only partly open that door.

The argument favoring treating § 1498(b)'s exceptions as affirmative defenses is more complex. For instance, the Supreme Court, in *Franconia Assocs. v. United States*, 536 U.S. 129, 145 (2002), noted that while the Tucker Act, 28 U.S.C. § 1491, constitutes a waiver of sovereign immunity, the Tucker Act's six year limitations period, 28 U.S.C. § 2501,[15] "should generally apply to the Government 'in the same way that' they apply to private parties," citing *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 95 (1990). As such, the argument goes, once immunity from suit has been waived, all other "conditions" are merely statutory provisions that do not implicate jurisdiction.

To be sure, this distinction between a jurisdictional prerequisite and an affirmative defense is significant. As indicated, affirmative defenses do not generally call into question subject matter jurisdiction, and the burden on persuasion is on the defendant. *See United States v. Hitachi America, Ltd.*, 172 F.3d 1319, 1333-34 (Fed. Cir. 1999) (noting an affirmative defense was non-jurisdictional

---

[14] The "work made for hire" is an exception to the general rule that ownership vest with the author of the work, and instead vests with the author's employer. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."); *See also* 17 U.S.C. § 101 (defining a "work made for hire" as "a work prepared by an employee within the scope of his or her employment . . . .").

[15] 28 U.S.C.A. § 2501 provides in pertinent part that every "claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

and can be waived by the parties). If, however, the § 1498(b) exceptions are considered jurisdictional conditions or limitations on the waiver of sovereign immunity, they place the burden of persuasion on the plaintiff to disprove the § 1498(b) provisos. *See Barrett v. Nicholson*, 466 F.3d 1038, 1041 (Fed. Cir. 2006) (noting the plaintiff bears the ultimate burden of establishing jurisdiction by a preponderance of the evidence). Because jurisdiction is a matter that a court is duty bound to address first, *see, e.g., Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir 1999), (indeed, a court, *sua sponte*, may raise the jurisdiction issue, *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004)), this issue must be addressed before the merits of the copyright infringement claim.

The Court will first look to how past cases of the Court of Federal Claims have dealt with this issue. It will then examine how patent cases have considered this question. And, finally, the Court will probe more deeply into how the Supreme Court and the Federal Circuit have resolved the general issue of whether conditions to waivers of sovereign immunity should always be considered as jurisdictional.

## B. Previous Treatment of § 1498(b) in the Court of Federal Claims

No Federal Circuit case seems to have directly examined whether the provisos in § 1498(b) are affirmative defenses or conditions on the court's jurisdiction. The only Court of Federal Claims cases to review the exceptions under § 1498(b) are two related actions in the same case, entitled *Herbert v. United States*. ( *Herbert I*, 32 Fed. Cl. at 296-97; *Herbert II*, 36 Fed. Cl. at 305-07.) While not concretely deciding the issue, the court in *Herbert I* seems to have considered the exceptions jurisdictional, *Herbert I*, 32 Fed. Cl. at 296, while latter in *Herbert II*, the same court appears to have implicitly treated the § 1498(b) exceptions as mere affirmative defenses. *Herbert II*, 36 Fed. Cl. at 299. In *Herbert I*, the government-defendant moved for summary judgment on the plaintiff's copyright infringement claim, arguing that the § 1498(b) exceptions denied the court jurisdiction. *Herbert I*, 32 Fed. Cl. at 296. The court explained that "[d]efendant's first argument was based on the *jurisdictional limitations* contained in 28 U.S.C. § 1498(b), which waives sovereign immunity for copyright infringement actions filed against the United States." *Id.* (emphasis added). The court also noted that "[a]n affirmative finding might bar plaintiff from suing the government for copyright violation . . . ." *Id.* The court denied the defendant's motion, concluding that defendant's arguments were either based on facts in dispute or were not sufficiently developed for the court to reach a firm conclusion. *Id.*

Two years later, after a trial, the same court once again examined the § 1498(b) exceptions in *Herbert II*. 36 Fed. Cl. at 305-07. In *Herbert II*, the court stated that § 1498(b) was a "jurisdictional statute which considers a right of action . . . ." *Id.* at 304. The court then stated that it had "jurisdiction under 28 U.S.C. § 1498(b) to hear the claim to determine whether plaintiff has a right of action for a copyright infringement against the government." *Id.* While that statement could possible be interpreted to mean only that the *Herbert II* court had jurisdiction to determine whether it had jurisdiction over the matter, *see Moyer*, 190 F.3d at 1318, the court went on to label entire discussion of the provisos in § 1498(b) as "the government's defense." *Id.* To demonstrate that the court perhaps changed its mind and no longer viewed the § 1498(b) provisos as jurisdictional, the court concluded in *Herbert II* that the plaintiff failed to overcome what it characterized as the "government's defenses" [in § 1498(b)], and not as the failure to meet the jurisdictional requirement in § 1498(b). *Id.* at 313. Indeed, the court in a footnote stated that it possessed jurisdiction over the case. *Id.* at 313 n.8.

The only conclusion one can cogently draw is that *Herbert* I and II collectively are ambiguous at best regarding the jurisdictional versus affirmative defense issue.

## C.  Jurisdictional Treatment of Patents Claims under 28 U.S.C. § 1498(a)

Patents cases represent the closest legal analogy to copyright matters.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984) (noting when there is no precedent in the law of copyright, "the closest analogy is provided by the patent law cases to which it is appropriate to refer because of the historic kinship between patent law and copyright law."); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 841 n.4 (Fed. Cir. 1992) (noting that patent law is analogous to copyright law).  Both are species of intellectual property, and Congress' grant of authority to legislate for both emanate from the Constitution.  *See* U.S. Const., art. I, sec. 8 ("The Congress shall have Power . . . to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.").

That patent cases may be cited as persuasive authority for copyright actions, has been recognized by the Federal Circuit.  *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1275 (Fed. Cir. 2004) (citing *Sony Corp. of Am.*, 464 U.S. at 439).  One reason that this is true is that the provision allowing for suits against the United States for patent infringement, 28 U.S.C. § 1498(a), is worded very similarly to the copyright provision, 28 U.S.C. § 1498(b).[16]  Indeed, with the addition of a subsection covering copyright infringement in 1960, 28 U.S.C. § 1498 was split into two subsections: (a) for suits against the United States patent infringement, and (b) for suits against the United States for copyright infringement.  *See Boyle v. United States*, 44 Fed. Cl. 60, 63 n.3 (1999) (observing that section 1498(b) was created when Congress "extended" the provisions of section 1498(a) concerning patent infringement to permit an action in the Court of Federal Claims for copyright infringements).  *See also Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 179-80 (D.C. Cir. 1987) (construing § 1498(b) by analyzing "case law interpreting the sister provision, section 1498(a),

---

[16] *Compare* 28 U.S.C. § 1498(a) ("A Government employee shall have the right to bring suit against the Government under this section *except where he was in a position to order, influence, or induce use of the invention by the Government*.  This section shall not confer a right of action on any patentee or any assignee of such patentee with respect to any invention discovered or invented by a person while in the employment or service of the United States, *where the invention was related to the official functions of the employee*, in cases in which such functions included research and development, or in the making of which Government time, materials or facilities were used."(emphasis added) *with* §1498(b) ("Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States . . . the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims . . . : Provided, That a Government employee shall have a right of action against the Government under this subsection *except where he was in a position to order, influence, or induce use of the copyrighted work by the Government*: Provided, however, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States, *where the copyrighted work was prepared as a part of the official functions of the employee*, or in the preparation of which Government time, material, or facilities were used . . . .") (emphasis added).

waiving immunity for patent infringements by the government"). Nevertheless, as with § 1498(b), no case considering the three provisos of § 1498(a) has determined whether they were affirmative defenses or jurisdictional limitations. *See Myers v. United States*, 147 Ct. Cl. 485, 489-90 (1959) (holding that plaintiff had no right of action under the provisos of § 1498, but without considering whether the provisos were affirmative defenses or jurisdictional).

With that said, there is scant authority interpreting § 1498(a) that address a similar jurisdictional question that is presently before this Court. That the Federal Circuit does draw a distinction between statutory affirmative defenses and jurisdiction in § 1498(a), however, may be shown by an analysis of the first paragraph of § 1498(a), which provides that if a private company makes an infringing use of a patented invention "*for* the United States . . . the owner's remedy shall be by action against the United States . . . ." 28. U.S.C. § 1498(a) (emphasis added). *See Crater Corp. v. Lucent Tech., Inc.*, 255 F.3d 1361, 1364 (Fed. Cir. 2001) ("If a patented invention is used or manufactured for the government by a private party, that private party cannot be held liable for patent infringement."). Not surprisingly, when suits that implicate this provision are between private parties, the Federal Circuit has allowed the private party-defendant to assert an affirmative defense that it had acted on the orders of the government. *See Madey v. Duke Univ.*, 307 F.3d 1351 (Fed. Cir. 2002) (noting against private parties § 1498(a) relieves third parties of patent infringement liability and in application acts as an affirmative defense); *Crater Corp.*, 255 F.3d at 1364 ("[D]ismissal of a lawsuit against a private party pursuant to § 1498(a) is a dismissal because of the successful assertion of an affirmative defense rather than a dismissal because of the district court's lack of subject matter jurisdiction over the patent infringement claims."); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990) ("The Supreme Court has established that section 1498(a) is to be applied, at least with respect to suits to which the United States is not a party, as a codification of a defense and not as a jurisdictional statute." (*citing Sperry Gyroscope Co. v. Arma Eng'g Co.*, 271 U.S. 232, 235-36 (1926))). But where the United States is the defendant, its sovereign immunity is implicated and the Federal Circuit views the same section of § 1498(a) as jurisdictional. *See Hughes Aircraft Co. v. United States*, 534 F.2d 889, 897-98 (Ct. Cl. 1976) (explaining that in suits pursuant to § 1498(a) against the government, the conditions are jurisdictional in nature). These cases do then lend at least some support that conditions to waivers of sovereign immunity are jurisdictional in nature.

## D. Supreme Court and Federal Circuit Treatment of Conditions to Waivers of Sovereign Immunity

The examination of relevant U.S. Supreme Court and Federal Circuit precedent reveals two paradigms that harken back to the discussion above that framed the jurisdictional versus affirmative defense argument. The first, the traditional view, is represented by the opening and partial opening of the sovereign immunity waiver door. This model views any conditions to the waiver of sovereign immunity as limitations on jurisdiction. A more modern view is that once a statute contains the waiver, all further statutory limitations or conditions,[17] even if not met, do not divest the court of

---

[17] Of course, one can take the concept of "conditions" to jurisdiction as jurisdictional too far. As a matter of semantics, any substantive statutory provision could be considered a condition or limitation on jurisdiction. But more than semantics is at stake. An absolute view would in essence negate the distinction between a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, and a

jurisdiction.  To be sure, the waiver itself becomes a rebuttable presumption of jurisdiction.  This presumption may be overcome if the meaning and the structure of the statute so reflect congressional intent that the conditions or limitations are jurisdictional in nature.   As will be made clear, under either model, the § 1498(b) provisos should be treated as jurisdictional requirements that place the burden of proof on plaintiffs.

## 1.  <u>Two Models on Conditions on Waivers of Sovereign Immunity</u>

The treatment of the Tucker Act's six-year limitations period, § 2501 (as well as whether the limitations period is subject to equitable tolling), provides an excellent example of the two models.  The traditional view that conditions to sovereign immunity waiver are themselves jurisdictional limitations is exemplified by several Supreme Court cases in the Nineteenth Century.  In *Kendall v. United States,* 107 U.S. 123 (1883), the Court held that the appellant's claim against the United States was time-barred pursuant to § 2501's predecessor statute.[18]  The appellant, a veteran soldier of the Confederacy, contended that he was unable by law to file his claim until his civil disabilities were removed by the general amnesty provided by the Proclamation of December 25, 1868.  107 U.S. at 125.  His argument was that his claim did not accrue until the Proclamation granted amnesty to those who supported the "insurgent government" and restored their "rights, privileges and immunities" under the Constitution.  Justice Harlan, writing for the Court, rejected this argument, recognizing that "the government could not be sued except with its consent" and may "restrict the jurisdiction of the court of claims to certain classes of demands."  *Id.*  The six-year limitations period constituted such a restriction and barred the ex-soldier's claim: "To that class may be referred claims which are declared barred if not asserted within the time limited by the statute."  *Id.*  This strict rule that conditions (or as the *Kendall* Court termed it, "restrictions") to waivers of sovereign immunity are limitations on jurisdiction was the law for the remainder of the Nineteenth Century, and indeed for almost all of the Twentieth.  *See United States v. Wardwell,* 172 U.S. 48 (1898) ("[statutory limitations period] is not merely a statute of limitations but also jurisdictional in its nature, and limiting the cases of which the Court of Claims can take cognizance."); *Finn v. United States*, 123 U. S. 227, 232-33 (1887) (holding that the general rule that limitations period is an affirmative defense "has no application to suits [in the Court of Claims] against the United States."); *see also De Arnaud v. United States*, 151 U.S. 483, 495-96 (1894) (denying a claim for compensation by a former Russian Imperial Army officer, and alleged special agent of General Fremont during American Civil War, as time-barred (citing *Finn*, 123 U.S. at 232-33, despite a saving clause suspending the limitations period in favor of "idiots, lunatics, and insane persons . . . .")); *see generally* 36A C.J.S.

---

Rule 12(b)(6) motion to dismiss for failure to state a claim.  *See generally Fischer v. United States*, 402 F.3d 1167, 1171-72, 1175-76 (Fed. Cir. 2005).

[18] The Court characterized the pertinent part of the statute as follows:

> "It is provided by the act of March 3, 1863, amending that of February 24, 1855, establishing the court of claims, 'that every claim against the United States, cognizable by the court of claims,'-that is, such as the government permits to be asserted against it by suit in that tribunal,-'shall be forever barred, unless the petition, setting forth a statement of the claim, be filed in the court or transmitted to it under the provisions of this [that] act within six years after the claim first accrues.'"

107 U.S. at 124.

Federal Courts § 823 (2007) (terming the limitation period in § 2501 as "jurisdictional" and "as such must be strictly construed," (citing, *inter alia*, *Soriano v. United States*, 352 U.S. 270 (1957), *Goldstein v. United States*, 131 Ct. Cl. 228 (1955), judgment aff'd, 350 U.S. 888 (1955), and *Frazer v. United States*, 288 F.3d 1347 (Fed. Cir. 2002))).

The earth shifted in 1990, when in *Irwin*, the Court adopted a more flexible test. In *Irwin*, the Court upheld a dismissal of the case for lack of jurisdiction because the complaint was not filed within the time specified by Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16(c), which provides that a complaint against the Federal Government must be filed within 30 days "of receipt of notice of final action taken" by the EEOC. Irwin contended that inaction on the part of his attorney justified lifting of the limitations period under the doctrine of equitable tolling. In upholding the dismissal, the Court observed that the limitations period § 2000e-16(c) is a "condition to the waiver of sovereign immunity and thus must be strictly construed." 498 U.S. at 94. But, the Court also noted that "our previous cases dealing with the effect of time limits in suits against the Government have not been entirely consistent, even though the cases may be distinguished on their facts." *Id.* (internal citations omitted).

Viewing the case as affording "an opportunity to adopt a more general rule to govern the applicability of equitable tolling in suits against the Government," *Id.* at 95, the Court noted that lawsuits between private litigants are customarily subject to equitable tolling, and that it had extended the doctrine to cases under Title VII. *Id.* The Court announced a test to determine whether conditions to waivers of sovereign immunity are jurisdictional: "Once Congress has made . . . a waiver . . . [the] condition . . . [ought to be] applicable to suits against the Government, in the same way that it is applicable to private suits . . . ." *Id.* at 95-96. A rebuttable presumption exists, therefore, that such doctrines, such as equitable tolling, that are "applicable to suits against private defendants should also apply to suits against the United States." To be sure, the Court recognized that Congress "may provide otherwise if it wishes to do so." Irwin's tolling argument was, however, rejected because the facts, to the Court, did not justify applying the doctrine. *Id.*

Exactly by what means Congress was to "provide otherwise," *i.e.*, a showing that the presumption was not intended, was what was at issue in a duo of cases: *United States v. Brockamp*, 519 U.S. 347 (1997), and *United States v. Beggerly,* 524 U.S. 38 (1998). Both involved a waiver of sovereign immunity. *Beggerly*, 524 U.S. 38 (suit under the Quite Title Act, 28 U.S.C. § 2409(a)); *Brockamp*, 519 U.S. 347 (tax refund). Both involved the propriety of applying equitable tolling to a limitations period. *See Beggerly*, 524 U.S. at 48; *Brockamp*, 519 U.S. at 348. In both cases, the private parties cited *Irwin* as a justification. *See Beggerly*, 524 U.S. at 48; *Brockamp*, 519 U.S. at 349-50. In both, the Supreme Court held against the private parties. *See Beggerly*, 524 U.S. at 48-49; *Brockamp*, 519 U.S. at 354. And in both cases, the Court applied a textual analysis and determined that the structure and wording of the statutory provision evinced a congressional intent that the waiver of sovereign immunity precluded application of equitable tolling (or, and this is pure semantics, the presumption is rebutted). *See Beggerly*, 524 U.S. at 48-49; *Brockamp*, 519 U.S. at 354.

*Brockamp* is illustrative of whether the statutory limitations period for a tax refund in the Internal Revenue Code, 26 U.S.C. § 6511, is subject to the "implied" doctrine of equitable tolling. In holding that it is not, the Court opined that the very nature of a tax statute—that an individual's particular numbers are at play and that there is an administrative need for the general applicability of rules—worked against any presumption that Congress intended equitable tolling to apply. *Brockamp*,

519 U.S. at 352.[19]  Although this is a tax case, what was crucial to the Court was the textual analysis that demonstrated the requisite intent to overcome the presumption:

> To read an "equitable tolling" provision into these provisions, one would have to assume an implied exception for tolling virtually every time a number appears.  To do so would work a kind of linguistic havoc.  Moreover, such an interpretation would require tolling, not only procedural limitations, but also substantive limitations on the amount of recovery-a kind of tolling for which we have found no direct precedent.  Section 6511's  detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together, indicate to us that Congress did not intend courts to read other unmentioned, open-ended, "equitable" exceptions into the statute that it wrote.   There are no counterindications.  Tax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities.

*Id*. (internal citations omitted).

## 2. The Federal Circuit and the Two Models

Of course, this Court is bound by the precedent of the Federal Circuit unless such precedent "is expressly overruled by statute or by a subsequent Supreme Court decision," *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (2005), which is not the case here.  Our Circuit seems to be of two minds as to the issue of whether conditions to waivers of sovereign immunity are themselves jurisdictional.  Take the example of the Tucker Act's six-year jurisdictional statute, § 2501.  One set of cases treats the failure to meet the limitations period as not jurisdictional, but instead an element of a failure to state a claim under RCFC 12(b)(6).  *See Venture Coal Sales Co. v. United States,* 370 F.3d 1102, 1105 n. 2 (Fed. Cir. 2004) (affirming dismissal of the case as time-barred under 28 U.S.C. § 2501, but opining that the proper ground for dismissal is failure to state a claim, not lack of subject matter jurisdiction); *Ariadne Fin. Servs. Pty. Ltd. v. United States* 133 F.3d 874, 878 (Fed. Cir. 1998) (affirming dismissal of the case on statute of limitations grounds under 28 U.S.C. § 2501, observing "that the question of a time bar on [plaintiff's] claim does not affect the subject matter jurisdiction of the Court of Federal Claims").

The other set of Federal Circuit precedent takes the more traveled road and views conditions to the waiver of sovereign immunity, such as under the Tucker Act's six-year limitations period under 28 U.S.C. § 2501, as strictly jurisdictional.  *See, e.g., MacLean v. United States*, 454 F.3d 1334, 1336

---

[19] As the Court observed:

> The IRS processes more than 200 million tax returns each year.   It issues more than 90 million refunds. To read an "equitable tolling" exception into § 6511 could create serious administrative problems by forcing the IRS to respond to, and perhaps litigate, large numbers of late claims, accompanied by requests for "equitable tolling" which, upon close inspection, might turn out to lack sufficient equitable justification.

*Id*. (internal citations omitted).

(Fed. Cir. 2006) ("In the Court of Federal Claims, the statute of limitations 'is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed.'" (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)); *Hopland Band of Pomo Indians,* 855 F.2d at 1577 (holding that limitations period "serves as a jurisdictional limitation rather than simply as an affirmative defense, such a statute of limitations have been held as not capable of waiver or subject to an estoppel, whether pled or not").

The majority of the judges of the Federal Circuit, however, appear to subscribe to a variant of the Supreme Court's *Irwin* analysis.  In *Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003), the court, sitting en banc, even though characterizing § 2501's limitations period as a "condition on the waiver of sovereign immunity" and, therefore, "jurisdictional in nature," would nonetheless apply (paradoxically[20]) *Irwin's* presumption favoring equitable tolling.  *Id*. at 1316.[21]  Yet, this analysis was *dicta* for the court declined to decide the issue because "Mr. Martinez has not made a sufficient factual showing to invoke equitable tolling in this case . . . ." *Id* at 1319.  *See also Frazer v. United States,* 288 F.3d 1347, 1353 (Fed. Cir. 2002) (declining to decide whether § 2501's limitations period was subject to equitable tolling because of a lack of a factual predicate).

A different tack was more recently followed in *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345 (Fed. Cir. 2006). In that case, the court held that the lessee's Fifth Amendment takings claim was time-barred.  Recognizing that the limitations period in § 2501 "is a jurisdictional requirement for a suit in the Court of Federal Claims," 457 F.3d at 1354 (citing (ironically), *Martinez,* 333 F.3d at 1316), the court opined that because of the "jurisdictional nature of section 2501 it may not be waived." *Id.* (citing *Hopland Band of Pomo Indians,* 855 F.2d at 1577).  For support, the court noted that § 2501 "enjoys a longstanding pedigree as a jurisdictional requirement.  Since 1883 when the [U.S. Supreme] Court first held that the statute of limitations was jurisdictional . . . , the Court has consistently maintained that the time limit is jurisdictional and therefore cannot be waived." *John R. Sand & Gravel Co.*, 457 F.3d at 1355 (citing *Kendall,* 107 U.S. at 125).

Whether this Court, however, follows the "hard" view that conditions to waivers of sovereign immunity are always jurisdictional (typified by the Supreme Court's *Kendall* decision and the Federal Circuit's *John R. Sand & Gravel Co.* decision), or the "soft" view that such conditions are jurisdictional only if textual analysis demonstrates that Congress so intended (typified by the Supreme Court's *Irwin* case and the Federal Circuit's en banc *Martinez dicta*), it is clear that the § 1498(b) provisos are jurisdictional.  First and foremost, to not treat the three conditions contained in §

---

[20] The confusion lies in the characterization of the limitations period as a *condition* to a waiver of sovereign immunity.  *See Hopland Band of Pomo Indians,* 855 F.2d at 1577 (holding that when limitations periods are conditions to waivers of sovereign immunity they are not subject to equitable remedies).  Equitable tolling has been applied to such statutes of limitations, as explained, because it was held that Congress, aware of such equitable doctrines, presumptively intended their application.  *See Beggerly*, 524 U.S. at 48 (rejecting contention that limitations periods are, *ipso facto,* conditions to waivers of sovereign immunity); *Brockamp*, 519 U.S. at 348 (same).

[21] "We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.  Congress, of course, may provide otherwise if it wishes to do so." *Id.*

1498(b) (and the parallel patent infringement conditions contained in § 1498(b) as well) as jurisdictional would "work a kind of linguistic havoc." *Brockamp*, 519 U.S. at 352. The plain meaning of the text demonstrates that Congress waived sovereign immunity only if certain conditions were present. Textually, these conditions were drafted in close proximity[22] to the waiver and thus should be considered exceptions to that waiver. To be sure, the conditions were literally and deliberately termed "provisos" to the waiver of sovereign immunity for copyright infringement:

> "*Provided*, That a Government employee shall have a right of action against the Government under this subsection *except* where he was in a position to order influence, or induce use of the copyrighted work by the Government . . . ."

> "*Provided, however*, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States, where the copyrighted work was prepared as part of the official functions of the employee, or in the preparation of which Government time, material, or facilities were used . . . ."

28 U.S.C. § 1498(b).

Furthermore, these conditions do not at all fit the *Irwin* rationale: "Once Congress has made . . . a waiver . . . [the] condition, [ought to be] applicable to suits against the Government, in the same way that it is applicable to private suits . . . ." *Irwin*, 498 U.S. at 96. The exceptions in § 1498(b) go to the very heart of a sovereign *qua* sovereign. The scope of the waiver itself is being defined by the exceptions, as well as the substance of the claim for copyright infringement action against the government itself. *See Zoltek Corp. v. United States*, 51 Fed. Cl. 829, 833 (2002) (noting 28 U.S.C. § 1498(a)—as noted a subsection using similar language as § 1498(b) for patent infringement claims—"fully sets out what a plaintiff must prove in the Court of Federal Claims in order to be compensated for the use and manufacture by the United States of its patented invention"). The exceptions in § 1498(b) are analogous to traditional copyright notions such as the "work for hire" doctrine and "government work," Nimmer & Nimmer, *supra*, § 5.13(b)(1)-(2) at 5-98, and were specifically tailored to fit an infringement claim against the government. This is not like the example of a limitations period, or even equitable tolling, that are general in application and, of course, are not at all unique to copyright and patent infringement actions. But it is not unlike the "tort" exception to the Tucker Act itself,[23] which has always been treated as jurisdictional and subject to a dismissal under RCFC 12(b)(1). *E.g., Jentoft v. United States*, 450 F.3d 1342, 1349 (Fed. Cir. 2006) (upholding the granting of a Rule 12(b)(1) motion on the ground that plaintiff's claim of retaliation "sounds in tort").

---

[22] Unlike the "work for hire" and "government work" provisions of the Copyright Act, which are contained in their own sections. Linguistically, this supports the idea of treating the preceding conditions as affirmative defenses. Of course, no waiver of sovereign immunity is involved here.

[23] Whereby the Court of Federal Claims has jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases *not sounding in tort*." 28 U.S.C. § 1491 (emphasis added).

**E.  Plaintiff's Use of *Prescott* Is Inapplicable to the Jurisdictional Basis of § 1498(b)**

While not directly addressing the issue of whether or not the provisos are jurisdictional in nature, *see* Pl.'s Post Trial Br. 1-2, plaintiff argues that the issue is "ultimately a burden of proof question," with the burden resting with defendant to overcome the presumption of jurisdiction.  Pl.'s Post Trial Resp. 3.  For support, plaintiff argues that the three § 1498(b) exceptions are analogous to the discretionary function exception under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).  Pl.'s Post Trial Br. 1-2.  This exception precludes the government's general waiver of sovereign immunity for torts when a claim is: "[B]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government . . . ."  28 U.S.C. § 2680(a).

Plaintiff, without any real elaboration, states that the exceptions in § 1498(b) "are very similar in effect to the discretionary function exception" under the FTCA,  Pl.'s Post Trial Br. 1,  and points to the Ninth Circuit decision in *Prescott v. United States*, 973 F.2d 696, 701-02 (9th Cir. 1992) (holding that the government bears the burden of proving the discretionary function exceptions),[24] and, thus, that the burden of proving the three exceptions in § 1498(b) should rest with the government.  Pl.'s Post Trial Br. 2.  The court is unpersuaded by plaintiff's argument.

Of course, *Prescott* has nothing to do with copyright infringement claims or this Court's jurisdiction, which, as noted above, explicitly does not extended to claims sounding in tort.  28 U.S.C. § 1491.  Nevertheless, *Prescott* is also a case striving to resolve whether a condition to a waiver of sovereign immunity is itself jurisdictional.  The court declared that the discretionary function exception, "although jurisdictional on its face, is analogous to an affirmative defense," *Prescott*, 973 F.2d at 702, and, accordingly, placed the burden of persuasion on the defendant.  Yet, no textual analysis (other than the analogy to an affirmative defense) was here attempted.  No Supreme Court case law, precedent that possibly could be binding, was cited.  It is difficult to see how this case helps plaintiff's cause.

In conclusion, the language and structure of § 1498(b), the Federal Circuit's treatment of certain provisions for patents as jurisdictional, and the fact that no matter whether the "hard" or "soft" model is applied, this Court must come to the unavoidable conclusion that the three exceptions are jurisdictional limitations.[25]  Accordingly, before the Court can proceed to address the merits of

---

[24] The Court notes that several Circuits have declined to adopt the holding in *Prescott*.  *See Sharp v. United States*, 401 F.3d 440, 443 n.1 (6th Cir. 2005) (noting other circuit courts have declined to follow *Prescott* and reserving judgment on the issue); *Kiehn v. United States*, 984 F.2d 1100, 1105 n.7 (10th Cir. 1993) (noting that "the reasoning in *Prescott* may be suspect" in light of *United States v. Gaubert*, 499 U.S. 315 (1991), but not making a formal ruling on the issue; *Autery v. United States*, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993) (declining to address the burden of proof issue in *Prescott*, but noting *Prescott* may be at odds with *Gaubert*).

[25] Ultimately, regardless of which party bears the burden of proof for the three exceptions,  the parties agree that the facts as presented weigh in favor of their respective positions.  *Compare* Def.'s Post Trial Resp. 4 ("Whether or not Blueport bears the burden of proving the creation limitations are inapplicable, the facts of this case demonstrate" the exceptions preclude Blueport's right of action.) *with* Pl.'s Post Trial Resp. 8 ("Whether the § 1498 defenses are jurisdictional or not, and whomever

plaintiff's copyright infringement claim, plaintiff must demonstrate that the three § 1498(b) exceptions are inapplicable to Technical Sergeant Davenport's development of the AUMD program.

## II.  HAS THE PLAINTIFF MET ITS BURDEN?

Having determined that the provisos to § 1498(b) are jurisdictional limitations, the Court now turns to see if plaintiff has met its burden of demonstrating that the provisos do not apply in this instance. Why statutory provisions were enacted often gives a clue as to how they should be applied. *E.g.*, *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."). *See General Dynamics v. Cline*, 540 U.S. 581, 587-591 (2004) (construing Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*, in light of congressional purpose of preventing "old age" discrimination in employment); *see also PCL Construction Co. v. United States*, 41 Fed. Cl. 242, 253 (1998) (statute may be construed consistent with underlying reason for its enactment especially where contrary interpretations of the legislative purpose are proffered). Such is the case for the § 1498(b) provisos.

### A.  Historical Background  of § 1498(b)

An examination of the history behind § 1498(b) is useful for two reasons. First, it lends further support to the Court's "plain meaning" interpretation and case law analysis that the three provisos are jurisdictional in nature. Second, and equally important, the history of the three provisos supplies the necessary context for the application of those provisos to the facts of the present case.

### 1. Reason for Enactment

As previously mentioned, Congress amended §1498 in 1960, to allow suits against the government for copyright infringement, by adding the language that currently makes up § 1498(b). The legislative history to that act indicates this was done because it seemed "illogical to treat copyright infringements by the United States differently from patent infringements . . . ." H.R. Rep. No. 86-624, at 3 (1959), *reprinted in* 1960 U.S.C.C.A.N. 3444, 3446. Another motivating factor was that, while the government enjoyed immunity from suit for copyright infringements, government employees did not. *Id.* at 3445. Congress considered it "inequitable that employees of the United States, acting for the benefit of the Government, are now personally liable for copyright infringement and that the Government is not." *Id.* at 3446. In order to rectify these perceived injustices, Congress determined to waive sovereign immunity for suits against the government for copyright infringement. *Id.* To accomplish this, the legislative history explained that the act was "based, generally, upon provisions similar to those now existing in Federal law for patents, but with modifications appropriate to the nature of copyright property." *Id.*

Given that Congress drew from the patent infringement provisions in § 1498 to create the copyright infringement provisions, it is reasonable to examine § 1498 writ large to find the purpose

---

has the burden of proof, plaintiff established through the evidence that the defenses do not apply . . . ."). As will be seen in the following sections, even if the exceptions are not jurisdictional, the evidence is overwhelming that plaintiff's claim falls under all three exceptions.

behind the three provisos.  As entered into law in 1910, § 1498 originally only concerned suits against the United States for patent infringement.  The law also did not allow any employee of the government a right of action against the United States.  *Strategical Demolition Torpedo Co. v. United States*, 96 F. Supp. 315, 316 (Ct. Cl. 1951) ("This section shall not confer a right of action on any patentee who, when he makes such a claim, is in the employment or service of the United States, or any assignee of such patentee, and shall not apply to any device discovered or invented by an employee during the time of such employment or service." (*quoting* 28 U.S.C. § 1498 (1948))).  This was done in order to safeguard against the possibility of a government employee using his position to influence the use of the invention by the government in order to maintain a claim for compensation and to prevent a government employee who made an invention as part of his official duties from bringing claim for infringement by the government's use.  H.R. Rep. No. 82-1726 (1952) *reprinted in* 1952 U.S.C.C.A.N. 2322, 2322-23.

This complete prohibition on government employees maintaining a suit against the United States eventually came to be seen as "inequitable and unnecessary . . . in order to erect safeguards against those few who might be in a position to benefit unjustly from use of their inventions by the Government."  *Id.* at 2323.  As a result, in 1952, Congress sought to allow patent infringement suits against the United States by government employees, by adding the following language to § 1498:

> A Government employee shall have the right to bring suit against the Government under this section except where he was in a position to order, influence, or induce use of the invention by the Government. This section shall not confer a right of action on any patentee of any assignee of such patentee with respect to any invention discovered or invented by a person while in the employment or service of the United States, where the invention was related to the official functions of the employee, in cases in which such functions included research and development, or in the making of which Government time, materials or facilities were used.

*Strategical Demolition Torpedo Co. v. United States*, 110 F. Supp. 264, 265 (Ct. Cl. 1953) (*quoting* 28 U.S.C. § 1498 (1952)).

In the legislative history to the 1952 amendment to § 1498, it was noted that in the case *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933), the Supreme Court had ruled that if an employee was hired to make an invention, the employer had title to the invention.  1952 U.S.C.C.A.N. at 2324; *See Dubilier Condenser Corp.*, 289 U.S. at 187 ("One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained.  The reason is that he has only produced that which he was employed to invent.  His invention is the precise subject of the contract of employment.").  The legislative history also noted that *Dubilier Condenser Corp.* held that if an employee was not hired to make an invention, but did so anyway using the time and facilities of the employer, title remained with the employee, but the employer had a license to use the invention.  1952 U.S.C.C.A.N. at 2324; *See Dubilier Condenser Corp.*, 289 U.S. at 188-89.[26]  The legislative history specifically noted that, "[t]he right to sue, pursuant

---

[26] The Court explained:

> Recognition of the nature of the act of invention also defines the limits of the so-called shop right, which, shortly stated, is that, where a servant, during his hours of employment, working with his master's materials and appliances,

to this bill, in large part, follows title under the present law as established by the *Dubilier* case and similar decisions." 1952 U.S.C.C.A.N. at 2324.

## 2. **The Provisos**

This legislative history makes clear that the three exceptions listed in the 1952 additions to § 1498 were created to address three separate scenarios for possession of title of the invention. The first scenario was where title to the patent without question belonged to the employee. In that instance, the concern was an employee might use his position within the government to order, induce or influence the government to unlawfully use the invention, thereby creating a claim for patent infringement. *See Govt. Acquisition of License to Employee's Invention*, B-199026, 60 Comp. Gen. 248, 251 (Feb. 11, 1981) (hereinafter "*Employee's Invention*"). To avoid this, the government denied a right of action to employees who were in a position to order, influence or induce the use of their work. The second scenario was where an employee claimed title to a patent for which he had been hired to produce for his employer. The Supreme Court in *Dubilier Condenser Corp.* indicated that in such situations, title should rest with the employer. 289 U.S. at 188-89. Thus, under the reasoning of *Dubilier Condenser Corp.*, the government denied a right of action to employees who claimed title to an invention produced as part of their official function, since the government, as the employer, should have title to the invention. *See Myers*, 147 Ct. Cl. at 489-90. The third scenario was where an employee claimed title to a patent produced outside his official function, but using his employer's resources. As noted above, in *Dubilier Condenser Corp.*, the Supreme Court indicated that in such situations, while title remained with the employee, the employer should have a free license to use the invention. *Dubilier Condenser Corp.*, 289 U.S. 188-89. Accordingly, the government denied a right of action to employees who claimed title to an invention produced with government time, material, or facilities, since under the reasoning of *Dubilier Condenser Corp.* the government should have a license to use the invention as it wished.

As stated previously, *see* discussion *supra* I(A). p. 12, while not a part of § 1498, the Court notes that in 1976, Congress passed amendments to revise the Copyright Act. An Act for the General Revision of the Copyright Law, Pub. L. No. 94-553, 90 Stat. 2541 (1976) (currently codified at 17 U.S.C. §§ 101 *et seq*). That act codified the work made for hire doctrine for suits between private parties, allowing employers title to copyrighted works produced within the scope of employment of their employees. 17 U.S.C. §§ 101, 201(b). *See Cmty. for Creative Non-Violence*, 490 U.S. at 751-52. Under the work made for hire doctrine, the district courts "first should ascertain, using principles of

---

conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. This is an application of equitable principles. Since the servant uses his master's time, facilities, and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits."
*Id*. (internal citations omitted).

general common law of agency, whether the work was prepared by an employee or an independent contractor." *Cmty. for Creative Non-Violence*, 490 U.S. at 751. If the courts find the work was prepared by an employee, the employer is considered the author under 17 U.S.C. § 201(b). *Id.* While there is scant legislative history on the issue, the better view seems to be that the work made for hire doctrine is at least analogous to the second § 1498(b) exception—work created as part of the government employee's official function.[27]

With this understanding of the statutory scheme in mind, the Court proceeds to determine if plaintiff has demonstrated that the three 28 U.S.C. § 1498(b) exceptions do not apply to the creation and use of the AUMD program.

**A. How do the § 1498 exceptions apply to the AUMD program?**

Examining each of the exceptions reveals that Davenport was in a position to influence the use of the AUMD program by the government, that the AUMD program was prepared as part of Davenport's official function as an employee of the government, and that the AUMD program was prepared using government time, material, and facilities. The inescapable result drawn from these conclusions is that plaintiff has failed to make the requisite showing that it has met the conditions required for the waiver of sovereign immunity. As such, the Court is without jurisdiction to adjudicate plaintiff's infringement claim.

**1. Was technical sergeant Davenport in a position to induce and influence the use of the AUMD program within the Air Force?**

Turning to the first exception, plaintiff must demonstrate (or the facts adduced at the trial must demonstrate) that Davenport was not "in a position to order, influence or induce use" of the AUMD program by the government. The Court notes that the language of the statute does not require that Davenport have actually ordered, influenced or induced the use of the copyrighted AUMD program, but only that he was in a position in which he could have done so. *See Herbert II*, 36 Fed. Cl. at 307 ("[T]he plain language of the statute does not require that he must have *actually* influenced the use of his work, but merely that he must have been *in a position* to influence its use." (emphasis original)). While the parties do not dispute that Davenport's rank of Technical Sergeant prohibited him from ordering the use of the AUMD program, they vigorously dispute whether his actions influenced and induced the government's use of the program after May 15, 2000.

---

[27] Interestingly, the work made for hire doctrine under the Copyright Act does not mean that the government may claim a copyright of work made at its behest. *See* 17 U.S.C. § 105 ("Copyright protection under this title is not available for any work of the United States Government . . . ."); *see also* 17 U.S.C. § 101 (defining a "work of the United States Government" as "any work prepared by an officer or employee of the United States Government as part of that person's official duties."). H.R. Rep. No. 94-1476, at 58 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5672 (noting that "[a]lthough the wording of the definition of 'work of the United States Government' differs somewhat from that of the definition of 'work made for hire,' the concepts are intended to be construed in the same way"). Nevertheless, this does not prejudice the United States since a government employee's assertion of title for a work made at the behest of the government-employee is proscribed by the second proviso of § 1498(b).

The facts presented at trial show that Davenport freely distributed his AUMD program throughout the USAF manpower community. The Court finds that shortly after developing the program in May 1998, Davenport sent a version to Master Sergeant Luckie. CSPFF ¶ 16; Tr. 103-04. Davenport then provided other members in his command with copies of the program. *Id.* at 158. Davenport posted a link to the program on the PACAF's official webpage so that all USAF manpower personnel could easily download the latest versions of the program. Tr. 156-57. Davenport admitted at trial that he took no action to curtail the widespread distribution and use of the program. *Id.* at 358-59. Davenport also supported the use of the program by the manpower community. He incorporated suggested changes and new features in different versions of the program. *Id.* at 347. He routinely responded to telephone calls for technical assistance with the program. *Id.* at 495, 504. On trips to bases through PACAF to provide training on the MDS, Davenport demonstrated the AUMD program and answered questions about its use. *Id.* at 113, 334-36. Davenport also demonstrated the AUMD to senior manpower officers at a Manpower Conference in San Antonio. CSPFF ¶ 17; Tr. 111-12. The Court concludes that Davenport's willingness to allow unlimited, free, continuous use of the program created an environment in which virtually everyone in the USAF manpower community was regularly relying on the AUMD program. It is hard for this Court to think of a more direct way Davenport could have actually influenced or induced the use of the AUMD program.

Even if Davenport's actions did not actually influence or induce the use of the AUMD, the Court finds that he was in a position to influence and induce the use of the program. This distinction was apparent in *Herbert II*, where the author of portions of a copyrighted book containing dietary allowance recommendations filed a copyright infringement claim against the United States. *Herbert II*, 36 Fed. Cl. at 302. The dispute in *Herbert II* involved a contract between the National Institute of Health, a government agency, and the National Academy of Sciences ("NAS"), a private corporation, to create a book on recommended dietary allowances. *Id.* The NAS established a committee of volunteer experts to draft portions of the book. *Id.* The plaintiff, a Dr. Herbert, was a member of the Food and Nutrition Board ("FNB"), which supervised the committee's work. *Id.* at 307. The committee eventually used three written works by Dr. Herbert in the tenth edition of the book. *Id.* at 302. That book was copyrighted and copies sold to the general public. *Id.* Dr. Herbert then sued for copyright infringement for the portions of the book he had written. *Id.* In hearing Dr. Herbert's copyright infringement claim, the court examined the three exceptions in 28 U.S.C. § 1498(b). *Id.* at 305. Examining whether Dr. Herbert was in a position to influence use of his work, the court noted that the FNB had the power to make suggestions to the committee, and those suggestions were taken seriously. *Id.* at 307. The court reasoned that since Dr. Herbert was a member of FNB, he was therefore in a position to influence the committee's use of his materials in the final copy of the book. *Id.*

Just as Dr. Herbert's membership on the FNB placed him in a position to influence the use of his works, the same is true for Davenport's involvement in the Manpower User Group ("MUG"). Based on the testimony at trial, the Court finds that MUG was comprised of manpower personnel from each USAF MAJCOM, and provided guidance and suggestions to AFMA on the use of the MDS. Tr. 115. MUG's members looked at changes that could be made to improve the performance of the MDS and made a prioritized list of such changes. *Id.* at 877-80. MUG's prioritized list was forwarded to the Executive Steering Committee of AFMA, which then decided whether or not to implement the suggested changes. *Id.* at 880. Davenport was a member of MUG from 1996 to 1999—throughout the time he was creating and updating the AUMD program. Tr. 119, 323. Davenport actually brought the AUMD program to a MUG meeting and demonstrated to MUG members how it operated. *Id.* at

883-84. Regardless of whether Davenport's membership in MUG actually influenced or induced the USAF's use of the AUMD, his position on MUG—like that of Dr. Herbert's on the FNB in *Herbert II*—was a position that could influence or induce the use of the AUMD within the USAF.

Plaintiff argues that Davenport could not have influenced the use of the AUMD program because he was not in "a position of decision making authority." Pl.'s Post Trial Br. 4. Pointing to the Comptroller General's decision in *Employee's Invention*, plaintiff argues that as long as an employee is insulated from the decisions to procure the copyrighted work, he is not in a position to influence or induce the use and his right of action is preserved. *Id.* at 5 (citing *Employee's Invention*, 60 Comp. Gen. at 248). *Employee's Invention* involved the Air Force's attempt to procure a license to a patent for a high contrast display lens held by a Mr. Jeffers, a civil servant employee of the Air Force. *Employee's Invention*, 60 Comp. Gen. at 248. Prior to the suit, the Air Force determined that Mr. Jeffers was entitled to all the rights of ownership to the patented lens. *Id.* ("Based on a complete review of his work responsibilities and the extent of the government's contribution to the invention . . . the Air Force left the entire right, title, and interest in the display lens to the inventor."). Nine years later, the Air Force expressed an interest in obtaining a patent license from Mr. Jeffers for use of the lens. *Id.* at 249.

The Air Force's Judge Advocate General ("AFJAG"), however, issued an opinion indicating it would be improper for the USAF to enter into such a licensing agreement with an employee, citing the influence or induce exception of § 1498. *Id.* The issue before the Comptroller General ("CG") was whether § 1498 was applicable. *Id.* at 251. The CG made clear that § 1498 did not apply because there was no question Mr. Jeffers owned the patent. *Id.* at 250. Further, Mr. Jeffers was not seeking to influence or induce the unlawful use of the patented lens and thus the infringement of his patent, but rather was seeking to enter into a licensing agreement, allowing for the lawful use of the lens. *Id.* at 251. Since § 1498 was not applicable, the CG indicated that the only issue was "whether the inventor can be insulated from the decision making process," in compliance with regulations involving conflicts of interest between the government and its employees. *Id.* The CG concluded that such concerns of conflicts of interest would not preclude Mr. Jeffers from "assisting in the testing and use of the invention if he [was] no way in a position to determine whether, or how many, items involving his patent [were] produced." *Id.*

*Employee's Invention*, is inapposite in this matter. Plaintiff misconstrues the holding of *Employee's Invention*, by arguing it stands for the proposition that as long as the employee is insulated from the decision to procure the protected work, the employee is not in a position to influence or induce the work's use. Pl.'s Post Trial Br. 5. Instead, *Employee's Invention*, indicates § 1498 is inapplicable when the government seeks to obtain a license for a work it is not using and has otherwise no rights to. The discussion plaintiff focuses on, regarding insulating an employee from the procurement decision process, relates only to overcoming concerns of conflicts of interests when the government procures an item from an employee. *Employee's Invention*, 60 Comp. Gen. at 251. The Court notes that in *Employee's Invention*, the Air Force had already determined that Mr. Jeffers was entitled to all the rights of ownership with the invention. *Id.* at 248. Such is not the case with the AUMD program, which the USAF has maintained it had the right to use. Tr. 901. Additionally, in *Employee's Invention*, the Air Force was not using Mr. Jeffers's patented lens, but desired to enter into a licensing agreement for the future use of the lens. *Employee's Invention*, 60 Comp. Gen. at 249. In this matter, the USAF's use of the AUMD was both widespread and continuous for several years prior to Davenport obtaining a copyright. As defendant points out, at most, *Employee's Invention* stands

- 27 -

for the proposition that § 1498 would not have barred the USAF from licensing the AUMD program if the program had never been used by the USAF.  Def.'s Post Trial Resp. 6.

Davenport's free distribution and maintenance of the AUMD program, as well as his membership on MUG, placed him in a position to influence and induce the USAF's use of the AUMD program, and therefore precludes plaintiff's right of action under 28 U.S.C. § 1498(b).  Since the provisos of § 1498(b) are disjunctive, even if Davenport was not in a position to influence and induce the use of the AUMD, plaintiff would still have to demonstrate the other two provisos were inapplicable in order for this Court to have jurisdiction.

## 2.  **Was the AUMD program prepared as part of the official functions of technical sergeant Davenport within the Air Force?**

The Court now turns to the second exception.  As discussed earlier, this exception questions the very legitimacy of plaintiff's ownership claim, much as the work made for hire doctrine allows an employer to challenge an employee's copyright.  Under the second exception, the question before the Court is whether Davenport prepared the AUMD program as part of his "official functions" in the USAF.  *See* 28 U.S.C. § 1498(b).  The statute itself does not define "official functions" and the parties, naturally, offer the Court competing possible interpretations.  Plaintiff advocates a narrow interpretation of the phrase, looking only at the specific duties Davenport was trained to do and the work he was required to do.  Under plaintiff's interpretation, since Davenport was not a computer programer in the USAF, since he was not expected to write computer programs, and since he was not ordered to work on the AUMD program, his work on the program cannot be described as within his "official function."  *See* Pl.'s Post Trial Br. 7-15.  Defendant counters that the phrase is much broader than simply a list of tasks assigned, but encompasses the general type of work Davenport performed.  Def.'s Post Trial. Br. 14-15.

In the past, when Congress has used the term "employee" without defining it, the Supreme Court has concluded "that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."  *Cmty. for Creative Non-Violence*, 490 U.S. at 740.  Just as the Supreme Court stated in relation to the use of the term "employee" in the Copyright Act, *Id.* (quoting *Kelley v. S. Pac. Co.*, 419 U.S. 318, 323 (1974)), there is nothing in the text of § 1498(b) that indicates "Congress used the words 'employee' and 'employment' to describe anything other than 'the conventional relationship of employer and employee.'"  Viewed through the lens of the master-servant relationship, the Court sees the term "official function" as similar to that of "scope of employment," a term widely used in agency law.  *Id.* (citing Restatement (Second) of Agency §228 (1958)).  The relevant part of the Restatement (Second) of Agency (hereinafter "Restatement") indicates that:

> Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master . . . .

Restatement § 228(1).  The Restatement goes on to explain that "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized."  *Id.* § 229(1).

Using the Restatement factors as a guide, it is clear that Davenport's "official function" is simply much broader than the condensed job description proffered by plaintiff. The focus of the Court's inquiry is not a specific task assigned, but rather on the general type of work performed. *Herbert II*, 36 Fed. Cl. at 306 (noting that where a government employee's official function includes a general type of work, "the employee may be barred a right of action for infringement even where he was not specifically required to perform the work at issue" (citing *Myers*, 147 Ct. Cl. at 489)). In this regard, this case is similar to *Myers*, a patent infringement case against the government. *Myers*, 147 Ct. Cl. at 486. At the time the plaintiff brought suit in *Myers*, there was no right of action for patent infringement against the government by a government employee, "where the invention was related to the official functions of the employee." *Id.* (quoting 28 U.S.C. § 1498 (1952)). In that case, Myers was an employee of the Preliminary Aircraft Design ("PAD") section of the Navy Bureau of Aeronautics. *Id.* The PAD section performed analysis and preparation of preliminary aircraft designs. *Id.* at 487. On his own time and using his own materials, Myers developed and eventually patented a mechanism for opening and closing a gun port in an exterior surface of an aircraft. *Id.* This apparatus had the effect of streamlining the airflow over the aircraft. *Id.* at 488. Later, after the government began incorporating Myers's design into its aircraft, Myers brought suit for patent infringement. *Id.* at 487.

The sole issue before the court was whether Myers had created the invention as part of his official functions. *Id.* at 490. Myers argued that his invention had not been created as part of his official functions, since he was only tasked with making illustrative layout drawings of possible designs. *Id.* at 487. The court found it "immaterial that the Preliminary Aircraft Design section did not prepare the final working and engineering drawings necessary to aircraft manufacturers" to create the final gun port. *Id.* at 488. The court instead looked at the general objectives of Myers's official function and found that they entailed minimizing the air drag of aircraft. *Id.* Since Myers's gun port was designed to limit the air drag on aircraft, the court found that he had created the invention as part of his official functions at the PAD section. *Id.* at 489.

Like the plaintiff in *Myers*, Davenport's development of the AUMD program was well within the type of work he was generally called to perform. The Court finds that the general types of duties a manpower manager such as Davenport would perform include: using industrial engineering and computer techniques to facilitate work measurement and process improvement; revising manpower documents; designing, operating and maintaining manpower data systems; developing and preparing manpower documents; and preparing and maintaining manpower reports. Pl.'s Trial Ex. 125 at 100454. Manpower employees with Davenport's job code were expected to operate database software. Pl.'s Trial Ex. 65 at G000353. They were also to have the ability to design, analyze, supervise, or monitor computer applications. Pl.'s Trial Ex. 59 at 200180. At trial, Davenport testified that his duties involved many of these activities, including making sure the MDS was updated in a timely manner, training other personnel on the MDS, and printing products using data stored in the MDS. Tr. 77. Davenport testified that he was involved in the beta testing of the MDS. *Id.* at 92. As such, he took part in testing and analyzing the MDS for ways to improve the USAF's ability to use the program. Additionally, as a member of MUG, Davenport reviewed the MDS for improvements and changes. *Id.* at 119, 323, 877-80. Davenport also indicated, in an e-mail to his uncle, that he had written six other computer programs—in addition to the AUMD program—which were used in varying degrees by USAF manpower personnel. Def.'s Trial Ex. 3 at 200133. Glendon Hendricks, a civilian USAF employee and Chief of the Information Systems Division of AFMA during the period Davenport was writing and supporting the AUMD program, testified that it was not an uncommon

practice in the manpower field for non-computer programers to write computer programs for use in the USAF.  Tr. 901.  Describing why he believed the USAF had tried to obtain the source code to the AUMD program from Davenport, Mr. Hendricks stated:

> And it goes back to the practice we had done for years.  I developed something.  Joe developed something, Jerry Hayes developed something, all of us we pooled our different pieces together to make the Air Force work.  And it wasn't, oh, this is my piece and you can't have it.  And it's to bring it up to date right now, guys in [AFMA] and the commands are doing the same thing today, working to improve ways we're doing things, using people's ideas, developing code.

*Id.*

The Court finds that Davenport's position involved working extensively with computers, and in particular managing the MDS database.  An important part of his work involved preparing numerous reports from information stored on a computer database.  Other elements of his work included beta testing computer programs and evaluating suggestions for improvements to computer systems.  Additionally, on several occasions, Davenport wrote computer programs for the USAF's use.  All of these functions leads the Court to conclude that writing the AUMD program was the within the general type of work that Davenport was employed to perform.

The second factor courts examine when determining whether an activity was within an employee's scope of work is if the work occurred within the authorized time and space limits.  While Davenport may have created the original beta version of the AUMD at home, using his own computer, that is not enough.  What is much more significant is the fact that he created and perfected the AUMD program during the time period in which he was employed by the USAF as a manpower database manager.  *Genzmer v. Pub. Health Trust of Miami-Dade County*, 219 F. Supp. 2d 1275, 1282 (S.D. Fl. 2002); *Miller*, 808 F. Supp. at 1243 (finding an employee satisfied the authorized time and space limit requirement because the copyrighted work in question was created during the time period in which the employee was employed at a company).  In *Genzmer*, a doctor developed a computer program which allowed the Critical Care Department of a hospital to computerize its consultation reports.  219 F. Supp. 2d at 1277.  Prior to the development of the program, all patient consultation reports were produced by hand.  *Id.*  When the doctor's fellowship at the hospital ended, he demanded the hospital pay him for the use of the computer program.  *Id.* at 1278.  When the hospital refused, the doctor filed a complaint for copyright infringement.  *Id.*  Examining the second factor of the scope of work under the work made for hire doctrine, the court noted that the doctor wrote the program on his own time, during nonbusiness hours, using his home computer.  *Id.* at 1277, 1282.  The court focused, however, on the fact the doctor created the computer program during the period he was employed at the hospital.  *Id.* at 1282.  Additionally, the court observed the doctor completed the "second aspect of the computer programming"—beta testing—at the hospital.  *Id.*  These facts were enough to allow the court to conclude the doctor created the program within the authorized time and space limits.  *Id.*

The same observations can be made about Davenport's work with the AUMD program.  The program was created and continually revised while Davenport was a Technical Sergeant in the USAF.  The Court finds that while Davenport may have created the original beta version of the AUMD program at his home, with his own computer, the beta testing of the program he conducted at work

with the help of Master Sergeant Luckie.[28]   CSPFF ¶ 16.   After having initially written the "beta" version of the AUMD program, Davenport sent the program to Master Sergeant Luckie to get his input on the program.   Tr. 103-04.   Master Sergeant Luckie reviewed the program on his work computer, as did Davenport.   Tr. 104.   At this point, both men began beta testing the program from their computers at their places of work.   Tr. 105, 328-29.   This beta testing in the office environment, observing how the AUMD program "interfaced" with the MDS, was essential to gain confidence that the initial AUMD program was working properly.   *Id.* at 328.   Significantly, since the MDS was a closed database—incapable of being accessed from outside the office—the only way to test how the AUMD program performed with the MDS was at the office, on official computers, during working hours.   *Id.* at 328-30.   Without such confidence that the program worked, the eventual copyright version of the AUMD, version 2.1d, would not have been possible.

Additionally, whatever Davenport's duties were prior to developing the AUMD program, those duties evolved almost immediately after the AUMD was disseminated.[29]   The Court observes that in June and July 1998, Davenport traveled to several bases in PACAF, answering questions about the AUMD as part of his official training program on the MDS.   *Id.* at 113, 334-36.   Shortly thereafter, in September 1998, Davenport was "asked" to give a presentation to senior USAF officers on the AUMD program at a manpower conference.[30]   *Id.* at 509.   Colonel Manning, Major Douglas

--------

[28] Creating the AUMD program required more than writing computer code.  Plaintiff's own expert witness, Dr. Rudd, acknowledged this during his testimony.  Tr. 775.  Dr. Rudd indicated that in addition to writing code, the development of a computer program requires planning, analysis, design, development, testing, and documentation.  *Id.*

[29] Davenport candidly admitted in an e-mail to his uncle, that "because I'm in the military and not a civilian employee, I don't have a specific 'Job Description.'" Def.'s Trial Ex. 12 at 100449. Elaborating on this at trial, while answering a question from defendant's counsel, Davenport stated: "Well, you know, as we went through those documents yesterday, there was no—there is no tasking, no listing that says Manpower Data manager.  The things I did in that job, in that position were the ones that were prescribed to me by my supervisors."  Tr. 318.

[30] As was made clear during the hearing by questions posed by plaintiff's counsel and answered by Colonel William Manning—Davenport's former commanding officer at PACAF Headquarters at Hickam USAF base—requests by senior officers, while not direct orders, certainly conveyed expectations of action:

Q:   Now, in the position of Technical Sergeant Davenport as someone who perhaps is seeking a promotion in the future, would it have been in the normal course to refuse a request from a senior colonel in your career field?
A:   It would be very unusual . . . . [T]o deny that request would be very unusual.
Q:   Could it have affected his future promotion possibilities?
A:   It may have . . . . There were certainly possibilities that it could be harmful to the individual's future.

Tr. 510-11.

Meaker—Davenport's superior, and Master Sergeant Anthony Dant—Davenport's supervisor, all requested Davenport install the AUMD program on their computers. *Id.* at 495, 508. Thus, from an early date, Davenport's superiors urged or expected him to provide assistance with the AUMD program during his working hours. And Davenport clearly stated that his official duties were whatever his supervisors directed him to do. *Id.* at 337.

This expectation of assistance increased as the use of the AUMD program spread. The Court notes that Davenport's work telephone number was listed on the "about screen" of the AUMD program. *Id.* at 347. This had the effect of turning Davenport's office at PACAF headquarters essentially into a "call center" for personnel throughout the USAF with questions about the AUMD program. *Id.* at 495. A link to the latest available version of the AUMD program was posted on the PACAF webpage. *Id.* at 351-52. Davenport's commanding officer understood Davenport was maintaining the AUMD program from the office—answering questions, taking suggestions, providing updates—and expressed no reservations about that. *Id.* at 504. Further, Davenport's yearly Performance Reports for 1999 and 2000 praised his work with the AUMD program. Def.'s Trial Ex. 30-1.

All of these facts lead the Court to one conclusion: by the time the copyrighted version 2.1d of the AUMD program was created in November 1999, Davenport's function had evolved to include all types of support, development and programming of the AUMD program during the time he was on duty. Davenport's superiors recognized that he had developed a very useful computer program, even though he was not ordered or expected to do so. These same superiors also recognized the USAF's manpower personnel's dependance on that program to perform their daily assignments. Davenport was allowed to spend his work hours providing support for the AUMD program and praised in his evaluations for doing so, because his superiors saw his official function as including all the work necessary to keep the AUMD program performing.

Finally, courts also look at the employee's motivation in producing the work to in determining if a copyrighted work was produced within an employee's scope of work. Illustrative of this point is *Miller v. CP Chemicals, Inc.*, 808 F. Supp. 1238 (D.S.C. 1992), a copyright infringement case involving the application of the work made for hire doctrine. In that case, the plaintiff, Miller, was a laboratory supervisor for CP Chemicals, with overall responsibility for the operation of the quality control laboratory. *Id.* at 1240. Miller became concerned about the efficiency of performing manual calculations in the company's quality control process. *Id.* Working at home, on his own time and for no additional compensation, Miller wrote a computer program that computed complex mathematical calculations, eliminating the need for the manual calculations previously used. *Id.* After his termination from the company, Miller demanded CP Chemicals either return the computer program he had written or pay a license fee for the continued use. *Id.* 1240-41. When CP Chemicals refused Miller's demands, Miller brought suit for copyright infringement. *Id.* at 1241. In applying the work made for hire doctrine, the court sought to determine if the writing of the computer program was in Miller's scope of employment. *Id.* at 1242. The court noted that the program dealt specifically with products manufactured by CP Chemical, was created to simplify Miller's job, and eliminate errors for the ultimate benefit of the company. *Id.* at 1243. From these facts, the court concluded the program was written within the scope of Miller's employment and therefore the program was a work made for hire belonging to CP Chemical. *Id.* at 1244.

Examining the record here, it is clear that the MDS program, by itself, was very slow in accessing data. Def.'s Trial Ex. 3 at 200133. Davenport stated in an e-mail to his uncle that "the [AUMD] program was developed because the MDS program that the Air Force was developing did not do what was necessary for [Davenport] to perform [his] day to day duties." *Id.* at 200146. In that e-mail, Davenport gave an example that to produce a customized manpower report using the AUMD program took him 30 seconds, while to create the same type of report without using the AUMD took an entire day. *Id.* In another e-mail, Davenport acknowledged that his "original intention was to create a program that we could use to print [Unit Manpower Documents] until MDS caught up." *Id.* at 200134. Davenport also stated in an e-mail to two other members of the USAF, that "originally I had no intention of selling this program to anyone, including the Air Force. I wanted it to die and MDS to live up to its hype." Def.'s Trial Ex. 18 at 100579. Further, the AUMD program could only be used by the USAF in conjunction with the MDS. This is evidenced by the fact that plaintiff has never managed to sell a copy or license for the AUMD program. Def.'s Trial Ex. 50; Tr. 54-55. Plaintiff, Blueport Company, was only formed by Davenport and his uncle in February 2000, well after the AUMD program had been developed and disseminated throughout the USAF's manpower community. CSPFF ¶ 7. Finally, Davenport did not seek a copyright for the AUMD program until March 2000—some twenty-one months after first developing the program. Pl.'s Trial Ex. 139. From these statements, the Court concludes that Davenport's intent in creating the AUMD program was not based on gaining some commercial and pecuniary benefit. Instead, Davenport was motivated by a desire to make his daily work easier, and, as such, to benefit the USAF.

Given that the writing of the AUMD program was the same general type of work Davenport was expected to do, that he created the program during his employment in the USAF, worked on the program during his working hours, and that he was motivated to create the program out of a desire to benefit the USAF, the only logical conclusion for the Court to draw is that Davenport produced the AUMD as part of his official function as an employee. Plaintiff is therefore also without a right of action under 28 U.S.C. § 1498(b).

### 3. **Did technical sergeant Davenport use government time, material, and facilities in preparing the AUMD Program?**

Even if Davenport's creation of the AUMD was outside his official function, plaintiff still must demonstrate that government time, materials, and facilities were not used in the program's preparation. In this sense, § 1498(b) casts a wider net than the traditional work made for hire doctrine, for a government employee who creates a work outside his official function, but happens to use government time, material, or facilities is denied a right of action. Here, plaintiff states that Davenport performed all of the program writing at his home, in the evening after working hours. Pl.'s Post Trial Br. 16. Plaintiff also points out that while programming, Davenport used his own computer with copies of software that he had personally purchased. *Id.* Defendant counters that non-code writing activities were essential for the creation of the AUMD program and in these activities, Davenport and others acting on his behalf used government resources. Def.'s Post Trial Br. 22-23.

Again, plaintiff's concept of the preparation of a computer program—entailing only the writing of computer code—is too narrow. *See Genzmer*, 219 F. Supp. 2d at 1282 (noting beta testing was the "second aspect" of computer programming). As has already been mentioned, plaintiff's own expert, Dr. Rudd, indicated that the development of a computer program required planning, analysis, design, development, testing, and documentation. Tr. 775. Davenport himself mentioned that part of the

duties of computer programers in the USAF included analysis and design. Tr. 87; Pl.'s Trial Ex. 120. Davenport testified this analysis and design involved talking to people who would use the program, determining what was really needed from the software, what users would want to input and extract from the software, and then coming up with a design and layout of the system to show users. Tr. 87. The Court finds that these areas of analysis, testing, and development were equally as vital to the preparation of the AUMD program, as code writing.

As mentioned in the previous section, Davenport conducted beta testing of the AUMD program at work on his government furnished computer. The Court finds that since the MDS was a closed database with restricted access, the only way to test how the AUMD program performed with the MDS was at the office. *Id.* at 328-30. To assist in his use of the MDS data for the AUMD, Davenport obtained a special database administrator username and password to the MDS. Tr. 367, 369-70; Def.'s Trial Ex. 7. Davenport also enlisted the help of Master Sergeant Luckie to assist him in the beta testing. CSPFF ¶ 16. Additionally, Davenport received feedback from countless USAF personnel who used the AUMD program, suggesting additional features that could be incorporated in the AUMD program. Tr. 347. Many of these suggestions were incorporated into later versions of the AUMD program, which allowed later versions of the AUMD to produce more reports and different products. *Id.* at 346. Master Sergeant Luckie also wrote a user manual to assist other manpower personnel in using the AUMD program. Def.'s Trial Ex. 32. Davenport testified that he spent time during his working hours revising and editing the manual. Tr. 394. Davenport also testified that he distributed the manual to others and made it available on the PACAF website. *Id.* at 395.

These activities are more than enough use of government time, material and facilities for the Court to conclude this proviso applies to plaintiff's claim. For example, in *Herbert II*, the plaintiff acknowledged that some work on the copyrighted health articles in question occurred in a government facility. *Herbert II*, 36 Fed. Cl. at 307. The plaintiff argued, however, that all of the furniture and equipment in the office was the personal property of the plaintiff. *Id.* It appears that, in essence, the plaintiff was arguing that any use of government facilities was so *de minimis* as to not trigger the proviso. The court found the plaintiff's argument "unpersuasive" and held that "[t]he walls, floor, and ceiling of the laboratory are enough to qualify as government facilities." *Id.*

The same reasoning applies with equal force to plaintiff's claim in this matter. Plaintiff acknowledges many USAF personnel made suggestions for additional features to be added to the AUMD program and that Davenport incorporated many of those suggestions into later versions of the AUMD. Pl.'s Post Trial Br. 18. Plaintiff argues, however, that all of the actual programming was done by Davenport at his home, on his personal computer, after his working hours. *Id.* at 18-19. Plaintiff also argues that it was Davenport who selected which features to incorporate into later versions and how to design those features using computer code. *Id.* at 19. Plaintiff's arguments miss the point that these calls were often received by Davenport at the office during his working hours. *Id.* at 347. This input from users, as Davenport himself stated, was an essential element for creating any computer program. *Id.* at 87. The fact that these suggestions were received during Davenport's official working hours, by other USAF personnel, via government telephones and e-mails, indicates that government time, materials, and facilities were used to help create later versions of the AUMD program. This use of government time, materials, and facilities denies plaintiff a right of action for copyright infringement under 28 U.S.C. § 1498(b).

## III. CONCLUSION

"When jurisdiction is lacking, 'the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Chertkov v. Office of Pers. Mgmt*, 52 F.3d 961, 966 (Fed. Cir. 1995) (quoting *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). Such is the case here. A party factually falling under any one of the three jurisdictional exceptions listed in 28 U.S.C. § 1498(b) is denied a right of action against the government for copyright infringement. In this matter, plaintiff failed to meet its burden to prove that the three jurisdictional exceptions are not applicable and is, therefore, without a right to maintain an action for copyright infringement. Judgment, accordingly, is entered on behalf of the United States.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

Lawrence J. Block
Judge